IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| KEITH REED, ELIZABETH SCHENKEL, EMILY WINES, MARK GARAN, and AUGUST ULLUM, individually and on behalf of others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>ALECTO HEALTHCARE SERVICES LLC, and ALECTO HEALTHCARE SERVICES WHEELING, LLC d/b/a OHIO VALLEY MEDICAL GROUP and d/b/a OVMC PHYSICIANS,<br><br>     Defendants. | Case No. 5:19-cv-00263-JPB<br><br>Judge John Preston Bailey<br><br>CLASS ACTION |

PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT MOTION FOR SUMMARY JUDGMENT

Timothy F. Cogan, Esq. (WVSB # 764)
**Cassidy, Cogan, Shapell & Voegelin, LC**
The First State Capitol Building
1413 Eoff Street
Wheeling, WV 26003
T.: (304) 232-8100

F. Alex Risovich, Esq. (WVSB # 10866)
**Risovich Law Offices, PLLC**
3023 Pennsylvania Avenue
Weirton, WV 26062
T.: (304)723-2588

Bren Pomponio, Esq. (WVSB # 7774)
Laura Davidson, Esq. (WVSB # 13832)
**Mountain State Justice, Inc.**
1217 Quarrier Street
Charleston, WV 25301
T.: (304) 344-3144

Maureen Davidson-Welling, Esq. (*pro hac vice*)
John Stember, Esq. (*pro hac vice*)
**Stember Cohn & Davidson-Welling, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445

Dated:  July 8, 2022         *Attorneys for Plaintiffs*

# I. INTRODUCTION[1]

Plaintiffs Keith Reed, Lisa Dolence, Elizabeth Schenkel, Emily Wines, Mark Garan and August Ullum (collectively, "Plaintiffs") submit this Memorandum of Law in support of their Motion for Summary Judgment. This case arises from the 2019 decision of Defendants Alecto Healthcare Services, LLC ("AHS") and Alecto Healthcare Services Wheeling, LLC ("AHSW") (collectively, "Defendants") to close the Ohio Valley Medical Center ("OVMC") without providing Plaintiffs and hundreds of other affected employees with the 60-days advance notice required by the Worker Retraining and Notification Act of 1988 (the "WARN Act"), 29 U.S.C. § 2101, *et seq*. Instead of providing 60-days' notice, or 60-days' full pay and benefits in lieu of notice, Defendants ordered plant closure and cut employees' hours and pay, and tried to circumvent the WARN Act by keeping employees formally on its books until a date that they arbitrarily (and wrongly) decided was the end of the 60-day WARN Act notice period.

Plaintiffs now move for summary judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure* on liability on the sole count alleged in the Amended Complaint: violation of the WARN Act. As the following discussion sets forth, there are no genuine issues of material fact, and Plaintiffs are entitled to judgment as a matter of law.

---

[1] Plaintiffs Reed, Dolence, Schenkel, Garan, and Wines filed this case, while Plaintiffs Ullum and Lucas commenced a separate suit against Defendants. Later, their claims were consolidated by this Court by filing an Amended Complaint adding Ullum and Lucas to this action. Plaintiffs Lucas and Dolence were voluntarily dismissed, [ECF Doc. ## 107, 139], and are no longer proposed class representatives.

## II. STATEMENT OF FACTS[2]

A. <u>The Alecto Entities</u>

AHS is a privately-held Delaware Limited Liability Company headquartered in Irvine, California that owns and manages acute care hospitals and related businesses. AC ¶ 3; AA ¶ 3; PX 2 at 35971. AHS is 80% owner of Alecto Healthcare Services Ohio Valley, LLC ("AHSOV"), PX 3 at 3, which, in turn, owns and is the sole member of AHSW and Alecto Healthcare Services Martins Ferry, LLC ("AHSMF").[3] *Id.*; PX 4 at 2091. At relevant times, AHSW and AHSMF held the assets of OVMC and its sister hospital, East Ohio Regional Hospital ("EORH"), respectively.[4] *See* PX 4; PX 5 at 16435.

B. <u>Alecto Purchases OVMC</u>

For more than a century, OVMC operated as an acute-care hospital in Wheeling, West Virginia, providing medical services to the Ohio Valley, including an emergency department, medical/surgical services, and inpatient psychiatric services for children and adults. *See* PX 5 at 16435. In 2017, AHS and its subsidiaries purchased OVMC and EORH from the Ohio Valley Health Services & Educ. Co. ("OVHS&E") in a sale leaseback transaction that resulted in the transfer of the OVMC and EORH hospital assets to AHSW and AHSMF, respectively. PX4; PX5

---

[2] Citations to "AC ¶ ___" and "AA ¶ ___" are to Plaintiffs' Amended Complaint, [ECF Doc. # 37], and Defendants' Amended Answer, [ECF Doc. # 39], respectively. Citations to "PX __ at __" refer to the exhibits and their bates-stamps numbers, respectively, in the Appendix to Plaintiffs' Motion for Class Certification, [ECF Doc. # 124-1], and citations to "PSX __ at __ refer to the exhibits and bates-stamped numbers, respectively, in the Supplemental Appendix to Plaintiff's Reply Memorandum to Defendants' Response to Plaintiffs' Motion for Class Certification. [ECF Doc. # 152-1.]

[3] AHSOV was grossly undercapitalized, *see* PX 6 at 16501, and had no separate existence from AHS anywhere except on paper. AHSOV had no employees of its own or any Board of Directors; its only three officers were AHS' officers; and its decisions were made by consent of its general member—AHS). *See.* PX 3 at 1.

[4] In 2020, EORH was sold to a new owner. PX 7.

2

at 16436. AHS financed acquisition by simultaneously selling OVMC and EORH's real property (and 20% of AHSOV) to a real estate investment trust, MPT Corporation, and leasing back the real estate from MPT through a long-term lease. *See* PX 5 at 16436; PX 8 at 1-2. This structure allowed AHS to buy the hospitals without investing its own money but encumbered the already struggling hospitals with additional debt and expensive long-term leases.

C.  **Defendants' Joint Operation of OVMC**

Following the sale, AHS and AHSW jointly operated OVMC. AHSW was nominal operator of OVMC, PX 6 at 16454; as General Manager of AHSOV, *id.* at 16459, AHS controlled AHSOV's subsidiaries, including AHSW. *See* PX 6 at 16468; *see also* PX 9 at 2219 (describing in AHSW bylaws the General Manager's rights of control). AHS controlled all AHSW funds, PX 10, and had management rights over OVMC under a Management Services Agreement ("MSA") whereby AHSW, ASHMF, and AHSOV engaged AHS to manage each of them. PX 11 at 2190 (reflecting AHS' total control and the lack of separate decision-makers for AHS-subsidiaries). AHS VP Michael Sarrao signed the MSA on behalf of AHS *and* each AHS-subsidiary. *Id.* at 2203.

D.  **AHS Decides to Divest Its Out-of-State Operations**

In 2018, certain of AHS' hospitals, including OVMC and EORH, struggled. *See* PX 12 at 33053. In March 2019, AHS decided to divest specified hospitals, including OVMC and EORH, which were cross-collateralized with certain of AHS' other, more lucrative businesses. PX 12 at 33042; PX 52. OVMC and EORH had significant operating losses in 2018, PX 12 at 33053, and AHS contemplated keeping these two hospitals open for another six months while it tried to sell them.[5] *Id.* at 33045.

---

[5] AHS was interested only in selling OVMC or shutting it down; AHS was unwilling to spend further capital to operate or improve OVMC—as evidenced by Defendants' decision to forego and not use funds available under the lease agreement with MPT. *See* PX 17 at 35154.

3

When AHS could not sell OVMC and EORH, it began planning to close these hospitals. By July 2, 2019, AHS executives had prepared draft WARN notices to regulators and employees on OVMC's closure. PX 13. On July 15, 2019, AHS executives met with West Virginia Secretary of Health and Human Resources, Bill Crouch, to alert him to the "extreme distress OVMC and EORH were under" and prepare state officials for the "very real possibility" that the hospitals would close in the coming weeks. PX 5 at 16436. In late July, AHS senior leadership proposed closing one or both hospitals. They held discussions with MPT and their bankers (CNHF) to get approvals needed to shut down without defaulting under AHS' various lease and credit agreements. PX 14 at 31918; PX 15; PX 19.

E.     **Defendants Announce OVMC Closure, but Give Inadequate Notice to Employees**

After MPT and the bankers signed off, on August 7, 2019, Defendants issued a press release announcing the closure of OVMC and EORH and a Q&A on the closure. PX 16-17, 20. The press release stated, in part,

> WHEELING. WV -August 7, 2019 Ohio Valley Medical Center in Wheeling, West Virginia ("OVMC") and East Ohio Regional Hospital in Martins Ferry, Ohio ("EORH") today announced that after a thorough evaluation of all available options, losses of more than $37 Million over the past two years, and an exhaustive but unsuccessful search for a strategic partner or buyer, OVMC and EORH have decided to begin the process to close both OVMC and EORH. OVMC and EORH will immediately begin working with federal, state, and local agencies to develop a definitive time line for the closure of both facilities. The closure process for facilities like OVMC and EORH typically takes 60 to 90 days and OVMC and EORH will share a definitive timeline with all interested parties in the coming days.

PX 16.

The next day, AHS executives contacted West Virginia and Ohio officials to inform them of the impending hospital closures and timeline. *See* PX 21-22. AHS' timeline submitted to West Virginia identified October 1, 2019 as OVMC's target closure date. PX 21 at Defendants' 00008

4

(listing target date on 2nd line below title). However, Defendants never actually intended to keep OVMC open as long as October 1, 2019. The timeline AHS circulated internally on August 6, 2019—just two days before AHS sent the final version to regulators—identified September 8, 2019 as OVMC's target closure date. PX 28 at 31922 ("Target Closure 9/8/19"). AHS revised its timeline to October 1, 2019 before submitting it to West Virginia state officials, but then shut OVMC down in early September around the time originally planned.

AHS corporate counsel Mark Bradshaw sent letters dated August 8, 2019, to employees under the signature of AHSW CEO Dunmyer. *See* PX 17 at 32059; PX 23. However, the letters were sent by first class mail (and would not arrive immediately), did not include termination dates or otherwise comply with WARN Act regulatory requirements, and falsely represented that OVMC would close on October 7, 2019. PX 23.

Instead of waiting 60 days, Defendants began the "closure process" immediately. More particularly, OVMC stopped accepting new patients after August 21, PX 21 at 9; cut offered services (*e.g.*, MRIs by August 19), PX 24 at 17589; terminated medical office leases by August 30, PX 25 at 15138; reduced inventory and told patients in mid-August 15 that OVMC could close **_anytime before_** October 7, PX 26 at 33025. As they cut services, Defendants reduced employee hours to save themselves money. *See, e.g.*, PX 27 at 2730 (discussing calling employees off).

On September 3, 2019, AHS VP and General Counsel Michael Sarrao conferred with MPT, *see* PX 29 at 32016. Defendants then publicly announced that they were closing OVMC the next day, stating,

> after a thorough evaluation of all available options, losses of more than $37 Million over the past two years, an exhaustive, but unsuccessful, search for a strategic partner or buyer, and a lack of interest from the State of West Virginia, the hospital

   will suspend Acute and Emergency Medical services at 11:59 p.m. on September 4, 2019.

PX 45 at 16762. This was a plant closure within the meaning of the WARN Act. *See* 20 C.F.R.

§ 639.3 (defining "plant closing").

**F.      Timeline of Closure of OVMC**

   The timeline leading to the closure of OVMC appears to be undisputed:

- On August 8, 2019, Defendants mailed letters to OVMC employees notifying them of the impending hospital closure "on or about October 7, 2019" and that they would not "be scheduled after that date." *See* [ECF Doc. # 145-12.] If the letters arrived the next day, 60 days later would be October 8, 2019.

- OVMC stopped accepting new patients after Aug. 21, [ECF Doc. # 124-22 (PX 21 at 9)]; cut offered services (*e.g.*, MRIs by August 19), [ECF Doc. # 124-25 (PX 24 at 17589)]; terminated medical office leases by Aug. 30, [ECF Doc. # 124-26 (PX 25 at 15138)]; reduced inventory and told patients in mid-Aug. that OVMC could close ***anytime before*** Oct. 7, [ECF Doc. # 124-27 (PX 26 at 33025).]

- As Defendants cut services, they reduced employee hours to save money. *See,* [ECF Doc. # 124-28 (PX 27 at 2730) (discussing calling employees off)]; (PSX 5 (Sarrao Dep. at 164-65) (explaining employees are temporarily laid off when there is less work "because staffing is the biggest cost a hospital has.").) As former AHSW CEO Daniel Dunmyer acknowledged, after the closure announcement, "we reduced staff because of reduced activities" and "if their job was not required, they would have been called off, yes." (PSX 6 (Dunmyer Dep. at 38-41).)

- On September 4, 2019, Defendants suspended all acute care and emergency medical services. (*See* PX 30 at 5.) This was a plant closure within the meaning of the WARN Act. *See* 20 C.F.R. § 639.3 (defining "plant closing"); (PSX 1 ¶ 8; PSX 2 (Class member chart reflecting that more than 50 full-time ("FT") employees worked their last day at OVMC in the 30-day period ending Sept. 4, 2019).)

- Defendants' pay records reveal that less than 3% of Class members worked on Oct. 7, 2019, and only one on October 8, 2019, with the vast majority of the workforce no longer working and effectively terminated days or in many cases weeks before. (*See* PSX 1 ¶¶ 9-11; PSX 2 (reflecting 19 out of 696 class members last day of actual work at OVMC was Oct. 7, 2019, and 1 out of 696 class members' last day of actual work at OVMC was Oct. 8, 2019).

6



(PSX 3; PSX 1 ¶¶ 12-13.)

**G.    Defendants Scheme to Evade WARN Act Liability**

On September 3, 2019, AHSW CEO Daniel Dunmyer discussed the impending closure of OVMC at a hospital managers' meeting, *see* PX 30 at 5, telling them that:

> OVMC will stop taking patients through the ED and for acute services after Sep. 3rd 11:59 PM. All inpatients remaining on Sep. 6th will need to be transferred out, preferably to EO. Hillcrest patients will all need to be transferred out as well.
> …
>
> **Employees will not be laid off at this time, but most will have their hours reduced to zero.** Low-earnings slips can be obtained from HR. Employees cannot be laid off during warn notice period, which ends Oct. 7th.
>
> During this period PTO can be used. Lump sum payout of remaining PTO during this period still requires resignation.
>
> A small number of staff will remain on site for packing and storing.

PX 31 at REED1 (emphasis supplied).

Consistent with Dunmyer's admissions at the September 3, 2019 meeting, Defendants shut down OVMC and quickly eliminated the positions of most of OVMC's workforce (though some got to work a few days longer to help pack up). However, OVMC listed employees on the books

7

(as if they were still working) unless they resigned. *See* PX 32 at 3371 (employees discussing not being given hours anymore on September 4, 2019). AHS VP Sarrao confirmed in an email on October 1, 2019, that for OVMC and EORH combined the total employees on the roster at that time was over 800 but the number of employees actually working was approximately 200, *see* PX 33 at 25373, and more cuts (down to 70 or less) were to occur that day. *Id.* Thus, by October 1, 2019, less than seven percent (7%) of the nearly 1,100 workers employed at OVMC/EORH in August 2019 were still getting any work at all. *See* PX 22-23 (indicating that as of August 8, 2019, there were 736 and 343 positions at OVMC and EORH, respectively, that would be lost due to closure, which was "substantially the entire workforce").

On October 7, 2019, Defendants updated its books to mark as terminated OVMC and EORH employees who they had effectively laid off earlier, but whose separations they had delayed recognizing in an effort to evade WARN Act obligations. *See* PX 34 (stating employees were terminated 8/7/19); PX 35 at 14758 (reflecting 819 terminations on 10/7/19); PX 36 at 16730-16747 (listing OVMC and EORH staff).

### III. DISCUSSION

Plaintiffs have established Defendants violation of the WARN Act, 29 U.S.C. § 2102, *et seq*. on through Defendants' records, testimony, and other common evidence. As is more fully set forth below, because there is no genuine issue of material fact as to Defendants' liability for Count I of the Amended Complaint, Plaintiffs are entitled to summary judgment.

**A.**     **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those necessary to establish the elements of a party's cause of action.

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248.

Notably, the burden of persuasion is on an employer in raising a defense for its failure to provide the sixty-day notice when such notice is due under the WARN Act. *See Local Union 7107 v. Clinchfield Coal*, 124 F.3d 639, 640-41 (4th Cir. 1997) ("[A]n employer relying on an exception [under the WARN Act] bears the burden of persuasion.") (citing 20 C.F.R. § 639.9).

**B.** **Elements of WARN Act Claim**

The WARN Act requires covered employers to provide sixty (60) days written notice in advance of a plant closing or mass layoff to all affected employees or their collective bargaining representative. 29 U.S.C. § 2102(a).

A "plant closing" means the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an "employment loss" at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees. 29 U.S.C. §2101(a)(2). A mass layoff is defined as follows:

> a reduction in force which— (A) is not the result of a plant closing; and (B) results in an employment loss at the single site of employment during any 30-day period for— (i) (I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees); or (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. §2101(a)(3).

Under the WARN Act, there are three separate conditions which amount to an employment loss: defining employment loss as "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period"). To constitute a covered employer under the WARN Act, an employer must employ "100 or more employees, excluding part-time employees." 29 U.S.C. § 2101(a)(1).

The cause of action for relief under the WARN Act is set forth in 29 U.S.C. § 2104, providing that "[a]ny employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff …." 29 U.S.C. § 2104(a)(1). Section 2104 defines the term "aggrieved employee" as follows:

> For purposes of this subsection, the term, "aggrieved employee" means an employee who has worked for the employer ordering the plant closing or mass layoff and who, as a result of the failure by the employer to comply with section 2102 of this title, did not receive timely notice either directly or through his or her representative as required by section 2102 of this title.

29 U.S.C. § 2104(a)(7).

C. **Defendants Are "Employers" Covered By the WARN Act**

Plaintiffs can establish that AHSW and AHS are "employers" covered by the WARN Act. *See* 29 U.S.C. § 2101(A)(1)(a)–(b) (defining an employer as a business "that employs—(A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime) …"). It is undisputed that AHSW is an "employer" subject to the WARN Act. AA ¶ 38 ("Defendants admit…that [AHSW] is an 'employer' of Plaintiffs as defined by 29 U.S.C. § 2101(a)(1)."); PX 43 (Defs.' Answers to Reqs. for Admissions Nos. 1–2).

Further, Plaintiffs can prove that Defendants together constitute a single employer subject to the WARN Act, since common evidence shows that AHSW was controlled by, and not independent from, AHS. As WARN Act regulations recognize, in pertinent part:

> subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). *See Pennington v. Fluor Corp.*, 320 F. Supp. 3d 762, 769-70 (D.S.C. 2018). The DOL "factors" "are guideposts only" and "[s]ingle employer status ultimately depends on all the circumstances of the case and is characterized as an absence of an arm-length relationship found among unintegrated companies." *Local 2-1971 of PACE Intl Union v. Cooper*, 364 F. Supp. 2d 546, 564-65 (W.D.N.C. 2005) (quoting *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1005-06 (9th Cir. 2004)).

Here, each of the DOL factors supports a finding that AHS and AHSW were a single employer. The evidence shows that AHS owned, managed, and heavily controlled AHSW.[6] Moreover, AHS developed the notices, timelines and policies, and made the decision to close OVMC without 60 days-notice that are at the center of this case. *See Ray v. Mechel Bluestone, Inc.*, 2016 U.S. Dist. LEXIS 26314, at *12 (S.D.WV. Mar. 2, 2016) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 495 (3rd Cir. 2001)) (*de facto* control factor refers to "whether the parent has specifically directed the allegedly illegal employment practice that forms the basis for

---

[6] AHS exercised a high degree of control over AHSW—so much so that AHSW CEO Dunmyer complained to AHS executives in August 2019 that he and AHSW CFO Coello were being excluded and not permitted to provide "input" into organizational decisions. PX 44 at 17440 ("Every day (MRI, drugs etc.) we are hearing of decisions being made without even being part of the discussion let alone being the ones to make the decision.").

11

this litigation."); *Pennington*, 320 F. Supp. 3d at 771 (citing *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 143 (S.D.N.Y. 2004)) ("[i]n the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy."). Plaintiffs established that AHS and AHSW acted as a single employer, and should be treated as such. *See* 20 C.F.R. § 639.3(a)(2).

**D.     OVMC Shutdown Was a Plant Closing that Triggered Class Entitlement to Notice**

Plaintiffs established Defendants ordered a plant closure, triggering Class entitlement to 60 days advance written notice. *See* 29 U.S.C. § 2102(a)(1) (requiring employers to give sixty (60) days written notice of a mass layoff or plant closing to affected employees). The WARN Act defines "plant closing" as "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss…during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2). "An employment action that results in the effective cessation of production or the work performed by a unit, even if a few employees remain, is a shutdown." 20 C.F.R. § 639.3(b).

Here, Defendants ordered a plant closing on September 4, 2019, when Defendants' shut down OVMC. PX 45. The last patients were transferred out by September 6, 2019. PX 31. And Defendants cut employees' hours and pay, such that within 30 days, substantially OVMC's entire workforce was no longer working. PX 33 at 25373. It of no moment that Defendants kept employees on the books, after it stopped paying them until the date it believed "the 60-day clock" had run. *See, e.g., Gray v. Walt Disney Co.*, 915 F. Supp. 2d 725, 732 (D. Md. 2013) ("employers are not permitted to actually close a plant yet technically prevent their employees from suffering an "employment loss" under the Act until the 60–day clock has run…"). "[O]nly *full* pay—pay

12

that replaces a 60–day continuation of employment following a plant closing—suffices in lieu of notice." *Id.*

E.  **Plaintiffs Suffered an Employment Loss**

Under the WARN Act, termination without cause is a compensable "employment loss" without regard to the duration of time off work after termination. 29 U.S.C. § 2101(a)(6)(A); *see, e.g., Brewer v. American Power Source, Inc.*, 517 F. Supp. 2d 881, 885 (N.D. Miss. 2007). The WARN Act statute provides additional guidance for making "determinations with respect to employment loss:"

> For purposes of this section, in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff ***unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter***.

29 U.S.C. § 2102(d) (emphasis added).

Here, undisputed interrogatory answers, hospital census, and payroll records establish that there were 726 OVMC employees[7] as of August 2019 to whom Defendants sent the Aug. 8, 2019, letter informing them of OVMC's closure and their expected employment loss. PSX 1 ¶ 14; PSX 4. Of these, Defendants' pay records establish that only 29 continued to work past Oct. 8, 2019, *see* PSX 2 at12, n.2, and only that small group could have had 60 or more days' notice of the hospital closure before separation. Thus, Defendants' own records establish 696 aggrieved employees (725-29 = 696). *See* PSX 2.

---

[7] Defendants' census reflects 732 employees assigned to OVMC as of August 2019, but six (6) had no work at OVMC in 2019. *See* PSX 2 at 12 n.2.

13

Defendants argue there are fact issues regarding whether individual employees and Plaintiffs suffered an employment loss where some employees left to take new jobs or otherwise quit. However, the fact that some employees left after Defendants prematurely ordered a plant closure, cut their hours, and laid them off does not establish a "voluntary departure" outside the protection of the WARN Act. And, even assuming it did, this argument only applies to a small fraction of the workforce: Defendants admit they terminated hundreds of OVMC employees due to low census.

Defendants' payroll records reflect 107 putative Class members, including Plaintiff Mark Garan, accepted new positions <u>after</u> Defendants shut down OVMC on Sept. 4, 2019.[8] *See* PSX 2. However, leaving after a job is permanently eliminated or hours reduced is not a "voluntary" departure within the meaning of the WARN Act. *See* 29 U.S.C. § 2101(d); *Collins v. Gee W. Seattle LLC*, 631 F.3d 1001, 1008 (9th Cir. 2011) ("[A]n employee departing a business because that business was closing, has not 'voluntarily departed' within the meaning of the Act.").

Here, the evidence demonstrates that shortly after the Aug. 7, 2019, announcement of the hospital closing, Defendants began eliminating employee positions and dramatically reducing hours, until Defendants suspended acute care and emergency medical services altogether on September 4, 2019. After the hospital shut down, the elimination of jobs accelerated until over

---

[8] Defendants misstate the number of OVMC employees listed leaving for new jobs or quitting etc., because the "employee census" they cite includes employees from both OVMC and East Ohio Regional Hospital ("EORH"). Plaintiffs' summary table at PSX2 only includes OVMC employees and shows 109 OVMC employees listed in the census as having terminated for new jobs or quit, and that <u>none of those</u> terminations occurred before the September 4, 2019, plant closing. Defendants assert differences in department practices, (Def. Mem. at 15-16), without providing any evidence to support this assertion. In contrast, Defendants' top executives testified to an across-the-board staffing policy, namely that employees were "flexed" and told not to come in when there was not enough work during the WARN Act notice period, which affected all Class members.

95% of class members' positions were eliminated prior to October 7, 2019. Any employee who accepted a job elsewhere after her or his OVMC position was eliminated or whose hours were dramatically reduced, cannot be said to have voluntarily departed under the WARN Act. *Collins*, 631 F.3d at 1006 ("[U]nless there is some evidence of imminent departure for reasons other than the shutdown, it is unreasonable to conclude that employees voluntarily departed after receiving notice of the upcoming closure.").

Defendants may dispute that these employees' positions were terminated involuntarily but can produce <u>no evidence</u> that any employee who departed did so for reasons other than the hospital shutdown. And whether the new employment was at equal or greater pay is irrelevant since the only amounts that can permissibly offset the 60 days' pay and benefits under the statute are amounts paid *by Defendants* during the violation period. *See* 29 U.S.C. § 2104(a)(2)(A).[9]

The 107 employees whose terminations are listed as due to "new job" or the 2 who otherwise "quit" or the 2 who retired in early October 2019, after OVMC already closed its doors for good, and Defendants had systematically flexed employees to save themselves money at the expense of those same employees' ability to stick around until the end of the notice period. Terminations under these circumstances cannot be reasonably classified as voluntary departures. And it would eviscerate the WARN Act's intended protections if employers could avoid having to pay WARN Act damages at all by cutting wages and making it financially untenable for employees to stay during the 60-day notice period.

Likewise, employees who were required to use paid time off ("PTO") after their positions were eliminated still suffered an employment loss under the WARN Act. *See Gray v. Walt Disney*

---

[9] There is no authority for the proposition that an employer is entitled to offset WARN Act damages by earnings from a third-party employer.

15

*Co.,* 915 F. Supp. 2d 725, 735 (D. Md. 2013) ("The . . . 'paid leave in lieu of notice' arrangement challenged by the plaintiffs is in fact a violation of the WARN notice requirement . . . ."). Class members were entitled to sixty days regular wages and benefits under the WARN Act, and this entitlement did not depend on whether they had accrued PTO.

**F.** **Plaintiffs and the Class Did Not Receive Statutorily-Sufficient Notice**

Plaintiffs established the Class did not receive adequate or 60-days' notice required by the WARN Act. The WARN Act "requires employers who are planning a plant closing or a mass layoff to give affected employees at least 60 days' notice of such an employment action." 20 C.F.R. § 639.2. Delivery method must be "designed to ensure receipt of notice of least 60 days before separation." 20 C.F.R. § 639.8. The notice is to be in writing, "specific," and based on "the best information available…at the time notice is served." 20 C.F.R. § 639.7(a). Notice to affected employees must tell them: "whether the planned action is expected to be permanent or temporary;" the "expected date when the plant closing or mass layoff will commence;" the "expected date when the individual employee will be separated;" (3) "whether or not bumping rights exist;" and the name and phone number of a company official to contact for more information. 20 C.F.R. § 639.7(d).

Here, Defendants did not comply with legal requirements, and the notice given was defective and insufficient. Most fundamentally, Defendants' August 8, 2018 letters failed to give notice of the employment loss that actually occurred. PX 23. These letters do not specify a termination date or bumping rights and were not based on "best information available." Instead, they misrepresented that OVMC would close on or after October 7, 2019, though Defendants expected it to close sooner, and planned to cut hours sooner. The October 7, 2019, date in the

16

letters was a sham and a record-keeping fiction, wholly unrelated to the dates on which the Class suffered employment loss. In truth, the notice given amounted to no notice at all.

The substantive defects in the August 8 letters justify the conclusion that the Class received no notice (and that damages are due for the full 60-days). However, even if the content of these letters met statutory requirements (and it did not), these letters were not sent timely, and did not provide affected employees with 60 days' notice as required by law. 20 C.F.R. § 639.2. Indeed, Defendants shut OVMC down on September 4, 2019—just 27 days after they mailed the letters.[10]

### G. Damages Can Be Proved on a Class-wide Basis from Defendants' Records

Although Plaintiffs are moving for summary judgment on liability only, it is worth noting that Class damages may be proven based on Defendants' pay and timekeeping records. Pursuant to 29 U.S.C. § 2104(a), where an employer "orders a plant closing or mass layoff in violation of section 2102" it shall be liable to each aggrieved employee "who suffers an employment loss as a result" for "backpay for each day of violation" and benefits for "a maximum of sixty days." 29 U.S.C. § 2104(a)(1).

Here, Defendants produced timekeeping records reflecting the last date each affected employee actually worked, as well as hours worked, wage rate, and paid time off ("PTO") in summer and fall 2019. PX 1 (Decl. ¶ 57); PX 53. Defendants also produced documents for each affected employee indicating the average weekly hours, full/part time status, formal date of separation and reason for separation. PX 35-36. Thus, Class members' identities can be ascertained, and their damages calculated, from Defendants' pay and timekeeping records.

---

[10] Even if the letters were mailed on August 8, 2019, they would not have been received that day. Applying the customary three-day mailbox rule (and as USPS does not deliver on Sundays), at best, employees received these letters on Monday, August 12, 2019. *See Baldwin County Welcome Center v. Brown*, 466 U.S. 148 (1984) (in absence of evidence that a letter was delayed, a three-day mailing period is presumed).

17

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court enter summary judgment in favor of the Plaintiffs on liability against Defendants on Count I of the Amended Complaint for violation of the WARN Act.

Respectfully submitted,

/s/ Bren J. Pomponio

| | |
|---|---|
| Timothy F. Cogan, Esq. (WVSB # 764) | Bren Pomponio, Esq. (WVSB # 7774) |
| tfc@walslaw.com | bren@msjlaw.org |
| **Cassidy, Cogan, Shapell & Voegelin, LC** | **Mountain State Justice, Inc.** |
| The First State Capitol Building | 1217 Quarrier Street |
| 1413 Eoff Street | Charleston, WV 25301 |
| Wheeling, WV 26003 | T.: (304) 344-3144 |
| T.: (304) 232-8100 | |
| | Maureen Davidson-Welling, Esq. (*pro hac vice*) |
| F. Alex Risovich, Esq. (WVSB # 10866) | mdw@stembercohn.com |
| alex.risovich@risovichlaw.com | John Stember, Esq. (*pro hac vice*) |
| **Risovich Law Offices, PLLC** | jstember@stembercohn.com |
| 3023 Pennsylvania Avenue | **Stember Cohn & Davidson-Welling, LLC** |
| Weirton, WV 26062 | The Hartley Rose Building |
| T.: (304)723-2588 | 425 First Avenue, 7th Floor |
| F.: (304)723-2504 | Pittsburgh, PA  15219 |
| | T.: (412) 338-1445 |
| Dated:  July 8, 2022 | *Attorneys for Plaintiffs* |