**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**KEITH REED, ELIZABETH SCHENKEL,**
**EMILY WINES, MARK GARAN and**
**AUGUST ULLUM, individually and on**
**behalf of others similarly situated,**

      **Plaintiffs,**

**v.**                                      **Civil Action No.: 5:19-cv-263**
                                               **Judge Bailey**

**ALECTO HEALTHCARE SERVICES LLC,**
**and ALECTO HEALTHCARE SERVICES**
**WHEELING, LLC d/b/a OHIO VALLEY**
**MEDICAL GROUP and d/b/a OVMC**
**PHYSICIANS,**

      **Defendants.**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Defendants Alecto Healthcare Services LLC ("AHS") and Alecto Healthcare Services

Wheeling ("AHSW" and together with AHS, the "Defendants") offer this memorandum of law in

support of their contemporaneously filed motion for summary judgment. Plaintiffs alleged the

Defendants violated the WARN Act when Ohio Valley Medical Center ("OVMC") closed in 2019

without proper notice. Plaintiffs' claims, however, are without merit because:

- AHS is not an "employer" of Plaintiffs or anyone else at OVMC, as that term is defined
  in the WARN Act, and is therefore not subject to liability;

- AHSW, the actual employer of Plaintiffs and all OVMC employees, provided valid
  WARN notice of the hospital's permanent closure;

- AHSW provided valid notice 60 days before a "plant closing," as that term is defined;

- In the alternative, there is no violation as AHSW provided notices as soon as practicable
  pursuant to the faltering business exception, which permits a shorter notice period; and

- Even if a violation is found, the good faith exception applies to reduce damages.

1

## FACTUAL BACKGROUND

**A.** **AHS Wheeling Acquires OVMC in June 2017 and Suffers the Same Financial Difficulties as Predecessors—Plus Some New Ones.**

OVMC was a mid-sized hospital located in Wheeling, West Virginia that was facing severe financial distress and bankruptcy prior.[1] To save the hospital, AHSW purchased substantially all assets and assumed substantially all of the liabilities of OVMC effective June 1, 2017. *See* Exhibit 1, Deposition of Michael Sarrao 36:17-37:5. From June 1, 2017 onward, AHSW was the sole employer for all employees at OVMC. *See* Exhibit 2 (Bates Nos. 2022-2130 at Art. 5.3 & Bates Nos. 2190-2211, Sec. 1.4) (AHS expressly disclaiming that all OVMC employees are epmloyees of AHSW and MSA does not create employment relationship between AHS and anyone at OVMC). AHSW had roughly 736 employees at OVMC in August 2019.

Unfortunately, AHS Wheeling faced the same financial difficulties as the prior owner. Based on trended balance sheets, OVMC only had negative equity from June to November of 2017. *See* Exhibit 2 (Bates Nos. 36420-36423). The hospital exclusively had a negative net equity in every month from December 2017 onward, meaning its liabilities outnumbered its assets. *Id.* This negative net equity grew each month, despite the Defendants best efforts. *Id.* The trended income statement shows similar financial struggles that increased over time. OVMC had net losses in 26 of the 29 months it operated from June 2017 to October 2019, ranging from $294,000 to $11,072,000 in cash flow losses each month. *Id*. The number of patients visiting OVMC also declined. *See* Exhibit 3 (Deposition of Keith Reed 49:16-50:4 (decline in patient volumes in years leading to OVMC closure); Exhibit 4 (Deposition of Mark Garan) 46:10-47:4 (noting a "significant decline in the amount of [ICU] patients that we had regularly . . .beginning of 2019"). The payer

---

[1] The entities purchased on June 1, 2017, were designated as "financially distressed" by statutory definition.  *See* W. Va. Code Sec. 16-2D-10 (6) (2020).

mix, or the ratio of patients using government issued benefits v. private health insurance v. private pay/uninsured, also changed. *See* Sarrao 79:11-21 & 80:6-81:14. Both the declining patient volumes and changes to payer mix lowered the accounts receivable the hospital could collect. *Id.*

During this same time, OVMC also lost key physicians and practices to Wheeling Hospital, a competitor hospital in the same city, often under illegal circumstances, which culminated in the U.S. Government bringing a False Claims Act lawsuit against Wheeling Hospital, which the hospital settled for $50 million (after OVMC closed). The loss of physicians and their practices severely limited the services OVMC could offer patients. Sarrao 79:11-21; Exhibit 5 (Deposition of Elizabeth Schenkel 56:1-57:24 & 60:2-61:19) (doctors or practices had left in 2018 and 2019 causing ICU to regularly transfer patients to other facilities). Wheeling Hospital knowingly provided patients and the local community with false information about OVMC's ability to accept state benefits, insurance, and wait times to divert patients. Exhibit 2 (Bates No. 16447-16448). In 2018, Wheeling Hospital—without notice or provocation—withdrew from the joint trauma program with OVMC, causing OVMC's trauma designation to drop from Level II to IV, further curbing the services it could offer. Sarrao 79:11-80:5 & 81:15-87:15.

**B.** **Defendants' Endeavor to Find Buyer or Funds To Keep OVMC Open.**

Facing mounting financial losses, struggling with the significant lingering debt it acquired as part of the 2017 asset acquisition, and watching its patient and physician numbers dwindle, AHSW implemented various cost-saving measures and began searching for an investor, buyer, or strategic partner. At all relevant times, AHSW maxed out (and at times even over borrowed) its credit limit under its existing credit line. *See* Sarrao 50:10-53:18 (explaining credit line, requests for more credit, and maxing out available credit); Exhibit 2 (Bates No. 36419) (credit line report

showing OVMC was a net borrower that received more money under credit line than ever repaid)[2].

The Defendants' requests for additional sums from its lenders and AHSW's landlord were denied, including a specific request to use $20 million earmarked for capital improvements for operational cash instead. *See* Sarrao 50:10-53:18. Defendants explored seeking additional credit or financing but had no unencumbered or unsecured assets with which to secure one. *Id.* 101:11-103:4. They therefore sought government grants and unsecured loans from state and federal officials, to no avail. *Id.* Increasingly, AHS was advancing its own funds to AHSW to keep OVMC operational. *See* Exhibit 2 (Bates No. 36424-36426) (intercompany report showing AHS paid millions on behalf of AHSW over 2017-2019). In March of 2019, AHSW was forced to lay off approximately 80 employees at OVMC as it continued to seek investment or purchase by an interested party.

**C.     AHSW is Forced by Business Conditions to Announce on August 7, 2019 that OVMC Will Begin Wind Down and Closure Process—And the Backlash is Immediate.**

Despite meetings, discussions, and tours with multiple parties, AHSW could not secure the funding needed to keep OVMC operational. The Defendants reviewed a variety of options, but reached a consensus on August 5 or 6, 2019 that OVMC must close. On August 7, AHSW was announced it would begin the process of closing OVMC, with that process concluding on October 7, 2019. *See* Exhibit 2 (Bates No. 1-2). Employees were first told in a meeting held by OVMC CEO Dan Dunmyer, and were provided an e-mail, press release, and employee Q&A about the upcoming closure process. *See* Exhibit 2 (Bates Nos. 6707-12; 33416); Sarrao Depo. 167:4-17. The next day, AHSW held forums to further discuss the closure and provided letters to local officials, dislocated worker units, and employees. *See* Exhibit 2 (Bates Nos. 82); Sarrao 167:4-17.

---

[2] Bates Number 36419 is a large Excel spreadsheet with daily entries of bank account sweeping activity from June 1, 2107 to December 31, 2021. It was produced natively in this case. The full document can be provided to the Court upon request, but only the first summation page with annual totals is attached hereto as an exhibit.

Plaintiffs readily admit that the impact of this announcement was immediately felt at OVMC. Patient volumes plummeted. Schenkel 55:9-24; 59:1-7 (lower patient census in ICU after closure announcement); Garan 46:10-15; Reed 53:24-54:7 (patient numbers dropped "rapidly" after August 7, 2019); Sarrao 153:23-155:5 (hospital did not have sufficient patient volumes following closure announcement). Staff employees began resigning to start new positions elsewhere, making it increasingly difficult to properly and safely staff the few patients that remained. Exhibit 6 (Deposition of Emily Wines 56:16-22); Exhibit 7 (Deposition of August Ullum 47:4-13); Sarrao. 153:23-155:5. Doctors, residents, and other health care providers left to begin practices elsewhere (including Wheeling Hospital), thereby limiting the services OVMC could provide. Schenkel 56:1-8 (transferring patients from ICU because services limited); Reed 57:5-13 (physicians, care providers, and most residents left the hospital after closure announcement but before October 7, 2019); Sarrao 152:2-155:5 (discussing how departure of physicians and residents after closure announcement affected services available and target date for stopping patient services); Exhibit 8 (Deposition of Dan Dunmyer 31:18- 33:4)(discussing staffing issues and stating "[w]e had staff, but we didn't have staff in all the areas. We didn't have doctors to take care of [patients]"). Likewise, vendors refused to provide services or medical supplies fearing nonpayment. Sarrao 154:14-155:5; Exhibit 9 (Deposition of Roger Krissman 44:4-18).

**D.** **Concerned with Providing Quality Patient Care Due to Staff, Physician, Supply, and Patient Problems, AHSW Suspends Certain Services on September 3, 2019.**

Given these problems with staffing, available doctors/services, and obtainable medical supplies, the hospital had reasonable concerns about whether it could continue to offer quality patient care. Sarrao 152:2-155:5 Dunmyer 31:18- 33:4. Accordingly, AHSW announced on September 3, 2019, it would suspend its acute and emergency medical services at OVMC as of midnight on September 4th. *Id.*; Exhibit 2 (Bates No. 16762-16763). Contrary to the Plaintiffs'

assertion, this suspension did not close the hospital as of that date—the hospital would remain open for other services and general wind-down after September 4. *See* Sarrao 152:21-153:8 ("There's a difference between closing and patient services, having patients in the house.").

Overall, each department at OVMC had a unique wind-down process, with fluctuations in patient census, requirements for informing/referring patients, processes for transferring and preserving medical records, inventory of medical equipment, and staffing needs. Under AHSW's usual policy (which is also typical of the hospital industry), when patient census in a department dropped below certain levels, staffing was adjusted, employees were provided fewer hours, and management encouraged employees to take vacation or use other paid time off. *See* Sarrao 164:11-166:5; Dunmyer 38:9-39:21. Therefore, some employees at OVMC worked full time through October 7; some worked sporadically or at lower-than-average hours between September 4 and October 7; some used PTO or vacation during that same time; and some resigned to begin employment elsewhere. *See generally* Exhibit 2 (Bates Nos. 91-2018 & 14787-15075 payroll); (Bates No. 14758 employee census) & (Bates No. 16769 timecard).[3]

As part of this wind-down process, AHSW coordinated volunteer lists, so employees could work on closing other departments. Schenkel 96:1-98:8 (responding to direct supervisor's e-mail request for help in other departments); Exhibit 2 (Bates Nos. 2963). Even if an employee was working in another department or were performing administrative tasks, they were paid their usual base rate. *See* Exhibit 2 *(*Bates Nos. 91-2018 & 14787-15075). AHSW continued to pay its portion for all employees' benefits through that date, regardless of an employee's working hours, and provided a variety of support ranging from written Q&A, recommendations, daily huddles, and arranging unemployment site visits. *See* Schenkel 18:2-19:7; 66:20-23; Exhibit 2 (Bates Nos. 91-

---

[3] Bates No. 16769 is a large Excel spreadsheet that was produced natively in this lawsuit. The full file will be provided upon the Court's request, though only a representative portion is attached hereto.

2018 & 14787-15075). Ultimately, OVMC closed its doors permanently on October 7, 2019 and the vast majority of remaining OVMC employees had their employment terminated as of that date. *See* Exhibit 2 (Bates No. 14758).

## **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure states, in pertinent part, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See, e.g., Walker v. Medtronic, Inc.*, No. CIV.A. 2:07-00317, 2008 WL 4186854, at *1 (S.D.W. Va. Sept. 9, 2008). Although the Court views the evidence in the light most favorable to the non-moving party, it need not accept legal conclusions, and the non-moving party must produce evidence beyond "[c]onclusory or speculative allegations" and rely on more than "a mere scintilla of evidence" to withstand summary judgment. *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018).

## **LEGAL ANALYSIS**

The WARN Act requires an "employer" to provide notice to each "affected employee," the chief elected official of the unit of local government, and state dislocated worker unit 60 days prior to a "plant closing." 29 U.S.C. § 2102(a). The WARN Act contains definitions for key terms like "employer," "affected employee," and "plant closing," in addition to criteria for valid notice. *See, e.g.,* 29 U.S. Code § 2101; 20 CFR § 639.3. Furthermore, the WARN Act contains exceptions by which an employer may provide less than 60 days advance notice. 20 CFR § 639.9. As explained below, AHSW was the sole employer of Plaintiffs and provided valid notice 60 days before a plant

closing, as that term is defined, occurred. In the alternative, AHSW qualifies for the faltering business exception to provide less than 60 days' notice. Finally, even if liability is found, AHSW has a reasonable, good faith belief it provided compliant notice, and damages should be reduced.

I.     **AHS Is Not The Plaintiffs' Employer, As That Term Is Defined By The WARN Act.**

The WARN Act only requires notice from an "employer," which is a statutorily defined as "any business enterprise that employs—(i) 100 or more employees, excluding part-time employees." 20 C.F.R. § 639.3(a). Here, it is undisputed that AHSW employed 100 or more employees at OVMC (including all Plaintiffs) as of August 2019. [CM/ECF Doc. No. 39 ¶ 38]. Plaintiffs nonetheless seek to hold AHS as a single employer with AHSW in an effort to secure alternative sources of remuneration, as AHSW has had no income since OVMC closed. As explained below, though, the Defendants are not a single employer.

As a general matter, the doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees. *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 981 (4th Cir. 1987) (also noting a "normal parent-subsidiary relationship . . . will retain the benefits of limited liability"); *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1102 (5th Cir. 1973) (corporate form is not disregarded lightly since the law created corporations primarily to allow limited liability); *W. Virginia Highlands Conservancy,* 206 W. Va. at 640 (West Virginia state law "presumes that two separately incorporated businesses are distinct entities."); *S. States Co-op. v. Dailey*, 167 W. Va. 920, 930 (1981) (Under West Virginia state law, the "corporate form will never be disregarded lightly."). Only evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary—domination similar to that which justifies piercing the corporate veil— is sufficient to rebut this presumption. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir.

1997); *Johnson*, 814 F.2d at 980 (noting parent company "retains the benefits of limited liability even if it exercised *some* control over the . . . subsidiary") (emphasis added). Given this strong presumption of separate status, the WARN Act limits veil piercing to certain instances:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

> 20 C.F.R. § 639.3(a)(2).

Here, under both the general law of veil piercing and the specific WARN Act factors, AHS and AHSW are not a single employer.

First, the common ownership factor asks "whether a parent or related entity directly owns a separate corporate entity." *Butler v. Fluor Corp.,* No. 0:17-CV-02094-JMC, 2021 WL 51412, at *7 (D.S.C. Jan. 6, 2021); *Guippone v. BH S & B Holdings LLC*, No. 09-CV-1029-CM, 2010 WL 2077189, at *4 (S.D.N.Y. May 18, 2010). Here, AHS is a Delaware LLC with eight members, all of whom are individuals (or trusts benefitting individuals) that reside outside West Virginia. [CM/ECF Doc. No. 20]; Exhibit 2 (Bates Nos. 16762). AHSW is a Delaware LLC whose sole member is Alecto Healthcare Services Ohio Valley LLC ("AHSOV"). [CM/ECF Doc. No. 20]. AHS and AHSW therefore do not share common ownership because: (a) AHS is owned by individuals (or trusts to individuals' benefit) while AHSW is owned by an LLC; (b) AHS does not directly own AHSW because AHSW's sole member is AHSOV, an intervening non-litigant against whom Plaintiffs have made no claims; (c) AHSW is also not a "partially or wholly owned subsidiary" of AHS as referenced in the WARN regulation 20 C.F.R. § 639.3 because AHSW's

sole member is AHSOV; and (d) until this year, the unrelated entity of MPT of Wheeling-Alecto Hospital, LLC held a 20% membership interest in ASHOV, demonstrating the various corporate entities are not solely owned by the eight members of AHS. As a result, AHS is merely the grandparent of AHSW and the first factor weighs against single employer status. *See, e.g., Vogt v. Greenmarine Holding, LLC,* 318 F. Supp. 2d 136, 142 (S.D.N.Y. 2004) ("Because the other defendant [sic] companies are at best grandparents of OMC, plaintiffs have not alleged "common ownership" as to those companies"); *Guippone v. BH S & B Holdings LLC*, No. 09 CIV.1029 (CM), 2010 WL 2077189, at *4 (S.D.N.Y. May 18, 2010), aff'd, 737 F.3d 221 (2d Cir. 2013) (finding no common ownership when investment vehicles separated defendant entities).

Second is whether there are common directors and officers. Here, AHS and AHSW may have shared a common corporate president (Lex Reddy) and corporate secretary (Michael Sarrao), but the duties of those two AHSW corporate officers were limited. *See, e.g.,* Sarrao 25:17-26:18 (duties limited to written consents and singing "one or two" contracts usually signed by hospital CEO). In reality, AHSW's corporate officers did not run OVMC—it was managed by the hospital's management team. *See* Exhibit 2 (Bates No. 2019-2020). These individuals were all located in West Virginia and the majority were in place prior to AHSW's acquisition in June 2017. Thus, the corporate officers of AHS were different from the management of OVMC.[4] *See Exhibit 2* (Bates No. 2019-2021). The second factor also weighs against single employer status.

Notably, even if these first two factors did weigh against the Defendants (which they do not), they are not determinative. *See, e.g., Hampton v. Navigation Cap. Partners, Inc*., 64 F. Supp.

---

[4] The only common management would be the brief period (June -December 2017) during which AHS President Lex Reddy temporarily stayed in West Virginia and served as interim CEO of OVMC. AHSW hired Dan Dunmyer (previously unaffiliated with AHS in any way) in December 2017 to serve as CEO of OVMC, at which time Mr. Reddy returned to California and relinquished all duties associated with that position. Mr. Reddy testified regarding this during his deposition in this case, but the transcript has not been provided to counsel despite requests.

3d 622, 627 (D. Del. 2014); *see also W. Virginia Highlands Conservancy, Inc. v. Pub. Serv. Comm'n of W. Virginia*, 206 W. Va. 633, 640, 527 S.E.2d 495, 502 (1998).

We turn, therefore, to the last three factors, which are determinative. Third is de facto control, where the core inquiry is "whether the parent [or lender] has specifically directed the allegedly illegal employment practice that forms the basis for the litigation." *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 491 (3d Cir. 2001); *In re APA Trans. Corp. Consol. Litig.*, 541 F.3d at 245. This factor is "not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of stock ownership." *In re Jevic Holding Corp.*, 526 B.R. 547, 553 (D. Del. 2014), aff'd, 656 F. App'x 617 (3d Cir. 2016); *Pearson*, 247 F.3d at 503. Here, AHS did not "specifically direct" or otherwise order AHSW to close OVMC. From the onset of litigation, the Defendants have been clear that representatives from both entities collaboratively participated in the August 2019 decision to close OVMC. *See* Exhibit 10 (Defendants' Responses to Plaintiffs' First Set of Interrogatories, with Interrogatory No. 1 listing 10 representatives of AHSW and 11 representatives of AHS who participated in discussions about potential closure of OVMC). Furthermore, all of the individuals deposed in this matter have agreed: the decision to close OVMC was made collaboratively and jointly. *See, e.g*., Sarrao 90:17-91:23; 134:1-135:14; 156:2-157:2; Dunmyer 19:5-22:24.[5] As OVMC CEO Dan Dunmyer testified, he and AHS representatives had an "open discussion about every option" prior to reaching a "consensus" to close both hospitals on or about August 5 or 6, 2019. Dunmyer 19:5-22:24. Dunmyer was clear—as CEO of OVMC, he participated in making the decision to close OVMC. *Id.* In the weeks leading up to that decision, Dunmyer and his management team, including COO Jennifer Coelleo, had

---

[5] Lex Reddy's deposition testimony was consistent according to counsel's memory, but the transcript is yet unavailable. Also, to be clear, the testimony is also consistent that both of the Defendants decided to begin marketing OVMC for sale, investment, or partnership and to suspend certain medical services in September 2019. Sarrao 90:17-91:23; 134:1-135:14; 156:2-157:2; Dunmyer 19:5-22:24.

discussions amongst themselves and with AHS regarding available "options" and different "ideas of what could possibly work" to keep OVMC open. *Id.* Many other members of management at OVMC participated in discussions with Dunmyer, Coello, and AHS regarding potential closure in order to provide information or input. Exhibit 10 (No. 1).[6] After going through those options and discussions, however, Dunmyer came to believe that the only viable options were to either (a) close both OVMC and EORH, or (b) close OVMC and try to keep EORH open because it had a better building. Dunmyer 19:5-22:24. Ultimately, the Defendants agreed that OVMC was "not going to be able to survive the way we were" and jointly decided to close both hospitals. Dunmyer 13:23-15:4. Given this uncontroverted testimony, AHS did not "specifically direct" or otherwise order AHSW to close OVMC. Thus, there is neither de facto control nor single employer status.

There are several points that further support this conclusion. First, the individuals at AHS identified as participating in the actual decision to close OVMC were also officers of AHSW— Michael Sarrao and Lex Reddy. Thus, these individuals could (and, as Sarrao testified, were) operating in their roles as officers of AHSW when making the decision to close OVMC. Sarrao 135:4-14. Other individuals at AHS who were <u>not</u> officers of AHSW (like CFO Jeremy Redin and Corporate Counsel Mark Bradshaw) were limited to providing input. Sarrao 134:9-135:6. This further demonstrates there is no de facto control by AHS. *See, e.g., In Re Consol. Bedding, Inc.*, 432 B.R. 115, 122 (Bankr. D. Del. 2010) (finding no de facto control as plaintiff had no evidence which "hat" decision makers were wearing, as they were directors for parent and subsidiary).

---

[6] During this process, AHS consulted with certain non-litigants regarding the potential effects of OVMC's closure, including (a) CNH, the primary lender to AHSW/OVMC, to confirm it would continue to provide financing if closure was announced, and (b) MPT, both member of AHSOV (who, in turn was sole member of AHSW) and owner/lessor of OVMC's real property, to confirm it would not restrict access to the hospital's real estate if closure was announced. Sarrao 115:17-117:14. Sarrao and Reddy handled both the MPT and CNH consultations for strategic reasons, namely because they had the best, longest relationship with MPT and CNH. This is not evidence of AHS control over AHSW.

Second, though Plaintiffs point to the Management Services Agreement ("MSA") between the Defendants for evidence of control, a thorough reading demonstrates that the opposite is true. The MSA expressly states that AHSW "shall at all times retain control over [OVMC's] assets and operation," that "all medical and professional matters shall be the responsibility of [AHSW]," that AHSW retains sole control over the hire and termination of OVMC employees, and that AHSW "shall have authority and responsibility to oversee the provision of health care services for [OVMC] and to conduct, supervise and direct the day-to-day operations of [OVMC]." Exhibit 2 (Bates No. 2190-2211 at § 1.3, 1.4, 1.6, 1.7). Additionally, even if AHS had wanted to "specifically direct" or demand that OVMC close, the MSA clearly states that AHS would have to secure AHSW's prior written authorization to do so—any "major decisions" like selling the company, making a material change to the scope of services, or entering into transactions that could terminate the hospital all required AHSW's prior written authorization. *Id.* (§ 1.5). Thus, the MSA actually confirms that the Defendants never intended for AHS to unilaterally operate OVMC or make major decision, and specifically included provisions whereby AHSW retained control.

Third, the testimony regarding AHS' participation in the decision to close OVMC is nothing more than usual parent entity involvement, which—on its own—is insufficient to establish de facto control or pierce the corporate veil. *See S. States*, 167 W. Va. at 930 (holding that activities "which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures" do not indicate that the parent corporation is in fact controlling the subsidiary"). For these reasons, and those discussed below under dependency of operations, there is no de facto control supporting a finding that the Defendants are a single employer.

Fourth, is unity of personnel policies emanating from a common source, and is "analogous to a determination of whether the companies had a centralized control of labor operations." *Young v. Fortis Plastics, LLC*, 2013 WL 5406276, at *6 (N.D.Ind. Sept. 24, 2013). The overall question is "whether the companies actually functioned as a single entity with regard to [their] relationship with employees." *In re APA Transp. Corp. Consol. Litig*., 541 F.3d 233, 245 (3d Cir. 2008), as amended (Oct. 27, 2008). This inquiry considers "whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping." *Id.* Here, there is no unity of personnel policies. AHS employs a limited number of individuals, and some individuals, like Michael Sarrao, are not employed by AHS (i.e. he is self-employed) but are officers. Exhibit 2 (Bates No 2021). Similarly the vast majority of AHSW's employees at OVMC were hired prior to it taking over operations in June 2017. Exhibit 2 (Bates No. 14758). All evidence points to AHS and AHSW having separate policies and procedures regarding employees. For example:

- AHSW maintained separate policies regarding employees that were expressly limited to OVMC and EORH, and have no impact on AHS. Exhibit 2 (Bates Nos. 12-81).

- Payroll journals demonstrate that OVMC employees were paid separately from any AHS employee. Exhibit 2 (Bates No. 91-2018 & 14787-15015).

- The OVMC benefit booklets demonstrate that OVMC employees had benefits separate and apart from AHS employees. Exhibit 2 (Bates Nos. 14759-14786).

- The timekeeping records show that AHSW/OVMC and AHS employees were separate. Exhibit 2 (Bates No. 16769 timekeeping records for OVMC).

- Defendants have different management and employees. Exhibit 2 (Bates Nos. 2019-2021).

- The MSA expressly states that OVMC employees are employed exclusively by AHSW, and the MSA does not create an employer/employee relationship with anyone at OVMC. Further, the MSA states that AHSW retains responsibility for its own payroll and the hire/fire of employees. Exhibit 2 (Bates No. 2190-2211 at § 1.1, 1.4).

- Plaintiffs admit they had no consistent or meaningful interaction with key AHS employees—at most, AHS CEO Lex Reddy spoke briefly to Plaintiff Schenkel and Plaintiff Ullum when he once visited OVMC. Plaintiffs reported to local OVMC management, and if they had an employment issue, they would have taken it to local HR or payroll. Garan 68:13-69:11; Reed 85:24-87:5; Schenkel 24:17-20 & 108:10-109:14; Ullum 16:22-17:8, 19:13-24 & 66:10-68:20.

Taken together, the Defendants did not have unified employee policies and did not operate as a single entity in regards to employees. Accordingly, the fourth "unity of personnel policies" WARN factor weighs against single employer status.

Fifth, and final, is dependency of operations. This is not present, as the timeline shows. AHS was formed in 2012 and operated for years before AHSW was formed in 2017. OVMC has operated as a hospital since its founding in 1890—as Ohio Valley General Hospital from 1914-1973, and OVMC since then. Before AHSW acquired the assets of OVMC in June 2017, the hospital was facing severe financial difficulties and had been deemed "financially distressed" under state law. AHS continued with its varied business interests after AHSW's acquisition of OVMC, and the hospital continued to operate without significant interruption or changes. Unfortunately, OVMC continued to face financial distress under AHSW's operation, as it had under its prior ownership. When ASHW was forced to cease operations at OVMC in October 2019, AHS continued to operate. Given this timeline and the fact that AHS and OVMC both operated independently of each other for years before ever crossing paths, the Defendants were not "dependent" upon one another to continue operations. *See, e.g., In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008), as amended (Oct. 27, 2008) (finding that parent and subsidiary "were clearly not "dependent" upon one another to continue operation, and there is no stronger evidence for this fact than that APA Truck Leasing continued to operate without incident after APA Transport folded").

Furthermore, as stated above, AHS and AHSW operated as separate entities even when they were both operational, with separate management (Bates Nos. 2019-2021), operating agreements (Bates Nos. 2212-2226 & 35970-36012), written consents (Bates No. 16530-16532 & 16762-3), payrolls (Bates Nos. 91-2018 & 14787-15075), timekeeping (Bates Nos. 16769), benefits (14759-14786), financial reports (Bates Nos. 2131, 2189 & 16770-16771), bank accounts (Bates Nos. 2132-2183) and taxes filings (Bates Nos. 14197-14323). Intercompany transfers of money from AHS to AHSW/OVMC were monitored and reported, demonstrating the two entities did not co-mingle funds and operated at arms' length. Exhibit 2 (Bates No. 36424-36426). As discussed above, the staff and management at OVMC were largely in place before AHSW acquired the hospital's assets, and AHS and AHSW did not share employees, supplies, or office space. Exhibit 2 (Bates Nos. 2019-2021). At most, AHS and AHSW were both creditor*s* under a line of credit—meaning AHS did not hold the principal purse strings for AHSOV or AHSW—and even this was done separately. Exhibit 2 (Bates Nos. 36419). Finally, common sense also demonstrates that AHS and AHSW operated separately. AHSW operated a mid-sized hospital in West Virginia and AHS was located in Irvine, California. It would be impossible and impractical for AHSW to reach out to AHS (2,300 miles and 3 time zones away) to make any day-to-day decisions regarding OVMC's operation. Instead, the experienced management team at OVMC made such decisions.

Taking all of this into account, the five WARN factors all weigh against finding AHS to be a single employer with AHSW. This, combined with the general presumption against a parent being the employer of a subsidiary's employees and West Virginia state law on LLC veil piercing, support a single conclusion: AHS did not exercise control over AHSW beyond what is customary for a "grandparent" entity and, accordingly, AHS was not the Plaintiffs' employer. Thus, there is no basis for liability against AHS and judgment as a matter of law in AHS' favor is warranted.

II.     **AHSW Sent Compliant WARN Notices To All Required Recipients.**

ASHW, as the employer of Plaintiffs, is required to provide notice to affected employees (when there is no union, like is the case here), the chief elected official of local government, and state dislocated worker unit. 20 CFR § 639.6. AHSW sent compliant notices to all required parties.

First, AHW provided an e-mail to employees on August 7, 2019 with a press release and Employee Q&A attached. Exhibit 2 (Bates No. 6707-67012). It also provided a letter to employees dated August 8, and an e-mail dated September 3 regarding the suspension of services. *Id.* (Bates No. 82 & 3135). These separate documents can be combined to create valid notice. *See In re TransCare Corp.*, 611 B.R. 160, 168 (Bankr. S.D.N.Y. 2020) ("An employer is entitled to combine multiple communications to cure ambiguities in earlier notices and argue that when read together, the communications provided sufficient notice under the WARN Act."); *In re AE Liquidation, Inc.*, 522 B.R. 62, 70 (Bankr. D. Del. 2014) ("The Court must consider whether the communications to employees, read together, satisfy the WARN Act."); *Kalwaytis v. Preferred Meal Sys., Inc.*, 78 F.3d 117, 122 (3d Cir. 1996). Together, these provided compliant notice.

WARN Act regulations require notice to affected employees without union representation to contain: (a) a statement as to whether the plant closing is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect; (b) expected date when the plant closing will commence and the expected date when the individual employee will be separated; (c) an indication whether or not bumping rights exist, and (d) the name and telephone number of a company official to contact for further information. 20 C.F.R. § 639.7

The August 7 e-mail, August 7 Employee Q&A, August 7 press release, and August 8 letters all informed Plaintiffs (and all other OVMC employees) that the hospital was going to permanently close in its entirety. Exhibit 2 (Bates No.  82 & 6707-67012). All identified October

7 as the target closure date, and the Employee Q&A and letter notified that employment would cease as of October 7, unless an employee was terminated before then under the hospital's usual policies on discipline. *Id.* Both the August 7 e-mail and August 8 letter identified Dan Dunmyer (and his telephone number) as the contact person for further information, and the former also informed employees that forums would be held the next day to provide additional information. *Id.* Importantly, Plaintiffs read and understood all the required information from the August 7 e-mail (including attachments) and/or August 8 letter. Ullum 32:18-21; 32:22-33:1 & 44:4-18; Garan 32:6-9; 32:22-33:15; Schenkel 66:3-15; Reed 39:18-40:20. Though bumping rights were not expressly mentioned, this is not fatal to the notice's effectiveness or compliance with the WARN Act, particularly as (a) the hospital had no union or formal bumping right programs, and (b) the other notices to the disclosed workers unit and mayor expressly disclosed there were no bumping rights, indicating—at most—a scriveners' error. *See, e.g.,* 20 C.F.R. § 639.7(a)(4) ( "[i]t is not the intent of the regulations, that . . . minor, inadvertent errors are to be the basis for finding a violation of WARN."); *Nagel v. Sykes Enterprises, Inc*., 383 F. Supp. 2d 1180, 1198 (D.N.D. 2005) (finding employer did not violate WARN Act for failing to include mention of bumping rights); 54 Fed.Reg. 16042, 16060 (1989) (DOL final rule making noted that minor errors in the notice "should not be the basis for liability."); Exhibit 2 (Bates Nos. 3-6 other WARN letters). Accordingly, affected employees were provided with compliant notice.

AHSW also provided compliant notice to the dislocated worker unit and chief elected officer. This notice must contain the same information as the notice to employees, plus the name and address of the employment site, the job titles of affected positions, and the number of affected employees in each job classification. 20 C.F.R. § 639.7. Complaint letters dated August 8 were sent to the Wheeling Mayor Glen Elliot and West Virginia Dislocated Workers Unit announcing

the permanent closure of OVMC and its related facilities (including its physical address of the main hospital campus), the anticipated closure date of October 1, the number of employee positions believed to be eliminated (736) upon that day, an Exhibit A including all affected job titles, and Dunmyer's contact information. Exhibit 2 (Bates Nos. 3-6 & 15077).

Thus, compliant notice was also sent to all recipients listed in WARN regulations.

### III.   Plant Closing Occurred October 7, 2019 when Plaintiffs Suffered Employment Loss.

The WARN Act requires valid notice, like AHSW provided, to be provided 60 days before a plant closing. A "plant closing" is statutorily defined as a "permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2).[7] An "employment loss" is defined as one of three specific events: (i) an employment termination, other than a discharge for cause, voluntary departure, or retirement; (ii) a layoff exceeding 6 months; or (iii) a reduction in hours of work of more than 50% during each month of any 6-month period. *See* 29 U.S.C. § 2101(a)(6); 20 CFR § 639.3(f)(1). Given these definitions, OVMC did not experience a "plant closing" until October 7, 2019 because 50 or more full-time employees did not experience "employment loss" before that date.[8]

---

[7] AHSW notes that, according to its census, it had 92 part time employees as of August 2019 which cannot be used to determine if a plant closing occurred. Exhibit 2 (Bates No. 14758). Further, AHSW employed 110 individuals who worked away from OVMC's main campus on Eoff Street in Wheeling. *Id.* (Bates No. 91-2018 & 14787-15015). Employees at these varied sites provided a range of different medical services (and thereby had different operational purposes) and used separate staff. Thus, AHSW argues these employees would not count towards plant closing as they are not on a "single site of employment." 20 C.F.R. § 639.3(i)(4).

[8] Plaintiffs use a chart to visually demonstrate the alleged percentage of OVMC employees who had hours reduced to zero after the September 4 suspension. The calculation/methodology of this chart is unclear, as it is not explained by Plaintiffs in the motion to certify class, but it does not appear to account for the 92 part time employees who are expressly excluded from the definition of plant closing, 6 retired employees who are expressly excluded from the definition of employment loss, the 171 who voluntarily resigned between August 7-October 7 expressly excluded from the definition of employment loss, the 110 who worked away from OVMC's main campus and therefore are not on a "single site of employment," the 118 employees who clocked in and worked regular hours or used PTO on October 7, 2019 and cannot logistically have suffered an "employment loss" prior to that date, or the 108 casual/per diem employees that had no legal expectation to work. *See, e.g.,* Bates No. 16769. Thus, Plaintiff's argument and

19

Plaintiffs have been clear in discovery—they only claim they suffered an "employment loss" under the first event, which is an "employment termination." *See* Exhibit 11 (Discovery Responses of Plaintiff Wines at RFA 1-5). Plaintiffs also concede that they did not suffer an "employment loss" under the third event (reduction in hours). *Id.* However, Plaintiffs argue that they nonetheless suffered an "employment termination" because their work hours were reduced (in some cases to zero) prior to October 7. [CM/ECF Doc. No. 124 p. 11-12)]. This is—at best— a warped interpretation of the statutory definition of "employment loss." The WARN Act clearly expresses the conditions under which a "reduction in hours of work" becomes an "employment loss," namely when an employees' hours are reduced more than 50% during each month of any 6-month period. *See* 29 U.S.C. § 2101(a)(6); 20 CFR § 639.3(f)(1). Plaintiffs conveniently ignore these conditions, since they admittedly cannot meet them, and urge the Court to take the same idea (reduction of hours) and deem it "employment termination" instead. This is contrary to the express wording of the WARN Act, which already contains the specifications for a reduction of hours.

Furthermore, Plaintiffs' argument would render 20 CFR § 639.3(f)(1)(iii) redundant—after all, a lesser reduction of hours (i.e. less than 50% in each month of past 6 months) could always just be a "employment termination" under 20 CFR § 639.3(f)(1)(i), and there would never be a need for the more stringent "reduction of hours" definition in 20 CFR § 639.3(f)(1)(iii). General principles of statutory construction, however, require a court to construe all parts to have meaning and to reject interpretation that render a term redundant. *PSINet, Inc. v. Chapman,* 362 F.3d 227, 232 (4th Cir. 2004); *Virginia v. Browner*, 80 F.3d 869, 877 (4th Cir. 1996) (court cannot "construe a statute in a manner that reduces some of its terms to mere surplusage"). Taken together, Plaintiffs cannot be permitted to rewrite when a "reduction of hours" constitutes an "employment loss."

supporting chart are misleading as to numerical content, in addition to improperly conflating reduction of hours with employment termination.

Their allegation that they suffered an "employment termination" prior to October 7, 2019 simply because their working hours were reduced is not supported by the clear, unambiguous wording of the WARN Act or general rules of statutory interpretation.

Instead, the DOL provides some insight on what an "employment termination" is, and urges it to have its "common sense meaning," which is the "the permanent cessation of the employment relationship." 54 FR 16042-01. A reduction of hours is simply not a permanent cessation of the employment relationship, as traditional employment related to layoffs, hour cuts, furlough, unpaid time off, flexing, TLO, unexempt status, and at will employment all make clear. Additionally, there is ample evidence that the employment relationship between Plaintiffs and AHSW did not permanently cease until October 7, 2019:

- Payroll records demonstrate Plaintiffs' termination date to be October 7, 2019 due to low census, except for Plaintiff Garan who is listed as having resigned to start new employment on September 13, 2019. Exhibit 2 (Bates No. 14758).

- In a September 3 e-mail from Plaintiff Reed summarizing the meeting in which management was informed of the suspension of certain services, he reports employees "will not be laid off at this time" and would not be laid off prior to October 7. REED_00001. Additionally, employees were informed of how to apply for low earnings unemployment compensation by getting "low earning slips from HR" as opposed to total unemployment compensation. *Id*. This indicates employment was not terminated when certain services were suspended.

- All Plaintiffs admit to having their usual employer-sponsored dental, vision, and health insurance coverage through October 31, 2019. Schenkel 18:2-19:7; 66:20-23 (employee understood coverage continued through October 31); WINES_000014 (Healthplan letter notes coverage ends October 31); *see, e.g.*, Exhibit 11 (RFA Nos. 6-7); Exhibit 12 (Schenkel Discovery Responses at RFA Nos. 6-7); Exhibit 13 (Reed Discovery Responses at RFA No. 5-8). Documents provided to employees, including the August 7 Q&A and August 8 letter, clearly state that insurance coverage will continue through the end of the month in which an employee is terminated. Exhibit 2 (Bates No. 82 & 6707-6712).

- Employees like Plaintiff Wines admit to having an employer-sponsored 401(k) retirement plan through October 7. Exhibit 11 (RFA No. 8).

- Employees like Plaintiff Ullum admit they were not required to return company prior to October 7. Exhibit 14 (Ullum Discovery Responses at RFA No. 6).

- Accrued and unused PTO was paid out to employees after October 7, like Plaintiff Reed who received all his outstanding PTO pay on payroll register dated October 19, though his last day of clocking in to work regular hours was September 23, in a prior pay period. Exhibit 2 (Bates Nos. 1553 & 1787). This process was explained in the August 7 Q&A. Id. (Bates No. 6708 "your accrued hours of PDO/PTO will be paid out in full at your base rate of pay following your separation of employment from the hospitals"). This again indicates employment permanently ceased October 7.

- Though not at their full time levels, Plaintiffs were continuing to clock in and work regular hours or use PTO after the suspension of services on September 4, 2019. For example, Plaintiff Wines worked regular hours on September 5, 6, 9, 11, 12, 16, 17, 18 and October 1 and 2. She also received paid time off pay on payroll registers dated October 5 and October 19. Plaintiff Reed worked regular hours on September 6, 9, 11-13, 16-20, 23. Plaintiff Schenkel clocked in and worked regular hours at OVMC on September 9, 11, 17, 20, 23, 25 and used paid time for October 1-2. Exhibit 2 (Bates No. 16769, 91-2018 & 14787-15015). Plaintiffs could not simultaneously have suffered an employment termination while working some hours and/or using PTO.

- Deposition testimony confirms that employees, including Plaintiffs, had been flexed off in the past when patient census was low, in line with both OVMC and industry common practice, without it being construed as a permanent cessation of the employment relationship. Sarrao 163:-166:10; Dunmyer 38:9-39:5; Garan 42:3-7; Schenkel 21:14-21 (noting there were "slow periods" in which that would happen "frequently"); Wines 12:3-7.

- The August 7 Employee Q&A clearly stated that employment may continue after October 7 if buyer or other investment was found. Exhibit 2 (Bates No. 6707-12).

Thus, the evidence shows that the employment relationship between AHSW and Plaintiffs did not permanently end until October 7, even if hours were lower than normal in the few weeks prior. Plaintiffs have provided no basis that their employment terminated prior to October 7 other than this reduction of hours, which is admittedly insufficient to satisfy the "reduction of hours" standard for "employment loss." Accordingly, Plaintiff have failed to show any evidence that they (or any other OVMC employee) suffered an "employment termination" as that term is statutorily defined prior to October 7. Given that all of the Plaintiffs' "employment terminations" occurred on October 7, that is the date when there was sufficient "employment loss" to constitute a "plant

closing."[9] Given the October 7 "plant closing" is 60 days after the employees were given notice via August 7 email, press release, Employee Q&A, and August 8 letter, there is no violation.

## IV.    In The Alternative, AHSW Qualifies For The Faltering Business Exception.

In the alternative, the WARN Act contains a "faltering company" exception which allows an employer to give less than 60 days' notice under certain circumstances if, at the time that notice would have been required, the employer "was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business." 29 U.S.C. § 2102(b)(1).

Here, AHSW qualifies for the faltering company exception and may give less than 60 days' notice of a plant closure. In the many months leading up to the closure of OVMC, AHS and AHSW (the employer) pursued every possible avenue of securing capital, investment, buyer, or strategic partner to keep all or part of OVMC open including, but not limited to, the following:

- In person meeting and ongoing discussions from October 2018-April 2019, with Steward Health about acquiring OVMC. Sarrao 117:4-14; Dunmyer 14:11-16:16.
- Site visits and discussions in March 2019 with NeuroPsychiatric Hospitals about purchase of OVMC and/or adding additional services to OVMC. Exhibit 10 (No. 5-7).
- Site visits and discussions April 2019 - October 2019 with Trinity Health about acquiring OVMC. An NDA was executed August 8, 2019. Bates Nos. 34991-2.
- Discussions with Wheeling Hospital (under operation of both R+V Associates and WVU Health) in spring and summer of 2019 about acquiring OVMC, including meetings on July 15-17, 2019. Dunmyer 14:11-17:17; Sarrao 98:2-100:9.
- Discussions, including completion of NDA, with Monarch Health Services Group in early July 2019 regarding potential acquisition of OVMC. Bates No. 34110, 35536.

---

[9] All other OVMC employees share the same October 7 "employment termination" and "employment loss" date unless they quit to start a new job before that date. These employees who quit, like Plaintiff Garan, are excluded from the definition of "employment loss" because they were a "voluntary departure." 20 CFR § 639.3(f)(1)(i). Plaintiffs argue in the motion for class certification that these employees are not voluntary departures. However, the DOL interpreted that an "employment termination" does not occur when "a worker who, after the announcement of a plant closing or mass layoff, decides to leave early" unless the worker was forced to quit because of a "hostile or intolerable work environment" or "pressure or coercion." 54 Fed. Reg. 16042, 16048 (1989); *accord Long v. Dunlop Sports Grp. Americas, Inc.*, 506 F.3d 299, 304 (4th Cir. 2007). Here, there are no allegations of a hostile/intolerable work environment, or any pressure or coercion—merely fewer hours. Thus, employees like Plaintiff Garan who resigned prior to October 7 and began a new job did not suffer "employment loss" as that term is statutorily defined.

- Discussions, including completion of NDA, with Allergy Services of America LLC, as of July 12, 2019 regarding potential acquisition of OVMC. Bates No. 34980-2.
- Discussions, including completion of NDA, with Access Ohio as of July 2, 2019 regarding potential assistance to OVMC. Bates No. 34115.
- Meeting with WV Healthcare Authority on July 15-17, 2019. Dunmyer 24:5-25:7.
- Discussions with Northwood Health, including execution of NDA, as of August 5, 2019 about acquiring psych services at OVMC. Bates No. 35012-3.
- Discussions with WVU Medicine about it acquiring OVMC. In late August 2019, there were discussions about WVU leasing certain buildings and operating psychiatric services at OVMC, a meeting held July 1, 2019, and an NDA was executed August 19, 2019. Bates Nos. 35071-2; Dunmyer 14:11-15:4. & 58:15-59:7; Sarrao 99:11-24.
- Site visits, in-person meetings, and ongoing discussions from May 2019 to September 2019 with Prime Healthcare about it acquiring OVMC. An NDA was signed August 18, 2019. Bates No. 34942. Numerous individuals at AHS and AHSW testified that, based on the long standing relationship between certain individuals at AHS and Prime, Prime remained a viable option in the "11th Hour." Krissman 35:13-36:7; Sarrao 109:17-111:22; Dunmyer 13:23-17:17.
- Approach of UPMC in the summer of 2019 about their interest in OVMC.
- Discussions in summer of 2019 with CommonSpirit Health about buying OVMC.
- Discussions, including completion of NDA, with GR&W, Inc dba Harmony, R.O.O.T.S. & Transformations TMS as of August 14, 2019 regarding acquisition of psych services at OVMC. Bates No. 35078-80.
- Discussions, including completion of NDA, with Firm Healthcare System LLC as of August 20, 2019 regarding potential acquisition of OVMC. Bates No. 35103-4.
- Discussions, including completion of NDA, with a physicians group based in Atlanta as of August 16, 2019 regarding potential acquisition of OVMC. Bates No. 34927-8.
- Discussions, including completion of NDA, with Cleveland Primecare Belmont as of July 13, 2019 regarding potential acquisition of OVMC. Bates No. 34110.
- Discussions, including completion of NDA, with an interested buyer represented by John Scott Law as of September 22, 2019 regarding potential acquisition of psych services at OVMC. Bates No. 35624-5.
- Discussions, including completion of NDA, with Acadia Healthcare as of July 16, 2019 regarding potential acquisition of OVMC.
- Discussions, including completion of NDA, with Diamond Health as of September 18, 2019 regarding potential acquisition of psychiatric services at OVMC. Bates No. 34927-8, 35581.
- Discussions, including completion of NDA, with ICA Group as of September 10, 2019 regarding potential assistance to OVMC. Bates No. 34173.
- Discussions with Universal Health Services in August 2019 about acquiring psych services at OVMC. Bates No. 34972.
- Discussions in August 2019 with City of Wheeling/Redevelopment Partnership, the regional redevelopment authority. REP sent had two developers tour older buildings at OVMC to determine if there are redevelopment opportunities.

- There were discussions with two different investors in the spring and summer of 2019 about purchasing EORH as an operating hospital, which could ease the strain on OVMC and potentially allow it to remain open.
- On September 9, 2019, there were inquiries/teasers sent to the following health systems/hospitals, regarding acquisition of EORH: Cleveland Clinic, Metro Health, Ohio Health, Adena Regional Medical Center, Ashtabula County Medical Center, Bon Secours Mercy, Fairfield Medical Center, Genesis Health System, Lima Memorial Hospital, Marietta Memorial Hospital, Salem Community Hospital, Southwest General Health Center, and St. Vincent Charity Hospital. This could ease the strain on OVMC and potentially allow it to remain.
- Approach of Washington Health Systems in Washington, PA about buying OVMC.
- Ongoing discussions with Congressman David B. McKinley, Senator Joe Manchin, and Senator Shelley Moore Capito and their staff about efforts to keep OVMC operating.
- Ongoing communications and discussions with Congressman Bill Johnson, Jobs Ohio, and representatives of Belmont County, Ohio about potential support for EORH, which could ease the strain on OVMC and potentially allow it to remain open.
- Meeting with Wheeling community leaders, local business leaders, and elected officials about OVMC and/or EORH and opportunities to support both hospitals. Meetings were held on July 15-17, 2019 and August 19, 2019 with more than 15 local elected officials.
- Discussions with West Virginia Attorney General Patrick Morrisey on August 9, 2019 regarding OVMC's and EORH's struggles, harm caused by Wheeling Hospital, and support needed for OVMC and EORH.
- Meeting with West Virginia DHHR on July 15, 2019 2019 asking for support.
- Correspondence to the Most Reverend Mark E. Brennan, Bishop of the Catholic Diocese of Wheeling-Charleston, dated September 2, 2019 seeking assistance for OVMC or the Diocese's acquisition of OVMC. Bates No. 16430-16432.
- Correspondence with Governor Jim Justice dated September 2, 2019 regarding the challenges faced by OVMC and EORH and proposing a solution to maintain the operations of OVMC. Bates No. 16435-16440; Dunmyer 23:22-25:1.

Additionally, AHS and AHSW also sought additional money to serve as operational funds to

keep OVMC open, including:

- Defendants analyzed financial records and determined that traditional secured loans were not an option, as all accounts receivable and other assets were already used as collateral. Sarrao 101:11-103:4; Bates No. 364).
- Defendants asked MPT numerous times for money in 2018 and 2019 but were denied, except for MPT permitting AHSW to continue to operate OVMC without paying rents due under the lease from October 2018 on. Sarrao 40:10-45:18; Krissman 17:23-18:15 & 27:19-29:9.
- Defendants maxed out the line of credit. Sarrao 50:17-53:20; Krissman 41:19-46:5.
- AHS and AHSW asked White Oak and CNH, the lenders for the accounts receivable line of credit, for over-advancements, increased borrowing capacity, to lift reserves, and to credit them with different types of AR, all in an effort to secure additional operating capital. Sarrao 50:17-53:20; Krissman 17:23-18:15 & 27:19-29:9.

- In June 2019, AHSW specifically asked MPT for a $20 million loan to support operations.  MPT denied the request. Sarrao 40:10-45:18.
- Defendants specifically sought unsecured loans and/or grants from the state and federal government to provide OVMC with operational funds. Sarrao 102:13-104:3.
- Defendants, led by Dunmyer, negotiated with vendors regarding debts and liabilities in an effort to manage, control, or minimize operational costs. Dunmyer 17:18-18:10.

Thus, Defendants made exhaustive efforts to secure funding or sale that would keep OVMC operating, and these efforts continued throughout the summer of 2019. Even assuming Plaintiffs' argument that OVMC suffered a "plant closing" on September 4, 2019 is true (which Defendants strongly oppose), then notice would have been required 60 days prior on July 6, 2019. At or around that time, AHS and AHSW were actively engaging in discussions with numerous potential purchaser or investors, notably WVU Health, Allergy Services of America LLC, Access Ohio, Primecare Belmont, and Acadia. Additionally, that is at or around the same time Defendants were having meetings with DHHR, elected officials in Wheeling and Martins' Ferry, and otherwise seeking investment from public sources. Given this timeline, AHSW "was actively seeking capital or business" in early July 2019 when Plaintiffs contend notice would have been required. This satisfies the first portion of the faltering business exception.

The exception requires, however, that the capital or business sought to be enough to "avoid or postpone the shutdown." Here, if another healthcare system had decided to purchase all or part of OVMC, it would have enabled AHSW to continue operating for at least a while longer, much like how OVMC was able to remain open after AHSW saved it from bankruptcy and financial distress in June 2017. When it came to capital, an influx of a $1 million dollars would have helped the hospital "break even" and remain open for longer, while a larger influx of $20 million would have allowed the hospital to make long-term improvements and reinvest profits. Sarrao 106:9-20. Here, the Defendants were seeking that amount of capital from multiple sources, including a $20 million loan from MPT and various relief measures from CNH. Sarrao 40:10-53:20; Krissman

17:23-18:15, 27:19-29:9 & 41:19-46:5. And though they did not seek a specific figure in unsecured grants or loans from the government, it was clear they were seeking enough to keep OVMC open. Sarrao 102:13-104:3. Thus, AHS' and AHSW's efforts to secure a buyer or additional funding from existing creditors or the government would have been enough to "avoid or postpone the shutdown" of OVMC.

Importantly, AHSW (the employer) "reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business" as required by the exception. As detailed above, it is undisputed that once the closure announcement was publically made on August 7, 2019, things got worse: patient volume dropped, staff resigned, health provider departed, medical services were restricted, and vendors withheld medical supplies. Schenkel. 55:9-56:8; 59:1-7; Garan. 46:10-15; Reed. 53:24-57:13; Sarrao. 152:2-155:5; Wines 56:16-22; Ullum 47:4-13; Dunmyer 31:18-33:4; Krissman 44:4-45:15. Inaccurate reporting, backlashing community opinion, and critical public statements by elected officials also decreased goodwill, which is a serious issue for a hospital. Sarrao 173:24-174:177:2; Bates No. 16435-16440. These negative effects of the August 7 announcement not only forced AHSW to suspend certain services in September 2019, but also made it infinitely more difficult for AHSW or AHS to market OVMC as a viable option for investment or purchase. Krissman 30:16-31:20 (noting loss of staff after WARN notice would be major concern for potential purchaser); Sarrao 154:23-155:1 (noting "once you announce a closure, or beginning the closure process, kind of everything breaks loose"); Dunmyer 26:12-27:17 (closure announcement added "urgency" and gave "leverage" to potential buyer/investor in an already "difficult" negotiation process). Thus, AHSW had a reasonable and good faith belief that providing WARN notice would have prevented or hindered it from obtaining the needed capital or buyer.

In light of this evidence, AHSW satisfies the faltering business exception under the WARN Act as long as notice was provided as "soon as practicable" and contained a "brief" explanation of the shorten notice period. The WARN Act does not specify what the brief statement must contain. *See* 29 U.S.C. § 2102(b)(3); 20 C.F.R. § 639.9. Here, both are satisfied. The decision to close OVMC was made August 5 or 6. Dunmyer 19:5-22:24; Sarrao 130:12-131:2. Within 24-48 hours, employees had verbal and written notice that OVMC would be permanently closing on October 7. A letter followed on August 8. Exhibit 2 (Bates No. 82, 6707-6712). This is as soon as practicable.

Additionally, the press release detailed recent financial losses, an "exhaustive but unsuccessful search for a strategic partner or buyer," unfruitful discussions with over 15 other healthcare providers, unfair competition by Wheeling Hospital, low patient volumes, and other factors leading to the closure. *Id.* The Q&A also provided information on the Defendants' attempts to find a buyer, that no offer had been made yet, and that the October 7 date was subject to change if a buyer came forward. *Id*. A second set of Employee Q&A circulated to staff provided even more detail on the Defendants' efforts to find a buyer. *Id.* (SCHENKEL19-22). Finally, on September 3, 2019, Dunmyer e-mailed all OVMC staff to inform them that a suspension of services would be occurring, specifically stating that, "as [employees] are aware our census has dropped significantly since our announcement in August" and AHSW "cannot continue to offer the services when we have dropped to so few of numbers." *Id.* (Bates No. 3135). The suspension was because AHSW was "just not able to maintain an adequate number of patients or staff to continue." *Id*. In doing so, AHSW also provided a brief basis for the decision to suspend services in September. Taken together, the documents circulated to employees on August 7, August 8 and September 3 provided a "brief" explanation of the "basis" for shortened notice—financial struggles, unsuccessful efforts to find a buyer, and backlash from the closure announcement. This

is reinforced by the fact that the notices to the mayor and dislocated workers unit contained explicit citations to this exception in the WARN Act. Exhibit 2 (Bates Nos. 3-6 & 15077).

In conclusion, the AHSW qualifies for the faltering business exception and may provide less than 60 days' notice. Accordingly, there is no violation of the WARN Act.

## V.   **In the Alternative, the Good Faith Exception Applies to Reduce Damages.**

Even if AHSW is found to have violated the WARN Act, the good faith exception permits this Court, in its discretion, to reduce the amount of liability or penalty when an employer satisfactorily proves they acted in "good faith" and "had reasonable grounds for believing that the act or omission was not a violation." 29 U.S.C. § 2104(a)(4). Here, there is ample evidence of both. AHSW provided multiple verbal and written notices to Plaintiffs and OVMC employees within 24-48 hours after the decision to close was made. Exhibit 2 (Bates No. 82, 6707-6712). Those documents made it clear that AHSW intended to fully close OVMC on October 7, which was 60 days away. *Id.* Thus, AHSW had reasonable belief and intention for its notice to comply with the WARN Act. Therafter, AHSW organized employee forums, daily huddles, drafted recommendations for new jobs, provided multiple employee Q&A, arranged for unemployment site visits, and otherwise supported its employees. *See* Schenkel 18:2-19:7; 66:20-23; Exhibit 2 (Bates Nos. 91-2018 & 14787-15075). However, AHSW was forced in September 2019 to suspend certain medical services to ensure patient safety. Exhibit 2 (Bates No. 3135, 16762-3). Nevertheless, AHSW continued to pay Plaintiffs to perform /windup duties at their usual base rate, paid its portion of employee benefits through October 7, and organized a "help list" so employees could work in other departments.[10] Several of the Plaintiffs took advantage of this option.

---

[10] Plaintiffs' claim that employees were reduced to zero hour to save money need only look at the financial documents. With losses in the tens of millions, the value of few weeks of payroll would not have a meaningful impact on AHSW's financial condition. Exhibit 2 (Bates No. 36420-3). Additionally, there is only savings if Plaintiffs did not use PTO, which Dunmyer and others encouraged them to do. Sarrao 181:2-11; Dunmyer 52:20-53:21.

Management also encouraged employees to take PTO to get funds faster. Dunmyer 52:20-53:21. This is all on top of the exhaustive efforts detailed above to find a buyer or funds to keep the hospital open. Taken together, there is sufficient evidence of good faith to warrant reduction—if not elimination—of any damages award for a violation of the WARN Act.

<u>**CONCLUSION**</u>

There is no basis for liability here. AHS is not a single employer with AHSW given the applicable factors. As the sole employer, AHSW provided compliant notice to all required parties on August 7-8, 2019. Plaintiffs cannot demonstrate an "employment loss" within the statutory definition prior to October 7. Sufficient other "employment losses" occurred October 7 to constitute a "plant closing." As AHSW provided notice 60 days prior to that date, there is no violation. In the alternative, AHSW qualifies for the faltering business exception and may provide less than 60 days' notice. If liability is found, the good faith exception applies to reduce damages.

WHEREFORE, Defendants move for summary judgment in their favor on all claims.

**ALECTO HEALTHCARE SERVICES LLC and ALECTO HEALTHCARE SERVICES WHEELING LLC**

By Counsel,

**SPILMAN THOMAS & BATTLE, PLLC**

/s/ Kevin L. Carr
Kevin L. Carr (WV Bar # 6872)
Chelsea E. Thompson (WV Bar #12565)
Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard, East
Charleston, WV  25301
Telephone: 304.340.3800
Fax: 304.340.3801
E-mail: kcarr@spilmanlaw.com
E-mail: cthompson@spilmanlaw.com

Michael S. Garrison (WV Bar # 7161)
48 Donley Street, Suite 800 (Zip: 26501)
P. O. Box 615
Morgantown, WV 06507-0615
Telephone: 304.291.7920
Fax: 304.291.7979
E-mail: mgarrison@spilmanlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

KEITH REED, LISA DOLENCE,
ELIZABETH SCHENKEL, EMILY WINES,
AND MARK GARAN, individually and on
behalf of others similarly situated,

        Plaintiffs,

v.

ALECTO HEALTHCARE SERVICES LLC,
and ALECTO HEALTHCARE SERVICES
WHEELING, LLC d/b/a OHIO VALLEY
MEDICAL GROUP and d/b/a OVMC
PHYSICIANS,

        Defendants.

Case No. 5:19-cv-00263-JPB

District Judge John Preston Bailey

Class Action

<u>**CERTIFICATE OF SERVICE**</u>

    I, Kevin L. Carr, certify that, on July 8, 2022, I served the forgoing "**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**" on the parties via e-mail and U.S. Mail addressed as follows:

Timothy F. Cogan, Esquire
tfc@walslaw.com
Cassidy, Cogan, Shapell & Voegelin, L.C.
The First State Capitol Building
1413 Eoff Street
Wheeling, WV  26003

Aubrey Sparks, Esquire
aubrey@ourfuturewv.org
Bren Pomponio, Esquire
bren@msjlaw.org
Mountain State Justice, Inc.
1217 Quarrier Street
Charleston, WV  25301

Vincent J. Mersich, Esquire
vmersich@stembercohn.com
Maureen Davidson-Welling, Esquire
mdw@stembercohn.com
John Stember, Esquire
jstember@stembercohn.com
Stember Cohn & Davidson-Welling, LLC
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219

F. Alex Risovich, Esquire
alex.risovich@risovichlaw.com
Risovich Law Offices, PLLC
3023 Pennsylvania Avenue
Weirton, WV  26062

    /s/Kevin L. Carr
    Kevin L. Carr (WV State Bar # 6872)