

# Transcript of Michael Sarrao

**Date:** May 19, 2022
**Case:** Reed, et al. -v- Alecto Healthcare Services, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Michael Sarrao
Conducted on May 19, 2022

1 (1 to 4)

---

**Page 1**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2     FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 3                 AT WHEELING
 4  ----------------------------x
 5  KEITH REED, et al.,        :
 6           Plaintiffs,   :
 7     v.                   : Case No.
 8  ALECTO HEALTHCARE SERVICES  : 5:19-cv-00263-JPB
 9  LLC, et al.,               :
10           Defendants.   :
11  ----------------------------x
12
13    Videotaped Virtual Deposition of MICHAEL SARRAO
14             Thursday, May 19, 2022
15                10:39 a.m. CST
16
17
18
19
20
21
22  Job No.:  449917
23  Pages:  1 - 184
24  Reported by:  Tiffany M. Pietrzyk, CSR RPR CRR
```

**Page 2**

```
 1        Videotaped virtual deposition of MICHAEL
 2  SARRAO, pursuant to notice, before Tiffany M.
 3  Pietrzyk, a Certified Shorthand Reporter, Registered
 4  Professional Reporter, Certified Realtime Reporter,
 5  and a Notary Public in and for the State of
 6  Illinois.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1           A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFFS:
 3      MAUREEN DAVIDSON-WELLING, ESQUIRE
 4      STEMBER COHN & DAVIDSON-WELLING, LLC
 5      The Hartley Rose Building
 6      425 First Avenue, 7th Floor
 7      Pittsburgh, Pennsylvania 15219
 8      412.338.1445
 9
10  ON BEHALF OF THE PLAINTIFFS:
11      TIMOTHY F. COGAN, ESQUIRE
12      CASSIDY, COGAN, SHAPELL & VOEGELIN, LC
13      The First State Capitol Building
14      1413 Eoff Street
15      Wheeling, West Virginia 26003
16      304.232.8100
17
18  ON BEHALF OF THE PLAINTIFFS:
19      BREN POMPONIO, ESQUIRE
20      MOUNTAIN STATE JUSTICE, INC.
21      1217 Quarrier Street
22      Charleston, West Virginia 25301
23      304.344.3144
24
```

**Page 4**

```
 1     A P P E A R A N C E S   C O N T I N U E D
 2  ON BEHALF OF THE DEFENDANTS:
 3      MICHAEL S. GARRISON, ESQUIRE
 4      CHELSEA E. THOMPSON, ESQUIRE
 5      SPILMAN THOMAS & BATTLE, PLLC
 6      300 Kanawha Boulevard, East
 7      Charleston, West Virginia 25301
 8      304.340.3800
 9
10  ALSO PRESENT:
11      Dominic Coppola, Planet Depos Remote
12      Technician
13      Jean-Louis Ziesch, Planet Depos Videographer
14
15
16
17
18
19
20
21
22
23
24
```

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

5

```
1            C O N T E N T S
2  EXAMINATION OF MICHAEL SARRAO          PAGE
3    By Ms. Davidson-Welling               8
4
5            E X H I B I T S
6        (Attached to transcript.)
7  DEPOSITION EXHIBITS                     PAGE
8  Exhibit 1   WRITTEN CONSENT OF THE SOLE  54
9              MEMBER OF ALECTO HEALTHCARE
10             SERVICES WHEELING LLC, June 1,
11             2017
12 Exhibit 2   MANAGEMENT SERVICES AGREEMENT 68
13 Exhibit 3   Email to Emmett McLean and  112
14             George Carlis from Mike
15             Sarrao, dated 7/23/2019
16 Exhibit 4   Email String, top email to  131
17             Mike Sarrao from Lou Cohen,
18             dated 7/30/2019
19 Exhibit 5   Email to Tim Peters, et al., 136
20             from Mike Sarrao, dated
21             7/31/2019
22 Exhibit 6   Letter to Jolynn Marra from 143
23             Michael Sarrao, dated
24             August 8, 2019
```

6

```
1           E X H I B I T S (Cont.)
2  DEPOSITION EXHIBITS                     PAGE
3  Exhibit 7   Press Release               157
4  Exhibit 8   Letter to Employees from Dan 178
5              Dunmyer, dated August 8, 2019
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

7

```
1            P R O C E E D I N G S
2       THE VIDEOGRAPHER:  This is the beginning of
3  Media Number 1 of the videotaped deposition of
4  Michael Sarrao, in the matter of Keith Reed, et al.
5  versus Alecto Healthcare, et al. in the U.S.
6  District Court for the Northern District of
7  West Virginia, case number 5:19-CV-00263-JPB.
8       Today's date is May 19, 2022.  The time on
9  the video monitor is 10:39 a.m. Central Standard
10 Time.
11      The certified videographer today is
12 Jean-Louis Ziesch, representing Planet Depos.  This
13 video deposition is taking place remotely.
14      Would counsel please identify yourself and
15 state whom you represent.
16      MS. DAVIDSON-WELLING:  Maureen
17 Davidson-Welling, on behalf of the plaintiffs.
18      MR. COGAN:  Timothy Cogan, on behalf of the
19 plaintiffs.
20      MR. POMPONIO:  Bren Pomponio, on behalf of
21 the plaintiffs.
22      MR. GARRISON:  Good morning.  Mike Garrison
23 and Chelsea Thompson, Spilman Thomas and Battle, on
24 behalf of the plaintiff.
```

8

```
1       THE VIDEOGRAPHER:  The court reporter today
2  is Tiffany Pietrzyk, representing Planet Depos.
3       Would the court reporter please swear in the
4  witness.
5            (Witness sworn.)
6       THE VIDEOGRAPHER:  You may proceed.
7  WHEREUPON:
8            MICHAEL SARRAO,
9  called as a witness herein, having been first duly
10 sworn, was examined and testified as follows:
11            EXAMINATION
12 BY MS. DAVIDSON-WELLING:
13    Q. Good morning, Mr. Sarrao.
14    A. Good morning.
15    Q. So my name is Maureen Davidson-Welling.  And
16 I'm going to be taking your deposition today.  I
17 guess as a starting point, I'll ask you to state
18 your full name for the record.
19    A. Michael Joseph Sarrao.  The last name is
20 spelled S-a-r-r-a-o.
21    Q. And, Mr. Sarrao, have you ever been deposed
22 before?
23    A. I have.
24    Q. How many times?
```

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

3 (9 to 12)

9

1    A. I would say between 15 and 20 times.
2    Q. So you're an old hand at this?
3    A. I don't know that, but I'm familiar with
4 depositions and all that, yes.
5    Q. All right.  So we will very briefly go over,
6 you know, just a few points, but I'm not going to go
7 through all the instructions unless you think you
8 need them?
9    A. I don't need all the instructions.
10    Q. Okay.  All right.  So, you know, if you need
11 a break, you know, you're welcome to take a break.
12 All I ask is that you don't ask for a break when a
13 question is pending.
14        Fair enough?
15    A. Okay.
16    Q. Okay.  Are you on any medications, or drugs
17 of any kind, that would affect your memory?
18    A. No.
19    Q. Okay.  Is there any reason today that you
20 cannot answer my questions fully and truthfully?
21    A. No.
22    Q. Okay.  And you understand your testimony
23 here is under oath; right?
24    A. I do.

10

1    Q. Okay.  Do you understand that you should not
2 be sending or receiving electronic messages while
3 you're giving testimony on the record?
4    A. Yes, I understand that.
5    Q. Okay.  Will you tell me if you don't
6 understand my question?
7    A. I will.
8    Q. Okay.  Will you tell me if you find my
9 question confusing?
10    A. I will.
11    Q. Okay.  Will you tell me if I have assumed an
12 incorrect fact in a question?
13    A. I will do my best to do that, yes.
14    Q. Okay.  Will you tell me if you don't know
15 the answer to a question?
16    A. Yes.
17    Q. Okay.  Just a word on definitions.  If I
18 refer to Alecto Healthcare Services LLC as Alecto or
19 as AHS, is that okay?
20    A. Yeah, generally, depending on the question,
21 and if I think there needs to be clarification, then
22 I'll provide the clarification.
23    Q. But you know what I'm referring to if I
24 refer to AHS; correct?

11

1    A. Yeah, if you define that as Alecto
2 Healthcare Services LLC, yes.
3    Q. Okay.  And if I refer to Alecto Healthcare
4 Services Wheeling LLC as Alecto Wheeling, will you
5 know what agency I'm referring to?
6    A. Yes.
7    Q. Okay.  If I refer to AHS and Alecto Wheeling
8 collectively as the defendants, will you know who I
9 mean?
10    A. Yes.
11    Q. Okay.  If I refer to Ohio Valley Medical
12 Center as OVMC, is that acceptable?
13    A. Well, technically, it's Alecto Healthcare
14 Services Wheeling LLC doing business as Ohio Medical
15 Center.  There's another entity, Ohio Medical Center
16 Inc., which I don't -- I'm not part of that, was the
17 seller.  So -- but I understand when you mean OVMC
18 what you're referring to is the hospital.  If I have
19 a question about it, I'll ask you about it.
20    Q. Okay.  And if I refer to East Ohio Regional
21 Hospital as EORH, will you know what I mean?
22    A. Generally yes.  Again, if I have a question
23 or need clarification, I'll ask.
24    Q. Okay.  Would you please state your home

12

1 address?
2    A. 34 Glen Echo, Dove Canyon, California,
3 92679.
4    Q. Okay.  And would you state your home phone
5 number?
6    A. I don't use a home phone number.  It's not
7 public.  My cell phone number, which is public, is
8 949-689-2243.
9    Q. Okay.  Is that a personal cell phone or a
10 work cell phone?
11    A. It's the only cell phone I have.  My email
12 address, my email signature block has that, so I use
13 it for work as well.
14    Q. Okay.  Did you do anything to prepare for
15 this deposition?
16    A. I reviewed the discovery responses that I
17 verified in this case.  I verified -- I checked the
18 Alecto operating agreement in case you had questions
19 about the owners of that, just to make sure I had
20 the timing right, and I spoke to my counsel -- our
21 company's counsel.
22    Q. Did you bring any notes or documents with
23 you to today's deposition?
24    A. I brought the discovery responses with me,

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

4 (13 to 16)

---

13

1 and then I brought one page of notes I typed up last
2 night, which is a list of members of Alecto because
3 my handwriting is bad and I didn't want to forget
4 the exact percentages.
5     Q. Okay. All right. Yeah. Well, if you
6 brought those notes, maybe we can get a copy of
7 those and have them later. That might make that
8 simpler?
9     A. That's fine. It's nothing -- no big
10 surprise or anything.
11    Q. Let's see here. Mr. Sarrao, how old are
12 you?
13    A. I am 52.
14    Q. Okay. And what is your educational
15 background?
16    A. I have a bachelor's degree in quantitative
17 economics from University of California San Diego,
18 and I have a juris doctorate degree from the
19 University of San Diego School of Law.
20    Q. All right. And so when did you get your
21 bachelor's?
22    A. 1991.
23    Q. And what about your juris doctor?
24    A. 1996.

---

14

1     Q. Are you presently employed?
2     A. I am self-employed as a lawyer, attorney.
3     Q. Okay. Is there a law firm that you practice
4 for?
5     A. I practice as the sole proprietor as the law
6 offices of Michael J. Sarrao. I'm also of counsel
7 for a firm called McNeil Tropp and Braun, but that's
8 limited to the representation of one hospital, a
9 critical access hospital. It's completely unrelated
10 to any of this stuff.
11    Q. Okay. Are you affiliated in any capacity
12 with AHS?
13    A. Yes.
14    Q. Okay. When did you first become affiliated
15 in any capacity with AHS?
16    A. That would be January 2013.
17    Q. Okay. Before we get there, tell me in
18 really high-level broad brush strokes what you did
19 between 1996 when you got your juris doctor, and
20 2013 when you became affiliated with Alecto.
21    A. So from '96 through 2006, I was in private
22 practice at different firms as -- primarily as a
23 litigation associate, firms in southern California.
24 And then from 2006 to 2012, I was the -- I think,

---

15

1 initially the vice president and general counsel,
2 then senior vice president and general counsel of a
3 healthcare firm called Prime Healthcare Services. I
4 was actually employed by Prime Healthcare management
5 from 2006 to the end of 2012. And then after I left
6 prime, I joined Alecto as an officer of Alecto,
7 became affiliated with Alecto.
8     Q. Okay.
9     A. But from '96 to 2006, I was in different law
10 firms. From 2001 to 2006, I'd say, 95 percent of my
11 work was related to Prime Healthcare.
12    Q. Were you in-house counsel at Prime
13 Healthcare, then?
14    A. Yes, I was general counsel at Prime
15 Healthcare, in-house, from 2006 to 2012.
16    Q. Okay. And then, how is it that you came to
17 leave Prime Healthcare and come to Alecto?
18    A. So a gentleman named Lex Reddy, he had been
19 the president and CEO of Prime Healthcare. He left
20 Prime in -- when I say Prime, I mean Prime
21 Healthcare and all its different entities -- in
22 February 2012. I think he started Alecto in
23 September or October of 2012. A gentleman named
24 Roger Krissman had been the CFO at Prime. I worked

---

16

1 with him as well. He left in July of 2012, and I
2 think, joined Mr. Reddy in October 2012 with Alecto,
3 and I had discussions with them probably November
4 and December, would you like to come join us, work
5 with us with Alecto, so that's how I joined Alecto.
6 So I left Prime -- I actually did some work for
7 Prime when I first left, and then I started doing
8 work with Alecto.
9     Q. Okay. So after you joined -- well, so what
10 capacity did you join Alecto in, in January of 2013?
11    A. So I've been -- well, in January 2013,
12 executive vice president, general counsel, and
13 secretary of Alecto. I've been an officer of Alecto
14 since 2013. Never been an employee of Alecto.
15    Q. Okay. In addition to -- so, okay -- so, I
16 think you told me, you started at AHS as an
17 executive vice president, general counsel, and
18 secretary; correct?
19    A. Correct.
20    Q. Okay. Did you change roles after that?
21    A. Well, I had different role -- I mean,
22 different roles. So Alecto has subsidiaries or
23 affiliates. And I'm generally an officer of those
24 subsidiaries and affiliates. For Alecto Wheeling, I

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

**17**

1 was the CEO for an initial period of time -- I
2 think from January -- when it was first formed by
3 Alecto Ohio Valley in January '17, to right before
4 the closing of when we acquired the hospital June 1,
5 2017, I was the CEO, and then Mr. Reddy became the
6 CEO again. I was primarily there for purposes of
7 finance, given the applications and what not.
8      But other than that, no my role hasn't
9 changed. I've been executive vice president,
10 general counsel and corporate secretary the whole
11 time. And then, at some period of time -- I'm
12 trying to remember -- probably in end of 2013 to
13 2014, I joined the board of managers of Alecto
14 Healthcare Services LLC, and I've been in that role
15 the -- since that time.
16   Q. What year did you say you started on the
17 board of managers for AHS?
18   A. I want to say it's probably the end of 2013,
19 beginning of 2014. Dr. Jay Kumar had been on the
20 board of managers. He stepped down as a member of
21 the board of managers, and I became a member of the
22 board of managers. I don't remember the exact date,
23 but I want to say it's probably the end of 2013,
24 beginning of 2014.

---

**18**

1   Q. Okay. Now, you mentioned that you are
2 also -- have a service corporate officer for some of
3 Alecto's subsidiaries.
4      Which ones have you served as corporate
5 secretary, or as a -- in a corporate officer role?
6   A. Well, whatever subsidiaries Alecto has, I've
7 been the executive vice president, general counsel,
8 and secretary for. So, as it relates to this case,
9 Alecto Ohio Valley direct subsidiary, I'm the
10 executive vice president, general counsel, and
11 secretary. Alecto Wheeling and Alecto Martins Ferry
12 are indirect subsidiaries, perhaps more affiliates,
13 and I serve in that role as well. And then, Alecto
14 has other subsidiaries or affiliates where I serve
15 in that role.
16   Q. Okay. So, in the sort of 2017 to 2019 time
17 frame, you served as the executive vice president,
18 general counsel and corporate secretary for AHS, AHS
19 Ohio Valley and also Alecto Wheeling?
20   A. Let me clarify that. I was wrong on that.
21 I actually wasn't the general counsel for those
22 entities. I was the executive vice president and
23 secretary for Alecto Wheeling, Alecto Martins Ferry
24 and Alecto Ohio Valley. As I said earlier, for the

---

**19**

1 initial period of time after Alecto Ohio Valley
2 formed, Alecto Wheeling and Alecto Martins Ferry, I
3 was the CEO as well for a period of time, from
4 like -- I know they were formed in January. Until
5 like, end of May, I served as the CEO of those
6 entities as well. And then end of May, I stepped
7 back and Mr. Reddy became the -- he would have been
8 the president the whole time, also became the
9 corporate CEO of those entities.
10   Q. Okay. So in the 2017 to 2019 time frame,
11 the leadership of the subsidiaries and the AHS was
12 basically the same group of people?
13   A. No. I would disagree with that. So those
14 subsidiaries that operate hospitals had people at
15 the hospitals that were -- served as like hospital
16 CEO, a hospital CFO. Between '17 and '19,
17 Mr. Krissman was there. Then Mr. Krissman retired.
18 There's different people involved in the leadership
19 of those entities.
20   Q. But they had the same corporate officers?
21   A. No, that's not true, because Mr. Krissman
22 retired at a period of time in 2019, was no longer a
23 corporate officer.
24   Q. What was Mr. Krissman's position besides --

---

**20**

1 after he was no longer the corporate officer?
2   A. He's a -- he has a membership interest in
3 Alecto Healthcare Service LLC, but when he retired,
4 he no longer had a position. I believe he retired
5 the end of 2019.
6   Q. Okay. And when he retired -- when he
7 retired, did he retire from his corporate officer
8 positions with both AHS and its subsidiaries?
9   A. He retired from any officer position he had
10 with Alecto or any of its related entities. Whether
11 a subsidiary or affiliate, but any related entities,
12 yes.
13   Q. Do you have an ownership interest in AHS?
14   A. I do.
15   Q. Okay. How long have you had that ownership
16 interest?
17   A. Since 2013. Probably February or March of
18 2013.
19   Q. Okay. And what is your membership interest
20 percentage-wise?
21   A. As of today, it's like 7.42 percent, I
22 think? Prior to 2021, it was 7 percent.
23   Q. How many members are there, currently, of
24 AHS?

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

6 (21 to 24)

---

**21**

1    A. Eight members -- seven or eight members.
2    Q. And is that -- has that figure sort of held
3 steady throughout the time that you've had a
4 membership interest?
5    A. No. Since 2017, it has. Prior to 2017,
6 there were initially less. Then some additional
7 people were added as members. But since
8 January 2017, that number has been the same.
9    Q. Okay. And you mentioned the board of
10 managers. What is the board of managers of AHS?
11    A. AHS is managed by a board of managers. And
12 so the board of managers acts as the -- manages the
13 AHS. Not the day-to-day operations, but certain key
14 decisions, the board of managers of AHS. That's
15 what it is. AHS is an LLC, so it's somewhat similar
16 to board of directors, but it's a bit different than
17 board of directors. Alecto's operating agreement
18 spells out the role of the board of managers.
19    Q. How many managers are on the board of
20 managers at any given time?
21    A. Well, it would depend what time we're
22 talking about. Currently there's two. In prior
23 periods there were three.
24    Q. Okay. In the 2017 through 2019 time frame,

**22**

1 who were the managers on the board of managers of
2 AHS?
3    A. Until Mr. Krissman retired, there were
4 three: It was myself, Mr. Krissman, and Lex Reddy.
5 And then, when Mr. Krissman retired, it was just
6 myself and Mr. Reddy.
7    Q. Did Mr. Krissman retire in August of 2019?
8    A. I think his official retirement date was
9 July 31st of '19.
10    Q. I'm going to ask you just a few questions
11 about your duties in each of these roles that you've
12 had. And I want to sort of focus in on the 2019
13 time frame.
14    A. Okay.
15    Q. So what were your duties as an executive
16 vice president of Alecto in 2019?
17    A. My duties as Alecto, (indiscernible) Alecto
18 as executive vice president and general counsel, so
19 90 percent of my time was related to legal matters,
20 providing legal advice to Alecto. I served on the
21 board of managers, but provided legal advice to
22 Alecto. So anything that had to do with legal, be
23 it corporate formation issue, contracts, litigation,
24 anything that has to do with legal, I was

**23**

1 responsible for that.
2    I also supervised, at that time, another
3 attorney, and we had an assistant as well that I
4 supervised. So -- but anything to do with legal and
5 Alecto and then its subsidiaries, so for example, in
6 West Virginia we had local counsel so I was involved
7 with engaging local counsel, discussions with local
8 counsel, quote, managing local counsel, reviewing
9 bills, all kinds -- anything to do with legal is
10 what I was responsible for.
11    Q. And with respect to your -- were the -- were
12 your duties as the executive vice president distinct
13 from your duties as general counsel?
14    A. I didn't view them as different, no.
15    Q. Okay.
16    A. Or distinct.
17    Q. All right. What were your duties in 2019 as
18 a member on the board of managers -- as a manager on
19 the board of managers?
20    A. So if there were decisions to be made by the
21 board of managers, I would be a person making those
22 decisions. Sometimes, as it relates to financing or
23 what not, the board of managers would -- we did
24 things by written consent. So we would execute a

**24**

1 written consent, I would execute those written
2 consents.
3    Q. Any other duties as manager on the board of
4 managers?
5    A. As issues came up that needed to be
6 discussed among the board of managers, I would
7 participate in those discussions with Mr. Reddy and
8 Mr. Krissman collectively.
9    Q. Okay.
10    A. And then we had the oversight role over AHS
11 as the board of managers, and that was done on a
12 day-to-day basis. But it wasn't like we had a
13 formal meeting of the board of managers every day.
14    Q. I mean, there were only two, or maybe three
15 of you; right, so...
16    A. Correct.
17    Q. Okay. Okay. So if I understand you
18 correctly, your EVP and general counsel duties were
19 the same duties, and that was primarily providing
20 legal advice; is that right?
21    A. That's correct.
22    Q. Okay. And your duties as a manager on the
23 board of managers, including -- included making
24 decisions and exercising oversight of AHS as

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

25

1  necessary and executing written consents?
2      A.  Yeah.  And the operating agreement for
3  Alecto, or the LLC agreement for Alecto, specifies
4  the decisions the board of managers would need to
5  make.  And so, those were the type of decisions the
6  board of managers would make, rather than the
7  day-to-day stuff for Alecto.
8      Q.  Okay.  Is it fair to say that the board of
9  managers sort of handled the, sort of the bigger,
10 bigger, you know, sort of, more important decisions
11 that were made within the organization?
12     A.  That would be relatively accurate, yeah.
13 The operating agreement provides for certain things
14 and the board has to approve, and certain things you
15 typically have the board of managers approve as
16 well.  You have a consent by the board of managers.
17     Q.  Did you have any duties in the 2019 time
18 period separate and apart from your duties to AHS
19 with respect to the subsidiaries?
20     A.  Well, I served as the corporate secretary
21 for the subsidiaries, so those duties would include,
22 you know, maintaining minutes, but primarily written
23 consents if it did act.  The subsidiaries generally
24 acted by written consent, so I maintained those,

26

1  maintained the corporate records, making sure the
2  annual filings were done with, for example, Alecto
3  Wheeling was registered in Ohio, West Virginia,
4  Delaware, making sure those corporate filings were
5  done.
6          And then certainty as it relates to certain
7  things, I met with, like, the governor in
8  West Virginia.  I met with various different people
9  at different times in the state of West Virginia or
10 the state of Ohio as an executive vice president of
11 Alecto Wheeling and Alecto Martins Ferry.  Sometimes
12 I would sign contracts on behalf of Alecto Wheeling
13 or Alecto Martins Ferry.  Typically they would be
14 signed by the hospital CEO, but I'm sure there was a
15 contract or two out there that I had signed as the
16 executive vice president.  And I also helped with
17 the certificate of need application for the
18 transaction involving Ohio Valley Medical Center.
19     Q.  Okay.  I don't think I asked you, did you
20 have duties as corporate secretary for AHS?
21     A.  Yeah.  My duties as corporate secretary
22 were, again, maintaining the corporate records,
23 primarily written consents, occasionally we do
24 amendments to the -- I think it's actually an

27

1  operating agreement for AHS -- to the AHS operating
2  agreement.  Making sure the filings were done.  So
3  AHS has filings in California and Delaware, and so
4  making sure those annual filings were done with the
5  secretary of state.  So those would be -- I don't
6  think we did any amendments.  So anything corporate
7  filing related, those would be my duties as
8  corporate secretary.  And if there was a written
9  consent too, I would draft the written consent.
10 That's probably more legal, but I would maintain
11 those, and maintain the corporate minute books.
12     Q.  How did you decide what actions needed to be
13 affected by written consent?
14     A.  Generally if it was a requirement to have
15 the written consent.  For example, if you're
16 borrowing money, you typically -- the lender wants a
17 written consent.  It just depended on the
18 transaction.  I used my judgment to determine
19 whether a written consent was necessary.  And
20 whether that was necessary.  So there was no bright
21 line test.  It was just, if an instance came up
22 where written consent was appropriate or required, I
23 would prepare that.  So I determined it based on my
24 judgment.

28

1      Q.  Okay.  I think you had mentioned taking
2  minutes as a duty with respect to the subsidiaries.
3  What -- from what meetings did you take minutes?
4      A.  I didn't really take minutes.  I think I
5  said I maintained corporate records.  I could have
6  said minutes, but really, I would prepare written
7  consents, because we didn't have -- the subsidiaries
8  didn't have a board of managers, so there wouldn't
9  be minutes of a meeting of the board of managers for
10 the subsidiaries.  So, it would be performing
11 written consents.  The hospitals have local
12 governing boards, but that was something completely
13 separate.  I wouldn't -- there wouldn't be any
14 minutes, so to speak, of the subsidiaries because
15 none of the subsidiaries had a board of managers.
16     Q.  Okay.  Would -- did you take minutes for the
17 board of managers of AHS?
18     A.  Not -- no.  I mean, I may have kept notes
19 for myself, more attorney work product, but no, I
20 wouldn't have kept minutes because our discussions
21 were constant and ongoing.  So, you know, we would
22 have a number of discussions about that, so
23 generally, any kind of thing that the board of
24 managers decided, would be memorialized in a written

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

**29**

1  consent if it was required.
2      Q. Other than written consents, were there any
3  other ways in which AHS kept records of the
4  decisions of its board of managers?
5      A. I don't think so.  I mean, if there was a
6  decision made, so typically there would be a written
7  consent for that if it was required, or if there was
8  a decision made, that it would have been passed down
9  to the appropriate people for that decision to be
10 made, if it affected other people.  But that's how
11 we would keep records of that.  And then our own
12 recollection and memory of that.  It's a small -- as
13 you said, it's two people so...
14     Q. Were there -- did you have official -- for
15 instance, some -- some -- some boards have sort of
16 quarterly meetings or, you know, meetings every sort
17 of periodic intervals, where they sort of do
18 everything officially and, you know, keep
19 appropriate records.  Did you have anything like
20 that for the board of managers?
21     A. We did not have regularly scheduled
22 meetings.  It's not called for by the operating
23 agreements.  We didn't have regularly scheduled
24 meetings, like a publicly-traded company would have

**30**

1  quarterly meetings, we didn't have quarterly
2  meetings.  We probably met or talked every day, but
3  we didn't have regularly scheduled notice meeting
4  you know January 15th is going to be a meeting,
5  April 15th -- no, we didn't have that.
6      Q. Okay.  In the 2017 to 2019 time frame, what
7  office location did you work out of?
8      A. I worked out of office in Irvine,
9  California.  16310 Big Parkway, Suite 200, Irvine,
10 California 92618.
11     Q. Was that the location of AHS's offices in
12 Irvine, California?
13     A. Yes, that was its primary corporate office
14 in 2017 through 2019.
15     Q. Okay.  Does it still have that office in
16 Irvine?
17     A. It does not.
18     Q. Okay.  Where has it moved to?
19     A. To Glendale, California.  101 North Brand
20 Boulevard, Suite 1780, Glendale, California 91203.
21     Q. Okay.  And do you now -- do you now work out
22 of that office in Glendale?
23     A. I sometimes work out of that office in
24 Glendale.  I primarily work out of my house now.

**31**

1      Q. In that 2017 through 2019 time frame, who
2  else at AHS worked out of the AHS office in Irvine,
3  California?
4      A. Mr. -- Mark Bradshaw worked out of that
5  office.  Jeff Meek.  I just forget's Jeff's timing.
6  I think he was there all of 2019.  Jeff Meek, who
7  was the controller for AHS, worked out of that
8  office.  Bridget Floyd, who was our executive
9  assistant, worked out of that office.  Mr. Reddy
10 would spend time in that office, also spend time at
11 the facilities.  Mr. Krissman would spend time at
12 that office.  A gentleman named Narishma,
13 N-a-r-i-s-h-m-a, Kota, K-o-t-a, accounting manager,
14 worked out of that office.  And then, different
15 people would come to that office.  If they weren't
16 at a facility, they would work out of that office.
17 Ms. Ventura, Sylvia Ventura, who is our vice
18 president of clinical operations, worked out of that
19 office as well.
20     Q. Okay.  Did AHS have any other corporate
21 offices in that 2017 through 2019 time period other
22 than the office in Irvine, California?
23     A. It had office space at Olympia Medical
24 Center in Los Angeles where people could use, but it

**32**

1  wasn't the corporate office.  So -- and then, and
2  then people would go to the facilities and work at
3  the facilities, so it wasn't like they sat in the
4  corporate office all the time.  They would actually
5  go and provide oversight or provide guidance or
6  provide services at the facilities.
7      Q. Did you have any duties as a member of
8  LLC -- of AHS?
9      A. Occasionally the members would make -- would
10 take action by written consent.  So if there was a
11 written consent by the members, I would either
12 approve or reject that written consent.  I can't
13 think of a written consent that I rejected, and I
14 would sign that written consent.  That would be my
15 duties as a member of AHS.
16     Q. What sort of items were taken up by the
17 members in any actions for written consent that they
18 undertook?
19     A. Certain actions with -- I think -- I'd have
20 to go back and look.  But like if we were -- like
21 when the purchase of -- Alecto Wheeling purchased
22 Ohio Valley Medical Center, there was likely a
23 consent by Alecto and consent by the members of
24 Alecto.  It would be something like that, because

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

**33**

1 that was a lot of material things.  There was a
2 transaction with MPT, there was the actual purchase
3 transaction.  And like, the transaction with MPT
4 affected other subsidiaries and put their assets as
5 security for Alecto Wheeling.  So it would be things
6 like that where the members would take action.
7 We -- if we had an amendment to the operating
8 agreement, which there wasn't between 2017 and 2019,
9 that would be something like that as well, so...
10     Q. Did the members have any oversight function
11 over the board of managers of AHS?
12     A. The oversight functions, yeah, generally
13 there's -- I think -- I'd have to go back and look
14 at the operating agreement.  There are a few things
15 where the members have to approve certain things.
16 Like, if AHS was to be sold, I think that has to be
17 approved by the members.  It has to be approved by
18 both the class A and class B members, so it would be
19 certain things like that, where the members would
20 have to approve it as well.  The board of managers
21 just could not approve it on their own.  But again,
22 that would all be laid out in the operating
23 agreement.
24     Q. Okay.  What's the distinction between class

**34**

1 A shares and class B shares?
2     A. It just -- class B, the class B, there's
3 certain things where even if the class -- the class
4 B member holds 51 percent, at least 51 percent.
5 It's always going to hold 51 percent, so certain
6 things can't be done without the approval of a class
7 B member.  It's a pretty routine structure for an
8 LLC with multiple members.  So that the class B
9 member has to approve certain things.  Class A
10 members have to also approve certain things.
11 Economic rights are the same.
12     Q. Who is the class B member for AHS in the
13 2017 through 2019 time frame?
14     A. The class B member the entire time of AHS
15 has been formed has been the Reddy Investment Trust.
16     Q. And that's -- Mr. Reddy was the one who had
17 formed AHS originally; is that right?
18     A. Yeah, Mr. Reddy formed -- I think
19 technically the Reddy Investment Trust formed AHS,
20 but Mr. Reddy is the creator and the -- I don't know
21 if he's the primary beneficiary, but he's the
22 trustee of the Reddy Investment Trust.  So when I
23 think of the Reddy Investment Trust, I think of
24 Mr. Reddy.  I hold my interest through a family

**35**

1 trust.  That's what I consider when you ask me about
2 my membership, it's actually the Sarrao Family Trust
3 that has that interest.
4     Q. Right.  Okay.
5         When did defendants acquire OVMC?
6     A. All the defendants didn't acquire OVMC.
7 Alecto Healthcare Services Wheeling acquired the
8 assets of OVMC on June 1, 2017.
9     Q. AHS was a party to the sales agreement, or
10 at least part of it, for that transaction; correct?
11     A. Yeah, AHS guaranteed, I believe -- I'd have
12 to go back and look at it -- but the actual closing
13 the deal, so to speak.  So it was a party, but it
14 didn't acquire any assets of -- it didn't acquire
15 the hospital, it didn't acquire any assets.  But it
16 was a party, and it offered certain security
17 interests for MPT to provide the financing to allow
18 the deal to close.
19     Q. Were you involved in that sales transaction?
20     A. Yes.
21     Q. Okay.  What was your role in that sale
22 transaction?
23     A. I drafted the asset purchase agreement.  I
24 negotiated the asset purchase agreement.  I prepared

**36**

1 the schedules.  I coordinated the closing on behalf
2 of Alecto Wheeling and Alecto Martins Ferry.  With
3 assistance of counsel, I participated in this
4 particular need for process, and then ultimately the
5 exemption from that.  There was approval necessary
6 from the Ohio Attorney General, so I was involved
7 with that.  I worked with sellers' counsel.  I
8 worked with sellers' lender.  I coordinated the --
9 securing the financing arrangement that allowed the
10 funding to pay off the sellers' loan through escrow,
11 which was the purchase price consideration.  I did
12 work on the licensing part of it, to secure the
13 appropriate licenses.  I worked on the Medicare
14 change of ownership application, the Medicaid change
15 of ownership application.  So I was involved in
16 numerous different aspects of the transaction.
17     Q. Okay.  What was the structure of the
18 transaction?
19     A. It was an asset purchase transaction.
20 Alecto Wheeling and Alecto Martins Ferry purchased
21 the assets of Ohio Valley Medical Center Inc., and I
22 believe it was called East Ohio Regional Hospital at
23 Martins Ferry Inc.  And then they had a Ohio Valley
24 Health Services and Education Corp, which sat above

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

**37**

1  those two entities the sellers did, and any assets
2  that had.  It was structured as an asset purchase:
3  There was a purchase price paid, as well as
4  assumption of certain liabilities associated with
5  the transaction.
6      Q. Was it also a leaseback transaction?
7      A. Not the actual transaction when the hospital
8  was acquired, I think there's a little -- you may be
9  confused.  The financing connection with the
10  transaction, to secure the financing that paid off
11  the Opus bank loan that the seller had, that was in
12  default, was a transaction -- was a transaction
13  between Alecto Wheeling and Alecto Martins Ferry and
14  Alecto Ohio Valley and certain subsidiaries or
15  affiliates of MPT.  But the acquisition of the
16  hospital was not a sell leaseback transaction.
17      Q. Okay.  So -- so the acquisition of the
18  hospital, right, that was an asset purchase.  And
19  then -- but then there was also a leaseback that
20  occurred, at or around the same time, in order to
21  obtain the funding to pay off that Opus loan?
22      A. Yeah.  After Alecto Wheeling and Alecto
23  Martins Ferry acquired the assets, all the assets
24  from sellers, it sold certain of the assets --

**38**

1  primarily the real property assets and fixtures --
2  to an affiliate of MPT, as part of a sell leaseback
3  transaction.  MPT paid to purchase that real estate
4  through escrow, and that money that hit escrow was
5  then transferred to escrow to Opus bank, which was
6  the secured lender of the seller.  So there were two
7  transactions involved, relatively simultaneous but
8  technically -- and remember, MPT didn't purchase all
9  the assets that Alecto Wheeling and Alecto Martins
10  Ferry acquired.  They purchased the real estate
11  assets, and it was sequential, it was Alecto
12  Wheeling Alecto Martins Ferry purchase first, then
13  sold those assets to MPT at Wheeling Alecto
14  hospital.  I believe that's who -- one of the MPT
15  affiliates, I think that's the right affiliate.  And
16  then that affiliate leased those assets back to
17  Alecto Wheeling and Alecto Martins Ferry and Alecto
18  Ohio Valley.
19      Q. Did AHS or Alecto Wheeling and Alecto
20  Martins Ferry have to sort of, pay -- pay out funds
21  up front as part of that transaction, or was -- was
22  the amounts received through the leaseback
23  sufficient to cover -- to cover the payment of the
24  purchase price?

**39**

1      A. There had been a deposit made when they
2  initially assigned the asset purchase agreement.  I
3  believe the deposit was $500,000, so that was
4  already in escrow.  But the funding for that
5  purchase was through the sell leaseback transaction.
6  That money went into escrow and that money went out
7  of escrow to pay off the Opus bank loan.  We also
8  assumed millions and millions of dollars in
9  liabilities as part of the transaction.  And certain
10  subsidiaries of AHS offered security to MPT to
11  provide the financing arrangement, or the sell
12  leaseback transaction, to provide the purchase price
13  for the transaction.
14      Q. You've referred several times to MPT.  What
15  does MPT stand for?
16      A. When I say MPT, it's the actual -- there's a
17  publicly traded real estate investment trust called
18  Medical Properties Trust Inc., and then MPT has
19  probably -- I don't know how many affiliates.  But
20  as it relates to this transaction, there's MPT of
21  Wheeling, I think, LLC, and an MPT of
22  Wheeling-Hospital LLC.  So really, what I'm
23  referring to MPT, I'm referring to those MPT of
24  Wheeling, MPT of Wheeling Alecto Hospital LLC.  But

**40**

1  MPT is short for Medical Properties Trust.
2      Q. Those two subsidiaries of MPT that you just
3  referred to, were those subsidiaries that were
4  created in order to affect the leaseback
5  transaction?
6      A. I'm not a party to MPT internal governance,
7  but those entities, as I understand them, are
8  single-purpose entities specific to that
9  transaction.
10      Q. Did the leaseback transaction include an
11  allowance of MPT funds to improve OVMC?
12      A. The lease with MPT provided capital -- you
13  can ask for capital financing, do capital additions.
14  That was never made available, never drawn down
15  upon.  But if there was a capital addition, not just
16  general funds but a capital addition for a capital
17  improvement, and certain parameters were met subject
18  to their approving it, the lease did include a
19  provision for that.  I believe it was up to 20
20  million.
21      Q. Did AHS ever ask to draw down on that 20
22  million?
23      A. Not on the capital addition section, because
24  we were in default pretty early on.  We stopped

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

41

1  paying rent in October of 2018.  We weren't meeting
2  the financial covenants.  And we didn't have
3  sufficient revenue -- AHS -- well, let me step back.
4      AHS wasn't a party to the lease, so it would
5  have never asked for anything.  It would have been
6  Alecto Wheeling and Alecto Martins Ferry.  They
7  stopped paying rent in October of 2018, were in
8  covenant defaults.  And it's not free money.  If you
9  take that money, you have to service that debt, you
10 have to service that money.  The lease payment goes
11 up, and there wasn't sufficient funds to have a
12 lease payment go up.  Wheeling -- Alecto Wheeling
13 and Alecto Martins Ferry did ask for money from MPT
14 to help fund operations, and that was rejected.
15     Q.  When did that happen?
16     A.  2018, 2019, pretty consistently we were
17 asking for money from MPT.  Effectively, we got
18 money from MPT, because we didn't pay rent starting
19 October 2018.  But we asked them for $20 million in
20 a loan to help support Ohio Valley and East Ohio.
21 That would have been the summer of 2019.  And that
22 was rejected.
23     Q.  You mentioned that you had asked them for
24 money before that point; it sounds like in 2018.  Is

42

1  that what you said?
2      A.  No, in 2018 is when we stopped making the
3  payments.  We stopped making rent payments and we
4  asked them to, kind of, give us grace for that.  I
5  think we actually had a forbearance agreement for
6  about six months, to try to see if we could figure
7  things out in 2018.  And then we had pretty regular
8  communications with MPT, because obviously we
9  weren't paying rent, and we raised the subject of
10 additional financing.  And that was pretty readily
11 shut down because we couldn't service that
12 additional financing.
13     Q.  So even when you asked in 2018, they said no
14 way, no can do?
15     A.  Yeah.  It wasn't necessarily a formal ask in
16 2018 but it was ongoing discussions.  We did make a
17 formal ask for $20 million -- a loan for $20 million
18 from MPT.  We didn't have any new collateral to
19 offer MPT.  And we weren't performing financially.
20 And in 2019, pretty -- you can see, in -- couldn't
21 keep operating.  So in 2019, we specifically asked
22 for $20 million, and the $20 million was rejected.
23     Q.  Okay.  I just want to make sure that I
24 understand this, because I might be a little

43

1  confused.
2      If I understood you correctly, in 2018, the
3  Alecto Wheeling started asking MPT for extra funds;
4  is that right?
5      A.  Yeah.  But again, it wasn't like a direct
6  ask.  Give us 5 million, give us 10 million.  It was
7  hey, we need some help here, can we get some more
8  money, kind of indirect questions about that.
9      Q.  Okay.  And -- and that got shot down; right?
10     A.  Correct.
11     Q.  Okay.  And so then -- then later, you asked
12 more specifically, and that got shot down too?
13     A.  Correct.  We asked specifically, more
14 specifically, for $20 million.  And that got shot
15 down, and any additional money got shot down.
16     Q.  All right.  Maybe that wasn't a surprise
17 since they had rejected the earlier asks.
18     A.  Yes and no.  I mean, we thought that they
19 might consider it again, and so we asked
20 specifically and that was rejected.
21     Q.  Is there documentation of that ask of 20
22 million?
23     A.  I don't believe there's documentation.  I
24 know Mr. Reddy met with the CFO of MPT.  I think --

44

1  I believe in-person.  And then Mr. Krissman and I
2  had a phone call with the CFO of MPT.
3      Q.  When did you have that phone call with the
4  CFO of MPT?
5      A.  Probably June, June of 2019.  I don't
6  remember the exact date.  But --
7      Q.  What was that gentleman's name?
8      A.  The CFO of MPT is Steve Hamner.
9      Q.  Okay.  And so -- so you and -- did you say
10 that was Mr. Krissman?  You and Mr. Krissman?
11     A.  Mr. Krissman and I, yeah.  So it would have
12 been before July 31st.  At the same time we were
13 talking to Prime Healthcare about potentially
14 purchasing the hospitals, and MPT has a relationship
15 with Prime, so it's right around that time period.
16     Q.  Okay.  So you and Mr. Krissman got on the
17 phone with Mr. Hamner and you asked him verbally for
18 $20 million?
19     A.  Correct.
20     Q.  Okay.  And he said -- what did he say?
21     A.  He said no.  Emphatically, he said no.  He
22 was surprised we were asking him again.  He
23 emphatically said no to $20 million.  Or any amount
24 of money, he said no.

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

**45**

1      Q. And you guys -- at that point you hadn't --
2  the Alecto Wheeling subsidiaries hadn't been paying
3  the lease for almost a year?
4      A. Yeah.  I believe we stopped paying rent in
5  October of 2018, was the first month.  It could have
6  been a month or two before that, but October 2018 we
7  stopped paying rent to MPT on the lease.  So Alecto
8  Wheeling and Alecto Martins Ferry.
9      Q. All right.  Do you think that factored into
10 MPT's decision?
11     A. I believe that factored into MPT's decision
12 as well as the financial performance of the
13 hospital.  The inability to overcome the -- what's,
14 at least, the federal government believes was
15 illegal conduct of Wheeling Hospital and the
16 Catholic diocese.  I'm sure there was a number of
17 factors that factored into their decision, but at
18 least those factors.
19     Q. Following the acquisition of OVMC and EROH,
20 did -- did Alecto Wheeling join a loan agreement
21 with White Oak?
22     A. Yeah, Alecto Wheeling, Alecto Martins Ferry
23 and Alecto Ohio Valley became borrowers under an AR
24 credit line, or credit facility, with White Oak

**46**

1  Healthcare Finance.  I think it was effective as of
2  June 1st or June 2nd of 2017.
3      Q. Okay.  What was the purpose of the AR credit
4  line?
5      A. To provide funding to those entities.  They
6  could borrow against their receivables and not have
7  to wait for the receivables to be collected.
8  Because that's how they provided -- to provide
9  financing for, against the receivables.  Because
10 typically if you bill a health plan, you have --
11 sometimes have to wait 60 or 90 days to get paid,
12 and you want to borrow against those receivables.
13     Q. So how did it work?
14     A. How did what work?
15     Q. How did the AR credit line work?  So were
16 there, in terms of sweeps, and how did -- how did
17 all that work?
18     A. So the different entities that operated
19 hospitals, so Alecto Martins Ferry, Alecto Wheeling,
20 we had a hospital on Fairmont, one in Texas, and one
21 in L. A., they were all borrowers, all co-borrowers.
22 There was a credit facility.  There was a borrowing
23 capacity based on the accounts receivable.  And then
24 there was different reserves.  So you'd have a

**47**

1  borrowing capacity, collections would come into
2  deposit accounts.  Those -- they were subject to
3  deposit account control agreements.  Those would
4  then get swept to the lender, which in this case
5  initially was White Oak Healthcare Finance, White
6  Oak, they would get swept.  They would
7  effectively -- it's a revolving credit line.  You
8  would pay down the loan balance.  So, if there was
9  16 million available on the line -- the line was for
10 30 million, but there was never 30 million
11 available.  We didn't have AR.  If there was 16
12 million available, we collected a million five, all
13 the hospitals collectively collected a million five.
14 There'd be a million five available to borrow.
15 Generally, a million five would be borrowed, and
16 then that would be distributed among the hospitals.
17     And in the case of Ohio Valley and East
18 Ohio, they got more money back than they collected.
19 And collectively, over the course of the operations,
20 most weeks they got more than they collected,
21 because they were running at a shortfall, which
22 meant other hospitals got back less than they
23 collected.  So if Ohio Valley collected $800,000,
24 and got back a million, that 200,000 probably meant

**48**

1  another hospital like Olympia collected a million
2  and only got $800,000 back.  So those other
3  hospitals were supporting Ohio Valley and East Ohio,
4  because of the nature of the credit line.
5      Q. Now you mentioned that the borrowing
6  capacity was -- was 30 million.  In terms of -- in
7  terms of the money that you had, that the Alecto
8  borrowers collectively had, were there caps on what
9  any particular entity could take?  Or was it just,
10 you know, that Alecto got to decide who got the
11 funds that were available through the credit line?
12     A. Well, I have to correct you on that.  The
13 borrowing capacity was never 30 million.  It was a
14 $30 million credit line.  I don't think the
15 borrowing capacity ever topped out more than 16, 17
16 million.  You'd have a (indiscernible) when the
17 borrowing certificate would come, because it's based
18 on the AR.
19     Now, they were all co-borrowers, so they
20 were all on the hook for the whole thing.  There's
21 certain minimum payments that had to be made, but
22 they were all co-borrowers.  So there was no
23 specific -- it wasn't a separate line for each
24 facility.  If Ohio Valley had its own separate line,

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

**49**

1  it wouldn't have been able to borrow the funding it
2  got -- it got through the line.  It needed the AR,
3  the other facilities, to help them.
4      Q.  Okay.  Right.  And it sounds like the --
5  the -- the -- the available money, understanding
6  that that was limited by the AR coming in, that that
7  money, there wasn't -- wasn't being -- was the
8  borrowing capacity that was actually available being
9  used pretty consistently?
10     A.  Yeah.  I can't imagine borrowing where we
11 weren't borrowed at capacity.  And there were often
12 times when we were overdrawn, so to speak, and would
13 ask for an over-advance, thinking the collections
14 would be better the next week, because of the cash
15 needs.  Especially for Ohio Valley and East Ohio.
16     Q.  How was the credit line secured?
17     A.  Credit line was secured by the accounts
18 receivable of the various hospitals and their
19 subsidiaries.  So White Oak had a first priority
20 lien on all the accounts receivable for all the
21 entities that were borrowers under the credit line.
22 So they had to perfect the first security interest
23 in all the receivables.  They also had deposit
24 account control agreements on the deposit accounts.

**50**

1  So under the loan agreement, we were required to
2  direct all payments to lock boxes, and so the monies
3  went to those lock boxes.
4      There were deposit account control
5  agreements between, like, Alecto Wheeling, White Oak
6  Healthcare Finance, and Huntington Bank that
7  directed Huntington Bank to sweep that money that
8  got deposited on a daily basis.  And there was a
9  government lock box and a non-government lock box.
10     Q.  How often was -- were the co-borrowers
11 maxing out the available credit during that 2017 --
12     A.  All the borrowers -- the credit was maxed
13 out almost every day.  There wasn't periods where
14 there was like, an extra million left on the credit
15 line.  We borrowed everything we could borrow under
16 the credit line.
17     Q.  And was that through -- was that true
18 throughout the 2017 through 2019 period?
19     A.  Yeah.  I mean, there might be a day where it
20 came in, there was a little bit less.  But I can't
21 imagine there was -- overall, there was -- that was
22 few and far between.  We were maxed out every day on
23 the credit line.  On many occasions we were asking
24 for over-advances.

**51**

1      Q.  Right.  And when you asked for
2  over-advances, I mean, were you getting them?
3      A.  It depended on why we were asking for the
4  over-advance.  Generally, if it was a small amount,
5  and we had -- we could show White Oak that something
6  was coming in, there was a payment coming in the
7  following week that we were expecting to justify the
8  over-advance.  But then that over-advance would have
9  to be paid back, and that would lower your borrowing
10 capacity the next week.  Occasionally, to meet
11 payroll, they would provide a -- you know, if we
12 were going to be short for payroll, they would
13 provide an over-advance to cover that, and that
14 would be collected back up the next week, so to
15 speak.
16     Q.  All right.  But White Oak wasn't willing to
17 increase the overall borrowing capacity.  If they --
18 if they gave you an over-advance, they expected it
19 to be paid back?
20     A.  Correct.  And we had pretty regular
21 conversations with them.  So White Oak looks at your
22 accounts receivable.  There's criteria in it that
23 accounts receivable, so many days old, don't count.
24 These so many days old.  Certain types of accounts

**52**

1  receivable, you get more credit for.  And they set
2  reserves on that, and expected reimbursement.  So
3  there was constant discussions, like, hey can you
4  lift up a reserve, can you do this, can you give us
5  more borrowing, and they generally were not willing
6  to do that.
7      Q.  Did the lender at some point change to a
8  different -- to a different.
9      A.  Yes.  CNH Finance Fund, what, LP.  I think
10 that's the exact name.  They bought, they bought the
11 loan from White Oak in July of '19.
12     Q.  Okay.  The -- and in terms of whether the
13 loan was maxed out regularly after that, did
14 anything change?
15     A.  No.  The loan was maxed out through -- in
16 the 2019, the loan was maxed out with CNH as well.
17 They were a little bit easier on the reserves.  How
18 much reserves they required, and stuff like that.
19 And some of the adjustments on how much they allow,
20 they gave us credit for in certain AR, so I had a
21 little bit more borrowing capacity but no, we didn't
22 have extra capacity.  If we could borrow it, we were
23 borrowing it.
24     The mechanics of it is you get a borrowing

---

**EXHIBIT 1**

Transcript of Michael Sarrao
Conducted on May 19, 2022

53

1  base certificate saying you're eligible to borrow.
2  Basically your availability is, they would tell us
3  the availability is a million one, we'd say we want
4  to borrow million one, they would send a borrowing
5  base certificate, which would be signed, and we
6  would get an advance for a million one. I can't --
7  I can't think of an occasion where we didn't borrow
8  at full capacity, from either White Oak or CNH
9  Finance.
10     Q. And was -- was CNH Finance the same as White
11 Oak in that, if you requested an over-advance, that
12 they expected you to pay it back?
13     A. Correct. You had to get back down to your
14 borrowing -- your borrowing capacity. Whatever that
15 number was, they expected that to be paid back.
16     Q. They weren't willing to just increase the
17 amount of the overall loan?
18     A. Correct, because the AR wasn't going up.
19     Q. Okay. Hold on just a second. Okay. Let's
20 see. Okay.
21        MS. DAVIDSON-WELLING: Can I ask that the
22 video tech to drop Defendants 16546 through 16549
23 into the chat for everybody?
24        PLANET DEPOS REMOTE TECHNICIAN: Please

54

1  stand by.
2        MS. DAVIDSON-WELLING: Okay. Would you mark
3  that as exhibit -- Plaintiffs' Deposition Exhibit 1.
4  BY MS. DAVIDSON-WELLING:
5     Q. And Mr. Sarrao, I'm going to share my screen
6  with you, so you can see this exhibit.
7     A. Okay.
8        (Exhibit 1 was marked for identification
9  and is attached to the transcript.)
10 BY MS. DAVIDSON-WELLING:
11    Q. Let's see here. Let's see. Sorry. I'm
12 just trying to make sure -- okay. Let's see what
13 this looks like. Okay. There we go. I see. Here
14 we go.
15        Okay. Do you see -- do you see -- do you
16 see a document on the screen?
17    A. I do see a document, yes.
18    Q. Okay. So I am going to scroll down when you
19 tell me, so that you can see the rest of this
20 document. So just, before I ask you any questions
21 about it, I'm going to let you review it.
22    A. Okay. Can you go ahead and scroll down, so
23 I can?
24    Q. Sure. Oops. Maybe. Okay. Maybe. We'll

55

1  do it the old-fashioned way. All right.
2     A. Okay. Can you just scroll to the last page?
3  I'm just curious of the last page of it. I know
4  what it is.
5     Q. Yeah, I don't think it's anything you
6  haven't seen before. Is that what you wanted to
7  see?
8     A. Yeah, that's what I wanted to see, yes,
9  okay.
10    Q. Okay. All right. Let me take you back up
11 to the top, and just ask you, what is this document
12 that is in plaintiffs' -- that is Plaintiffs'
13 Deposition Exhibit 1?
14    A. So I think as we discussed earlier, on
15 June 1 of '17, the Alecto Ohio Valley, Alecto
16 Wheeling, and Alecto Martins Ferry joined the AR
17 line with White Oak. And this is the written
18 consent of the sole member of Alecto Wheeling to
19 joining -- to joining that agreement, being bound by
20 the revolving loan and security agreement. So it
21 is -- it's a written consent. So it's the approval
22 of the sole member of Alecto Wheeling to join that
23 credit line, and be bound by the credit line, and
24 give its AR security for that credit line.

56

1     Q. Okay. Now, there are a whole bunch of
2  different entities who are listed in this first
3  paragraph of this written consent. Who are these
4  entities?
5     A. So -- well, the first entity is Alecto AHS.
6  The second, Alecto Healthcare Services Los Angeles,
7  Olympia Healthcare, and Horizon Real Estate
8  holdings. So, Olympia Healthcare operated Olympia
9  Medical Center in Los Angeles. Horizon owned the
10 real estate on which the hospital was located in Los
11 Angeles, and Alecto Healthcare Los Angeles owned
12 80 percent of Olympia Healthcare, and 100 percent of
13 Horizon Real Estate. So those three entities relate
14 to Olympia Medical Center.
15        Alecto Healthcare Services Fairmont LLC
16 owned and operated Fairmont Regional Medical Center
17 in Fairmont, West Virginia. FRMC Physicians was a
18 medical group associated with FRMC -- with Fairmont
19 Regional Medical Center, that was owned by Alecto
20 Fairmont.
21        Then the next group of entities, there's a
22 hospital in Texas called Wilson N. Jones Regional
23 Medical Centre. It has -- it's operated by
24 Sherman/Grayson Hospital LLC. There's another

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

57

1 entity called Sherman/Grayson Healthcare Services
2 LLC that's related to that.  And they also have a
3 medical group called Sherman MD Provider, that does
4 business as WNJ Wellcare Medical Group.  That is
5 owned by an entity called Sherman/Grayson Sponsor
6 LLC, which is owned by Alecto Healthcare Services
7 Sherman.
8      So those relate to the hospital in Texas, in
9 Sherman, Texas.  And Alecto Healthcare Services
10 Hayward provides management services to a hospital
11 in Northern California, and receives a management
12 fee -- a fee for providing those services, and
13 that's what that entity is.  It just simply provides
14 services to a hospital in Northern California, and
15 generates a fee.  But that fee is collateral for the
16 AR line, and provides borrowing capability -- when
17 the fee gets paid, it gets swept like the AR
18 collections do as well.  And then there's White Oak
19 which is the lender.
20     Q.  Okay.  So does Alecto no longer have some of
21 the subsidiaries that are listed in this first
22 paragraph of the exhibit?
23     A.  All the subsidiaries still exist.  Some of
24 those subsidiaries don't operate hospitals anymore.

58

1 They have different assets.  But all the
2 subsidiaries still exist.  But Olympia Healthcare
3 doesn't operate Olympia Medical Center anymore.
4 Horizon sold its real estate.  Fairmont doesn't
5 operate Fairmont Regional Medical Center anymore.
6 The Texas hospital is still operating, and Alecto
7 Hayward still provides management services.
8     Q.  Since 2017, has Alecto or any of its
9 subsidiaries acquired other hospitals?
10    A.  No.
11    Q.  When the loan was transferred to CNHF, was
12 there -- was there a written consent that was
13 entered with them, the document?
14    A.  Yes, there would have been a written consent
15 that would have been issued, because CNH purchased a
16 loan, and then there was an amended and restated
17 credit agreement.  So there'd -- I'd have to go back
18 and check, but there should have been a written
19 consent, a similar written consent, issued at that
20 time as well.
21    Q.  And you signed this written consent;
22 correct?
23    A.  I'd have to -- I'm pretty sure -- can you
24 just scroll down really quick?

59

1     Q.  Absolutely.
2     A.  Let's see.  Yes.  I signed the written
3 consent on behalf of the general manager of the sole
4 member of Alecto Wheeling, yes.  That's my
5 signature.
6     Q.  What's the significance of the title of
7 general manager there?
8     A.  So Alecto Ohio Valley has -- had two
9 members:  Alecto Healthcare Services LLC, and MPT of
10 Wheeling Alecto Hospital LLC, and it had a general
11 manager, which is Alecto Healthcare Services LLC.
12 And then, the LLC agreement provides for special
13 manager, which MPT exercised certain rights.  So as
14 general manager, it could -- it has certain -- the
15 general manager can do certain things, but was
16 limited in certain ways, and there were certain
17 abilities for MPT of Wheeling Alecto Hospital to
18 effectively kick out the general manager if it chose
19 to, if there were defaults.  But that was the title.
20 So there was limitations on what the general manager
21 could do, that's set forth in the LLC agreement.
22    Q.  And specifically the -- those, those rights
23 of the general manager and the special manager are
24 set out in the LLC agreement of Alecto Healthcare

60

1 Services Inc. Ohio Valley LLC; correct?
2     A.  Alecto Healthcare Services Ohio Valley LLC.
3 There's an amended and restated LLC agreement,
4 that's either May 31st or June 1 of 2017.  Those
5 rights are set forth in that agreement, yes.
6     Q.  And that's because MPT had acquired a
7 percentage of the ownership of AHS Ohio Valley; is
8 that right?
9     A.  Correct.  They -- they received 20 percent
10 of the membership interest of the Alecto Ohio Valley
11 either May 31st, June 1st, I just forget the exact
12 date.  But yes, they had a 20 percent interest in
13 Alecto Healthcare Services Ohio Valley LLC.
14    Q.  Okay.  I'm going to stop sharing my screen
15 on this.  Okay.
16      Following the 2017 acquisition of the OVMC
17 and EROH hospital assets, did AHS manage Alecto
18 Wheeling?
19    A.  No.  It provided management services to
20 Alecto Wheeling, but it did not manage Alecto
21 Wheeling.  Alecto Wheeling was managed by its
22 member, Alecto Ohio Valley.  But Alecto provided
23 management services under a management services
24 agreement, but did not manage the facilities.

EXHIBIT 1

Transcript of Michael Sarrao

16 (61 to 64)

Conducted on May 19, 2022

---

61

1    Q. Did Alecto Ohio Valley have any employees in
2  that time frame?
3    A. Alecto Ohio Valley did not have any
4  employees.
5    Q. It just had corporate officers?
6    A. Correct.
7    Q. Okay.  And the corporate officers of Alecto
8  Ohio Valley were the same as the corporate officers
9  of AHS in that time frame; correct?
10   A. That would be correct, yes.
11   Q. Was there a written management services
12 agreement?
13   A. Yes, there is a written management services
14 agreement between Alecto Healthcare Services LLC and
15 Alecto Wheeling, and Alecto Martins Ferry.
16   Q. And did you have any role in preparing or
17 affecting that management services agreement?
18   A. I drafted the agreement, yes.
19   Q. Okay.  Is that management services -- when
20 did that management services agreement go into
21 effect?
22   A. It would have went -- 95 percent sure it
23 would have went into effect June 1st, 2017, date of
24 the acquisition.

62

1    Q. And is it still in effect?
2    A. It's still in effect, yes.
3    Q. Throughout the time that OVMC was operating
4  after June 1st of 2019 -- or 2017, that management
5  services agreement was in place?
6    A. Correct.
7    Q. All right.  And was there -- under the
8  agreement, was there supposed to be an AHS manager
9  representative who met with Alecto Wheeling
10 representatives on a regular basis?
11   A. I'd have to look at the agreement, but I
12 believe there was provisions for that.  Well, there
13 was also provisions that Alecto Wheeling was
14 supposed to pay Alecto.  They never did.  So by your
15 question, I'm assuming you looked at the agreement.
16 I'd have to look at the agreement, but my
17 recollection is that would be included in there,
18 yes.
19   Q. Okay.  I'm just going to ask you if you knew
20 who the AHS manager representative was, who was
21 dealing with Alecto Wheeling.
22   A. It would be Mr. Reddy.
23   Q. Mr. Reddy?
24   A. A number of conversations and meetings with

63

1  the hospital CFO, the hospital CEO, the hospital
2  CNO, probably everybody at the hospital in
3  managerial roles, he had regular meetings with them.
4    Q. Okay.  And was there a specific Alecto
5  Wheeling representative who was slated to be the
6  representative for the hospital under the MSA?
7    A. I don't think it was under the MSA but the
8  representatives would be the people in the
9  leadership positions at the hospital.
10   Q. Do you remember who those individuals were?
11   A. Initially it was -- Mr. Reddy initially
12 served for an interim period; he was there every
13 day.  Bernie Albertini was at East Ohio, because I
14 remember the agreement was for both hospitals.
15 Bernie Albertini was there for a while.  Dan Dunmyer
16 was hired as the CEO.  Jennifer Coello was a COO.
17 Rick Scherich was the CFO.  We had different chief
18 nursing officers.  I forget their names for the
19 CNOs.  Mr. Reddy would have also communicated with
20 the, what I call the business office managers.  I
21 think their exact title was Director of Patient
22 Financial Services.  We had facilities people, but
23 those were the different people.  We had leadership
24 teams at each of the hospitals.  Mr. Dunmyer was the

64

1  CEO for both hospitals.  Ms. Coello was the COO, but
2  her time was focused on East Ohio versus Ohio
3  Valley, but each hospital had its own chief nursing
4  officer.  Mr. Scherich was the CFO for both
5  hospitals.
6    Q. Was Mr. Reddy the only AHS manager
7  representative who was assigned to sort of provide
8  management services to the subsidiaries?
9    A. No.  Everybody at Alecto provided -- every
10 employee of Alecto, and then myself as an officer of
11 Alecto, provided services to Alecto Wheeling and
12 Alecto Martins Ferry.
13   Q. Was Mr. Reddy the primary person in that
14 role?
15   A. It would depend how you define primary.  I
16 mean, he was CEO, and so he spent time as -- of
17 Alecto, so he spent time.  But Mr. Krissman did,
18 Mr. Meek did.  I spent a lot of time helping them.
19 Mr. Bradshaw spent a lot of time.  Ms. Ventura spent
20 a lot of time.  Ms. Falsis was there for a while as
21 our quality person, she spent time.  Mr. Kota, he
22 was intimately involved with the sweeps and
23 everything, so he spent time.  He paid their
24 insurance bills and things like that.  So everybody

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

65

1  spent time.
2      I don't know -- we didn't track our time, so
3  I can't tell you who spent what amount of time. I
4  suspect Mr. Reddy probably talked to them once a day
5  if not every other day. I probably spoke to people
6  at Ohio Valley and East Ohio two to three times a
7  week. It just depended, but it's hard to define who
8  was the primary person.
9      Q. And what about the -- you had mentioned a
10 few other individuals who you believe were providing
11 management services to Alecto Wheeling.
12     Who -- how often do you think those other
13 people were providing management services?
14     A. Mr. Bradshaw, probably similar volume as
15 myself. It just depended. He focused more, like,
16 on HR issues and different things than I did. We
17 kind of divided that up. Ms. Ventura, on average,
18 she probably much -- if not more than me -- she
19 would oftentimes go out there and spend time out
20 there in the hospital. She's a nurse. She's a CNO
21 by training, working with those people. Mr. Meek,
22 there were periods where we were borrowing every day
23 from White Oak or CNH, and he was having discussions
24 with the folks at the hospital about funding needs

---

66

1  every day, and them asking for more money than they
2  collected. Probably every day or every other day.
3      Mr. Kota was probably less frequent, because
4  he was more behind the scenes, but at least once a
5  month he would talk to them about intercompany
6  things, and things like that, and answer questions.
7  Ms. Falsis' quality, probably two, three, four times
8  a month, depending on what the issue was.
9  Mr. Krissman on a pretty regular basis, one or two
10 times a week probably, again, one week could be four
11 times and a week could be one time. So it just
12 depended. But there was active engagement by all
13 the Alecto people with the Ohio Valley and the East
14 Ohio people.
15     Q. Okay. So if I understand you correctly,
16 there was active engagement by, you know, AHS folks
17 with Alecto Wheeling folks, on a daily basis?
18     A. Yeah. At least somebody -- an AHS person
19 was speaking to somebody at Alecto Wheeling every
20 day, yes.
21     Q. Okay. Let's see here. Let's see if I can
22 find this document.
23     A. If we're going to go to an exhibit, can we
24 take a five-minute break? Just like a restroom

---

67

1  break, and stuff?
2      MS. DAVIDSON-WELLING: Yeah, absolutely. We
3  don't hold --
4      THE WITNESS: I kind of lost track of time
5  too. Not a problem.
6      MS. DAVIDSON-WELLING: No, absolutely.
7  Let's take a break, you know, five, ten minutes.
8  Perfectly fine.
9      THE VIDEOGRAPHER: Okay it's --
10     MR. GARRISON: Go ahead. Let me just -- how
11 about Maureen, starting with you, how about we
12 reconvene -- it's 12:55 Eastern, our time here.
13 Mike, how about 1:10? Is that all right, Maureen,
14 15 minutes?
15     MS. DAVIDSON-WELLING: Sure. Sure.
16     THE VIDEOGRAPHER: So it is 11:55 a.m. We
17 go off the record.
18     (A short break was had.)
19     THE VIDEOGRAPHER: It is the beginning of
20 Media Number 2 of the testimony of Michael Sarrao.
21 It is 12:16 p.m. We are back on record.
22     MS. DAVIDSON-WELLING: All right.
23 BY MS. DAVIDSON-WELLING:
24     Q. So, okay. Mr. Sarrao, before the break, I

---

68

1  was asking you about the management services
2  agreement.
3      Do you recall that?
4      A. I do recall. You asked me questions about
5  that, yes.
6      Q. So I am going to share my screen -- cross
7  your fingers -- and show you a document, which we
8  will mark as Plaintiffs' Deposition Exhibit 2.
9      (Exhibit 2 was marked for identification
10 and is attached to the transcript.)
11 BY MS. DAVIDSON-WHEELING:
12     Q. Okay. Let's see here. So everybody else
13 has it before I do that, the document is, let's see
14 here, numbered Defendants' 2190 through 2203?
15     MS. DAVIDSON-WELLING: Would the video
16 technician please drop that into the chat for
17 everyone.
18     PLANET DEPOS REMOTE TECHNICIAN: No problem.
19 BY MS. DAVIDSON-WELLING:
20     Q. Okay. Mr. Sarrao, do you see a document on
21 the screen in front of you?
22     A. I do.
23     Q. All right. I will scroll down so that you
24 can take a look at this document. Just tell me when

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

69

1 you're ready for me to --
2     A. You can go ahead and scroll down.
3     Q. If you want me to go faster or slower, just
4 let me know.
5     A. I know what -- I mean, it's probably just
6 easier if you ask questions.  I may ask you to look
7 at a certain page.
8     Q. Sure.
9     A. But I know the document so...
10     Q. Okay.  All right.  So tell me, what is this
11 document?
12     A. This is -- can I look at the last signature
13 page?  Is this a signed copy or not signed copy?
14     Q. In this copy, let me scroll down so you can
15 see this.
16     A. Okay.  Yeah, I've got you.  So this is -- we
17 were talking about earlier -- this is the management
18 services agreement between AHS and Alecto Wheeling
19 and Alecto Martins Ferry, whereas Alecto provides
20 certain management services to Alecto Wheeling and
21 Alecto Martins Ferry.
22     Q. Okay.  And on the last page of this exhibit,
23 there are several signatures, three of them; is that
24 right?

---

70

1     A. That's correct.  Yes.
2     Q. And are all three of those signatures yours?
3     A. They are my signatures in different roles
4 but they're my signatures, yes.
5     Q. And who -- who did you sign this MSA on
6 behalf of?
7     A. I signed it on behalf of Alecto Healthcare
8 Services LLC.  Then I signed it on behalf of the
9 general manager of Alecto -- for Alecto Wheeling,
10 and I signed it on behalf of -- well, it's signed on
11 behalf of Alecto Wheeling by its general manager,
12 and I signed for the general manager.  It's also
13 signed on behalf of Alecto Martins Ferry, signed by
14 its general manager, and I sign on behalf of the
15 general manager.
16     Q. Okay.  So the general manager for Alecto
17 Wheeling, and Alecto Martins Ferry, was Alecto
18 Healthcare Services Ohio Valley; correct?
19     A. That's correct.
20     Q. And as the general manager for each of them,
21 you signed?
22     A. Yeah.  And I'm not -- you know what?  When I
23 look at this, Alecto Wheeling was wholly owned by
24 Alecto Ohio Valley.  I'm not sure if the general

---

71

1 manager title is right.  It probably should be its
2 manager.  Because Alecto Wheeling and Alecto Martins
3 Ferry was managed by its member, which was Alecto
4 Ohio Valley.  That may be a mistake on my behalf.
5 Where it says its general manager, probably should
6 say its member or its manager, because Alecto Ohio
7 Valley owns 100 percent of Wheeling, and 100 percent
8 of Martins Ferry.  But I signed on behalf of Alecto
9 Ohio Valley for each of those entities.
10     Q. Okay.  All right.  So I'm just going to take
11 you further up here.  I'm going to take you to a --
12 there is a section on -- let's see here -- I think
13 it's 1.5, called Major Decisions.
14        Do you see that section?
15     A. I see that, yes.
16     Q. All right.  So were there some -- so under
17 the management services agreement, were there
18 decisions that the manager could not make without
19 prior approval from the hospitals?
20     A. Yeah.  I mean, there was -- any of these
21 major decisions.  I mean, there's certain things the
22 manager is supposed to do with respect to providing
23 services, and certain things it couldn't do without
24 the hospitals, Alecto Wheeling or Alecto Martins

---

72

1 Ferry, approving them.  At least, what you're
2 showing me here are, what, six of those items and I
3 think there's probably more on the third page, just
4 because of how it's worded.
5     Q. Okay.  And this -- can you just read for me
6 what it says in section 1.5 just that -- before the
7 list, but that first part?
8     A. Yeah.  [As read] "Notwithstanding anything
9 to the contrary within this agreement, the following
10 actions" -- open paren quote -- "major decisions" --
11 closed quote closed paren -- "shall require the
12 prior written authorizations of the hospitals prior
13 to being undertaken by manager."
14     Q. Okay.  So -- and the list of quote/unquote,
15 major decisions, includes the sale of the
16 facilities, does it not?
17     A. It does.
18     Q. And it also includes a material change of
19 the business of the hospitals; is that right?
20     A. It does.
21     Q. And it also includes a material change in
22 the scope of services offered at the facilities; is
23 that right?
24     A. That's correct.

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

73

1    Q. Okay.  So I guess my question for you is,
2   was there ever any prior written authorization that
3   was granted by the hospitals prior to the closure of
4   OVMC?
5    A. The manager didn't close the hospital.
6   Alecto didn't close the hospital, so this wouldn't
7   be applicable.  The hospitals were closed by Alecto
8   Wheeling and Alecto Martins Ferry.  They are the
9   entity that made -- they are the entity that closed
10  the hospitals.  So this wouldn't be -- it wouldn't
11  be something undertaken by Alecto AHS, the manager
12  under this agreement.  That would have been
13  undertaken by Alecto Wheeling and Alecto Martins
14  Ferry.
15   Q. As the corporate secretary of both Alecto
16  Wheeling and AHS, can you point me to any
17  documentation of that decision by the hospital that
18  you've just referred to?
19   A. Well, there's letters sent to the state of
20  West Virginia, the state of Ohio, reflecting that
21  decision.  There's a press release reflecting that
22  decision.  I don't think there was any written
23  record required to make that decision by Alecto
24  Wheeling and Alecto Martins Ferry.  We had

74

1   regulatory requirements, and it met those regulatory
2   requirements.
3    Q. Is there any consent to action or anything
4   like that that was undertaken, as far as you're
5   aware, when concerning the decision to close OVMC?
6    A. I don't understand what you mean by consent.
7    Q. I mean, like, was there any kind of -- so
8   for instance, we looked at a consent -- hold on.
9   Let me stop sharing this.
10      We looked at a consent for a written
11  consent, right, to join a loan agreement earlier.
12  Do you recall that?
13   A. I recall that.
14   Q. Okay.  Are there any written consents that
15  you're aware of, concerning the closure of OVMC?
16   A. I'm not aware of any written consents --
17  well, first of all, I'm not aware of them being
18  required, and I'm not aware of any written consents
19  like we looked at for the loan agreement when they
20  joined, that would spell out that the general
21  manager, or the general manager of Alecto Ohio
22  Valley, that Alecto Ohio Valley had that.  I don't
23  believe there's any written consents to that effect.
24  Are there a lot of discussions, a lot of

75

1   conversations with a whole boat load of people, yes,
2   but there's no official one-page, two-page written
3   consent.
4    Q. And as corporate secretary for both the
5   Alecto Wheeling and AHS, you would know if there
6   were any written consent; correct?
7    A. If there was a written consent, I would have
8   drafted it, so I would know, yes.
9    Q. And you didn't draft any such written
10  consent; correct?
11   A. No, because no written consent was required.
12   Q. Between 2017 and you know, the middle of
13  2019, how would you describe the condition of OVMC's
14  physical infrastructure and equipment?
15   A. OVMC specifically, its infrastructure was
16  aged.  There were things we had a -- at one point in
17  time we had a burst pipe, due to a winter storm, or
18  a freeze.  It was aged.  The equipment was aged.
19  The building was aged.  There were repairs being
20  made, but it was an old building when we bought it,
21  and it was an old building through that period of
22  those two years.  Certain parts were older than
23  others.
24       A building's a complex, like, a lot of

76

1   hospitals, one part was built a hundred years ago,
2   then they add another part, and they add another
3   part, and there's different ages of different
4   buildings.  But it was an older building.
5    Q. Did some of the -- sorry.
6       Did some of the buildings, or portions of
7   the structures, at OVMC need to be torn down?
8    A. There was discussion about tearing down the
9   nurse's residence, which was an old building that
10  was I think used for offices but next to no patient
11  care, and at some point had, in the history, had
12  housed nurses when they came for nursing school.
13  There were, kind of, ongoing discussions about
14  tearing that building down and creating more
15  parking, but that was an expensive proposition.
16      Then there was also -- I know Congressman
17  McKinley's wife, I think, had some concerns, kind of
18  the historical relevance of the business, would you
19  want to tear that building down.  But that was the
20  primary building that needed to be torn down.  Well,
21  there was discussions about -- whether it needed to
22  be or not, there was discussions about tearing down
23  the nurse's residence.
24   Q. Were there discussions about tearing down

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

77

1  any other buildings?
2      A. I don't believe so.  There may have been
3  some older buildings related to the nurses'
4  residence, but I don't believe there was discussion
5  about tearing down other buildings.
6      Q. Were there other buildings that needed to be
7  updated, even if they didn't need to be torn down?
8      A. Yeah.  In different levels, things needed
9  paint, some needed more infrastructure stuff.  Sure,
10  there were buildings that needed improvements to the
11  campus that hadn't been done for a long time.
12      Q. Did defendants ever estimate how much money
13  would be needed to update the physical
14  infrastructure and equipment at OVMC?
15      A. I don't think Alecto Wheeling ever -- ever
16  went through a full -- full, full assessment of what
17  would be required.  I know Alecto would have done
18  it.  Alecto Wheeling would have done it.  I think at
19  some time there was an estimate to tear down the
20  nurse's residence.  It would have been a half
21  million, or 800,000.  There were different projects
22  being identified and estimates for and stuff like
23  that.  We may have even hired an architect or
24  planning company to do that.  But I don't know if

78

1  there was ever a formal estimate to do that, an
2  overall scope of work.  Like, to get to be, like,
3  perfect, it would cost $50 million.  I don't think
4  there was ever an overall scope of work like that.
5  If there was, I wasn't part of it.
6      Q. Okay.  Did you have any knowledge of OVMC's
7  financial condition in that 2017 to 2019 period
8  after the sale of OVMC?
9      A. I had knowledge of it before and after, yes.
10      Q. Okay.  And sort of focusing on the period
11  after the acquisition of OVMC, how would you
12  describe its financial condition?
13      A. It was a poor financial condition.  It was a
14  distressed financial condition.  Partly because of
15  the liabilities that were assumed as part of the
16  sale and bills that weren't paid before the sale and
17  a number of other factors caused that distressed
18  financial condition.
19      Q. Okay.  So you said that there were -- after
20  the sale there were -- there were unpaid bills and
21  liabilities that were assumed; is that right?
22      A. Correct.  There were bills that weren't paid
23  before the sale.  They were in bad shape before the
24  sale.  They actually qualified for an exemption from

79

1  the certificate of need, because of this stress.  So
2  those liabilities were assumed.  So, in addition to
3  the operating expenses day-to-day, there were the
4  old liabilities that had to be paid as well.
5      Q. Right.  And were there -- did OVMC continue
6  to be distressed after its acquisition in 2017?
7      A. Yes.
8      Q. Okay.  You mentioned there were some other
9  factors that were reasons why it was in distressed
10  condition.
11      What were you referring to?
12      A. One of those was Wheeling Hospital and its
13  then for-profit manager, and frankly, Catholic
14  diocese illegal conduct towards Ohio Valley and East
15  Ohio.  And then -- at least what the federal
16  government believes is violations of federal law
17  about inducements and recoupment.  That was one
18  factor.  An aging physician base, and physicians
19  leaving the market, an increase in the
20  self-payer/uninsured payer mix led to patient volume
21  that wasn't being paid.
22      You mentioned building needs.  Repairs and
23  maintenance.  Those were the factors that Wheeling
24  Hospital is a big factor in what they did.  They

80

1  broke up -- they had a joint trauma program, they
2  broke that up.  Physicians were demanding more money
3  to get paid call, because they were probably being
4  overpaid for call at Wheeling Hospital.  Any number
5  of factors that caused that.
6      Q. Okay.  Let me go back and ask you for a
7  little bit more detail on a few of those.  You
8  mentioned something about the payment mix.
9      What were you referring to there?
10      A. I think I said payer mix.  So --
11      Q. I'm sorry.  Payer mix.
12      A. Obviously, as hospitals, we have to take
13  whatever patients come in; right?  We don't get a
14  choice of what patients come in.  And so, in the
15  ideal world, you have more commercial patients, you
16  know, PPO and HMO, that you get reimbursed better
17  for.  You have Medicare, Medicaid and then you have
18  a certain percentage of self-pay patients.  So if
19  your payer mix deteriorates, you're getting more
20  self-pay patients coming in that you're not going to
21  get paid anything for.  That affects your revenue.
22  Still costs the same to provide the care, and if
23  you're not getting paid anything for it versus
24  getting paid something for it.  So, then that payer

---

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

81

1  mix changes to the worse, it affects your financial
2  condition.  Because you've still got to provide the
3  care, but you're not getting paid anything for it.
4      Q.  So over the 2017-2018 period, did the payer
5  mix deteriorate?
6      A.  My recollection and understanding is that
7  the payer mix did deteriorate, and we would see
8  more -- more self-pay patients, uninsured patients,
9  in the ED.
10     Q.  And that had a negative effect on the
11 hospital's earnings?
12     A.  Yeah, because it had cost to provide that
13 care and no corresponding revenue, or the revenue
14 received was less than the cost to provide the care.
15     Q.  Okay.  And you also mentioned something
16 happening to the joint trauma group.
17         When did the joint trauma group leave OVMC?
18     A.  It wasn't a joint trauma group.  Maybe I
19 said it wrong.  There was a joint trauma program
20 between Wheeling Hospital and OVMC.  And effectively
21 what it meant was each of them had a trauma program,
22 and they rotated.  I believe it was day-to-day.  So
23 on Monday, Wheeling Hospital was the trauma center.
24 On Tuesday, OVMC was the trauma center.  And the

82

1  advantage of that was we shared the cost for having
2  the doctors on call, the trauma surgeons on call.
3  And then the paramedics would -- if it was a trauma
4  case on a Tuesday with Ohio Valley, they'd go to
5  Ohio Valley.  And vice versa.
6          Some time in -- I believe in '18, that was a
7  joint trauma program, unbeknownst to us, Wheeling
8  Hospital went to the state and said, we don't want
9  the joint trauma program anymore.  We had problems
10 with our trauma certification that we were fixing
11 that predated the closing, predated June 1st, 2017,
12 and that wasn't disclosed to us, but we were
13 addressing that with the certification program.  And
14 then Wheeling Hospital said we don't want to be part
15 of the joint program anymore.  The state pretty much
16 let them do that.  We don't think they should have
17 let them do that.  So therefore we didn't have -- we
18 either would have had to do the trauma program all
19 on its own, which really wasn't possible, or -- and
20 we lost those trauma programs.
21     Q.  When did OVMC lose its trauma program?
22     A.  I want to say 2018, 2019.  I don't know the
23 exact date.  I'd have to look it up.
24     Q.  And you also mentioned -- so okay.  So the

83

1  joint -- so let me just to clarify, so the joint
2  trauma program, Wheeling Hospital went to the state
3  sometime in 2018 and said, we don't want to do this
4  anymore?
5      A.  Yeah, and I don't know the exact date.  But
6  yeah, Wheeling Hospital said we're pulling out of
7  the joint trauma program.  There's no more joint
8  trauma program, and -- the trauma like that has to
9  be -- the state designates you as a trauma center;
10 right.
11     Q.  Right.
12     A.  They had this thing built up as a joint
13 trauma program.  Wheeling Hospital were -- likely,
14 Ron Violi, the for-profit guy went and said, we
15 don't want to do this anymore.  And that just left
16 us hanging in the lurch.
17     Q.  Right.  And so after -- when they went to
18 the state, and after you -- after OVMC was notified,
19 was there a lag, or was it immediate, that they
20 pulled out, and OVMC had to either cover or cut its
21 trauma program?
22     A.  It was like a 30 or 60 days.  I think they
23 pulled out pretty quickly.  And then, the paramedics
24 obviously pull out.  Generally, trauma pays pretty

84

1  well, so you're not -- you get good reimbursement
2  for trauma cases, and we lost that.  I think it was
3  like 30 or 60 days, and we fought with the state.
4  We fought with them and everything.  But everyone
5  just kind of told us, pound sand, this is what is
6  we're doing.  I think it was like 30 or 60 days.
7      Q.  So by the end of 2018, it was clear that
8  OVMC wasn't gonna have a trauma program anymore?
9      A.  I think so.  And I just could be wrong on
10 the dates, but there was a period of time where it
11 was clear.  We couldn't at that level -- we could
12 have trauma, but not the level of trauma that we
13 needed to have, that was beneficial, that was part
14 of that joint trauma program.  And, if we wanted to
15 have it, we would have to pay for every day of call,
16 which wasn't financially feasible.
17     Q.  Okay.  So it was less expensive to eliminate
18 the program than to offer it?
19     A.  We couldn't even get the state to designate
20 us at the right level of trauma to get the trauma
21 that we wanted.  I think it's like level 2 trauma
22 versus level 3, level 4.  Level 2 is where the joint
23 program was.  We couldn't get to the that because we
24 didn't have the call coverage, and the state

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

85

1  wouldn't designate us as that.
2      Q. So the loss of that joint trauma program was
3  also something that negatively affected OVMC's
4  earnings?
5      A. When you say earnings, I think of income or
6  financial condition, yes.
7      Q. Okay.  And you had also mentioned Wheeling
8  Hospital overpaying as a factor in the deterioration
9  of OVMC's financial condition.  Tell me more about
10 that.
11     A. So, if there's a lawsuit out there -- and I
12 think Wheeling Hospital paid like 50 or $60 million
13 to the government to settle it.  They were
14 overpaying to recruit doctors.  One, they would
15 employ doctors and overpay, they were also
16 overpaying for call.  And because of that, doctors
17 were getting recruited away from Ohio Valley, and
18 going to Wheeling Hospital.  And then when they
19 became employed, they were exclusive to Wheeling
20 Hospital.  They couldn't even practice at OVMC
21 anymore.
22         Then we had trouble getting doctors to
23 provide call for the same reason.  Or, I'm just
24 throwing these numbers out there as an example.  If

86

1  the market rate was 1,500 a day for a surgeon, and
2  Wheeling Hospital was paying 1,800, if we didn't pay
3  1,800, the surgeon wouldn't stay.  And so, they were
4  driving up the market price for those rates.  And
5  that's a violation of federal law, the Stark law,
6  and the Anti-kickback law.  That's what lawsuit is
7  about.  But they were overpaying for that,
8  overpaying for physicians, recruiting physicians
9  away, and getting them exclusive to Wheeling
10 Hospital.  Not necessarily -- some employed
11 physicians, but even community physicians, they were
12 hiring them, saying you can't go to any other
13 hospital except us.  So we were losing those
14 community physicians.
15     Q. So this -- these -- were these practices all
16 alleged in the lawsuit?
17     A. I believe a lot of the practices were
18 alleged.  We're not party to that lawsuit so -- and
19 I'm sure there's a lot of discovery that we're not
20 party to.  But there's a federal action.  Generally
21 my experience is, when you pay 50 or $60 million,
22 the government has got you pretty good on it, so...
23     Q. As far as you're aware, when did -- when did
24 those practices that you just referred to, what time

87

1  frame did they begin in?
2      A. Well, I think they probably started prior to
3  2017, and they certainly continued past 2017.  They
4  did other things after 2017, including in 2019, that
5  caused harm to Ohio Valley.  But the Stark, the
6  Stark and the anti-kickback violations, I think they
7  have some stuff ongoing, and they certainly
8  ratcheted up to -- I think Wheeling Hospital's goal
9  was, or at least a for-profit operator, was to crush
10 Ohio Valley Medical Center.
11     Q. Okay.  Okay.  And it sounds like to your
12 understanding, those -- those practices predated
13 Alecto Wheeling holding the assets of OVMC, and then
14 continued after that point?
15     A. Some of the practices, yeah.  Again, I'm not
16 privy to all their physician contracts, and all
17 their payments and stuff when they were doing that,
18 but we certainly saw those practices after 2017 and
19 continuing.  And I believe some of those practices
20 had started before then as well.
21     Q. Okay.  After defendants acquired OVMC, did
22 the hospital suffer operating losses?
23     A. Yeah, I believe it suffered operating losses
24 every year.

88

1      Q. Okay.  So OVMC had operating losses in 2017?
2      A. Yeah.  It had operating losses before we
3  acquired it, and after we acquired it.  They were in
4  default with their loan when we acquired it.  That's
5  why it was for sale.
6      Q. But the Opus loan was paid off as part of
7  the sale; right?
8      A. Correct.  It was in default and had to be
9  paid off.  Opus required it to be paid off.
10     Q. And so -- but even after those accounts were
11 squared, there were operating -- operating losses
12 that occurred in the second half of 2017; is that
13 right?
14     A. I believe so.  I'd have to go back and look
15 at the financials, but I'm pretty sure there were,
16 yes.
17     Q. And what about in 2018?
18     A. Yeah, I'm pretty sure there were losses in
19 2018 as well.
20     Q. And what about in the first half of 2019?
21     A. There were certainly losses in 2019, yes.
22     Q. Did OVMC perform worse financially than
23 AHS's other hospitals?
24     A. It would depend on -- again, they're not AHS

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

23 (89 to 92)

89

1  other hospitals, but those other subsidiaries, it
2  would depend on -- some yes, some no, but generally
3  yes.
4        Q. In the 2017 to 2019 time frame, did OVMC
5  have a pension plan?
6        A. It had a frozen pension plan, but yes.  It
7  still has a pension plan.  Technically the pension
8  plan sits with Alecto Ohio Valley as the sponsor,
9  but yes.
10       Q. So the sponsor was Alecto Ohio Valley.  Was
11 the -- but it was a pension plan that had applied to
12 OVMC employees?
13       A. OVMC employees and East Ohio employees.
14       Q. And was that --
15       A. And just to clarify, I mean some of the
16 people that were participants were retired too, or
17 had left, but were there before it got frozen.  But
18 yes, it was specific to those employees.
19       Q. Was it in 2017 through 2019 time frame, was
20 the pension plan underfunded?
21       A. No, I believe the funding was always above
22 80 percent.  I think even -- I don't know now
23 because how the market's behaving, but it's always
24 been funded above that 80 percent level.  It's been

90

1  funded above that 80 percent -- 80 percent is kind
2  of the threshold.  I believe from the actuarial
3  standpoint, it's been above 80 percent.  Now, again,
4  the recent market changes, I'm not sure how that's
5  going to affect the funding levels.
6        Q. So sort of big picture, did OVMC's financial
7  condition deteriorate steadily after it was acquired
8  by Alecto Wheeling?
9        A. No, I don't think it deteriorated steadily.
10 I mean, I think it deteriorated, it got a lot worse
11 in summer of '19, but I don't think it deteriorated
12 steadily.  I mean, certain things changed, certain
13 events happened, but there were opportunities, there
14 was hope, there was a plan, hopefully a plan, but by
15 the summer of '19, that plan seemed to look a lot
16 less possible.
17       Q. Okay.  You just referred to a plan.  I'm
18 gonna come back to that.  Maybe this is -- did AHS
19 at some point decide to try to sell OVMC?
20       A. Well, AHS wheeling did.  Try to find either
21 a seller or partner.  Somebody for those hospitals.
22 Was AHS part of that decision?  Sure, that was a
23 collective decision.  But the sellers was AHS
24 Wheeling and AHS Martins Ferry, yes.

91

1        Q. AHS Wheeling held the assets at the
2  hospital; right?
3        A. Correct.  Well, technically it had certain
4  assets.  Remember, the real estate wasn't owned by
5  AHS Wheeling.
6        Q. One of the MPT subsidiaries held the real
7  property?
8        A. Correct.
9        Q. Okay.  But in terms of the decision to try
10 to sell OVMC, it sounds like you were saying that
11 that was a collective decision between AHS and
12 Alecto Wheeling; is that right?
13       A. Yeah.  I'm not sure if it's collective as
14 between -- it was collective among everybody
15 involved, to try to find either a strategic
16 partner -- which a lot of people use the term
17 strategic partner or a buyer for those hospitals.
18 One or both hospitals.
19        Or, do something with somebody that would
20 bring in a -- take over a floor or do something.  A
21 hospital within a hospital.  To look for something
22 to increase, improve the financial performance, and
23 have those hospitals perform better.
24       Q. Why did AHS and Alecto Wheeling first decide

92

1  to try to sell OVMC?
2        A. Because its -- Alecto Wheeling's collections
3  weren't sufficient to meet their operating expenses,
4  and they were having to provide -- and other
5  hospitals were having to provide funding for
6  Wheeling and OVMC and East Ohio, and OVMC and East
7  Ohio were getting further behind with vendors and
8  other obligations.  So they weren't meeting their --
9  they weren't paying their bills.  They were getting
10 problems with vendors and paying obligations, and
11 the gap increased between what the collections were
12 and what the funding needs were to just even meet
13 the basic funding needs.
14        And like, for example, the basic funding
15 needs didn't include the rent payment that was due
16 to MPT.  So because of that, we looked to see if
17 there was an opportunity.  We still thought that
18 Ohio Valley presented opportunities with the right
19 partner, the right buyer, or perhaps a bigger health
20 system that had a bigger -- bigger footprint, so to
21 speak.
22       Q. So at the time that AHS Alecto Wheeling
23 decided to try to sell OVMC, its collections weren't
24 sufficient to, you know, break even, it was getting

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

93

1  further behind on paying its bills, and it also
2  couldn't pay its rent; is that fair?
3      A. That's correct, yes.
4      Q. And did you have a role in the decision to
5  try to start trying to sell OVMC?
6      A. I had a role in that.  Then I had a role in
7  the discussions with people that were trying to --
8  we were trying to encourage to acquire OVMC.  Most
9  of the discussions were OVMC and East Ohio together.
10 Some were just OVMC.  Some were just East Ohio.  But
11 most of the those discussions were -- because the
12 two hospitals really went together, so to speak;
13 right, so it was both of the hospitals.
14     Q. What was -- what was your role in the
15 initial decision that it made sense to try to find a
16 buyer for OVMC?
17     A. Ongoing discussions about the cash flow, and
18 then, would there be people who we can talk to and
19 who should we talk to about, you know, potential
20 parties to talk to and we should be doing something.
21 In addition to trying to fix the operations and turn
22 around the operations, we should also be looking at
23 other options as well.  Because they were doing two
24 things at the same time.  Trying to fix the

94

1  operations, trying to fix it so we wouldn't have to
2  do anything.  It wasn't our preference to sell but
3  at the same time, looking for other options as well.
4      Q. So you -- so you -- so you participated in
5  discussions about whether it made sense to try to
6  find somebody to buy OVMC; is that right?
7      A. That's correct.
8      Q. Okay.  And it sounds like you also had a
9  role in defendants' efforts to sell OVMC or find a
10 buyer; is that right?
11     A. Correct.  Or a partner.  To try to find
12 someone else to become involved with the hospitals
13 is the best way I can describe.
14     Q. Okay.  What's the difference between -- I've
15 heard you say two things: To find a buyer, and then
16 also a strategic partner.  What was the difference?
17     A. Well, a buyer could be, would buy it
18 outright.  A strategic partner could be someone to
19 come in and take over the medical group that
20 employed physicians.  A strategic partner, there was
21 one entity we talked to that does neuropsychiatric
22 stuff.  Come over, and take like a floor of the
23 hospital, and basically run the floor.  So I view
24 that more as a strategic partner.

95

1      Or an investor who would be willing to
2  invest, and say, okay, I'll acquire 50 percent of
3  the hospital, or any kind of different things.  When
4  I view a strategic partner, a buyer, when I think of
5  a buyer, it's buying the assets; right?  It's, okay
6  I'm going to take over that.
7      We thought about is there someone -- there's
8  an office building, there's a newer office building
9  on the OVMC campus and some older buildings.  Is
10 there someone that could -- they couldn't own it,
11 but would someone be willing to lease the whole
12 building out, you know, and start paying rent to us
13 so we could pay more money to MPT.  Those kind of
14 things.  When I think of buyer, it's -- they're
15 buying the assets and taking it over.  Strategic
16 partners, they're doing something different than
17 buying the assets.
18     Q. So a strategic partner would be somebody who
19 might, you know, take over one -- one little -- one
20 piece of the larger --
21     A. They can take one component of it, like I
22 said, the neuropsychiatry, they could take a
23 percentage of the operations.  Or, a big money loser
24 was employed physicians, right?  We employed a

96

1  number of physicians.  And take over the medical
2  group and become -- take over the employee
3  physicians would be another thing.  But it would be
4  taking a segment of it as a strategic partner, or
5  just acquiring a percentage of the operations.
6      Q. When did AHS first begin?  Or defendants --
7  I guess as a collective -- first begin trying to
8  find a buyer or strategic partner?
9      A. There's some discovery responses I just want
10 to check because there's some dates.
11     Q. Well, before you do that, hold up.  Put that
12 down.  Let's talk about your recollection first.
13 And then we can look at documents.
14     A. My recollection would be spring, spring of
15 '19.  Spring through the summer of '19 would be my
16 recollection.
17     Q. Okay.  Did defendants ever receive any
18 offers to buy OVMC at any time?
19     A. No.  We never received -- actually not OVMC,
20 no, we never received an offer to purchase OVMC.
21     Q. Did defendants ever receive an offer to be a
22 strategic partner from anyone?
23     A. Nothing formal.  The neuropsychiatric group,
24 there was some preliminary discussions about trying

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

**97**

1    to do something with the floor of the hospital.  I
2    don't think that -- that never made it to writing,
3    and never really kind of went beyond that.
4        Q. So no, there was no formal offer by anybody
5    to be a strategic partner?
6        A. No formal offer, you're right, correct.
7        Q. Over what period of time, or length of time,
8    was OVMC trying to find a buyer or strategic
9    partner?
10       A. So that spring of '19, if that's the correct
11   kind of start date, spring of '19 until October
12   November of '19.  Maybe even beyond November of '19
13   after the services were suspended there was still
14   efforts going on with that.
15       Q. Did defendants retain any -- any third party
16   to assist in finding a buyer or strategic partner?
17       A. We didn't engage any third party.  We
18   couldn't afford to engage that third party.  We did
19   ask MPT, because they have relationships with other
20   operators, large operators, to reach out to them on
21   our behalf, and we actually had direct discussions
22   with those people as well.  But we didn't hire,
23   like, an investment banker.  We talked about it, but
24   that cost money, and there weren't sufficient funds

**98**

1    to do that.
2        Q. AHS or some of its other subsidiaries did
3    retain investment bankers to find buyers for other
4    hospitals; correct?
5        A. At one point we engaged an investment banker
6    to look for buyers or strategic partners for our
7    hospital in Texas.  And then at one point prior to
8    that, like in 2017, we had an investment banker just
9    over all investment into Alecto.  But yeah, we had
10   an investment banker look at -- look for buyers for
11   our hospital in -- the hospital in Texas, correct.
12       Q. Okay.  Okay.  Before you mentioned that by
13   summer '19, the plan looked a lot less possible.  Do
14   you remember saying something like that?
15       A. Yeah.  I don't know if it was a plan, but
16   the hope, the hope was -- the hope, the optimism was
17   going down, would be the best way I could say it.
18       Q. So okay so by -- meaning the hope of
19   selling -- selling OVMC or finding a strategic
20   buyer -- a strategic partner for it?
21       A. The hope of the operations turning around,
22   changes to operations improving the financial
23   performance -- that's what I was referring to as the
24   plan -- became less likely it was going to turn

**99**

1    around on its own, and the hope of finding a buyer
2    or strategic partner, the same time, by the middle
3    of summer, July, August '19, those were getting less
4    hopeful as well.
5            We did more and more in August, and
6    September, and October, different options after we
7    announced the closure, we continued discussions, but
8    those hopes of not having to announce a closure,
9    obviously the hope of being able to do it without
10   having to announce that, went away.
11       Q. By early summer of '19, did you have a view
12   on whether defendants were going to be able to sell
13   OVMC?
14       A. I still thought there was an opportunity to
15   sell OVMC, or do something with somebody including
16   WVU, or Wheeling Hospital, as it relates to OVMC.
17       Q. Did you think it was likely?
18       A. How do you define likely?  I mean, what
19   percentage would be likely?
20       Q. Well, do you think it was more likely than
21   not, that there was gonna be a buyer?
22       A. I thought it was likely.  I would say it's
23   probably -- I would give it, like a 50 or 60 percent
24   probability, I thought, in the early summer of '19.

**100**

1        Q. Did your view ever change?
2        A. Yeah.  I mean, the view changed when we --
3    well, even after we announced the closure, I still
4    thought something would happen.  But by October of
5    '19, my view changed, yes.  For OVMC specifically,
6    yes.
7        Q. Meaning as opposed to EORH?
8        A. Yeah, I had different views on East Ohio,
9    yes.
10       Q. Did defendants ever calculate how much money
11   would be needed to make OVMC profitable in 2019?
12           MR. GARRISON:  Objection.  Asked and
13   answered.
14       A. What do you mean by how much money would
15   make it profitable?  You know, obviously we had the
16   financial statements.  We knew what the revenue was.
17   We knew what the expenses were.  We knew what the
18   gap was.  So we had -- we had that.  I don't know if
19   we ever did and said okay we need to invest
20   $30 million into the hospital.  But generally we
21   knew what -- the general thing would have to be
22   significant recruitment of physicians, which based
23   on what Wheeling Hospital was doing, would probably
24   cost at least $10 million.  But I don't know that we

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

26 (101 to 104)

---

101

1  had a formal estimate of that.  We had financials
2  that said -- I'm just making these numbers up -- it
3  costs 8 million bucks a month to run the place, and
4  we're collecting six and a half.  So obviously we
5  need at least a million and a half more, you know,
6  kind of thing.  But there was no formal -- I don't
7  think there was any formal, hey, we need another
8  $20 million.  And borrowing the money wasn't
9  possible so, that's what I would say.
10 BY MS. DAVIDSON-WELLING:
11     Q.  What do you mean borrowing the money wasn't
12 possible?
13     A.  Well, we had nothing to offer as collateral.
14 So MPT had a lien over all the assets except the AR.
15 White Oak, then CNH, had an asset -- a lien over all
16 the accounts receivable.  The federal government had
17 a lien because we were behind paying the IRS payroll
18 taxes.  So any lender wants to have collateral.
19 They want collateral for their loan.  Just like if
20 you have a house, and your house is worth a million,
21 you have a million dollars' loan, you can't go get
22 another home loan.  You need collateral.  We had no
23 collateral to offer to anybody to get a loan.
24     We have nothing -- nothing that was

---

102

1  unencumbered that we could offer, and all the other
2  Alecto hospitals were already cross-collateralized
3  with Ohio Valley.  So we had already offered that
4  security to get the financing we got.  We gave up
5  the value in those other hospitals to get Ohio
6  Valley the security it had and the financing it had.
7  So there was nothing to -- nothing to offer to a
8  lender.  No lender was going to lend to us without
9  collateral and there was nothing -- you couldn't do
10 AR lender, but the borrowing would be the same,
11 because it's the same collateral.  MPT had a lien
12 over everything other than the AR.
13     Q.  Okay.  So basically, you know, in 2019,
14 there was really no way to get a loan for, like,
15 additional investment funds?
16     A.  Correct.  Well, the only hope of getting a
17 loan would have been from, like, we asked the
18 Catholic diocese, we asked the governor.  It would
19 have to be an unsecured loan, more likely a grant
20 than it would be a loan, a traditional loan that you
21 would get from a lender or a financing source.  But
22 we did ask the government for a loan.  We asked -- I
23 wrote a letter, at one point, to the bishop for
24 money and kind of -- new bishop tried to -- I'm

---

103

1  Catholic.  I tried to use some Catholic guilt on
2  them, I really thought they should step up and do
3  something.  But any traditional financing sources
4  there was not a possibility.
5     Q.  When you say that you asked the Catholic
6  Church for money, how much did you ask them for?
7     A.  I don't know if there was a specific ask for
8  money.  I asked them to support the hospital, and
9  suggested that Wheeling Hospital should buy Ohio
10 Valley and take over Ohio Valley.  I wrote a letter.
11 He was a brand-new -- right when the bishop got
12 installed, he had made a public speech and said a
13 bunch of stuff, and I tagged off of that what he was
14 saying they were supposed to be doing, and I said,
15 well, you should do that in this case and take over
16 Ohio Valley, and pointed out what they had been
17 doing to us in a letter.  There's a letter I wrote
18 to the bishop.
19     Q.  So you wrote a letter to the bishop asking
20 him to support OVMC, not necessarily to like, donate
21 funds directly?
22     A.  Yeah.  And I think Dan Dunmyer -- I know Dan
23 Dunmyer was meeting with people that were involved
24 with the diocese and diocesan committees and

---

104

1  whatnot.  Like the bishop's advisory council.  I
2  just forget their names.  But there was a couple
3  different people that Dan Dunmyer met with as well.
4     Q.  And then, how much money would OVMC have
5  needed at that point?
6     A.  Well, if it would have gotten 5 or
7  $10 million, it could have kept going for a while,
8  could have made some changes.  If Wheeling Hospital
9  would have gotten better and stopped behaving badly,
10 it could have done better, and they would've stopped
11 doing what they were doing.  Wheeling Hospital was
12 telling patients oh, OVMC doesn't take your
13 insurance, or, you're Medicare, you can't go to
14 OVMC, you're Medicaid, you can't go to OVMC.  They
15 were offering employees -- they were paying
16 employees with Walmart gift cards, so they wouldn't
17 have to pay taxes.  And our employees were saying,
18 well, why don't you do that for us?  Well, we
19 weren't going to violate the law.  So we didn't do
20 that.
21     So our employees left, or even our per diem
22 employees, they wouldn't work -- they'd work more at
23 Wheeling Hospital.  That's the kind of stuff they
24 were doing, so...

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

27 (105 to 108)

---

105

1    Q. Did you have any reason in 2019 to believe
2 that Wheeling Hospital was going to change what it
3 was doing?
4    A. Well, eventually they did because they
5 kicked out the for-profit operators, and they
6 brought in WVU, and WVU behaves correctly and
7 behaves in accordance with the law. Fair
8 competition but not illegal competition. I hope
9 that -- I hope the new bishop, because the old
10 bishop got kicked out for a big huge scandal, I
11 hoped the new bishop would actually bring some
12 sanity into it.
13    Q. So you were saying that they were -- that
14 you were mentioning some monetary figures. To your
15 recollection, was there ever an estimate that AHS
16 calculated was what OVMC would need to continue
17 operating for an additional year?
18    A. Well, at one point we asked MPT for
19 $20 million, so that's an indicator. I'd have to go
20 back and look at the financials, but depending on
21 what the losses were, it would have been used to
22 cover those losses. So, if you looked at the
23 financials for, let's say, the first six months of
24 2019, first seven months, you figure out what those

---

106

1 losses were, you'd at least need that to cover your
2 losses.
3    But I don't think we'd ever added up --
4 other than having financial statements, I don't
5 think we actually had sat down and said, okay we
6 need this, this, and this. We knew we were in a
7 distress situation, and we were trying to figure out
8 any way to solve that distress.
9    Q. Okay. But as you said, you asked MPT for 20
10 million and that's an indication that was what you
11 thought you needed?
12    A. That's why we asked for $20 million. The
13 $20 million would have helped turn around OVMC, yes.
14 Less than 20 million could have helped OVMC continue
15 to operate, maybe on a break-even basis.
16    Q. As long as it covered whatever the operating
17 losses were?
18    A. Yeah, the 20 million was to get it beyond
19 break even, and improve it. The idea was to have
20 profits so you could put back into a hospital.
21    Q. How much did OVMC ask the government for?
22    A. I'm not sure if we asked for a specific
23 number. I wrote a letter to the governor, and at
24 some point Mr. Garrison and I met with Bill Crouch,

---

107

1 the secretary of the DHHR, and asked for support. I
2 don't think we ever asked for a specific number,
3 because my experience is when you ask the government
4 for a specific number, they just immediately say no.
5 So we asked for support, knowing that they can
6 provide us support in any number of different ways.
7    Q. When did you ask for support from the
8 governor?
9    A. We met with Bill Crouch I believe in July of
10 '19. And then I wrote a letter to the governor that
11 he wasn't very happy to get, I think, in August of
12 '19 or late July of '19. I forget the date of those
13 letters. But I think the Bill Crouch meeting was
14 June or July of '19.
15    Q. And in those communications, you asked for
16 support but didn't ask for any specific dollar
17 amounts of funds?
18    A. I don't believe so. I'd have to look at the
19 letter, but I don't believe I said give us
20 $10 million, give us $5 million. But support
21 because there's all kinds of different buckets they
22 could pull the money from, in my mind.
23    Q. Those communications that you refer to, were
24 those -- those -- those requests made specifically

---

108

1 in letters to Mr. Crouch and to the governor?
2    A. I don't think there's a letter to
3 Mr. Crouch. We actually met in person with
4 Mr. Crouch in Charleston. There is a letter to the
5 governor, yes, like there's a letter to the bishop.
6    Q. Did OVMC receive any monetary funds from the
7 government after July of 2019?
8    A. Well, we got paid, the whole company --
9 you're saying that's kind of an open question. So
10 obviously we got paid by West Virginia Medicaid,
11 maybe some supplemental money. But in response to
12 the specific request, I don't believe so, no.
13    MR. GARRISON: Hey, Maureen, this is Mike
14 Garrison. Would you mind if we took a very quick
15 five-minute break?
16    MS. DAVIDSON-WELLING: I'm also fine to do
17 like a 20 or 25-minute lunch break. You know, I
18 don't want to starve anybody. It's 2 o'clock on our
19 end.
20    MR. GARRISON: Yeah, I'm completely open.
21 We'll work with you, but we don't need more than
22 five minutes, but if you need to take longer, we
23 can.
24    MS. DAVIDSON-WELLING: All right. So, why

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

109

1  don't we take 20 minutes.  That way anybody who
2  wants to eat who -- can.  But it's 2:10 now.  That
3  would take us to 2:30.
4      MR. GARRISON:  Okay.  That sounds great.
5      THE VIDEOGRAPHER:  Okay.  It is 1:10 p.m.
6  We go off the record.
7      (A short break was had.)
8      THE VIDEOGRAPHER:  It is the beginning of
9  Media Number 3 of the testimony of Michael Sarrao.
10 It is 1:41 p.m.  We are back on record.
11 BY MS. DAVIDSON-WELLING:
12   Q.  Mr. Sarrao, so before the break, we were
13 talking about efforts to find a buyer for OVMC or a
14 strategic partner.
15      Do you recall that?
16   A.  I do.
17   Q.  Okay.  And you had testified that you had a
18 role in that process; correct?
19   A.  Correct.
20   Q.  Other than you, was there anyone else who --
21 who had a role, or who was in charge of trying to
22 find a buyer or strategic partner for OVMC?
23   A.  I don't think anybody, one person, was in
24 charge.  Different people had roles and we were

---

110

1  talking to different people.  So there was myself,
2  Mr. Krissman before he retired, Mr. Redin, Jeremy
3  Redin after Mr. Krissman retired, Mr. Reddy,
4  Mr. Dunmyer, Ms. Coello, they were involved.  Jeff
5  Meek was involved somewhat in preparing financial
6  data and stuff like that.  I know that Mr. Garrison
7  as our counsel reached out to some of the people
8  that his firm had relationships with, like UPMC.
9  Mr. Garrison attended some of the meetings with me
10 with Bill Crouch and other people like that.
11     There may have been one or two other people
12 at the hospital.  So Dan Dunmyer was reaching out to
13 the people locally, like at the diocese and Wheeling
14 Hospital, and he would have been talking to them,
15 and sometimes was, like -- Dan was from that area,
16 like, he had gone to college with somebody who knew
17 the bishop, and they coached basketball together, or
18 something like that.  So anybody we could reach out
19 to, we were talking to.  So everybody was playing a
20 role in talking to everybody we could talk to.
21   Q.  Was there someone who had primary
22 responsibility for trying to find a buyer or
23 strategic partner?
24   A.  I would say if anybody had primary

---

111

1  responsibility it would probably be me.  Because
2  like, buyers would want nondisclosure agreements, so
3  that would be me doing the nondisclosure agreements.
4  I would coordinate things.  Some of the people we
5  talked to -- like, I thought Prime Healthcare was
6  really going to buy the hospitals.  And we had
7  all -- myself, Mr. Krissman, and Mr. Reddy -- had
8  all worked at Prime.  We were talking to people, but
9  I was probably talking to the people at Prime the
10 most.  So if there was primary responsibility, I had
11 primary coordination, but we were all doing it.
12 Probably that got coordinated through me.
13   Q.  So you were the primary coordinator for --
14   A.  Yeah, except for Dan Dunmyer when he was
15 talking to the local people, he was doing that on
16 his own.  He knew the people.  I had met some of
17 them.  At one point we had, in August, we had a
18 meeting with all kind of different community people:
19 Elected officials, the county sheriff, and all that.
20 I attended that meeting with Mr. Garrison and his
21 partner, Mr. Kroft, so I was kind of out there doing
22 that stuff, yes.
23   Q.  Okay.  All right.  So I'm going to put a
24 document in front of you.

---

112

1      MS. DAVIDSON-WELLING:  Would the video
2  technician drop into the chat -- it's 31997 through
3  32009 is the exhibit.  And I will put that up on my
4  screen, Mr. Sarrao.
5      (Exhibit 3 was marked for identification
6  and is attached to the transcript.)
7      MS. DAVIDSON-WELLING:  Hold on.
8      THE WITNESS:  That's the hard part about
9  Zoom depos; right?  You can't just hand them across
10 the table.
11     MS. DAVIDSON-WELLING:  You can't hand them
12 across the table anymore.
13     All right.  And that will be marked as the
14 next deposition Exhibit 3, please.
15 BY MS. DAVIDSON-WELLING:
16   Q.  Oops, that's not the right one.  Sorry about
17 that.  Let's see here.  Okay.  Here we go.  Okay.
18 Okay.
19     So this is an email with some attachments
20 that was produced in this case.  Take a look at the
21 email, and then I will scroll down, Mr. Sarrao,
22 whenever you tell me you're ready for me to do that.
23   A.  Okay.  I know the email, so you can scroll
24 down to the attachments.

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

113

1    Q. Okay.  This is the first attachment.  Let me
2 know when you want me to scroll down.
3    A. You can scroll down.
4    Q. You want me to --
5    A. No, you can keep going.
6    Q. If you want me to go slower at any point,
7 just --
8    A. No, that's fine.  You can keep going.  Can
9 you scroll up a little bit on that page?  There's
10 that table there.  Okay.
11      Okay.  Go ahead.
12      Can you just stop scrolling a little bit.
13   Q. Yep.
14   A. Just so I can see.
15   Q. Do you want --
16   A. No, no, right there -- right there is
17 perfect.  Okay.
18   Q. Okay.  Just let me know when you're ready
19 for me to continue to scroll.
20   A. Okay.  Keep scrolling.  Okay.  All right.
21   Q. So this -- all right.  And then -- okay, so
22 I'm going to take you back up to the top here.
23   A. Okay.
24   Q. Okay.  So this was -- this exhibit has -- is

---

114

1 an email and then the first attachment, that memo.
2 Do you see that?
3    A. Yeah, I recognize that.  It didn't have the
4 Excel spreadsheet.  Yeah, I've got you.
5    Q. The second -- the second attachment entitled
6 OVMC Projection is not attached?
7    A. To the exhibit.  I understand what you mean,
8 yeah.  Okay.
9    Q. Okay.  So Mr. Sarrao, this first page is an
10 email.
11      Who was the email from?
12   A. It's from myself.
13   Q. Okay.  And who is it to?
14   A. It's to Emmett McLean, who is the chief
15 operator -- he's one of the founders and the chief
16 operating officer of Medical Properties Trust.  And
17 George Carlis, who -- I don't recall George's exact
18 title, but he basically works -- he works for MPT.
19 He's a senior guy.  And he works like in distress
20 situations, and he was assigned to Ohio Valley.  As
21 we were working through these things, he was
22 assigned to -- he was working on the Ohio Valley and
23 East Ohio stuff, and he worked closely with
24 Mr. McLean.

---

115

1    Q. Okay.  And it looks like there are a few
2 gentlemen who are cc'd to your email; is that right?
3    A. Correct.  Mr. Reddy is cc'd, Mr. Krissman,
4 and then Mr. Redin are cc'd.
5    Q. Okay.  So, Mr. Reddy was the CEO and
6 president of AHS; is that right?
7    A. That's correct.
8    Q. And then, was Mr. Krissman, at that point,
9 the CFO?
10   A. Yeah.  If I'm not mistaken, he retired end
11 of July of 19, so he was still the CFO.  And then
12 Mr. Redin was the VP of finance but then he became
13 the -- not corporate officer, but he served in the
14 role of CFO after Mr. Krissman retired.  So they
15 were doing a lot of stuff together at that point in
16 time.
17   Q. Okay.  So -- and with respect to this email,
18 it references -- well, for instance, what was the --
19 what was the purpose of you writing this email to
20 Mr. McLean and Mr. Carlis?
21   A. Well, if you remember Alecto Ohio Valley,
22 MPT owned 20 percent of it.  And for Alecto Ohio
23 Valley to take certain actions, MPT would have to
24 approve that -- the MPT willing to let the hospital

---

116

1 LLC -- that MPT entity would have to approve that.
2 And so I'm writing to give them an update, and then
3 if you look at the memo, certain things we want
4 them -- we want MPT to agree to.  So that was one
5 purpose.
6      The other purpose was to follow up on the
7 calls and discussions.  We kind of outlined
8 everything in one place, like here's where we're at,
9 and refresh their recollection as to different
10 structures, what the structure was.  But to do any
11 of this stuff, we would have needed MPT's approval
12 as a 20 percent owner of Alecto Ohio Valley.  Plus,
13 they are the landlord.  They could -- they have --
14 they're the landlords.  We want to get their consent
15 on that.
16      And I think I said before, the other
17 hospitals are -- everything's cross-collateralized,
18 so a default for Alecto Wheeling is a default for
19 the other hospitals that have leases or financial
20 arrangements with MPT.  So we need to get them on
21 board, so to speak, for what's happening, and
22 outline some options.  They've been in the
23 hospital -- they don't run hospitals, but I think
24 MPT probably owns the real estate of 4 or 500

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

117

1  hospitals across the world.  So they're pretty
2  astute thinkers, and maybe they had some
3  suggestions.
4       And they also -- they knew some of the
5  people we were talking to because, like, for
6  example, Stewart Healthcare has a bunch of hospitals
7  that are owned by MPT that they run.  How we know
8  MPT is to Prime Healthcare.  Prime Healthcare has a
9  bunch, so we want to give them an update on that and
10 see if they can do anything to push some people
11 along as well.  Because we were still hoping we
12 could get a buyer at that point.  Especially -- I
13 was hoping Prime was gonna step up and buy the
14 hospital even though it --
15     Q. So Mr. Sarrao, the first sentence of your
16 email says, "as a follow up to our call last week
17 and my discussion with George today," do you see
18 that?
19     A. I see that.
20     Q. (Inaudible)
21     A. I couldn't hear what you were saying.
22     Q. Okay.  Does the first sentence of your email
23 reference a phone call that had occurred the week
24 before July 23rd?

118

1       A. Yeah.  That first phrase would be a call
2  that would have happened before -- the week prior;
3  right?  And then whether -- I forget whether it was
4  just me Emmett and George, or was it me, Roger --
5  what the combination of the call was, but there was
6  a call the prior week, correct.
7       Q. So there was a call the prior week, and you
8  don't recall who all was on it?
9       A. Yeah, for sure I was on it and I -- my --
10 I'm pretty sure Emmett and George were on it.  I
11 don't know who else with me was on the call.  I
12 suspect Lex or Roger were on the call, or Jeremy was
13 on the call, but I just don't have a specific
14 recollection of that.
15     Q. Okay.  What do you recall being said in the
16 phone call that occurred the week before July 23rd?
17     A. Giving them an update on where things stand,
18 who we've been talking to, what the different
19 options are, get their input, and then if we were
20 gonna do something, close one, not the other, those
21 different options, what we would need their help or
22 consent to.  A lot of what's discussed in the memo
23 would have been discussed in the call.  So I
24 don't -- you know, I was giving them an update.

119

1       Q. So a lot of what's discussed in the memo
2  that's attached to this deposition Exhibit 3 had
3  already been referenced in the phone call that you
4  had with the MPT folks the week prior?
5       A. Yeah.  And then there was stuff like the
6  structure and stuff like that or the -- that stuff
7  wouldn't have been discussed in the call, but the
8  people we were talking to, the different options,
9  you know, close East Ohio, do this, close Ohio
10 Valley, those kind of things, would have been
11 discussed on that call the week prior.
12     Q. Okay.  All right.  Do you remember anything
13 specifically that you said on the call the week
14 prior?
15     A. I don't recall anything specifically that I
16 said on the week prior.
17     Q. Do you recall anything that was said to you
18 on the week prior?
19     A. No, I don't have any specific recollection
20 what was said to me.  A general recollection but not
21 a specific recollection.
22     Q. What is your general recollection of what
23 was said during that call?
24     A. That -- to keep working on it, and give them

120

1  a more detailed update, and what specifically we
2  needed from them.
3       Q. Okay.
4       A. Because there was a -- they're publicly
5  traded, there's a chain of command, so to speak, and
6  so they like to get things to specific asked in
7  writing.
8       Q. Okay.  Now, okay.  So you sent them this
9  email with the attached memo.  And I'm going to
10 scroll down to that memo.  Okay.  So the attached
11 memo at Plaintiffs' Deposition Exhibit 3, what is
12 this document?
13     A. It's a memo outlining kind of what the plans
14 were, what the options were for Ohio Valley Medical
15 Center, East Ohio, and trying to outline what's been
16 going -- what's happened, and what's going on to
17 MPT.  We've had -- by 2019, Mr. Reddy, myself, and
18 Mr. Krissman, had known them since -- well,
19 Mr. Reddy and Mr. Krissman had known them since
20 2001.  I had known them since like 2004, so we had
21 known those folks for a long time.
22       But we were giving them an update on what's
23 going on and what the different options are, and
24 what we wanted to -- what we wanted MPT to -- you

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

---

121

1  know, what we needed MPT's help with, so to speak.
2      Q. Okay. Did the memorandum that is attached
3  to the exhibit, was that a -- who wrote that
4  memorandum?
5      A. I wrote the memorandum. It was projections,
6  but I wouldn't have done the projections. There's a
7  number of things in there Mr. Krissman and Mr. Redin
8  would have given me the numbers, but I wrote the
9  memo.
10     Q. Okay. How long did it take you to draft
11 that memo?
12     A. Oh, it probably took me -- I don't know. I
13 don't bill my hours that way, so I don't track hours
14 that way, but it probably took me the course of a --
15 two or three days probably. I mean, I had to get
16 input from other folks, and then -- it's a long
17 memo. There was probably several drafts of it, but
18 a lot of the stuff is -- some of the preliminary
19 stuff is it structural stuff that I just know, so
20 that wouldn't have taken as long. It probably got
21 written over the span -- well, between that call we
22 had the prior week and, you know, so, no more than a
23 week it would have taken.
24     Q. Okay. In the memo, did you outline any

122

1  possible courses of action that you asked MPT to
2  think about?
3      A. Well, yeah. There were different courses of
4  action. There was one where we would close East
5  Ohio and keep Ohio Valley open. And we wanted them
6  to make sure that they -- again, they own the real
7  estate -- they could sell it, and we don't want --
8  if we did that action, we wanted them to think
9  about, you know, we wanted them to think about
10 making sure they didn't go sell East Ohio to WVU.
11 We talked about -- there was that option we
12 outlined.
13     The other option was if we closed OV and
14 kept East Ohio especially, would that work. Because
15 remember, the lease with MPT was a master lease for
16 both facilities. We also need to think about that.
17 We also need to think about how, if we did something
18 with respect to Ohio Valley and East Ohio, what that
19 would mean for the other leases we had with them
20 because everything was cross-collateralized. There
21 was also some discussion about bankruptcy filing, so
22 we asked them to think about that, because that all
23 affects them as well. So there were those things we
24 asked them to think about.

123

1      Q. Okay. So pop this back up. I'm going to
2  take you down a little ways in this exhibit.
3      Okay. So do you see there's a section that
4  is entitled Potential Options in your memo?
5      A. Yes, I see that, yes.
6      Q. How many options did you identify in this
7  first paragraph that's below the section titled
8  potential options?
9      A. Well, the first -- I mean, generally it's
10 one option, closing East Ohio and consolidating
11 services at OVMC. But then within that there's
12 different things that would -- that would happen
13 within that. But the general option is to close
14 East Ohio, and the idea was you consolidate service
15 at OVMC and those patient volumes that East Ohio had
16 would come over to Ohio Valley. And then you'd have
17 less expenses and more patient volumes. But like,
18 it talks about bankruptcy filing and all that. So
19 that was all like kind of subparts of that option.
20     Q. Were there two primary options that were
21 presented in your memo's?
22     A. I mean, yeah, there's -- I guess the third
23 option is to close the hospitals completely. But
24 one option was close East Ohio, consolidate to OVMC.

124

1  One was close OVMC, consolidate to East Ohio. And
2  there's still the discussions about potential
3  buyers. So that ended up -- East Ohio ended up
4  having a buyer way after it suspended services, but
5  the memo talks about those two things.
6      Q. Can you read the paragraph under the section
7  titled potential options for me?
8      A. You want me to read it out loud?
9      Q. Yes.
10     A. [As read] "Based on their thorough review of
11 all available options and the fact that OVMC -- OVMC
12 and EORH cannot continue to lose in excess of
13 $18 million per year, Alecto's senior leadership
14 team have determined there are two options for OVMC
15 and East Ohio: Close East Ohio and consolidate
16 service at Ohio Valley or close both East Ohio and
17 OVMC. Each option is discussed in detail below."
18     Q. Option A of your memo was close EORH and
19 consolidate services at OVMC; correct?
20     A. Correct.
21     Q. And option B was close both EORH and OVMC;
22 correct?
23     A. In the memo, yes. But there was also
24 discussions about doing the other things, closing OV

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

32 (125 to 128)

---

125

1  and operating East Ohio, but it's not in the memo.
2      Q. Okay.  Right.  Your memo only has these two
3  options?
4      A. Correct.
5      Q. And there's a reference here to Alecto's
6  senior leadership team.
7          Do you see that?
8      A. I see that.
9      Q. Okay.  Who were you referring to as Alecto's
10  senior leadership team?
11      A. I was referring to myself, Mr. Reddy, and
12  Mr. Krissman.
13      Q. Okay.
14      A. That's who MPT knew the best.
15      Q. Okay.  Now -- all right.  As between those
16  two options -- well, actually, before we go any
17  further, let me ask you a couple more questions.
18  I'm going to take you up to -- there's a section in
19  your memo that addresses financial performance of
20  OVMC and EORH.
21          Do you see that?
22      A. I see that.
23      Q. Okay.  And does this refresh your
24  recollection of how much -- how many -- how much the

126

1  operating losses were for 2018 for OVMC?
2      A. It doesn't necessarily refresh my
3  recollection.  I assume those numbers are accurate.
4  I wouldn't put inaccurate numbers in it.  But again,
5  and it's not just for OVMC.  It's the physicians'
6  groups, and the physicians in East Ohio as well.
7  But I assume those numbers are accurate, yes.
8      Q. Okay.  So based on your memo, it indicates
9  that for the year ending December 31st of 2018, OVMC
10  had -- had more than $6 billion [sic] in losses;
11  correct?
12      A. I'm sorry.  What was your question again?
13      Q. Well, how -- how -- how much were the losses
14  that are reflected for OVMC for year 2018?
15      A. Well, OVMC -- well, the losses were
16  6.3 million, but you have to remember losses include
17  depreciation, which is generally a noncash item, so
18  I'm more focused on EBITDAR.  So you had
19  1.57 million in EBITDAR, then you had net losses of
20  6.388 -- it says N, it should say M -- million
21  dollars.
22      Q. For OVMC physicians, there was another
23  8.311 million in losses; correct?
24      A. That's correct.

127

1      Q. Okay.  And your memo also indicates that in
2  the first five months of 2019, there were additional
3  losses suffered by OVMC; correct?
4      A. Correct.
5      Q. Okay.  And those were 4.886 million; is that
6  right?
7      A. Correct.  But again, I am more focused on
8  the EBITDAR.  But you're right.  The number that
9  you're reading is what the memo says, correct.
10      Q. Right.  And the OVMC physicians also
11  suffered losses in the amount of 3.823 million
12  according to your memo; right?
13      A. Correct.  A lot less than 18.  Correct.
14      Q. Okay.  So, okay.  Is it fair to say in 2018
15  and 2019, OVMC was experiencing millions of dollars
16  of operating losses?
17      A. Well, the numbers are the numbers.  They
18  had -- they had losses, correct.
19      Q. Okay.  All right.  Now, I'm going to take
20  you up to -- we're going to go up a page or two here
21  in this memo to -- to Defendants' 32000, and you see
22  that there is a section entitled Efforts to Sell or
23  Align with Strategic Partners?
24      A. Yes.

128

1      Q. Okay.  Now, can you read that first sentence
2  to me up to the colon?
3      A. [As read] "During the past 12 months, Alecto
4  has engaged in discussions with several potential
5  buyers or strategic partners, including."
6      Q. Okay.  So I had asked you earlier about how
7  long, or when Alecto began searching for a strategic
8  partner, or a buyer for the hospital.
9          Is it correct that according to your memo,
10  Alecto had been engaged in discussions with
11  potential buyers or strategic partners for over
12  12 months?
13      A. No, I don't think that's a correct -- what
14  you're saying is not correct.  During the past
15  12 months, it doesn't say when we started.  And
16  there's different people we talked to over
17  12 months, so I don't think -- been at it for more
18  than 12 months.  As I sit here and look at the memo,
19  I don't know.
20      Q. You would agree with me that your memo
21  references during the past 12 months; right?
22      A. The memo says what it says, yes, I agree
23  with you.  The five words say that, yes.
24      Q. Okay.  If that were correct, Alecto would

---

EXHIBIT 1

Transcript of Michael Sarrao

Conducted on May 19, 2022

129

1 have started searching for a buyer or strategic
2 partner in the summer of 2018; correct?
3    A. We would have engaged in certain -- some
4 discussions with potential buyers or strategic
5 partners, correct.
6    Q. Okay. I'll take that out of your -- off the
7 screen. Okay. After you sent that email and your
8 memo to the MPT folks, did you have a follow-up call
9 with them?
10    A. I'm sure -- I don't have a specific
11 recollection of a follow-up call, but I'm sure I had
12 follow-up calls. Because during that time period I
13 had regular calls with MPT, so I'm sure I had a
14 follow-up call. Most likely with Mr. Carlis.
15    Q. Okay. Did you make a recommendation to
16 Mr. Carlis, as to whether to go with option A or
17 option B from your memo?
18    A. No, I did not make a recommendation one way
19 or the other. That wouldn't be something we
20 would -- we would leave that -- we would get MPT's
21 consent to either one, and then -- but I don't think
22 I made a recommendation, we think A or B, one or the
23 other. I don't make a recommendation in that way.
24    Q. But you don't -- it sounds like you don't

130

1 recall making any recollection, and you don't recall
2 the phone call that occurred between yourself and
3 possibly Mr. Carlis; correct?
4    A. No, I had lots of phone calls with
5 Mr. Carlis during that time, so I don't specifically
6 recall that. We discussed lots of things like
7 what's going on, how about these people, how about
8 these people, what about the governor, what about
9 the diocese, and all -- all those kind of different
10 things. So we talked about a lot of different
11 things.
12    Q. Do you have a recollection as to what the
13 decision was about how to proceed in late July of
14 2019?
15    A. I don't think there was a decision in late
16 July. I think in early August, there was a decision
17 made to announce the closure of the hospitals. I
18 think it was like -- I think the press release and
19 stuff went out. I think my letters, to like, the
20 licensing went out on, like, the 5th or 6th of
21 August. So the final decision would have been right
22 before that. That was that. Nothing was final. We
23 were always looking for different things. We were
24 talking to Dan, Jennifer, different options. And

131

1 that's where the option came in of keeping East Ohio
2 then closing OV.
3    Q. Okay. All right. Okay. I am going to put
4 another exhibit in front of you. So this will be --
5       MS. DAVIDSON-WELLING: Please mark this as
6 the next deposition exhibit, and would the -- would
7 the video technician please distribute Defendants'
8 33065 through 33066 in the chat.
9       (Exhibit 4 was marked for identification
10 and is attached to the transcript.)
11 BY MS. DAVIDSON-WELLING:
12    Q. And I will also put that up on my screen.
13 All right. Okay. Mr. Sarrao, can you see the
14 Plaintiffs' Deposition Exhibit that I just put up in
15 front of you?
16    A. I can see the top part of the email. I
17 can't see what the second, you know, chain is.
18    Q. All right. And I will scroll down for you.
19 Just tell me when.
20    A. Keep scrolling. Okay. Keep scrolling.
21 Okay.
22    Q. Okay. I think all that's further down is
23 the --
24    A. The footer or the signature block on it.

132

1 Okay.
2    Q. Okay. Now, so if -- if you look at this
3 email that's in the bottom of the email chain, in
4 Defendants' 33065 to 33066, there's an email from
5 you to Emmett and George.
6       Do you see that?
7    A. I see that.
8    Q. Okay. And those are the gentlemen who
9 worked for MPT; correct?
10    A. Correct.
11    Q. And in your email, did you -- do you
12 indicate which option -- which option you were, or
13 Alecto, was going with?
14    A. I don't think we were going with. We were
15 operating under the assumption that we would go with
16 closing both hospitals. But, again, that's the
17 assumption in our current thinking, we'd be closing
18 both hospitals.
19    Q. Okay. Why were you proceeding -- strike
20 that.
21       What did you mean by, we are proceeding
22 under the assumption we will need to close both OVMC
23 and EORH in short order?
24    A. That we were preparing for that as an option

**EXHIBIT 1**

Transcript of Michael Sarrao
Conducted on May 19, 2022

133

1  because it's not simple to -- to do that.  You have
2  to do a lot of work.  So we were proceeding under
3  that assumption, but we were also hoping that
4  someone -- that someone would come in and buy the
5  hospital, and the state of West Virginia, the
6  governor, would step up, not wanting the hospital to
7  close.  Because in other areas, other states, our
8  experience is they generally don't want a hospital
9  to close.  Senator Manchin was on our butt about it.
10  And so we were operating under that assumption,
11  because you've got to be prepared for it.  You can't
12  just not be prepared for it, so that was the
13  assumption we were operating under.
14      Q.  Had a decision been made, one way or the
15  other, as of the date of this email, whether Alecto
16  was going to proceed with the closure of OVMC and
17  EORH?
18      A.  No.  I don't think a final decision had been
19  made.  Again, that was an option that was possible,
20  but no final decision was made, so...
21      Q.  That was an option that Alecto had proposed
22  to MPT, but it wasn't decided yet what would happen?
23      A.  Well, Alecto, and Alecto Wheeling, and
24  Alecto Martins Ferry, but yes.

134

1      Q.  All right.  Okay.  So just a second.  Okay.
2  At some point, was the decision made to announce the
3  closure of OVMC and EORH?
4      A.  There was a decision made, and those were
5  announced.  I think it was like the 6th or 7th, it
6  was announced, of August.  I just don't remember.
7  I'm sure you have the documents -- what the exact
8  date was.
9      Q.  Okay.  And who made the decision to close
10  OVMC and EORH that was announced on August -- on or
11  about August 7th?
12      A.  A bunch of different people.  Mr. Dunmyer,
13  Ms. Coello, Chuck Cave, I believe, was our interim
14  CFO for the hospital at that time, Mr. Reddy, Mr. --
15  Mr. Krissman had been retired, so Mr. Redin, kind of
16  but not really; myself.  And Mr. Krissman had
17  already retired, so the decision he wouldn't have
18  been involved in the decision.  Mark Bradshaw had
19  input, but I don't think he was involved in the
20  decision, but he had input into it.  So, and then we
21  talked to our counsel, about we had -- we had
22  questions, legal questions for our counsel.  We got
23  legal advice, so we didn't rely -- I'm not saying we
24  relied on that advice.  We just had questions.  We

135

1  talked to everybody about it, so it was
2  collectively.  I don't think any one person made the
3  decision.
4      Q.  So the decision to close OVMC and EORH was
5  made jointly by AHS management, and Alecto Wheeling
6  management, and Alecto Martins Ferry management?
7      A.  Correct.  Except I would say that --
8  remember, I'm also acting -- I was really acting on
9  behalf of Alecto Wheeling and Alecto Martins Ferry,
10  and I would say the same thing with Mr. Reddy.  So
11  everybody wants to group it together, they are
12  separate entities.  But those are the people that
13  were involved in the decision, and they had
14  different roles.
15      Q.  You made reference to consulting legal
16  counsel.  I just wanted to clarify.  There is no
17  advice of counsel defense in this case; correct?
18      A.  Correct.  Well, I mean, that I'm aware of.
19  Mr. Garrison can -- if there's -- I'm not aware of
20  that.  I'm not saying that there's some advice from
21  counsel, I'm not waiving the privilege or anything
22  like that so...
23      Q.  I'm gonna pull up another exhibit here.
24  Just give me a second.  Okay.  All right.

136

1          MS. DAVIDSON-WELLING:  Let me just ask the
2  video technician, what will the next exhibit be
3  marked?
4          PLANET DEPOS REMOTE TECHNICIAN:  This should
5  be 5.
6          MS. DAVIDSON-WELLING:  Five.  Okay.
7          (Exhibit 5 was marked for identification
8  and is attached to the transcript.)
9          MS. DAVIDSON-WELLING:  All right.  Thank
10  you.  Okay.  All right.  So would you please,
11  Mr. Video Technician, drop Defendants' 33036 through
12  33038 into the chat for everyone, and I will pull it
13  up on my screen as well.  Okay.
14  BY MS. DAVIDSON-WELLING:
15      Q.  Mr. Sarrao, please take a look at what's
16  being marked as Plaintiffs' Deposition Exhibit 5.
17      A.  Okay.
18      Q.  Let me know when you are ready for me to
19  scroll down for you.
20      A.  Go ahead and scroll down.
21          Okay.  That's fine.  Okay.
22      Q.  That's the end of that.  Do you need to look
23  at this anymore or can I pull it up to the top?
24      A.  You can pull it up, that's fine.

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

35 (137 to 140)

---

137

1    Q. Okay. All right. Do you recognize the
2 email that's on the first page of Plaintiffs'
3 Exhibit 5?
4    A. I mean, generally I recognize it. I know
5 it's an email from me to some folks at CNH and their
6 counsel.
7    Q. Right. So who -- who -- who are the
8 individuals that you sent this, your email to?
9    A. So Tim Peters and Steve Silver are senior
10 executives at CNH Finance. I forget their exact
11 roles, but effectively they're the top two people at
12 CNH Finance. The Ama Tusevich at CNH Finance,
13 that's somebody that worked with them. I forget
14 that person's name, other than I think that's their
15 last name, that Tusevich. Tim Kincaid and Alex
16 Frame are lawyers that represent CNH Finance. Now,
17 remember CNH Finances are, at that time -- by that
18 time, is our AR lender for Ohio Valley, East Ohio
19 and all the other co-borrowers.
20    Q. And did your email to them attach a press
21 release?
22    A. Attached a draft press release, yes.
23    Q. Okay. And was it a draft press release
24 announcing the closure of OVMC and EORH?

---

138

1    A. I'd have to look at the press release, but I
2 assume that's what it's about. That's what the
3 press release says. Yeah, to begin the closure
4 process, yes, that's the draft, yes.
5    Q. Okay. Why were you sending this press
6 release to the folks at CNH Finance on July 31st of
7 2019?
8    A. For a number of different reasons. One is
9 that was one of the options we were looking at, we
10 needed to be prepared for. Two, CNH Finance was the
11 lender. And even if you announce the closure,
12 you've still got to operate, you still need to
13 borrow money on your AR line, both for Ohio Valley
14 and East Ohio, and the other hospitals, so we needed
15 to make sure that we announced the closure. They
16 weren't going to -- a lot of times you announce
17 something, they shut your AR line off completely.
18 They collect your AR, but you can't -- you have no
19 money, because your AR goes to them. They pay it
20 down, but they don't let you borrow any more money.
21 So we needed to make sure we were going to be able
22 to get advances to continue to operate the hospitals
23 through the closure period. And it wasn't going to
24 affect the other hospitals that also relied on

---

139

1 that -- their collections also got swept by CNH.
2    The other reason is our general view is
3 these things get announced. What we don't want to
4 happen is we'd like CNH to hear it from us this is a
5 possibility, rather than hearing it in the press, or
6 getting a call from somebody. It's always good
7 practice to let us -- let them know what may happen.
8 But the primary reason was, CNH would have the right
9 to cut off all funding, and the hospital would have
10 shut down the day the press release went out if
11 there was no funding.
12    So we were trying to manage that
13 relationship to make sure we had funding through the
14 closure process, and we wanted to keep them in the
15 loop about it ahead of time, so they could think
16 about it and talk to us and they knew what was going
17 on. So they wouldn't overreact, and just
18 automatically cut off funding and say, sorry, you're
19 not getting another penny out of us. Then Ohio
20 Valley, East Ohio, Fairmont, Wilson N. Jones, and
21 Olympia, would likely all have to close down the
22 next day. They wouldn't have met payroll or done
23 anything without borrowing capabilities; all of
24 these collections were going -- all their

---

140

1 collections were going to CNH.
2    Q. Were you able to successfully manage that
3 relationship and keep the -- keep the line of credit
4 going?
5    A. Yeah, we were able to keep -- we still have
6 a line of credit today with CNH Finance. We were
7 able to keep it going. The borrowing capacity went
8 down as the -- remember, AR gets generated by
9 patient services. As patient volume dropped at Ohio
10 Valley and East Ohio, the AR dropped, so there was
11 less borrowing available. But they didn't cut us
12 off, so to speak. I think they may have put some
13 reserves in, but they didn't cut us off.
14    Q. Okay. Okay. In your -- can you read the
15 second sentence of your email out loud?
16    A. Yeah. While MPT has signed off on the
17 release, we have not shared with local management
18 team as of yet, and wanted to get any comments you
19 may have as well.
20    Q. Who was the local management team that you
21 refer to your email?
22    A. It would have been Dan Dunmyer, Jennifer
23 Coello, I believe Chuck Cave may have been acting as
24 the interim CFO, and it would have been the CNOs, as

---

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

141

1 well as the various department directors and
2 managers as well.
3     Q. Okay. Were you involved in developing the
4 closure process for OVMC and EORH?
5     A. Yeah, I think I prepared a number of drafts
6 of a schedule that kind of set forth -- because
7 there was all kinds of regulatory things to do. So
8 I think I prepared a draft of the schedule.
9 Ultimately I sent a closure timeline to the state
10 licensing in West Virginia, I think Jolynn Marra,
11 and then the counterparts, you know, in the state of
12 Ohio. So I did work on a schedule, and the dates
13 were all over the place, and various different
14 people corrected me on why my dates were wrong or
15 why we needed to adjust things, including
16 Ms. Ventura.
17     Q. Okay. All right. So you developed a
18 schedule for the closure process; is that right?
19     A. A schedule, a timeline. I forget exactly
20 what it was called, but I developed something, yes.
21 I took the first -- I created the first draft and
22 kind of coordinated that.
23     Q. Did you -- did you have several drafts that
24 you created of that document?

142

1     A. I don't think there were several drafts. I
2 think there was an initial draft. Then people
3 provided me comments and then I had a final draft,
4 and then a final version.
5     Q. Okay. And once you had the final version,
6 did you -- did you supply that -- who did you supply
7 that to?
8     A. Well, I think, prior to the final version,
9 the final version would have gone to the local
10 management teams. I wouldn't typically deal with
11 the department managers and stuff, but Dan Dunmyer,
12 Jennifer Coello, the CNO -- I think Lanette was the
13 CNO at Ohio Valley, and I forget the CNO at East
14 Ohio. To those people. I would have shared it with
15 the people at Alecto, that Alecto team. And then I
16 shared it with -- I think her name is Jolynn, but
17 Marra, the West Virginia state licensing. I shared
18 it with the state of Ohio licensing. And I may have
19 shared it with people at the city of Wheeling and
20 the city of Martins Ferry, but I forget about that.
21     Q. Okay.
22     A. I know for sure we shared it -- I shared it
23 with the licensing people.
24     Q. Okay. All right. I'm going to put another

143

1 exhibit in front of you. This will be -- something
2 happened here. This will be Plaintiffs Deposition
3 Exhibit 6. Let me get the Bates numbers.
4     (Exhibit 6 was marked for identification
5 and is attached to the transcript.)
6     MS. DAVIDSON-WELLING: All right. So would
7 the video technician please drop Defendants' 16533
8 through 16537 into the chat.
9 BY MS. DAVIDSON-WELLING:
10     Q. And Mr. Sarrao, I will open it up on my
11 screen so that you can review it as well.
12     A. Okay.
13     Q. Okay.
14     A. Can you just scroll to the top so I can
15 remember what her first name is. I feel bad that I
16 don't remember her first name.
17     Q. I'll see if I can get it up there.
18     A. Yeah, Jolynn. Okay. All right.
19     Q. Okay. All right. Let me scroll down for
20 you so you can review this exhibit. Just let me
21 know when you're ready for me to -- do you want me
22 to scroll further?
23     A. Yeah, scroll a little further, yeah.
24     Q. There's the first page?

144

1     A. Okay. I know what this is, so if you want
2 to ask me questions, maybe if I need to look at a
3 certain area, but I recall this.
4     Q. Okay. Good. All right.
5     What is this document that's in Plaintiffs'
6 Deposition Exhibit 6?
7     A. It's a letter that I sent to Jolynn Marra,
8 after Mr. Garrison and I had spoken to her, I think
9 either that morning or the day before, and told her
10 what was going on. And then also -- I called it a
11 draft timeline, because the point is, if they had
12 changes to it, I wanted to get their changes. We --
13 state licensing says change this, or change this, or
14 you forgot about this, you would add things to that.
15 It was kind of a work in progress. That's why I
16 called it a draft. But it's that timeline that we
17 worked on, and then asking her for any input and,
18 you know, saying we're going to work with her -- her
19 and her team, so -- which we did.
20     Q. Okay. All right. So if you look at this --
21 this letter, the letter makes reference to the phone
22 call that you had with Ms. Marra.
23     What do you recall being said in that phone
24 call with Ms. Marra? Who initiated it?

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

145

1    A. What's that?  I'm sorry.
2    Q. Who initiated the phone call to Ms. Marra?
3    A. I believe that Mr. -- I asked Mr. Garrison.
4  Again I'm not waiving the privilege, but generally
5  said hey, can you set up a call with her, because
6  Mr. Garrison knows the people in West Virginia
7  better than I do.  And we had a call in number or
8  one of us called and conferenced the other person
9  in.  We asked for the call.  We initiated the call.
10 So, I suspect -- I don't have a specific
11 recollection, but Mr. Garrison arranged a time to
12 speak with her.  I remember being at an airport when
13 I had the conversation with her.
14   Q. Okay.  How long was that phone call that you
15 had with Ms. Marra?
16   A. 10 to 15 minutes.  More likely 10 minutes.
17   Q. Okay.  And what do you recall saying to
18 Ms. Marra on that phone call?
19   A. I recall telling her that we're going to go
20 through a closure process at Ohio Valley.  We want
21 to make sure we work with them, make sure if they
22 have any questions or concerns to reach out to us,
23 to call us, so we can walk through those concerns
24 and questions, or other people called in and they

146

1  need to know an answer, to talk to us.
2       We appreciated their support, both at Ohio
3  Valley, and I know I mentioned it, did not affect
4  Fairmont Regional and Fairmont West Virginia.  We
5  weren't closing Fairmont, or suspending services at
6  Fairmont.  And that I would be -- we would be
7  sending her -- I would be sending her a draft
8  timeline and her and her staff.
9       I think she told me whoever the staff member
10 was that would be kind of handling it for her.  That
11 if her and her staff could take a look at it and
12 give us any feedback, we would appreciate that and
13 reiterated if any issues come up.  There's a
14 reference to Mr. Wright and Ms. Beard in the letter,
15 William Wright, and I forget Ms. Beard's first name.
16 I think it's Amber, but I could be wrong -- that
17 could be because I'm looking at Johnny Depp
18 television stuff, but I think it's Amber, Ashley,
19 but -- to call us, you know, if you have questions,
20 call us, and we're happy to answer any questions you
21 have.  She thanked us and looked forward to getting
22 the timeline.  So...
23   Q. Okay.  Other than thanking you, do you
24 remember anything else that Ms. Marra said during

147

1  that phone call?
2    A. She said that Mr. Wright and Ms. Beard would
3  be the ones kind of leading it from their end as
4  well.  So -- and feel free to reach out to them,
5  and, you know, include them in all the discussions
6  and things like that.
7    Q. Okay.  Did Mr. Garrison say anything on that
8  phone call?
9    A. Probably said hi Jolynn.  I think he knows
10 her.  And introduced me.  I don't think I had met
11 Jolynn before or talked to her.  And I thanked her
12 for arranging the call and probably repeating any
13 questions, you know, feel free to give him a call.
14 I don't recall anything specific he said.  I was the
15 primary speaker on the call.
16   Q. Okay.  After -- so after that phone call,
17 you sent Ms. Marra this letter which is in
18 Plaintiffs' Deposition Exhibit 6; correct?
19   A. Correct.
20   Q. Along with the attachment, which is the
21 timeline that you prepared; correct?
22   A. Correct.
23   Q. Okay.  After you sent the letter with the
24 timeline, did you have subsequent conversations with

148

1  Ms. Marra or her staff?
2    A. About Ohio Valley, but not with Ms. Marra.
3  With her staff, yes, I had conversations with her
4  staff.
5    Q. How many conversations did you have with
6  them about Ohio Valley?
7    A. I probably had, after the letter, two or
8  three conversations with them about like, paperwork
9  things, and the paperwork they needed, that kind of
10 stuff.
11   Q. In the first conversation that you recall
12 with them, what did they ask you?
13   A. I don't think they asked me anything.  I
14 think they asked me -- they told me maybe we need to
15 get this form or this form.  What about -- well,
16 they did ask me, well, have you talked to the board
17 of pharmacy, what about this, what about that, the
18 different divisions.  And then, I think they
19 mentioned some forms -- they needed something from
20 me on their end as well.  So I just forget what they
21 told me about that.  But they needed something from
22 us for part of the process.
23   Q. Other than them asking you for forms and
24 asking whether you had provided notice to some other

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

149

1  entities, did they raise any other issues with you
2  related to OVMC?
3      A. Not that I recall.
4      Q. Okay. All right. Okay. I'm going to
5  scroll down to the timeline, which is attached to
6  your letter to Ms. Marra.
7         Do you see the timeline there?
8      A. I do.
9      Q. Okay. Now, if you look at this, the title
10 of this document appears to be Closure Timeline for
11 OVMC.
12        Do you see that?
13     A. I see that.
14     Q. Okay. And then, can you read me the first
15 line below that?
16     A. Uh ...
17     Q. I might be able to.
18     A. Well, it says, "Publish notice 15 days
19 before closure. WV publish notice 21 days before
20 closure." Then it says 10/1/19; I think that's what
21 you're talking about.
22     Q. Okay. So first, let me ask you the Medicare
23 publish notice 15 days before closure, what was that
24 a reference to?

150

1      A. There's a Medicare regulation or a statute
2  that you have to publish a notice in the newspaper
3  that the hospital is closing, and so the Medicare
4  recipients can -- can see that, and know what's
5  happening with respect to Medicare. It's a
6  requirement, one of the Medicare -- I think it's a
7  regulation versus a statute, but it's a Medicare
8  rule. There's a format of a notice you're supposed
9  to publish.
10     Q. Okay. And what about the West Virginia
11 publish notice 21 days before closure, what did that
12 refer to?
13     A. Again, it's either a regulation or a
14 statute, you have to give notice either under the
15 state Medicaid rules, or DHHR, 21 days before the
16 closure. Again, publishing some sort of notice.
17 Part of the notice is, okay if you need your
18 records, this is where you can get your records and
19 things like that. The goal of it being people don't
20 come to the hospital looking for care after there's
21 no care to provide.
22     Q. Below that -- that first line is a date. Do
23 you see that date?
24     A. Yes.

151

1      Q. What's that date?
2      A. 10/1/19 was kind of the date when -- because
3  you can't just cut off services -- where kind of the
4  target date when we wouldn't be accepting new
5  patients and things like that. I can't -- when I'm
6  closing, when I'm closing, I can't stop taking -- I
7  can't keep taking patients that are going to stay
8  there for ten days. So, I think that's what that
9  refers to. I'd have to look at the deadlines in the
10 graph, but generally that's what that's referring
11 to.
12     Q. If we scroll down through the deadlines in
13 the graph?
14     A. So it would be like on the second or third
15 page of it, I think there's like -- it talks about
16 services and stuff. Okay. And then if you keep
17 scrolling. See like 2.3, stop providing outpatient
18 services 9/23 because, that's when you stop
19 providing outpatient service. And then if you
20 scroll down some more, so surgeries, stopping
21 earlier on surgeries. Stop scheduling deliveries.
22 You know, stop services so you don't have patients
23 in there after you're ready to suspend, knowing that
24 it's going to take a period of time to wind things

152

1  down after you stop having patients.
2      Q. So -- so is it fair to say that this
3  schedule included a set of dates by which certain
4  services were going to be stopped at OVMC?
5      A. Yeah. Or targets for those dates. It's on
6  the front of it there's a -- on the first page of
7  it, talks about having physician coverage and
8  staffing. So if all my OBs leave, I can't provide
9  OB services. If all my surgeons leave, I can't
10 provide -- I can't provide surgeons. We also had a
11 medical residency program, and they did a lot of the
12 in-patient work under the supervision of a
13 physician. So as they leave, we knew they were
14 going to leave, that would affect that as well.
15     Q. I'm just scrolling down to this last page so
16 that you can see this page as well.
17     A. Okay.
18     Q. So all of these dates in the schedule are
19 before 10/1 of 2019; correct?
20     A. Correct.
21     Q. Under the schedule that you provided to
22 Ms. Marra, was the target closure date for the
23 hospital 10/1/2019?
24     A. You know, I don't know if that 10/1 is the

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

153

1 target closure date, because you have the deadlines
2 here. But the idea, at least for OVMC, you wouldn't
3 have patients after 10/1. I forget when we stopped
4 taking in patients, but I don't know if this was the
5 target closing date was 10/1 or kind of patient
6 services was 10/1. There's a difference between
7 closing and patient services, having patients in the
8 house. So 10/1 was kind of a date we were looking
9 at. I don't know why 10/1 versus a different date,
10 but the more detailed deadlines are down there --
11 subject to that physician coverage and staffing.
12     Q. Okay. So it sounds like you don't recall
13 exactly what the significance was of the 10/1/2019
14 date?
15     A. I don't. And more details are on the
16 deadlines. I don't recall the specific date. I
17 know there was hope that there were still some
18 buyers out there, people we were talking to, that
19 people would come in after that August date and buy
20 the hospital and keep the hospital going, or the
21 governor would say, here's some money to keep the
22 hospital going.
23     Q. To the best of your knowledge, did OVMC's
24 closure process follow the deadlines that are

154

1 identified in your timeline?
2     A. It did not. Some of them were like -- I
3 think even some of the Medicare notices, I think we
4 held off on, because we thought there were some
5 buyers coming in. There was a potential for that,
6 that they would want the buyer number. I know that
7 we stopped -- we suspended patient services before
8 many of those dates, because we didn't have the
9 physician coverage, we didn't have the patient
10 volumes, or the staff, and people were leaving. I
11 know we stopped patient services, or suspended
12 patient services, I want to say, the first week of
13 September.
14     So these dates contemplate a longer date,
15 but I believe it was the first week of September
16 that did that. So it didn't follow everything.
17 Some of the stuff was followed, some of it wasn't.
18 Some of the notices were, maybe even off a day or
19 two. But the patient services, that was advanced
20 because we didn't have the physician coverage, we
21 didn't have enough physicians, and we didn't have
22 the staffing, and we had issues getting supplies,
23 because once you announce a closure, or beginning
24 the closure process, kind of everything breaks

155

1 loose. So those vendors who were kind of letting
2 you provide services stop providing -- letting you
3 get goods and supplies and all that, stop providing
4 that. Try to ratchet that back, so they don't want
5 to -- owe more money.
6     Q. So if I understand you correctly, some of
7 the -- the deadlines for notices that are identified
8 in this schedule were actually -- in reality, those
9 notices went out later; is that right?
10     A. Yeah, by a day or two. Yeah.
11     Q. And?
12     A. By a day or two. Within, I would say, three
13 to four days, they went out.
14     Q. Okay. And with respect to the deadlines for
15 patient services, some of those deadlines were moved
16 up; correct?
17     A. I think most of the deadlines for patient
18 services were moved up. Except maybe some of the --
19 there were some dates I think in August, those
20 weren't moved up. But those dates that were in
21 later September, those were moved up.
22     Q. Okay. All right. You made a reference to a
23 suspension of services at OVMC. Do you recall that?
24     A. Suspending services, yeah, I recall saying

156

1 that, yes.
2     Q. Okay. When did -- when was it announced
3 that OVMC was going to suspend services after August
4 of 2019?
5     A. You mean after the initial press release and
6 all that?
7     Q. Yes.
8     A. I want to say it was like September 2nd,
9 September 3rd. I don't remember the exact date, but
10 it was certainly like -- certainly the first week of
11 September. And it was announced like, the day
12 before, the day of, or two days. Very quickly.
13     Q. Okay. Were you involved in making the
14 decision to suspend OVMC's services in early
15 September of 2019?
16     A. I was involved in -- I was involved in that
17 decision-making process, yes.
18     Q. Okay. And was anyone else involved in that
19 decision-making process?
20     A. Yeah. Mr. Dunmyer. Ms. Coello may have
21 been off. I think her mother passed away. The
22 chief nursing officers. Ms. Ventura. Mr. Reddy.
23 Mr. Redin tangentially, but probably not as much.
24 But it would have been that group. There may have

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

157

1 been a few department managers, but I just don't
2 remember.
3    Q. I'm going to put another exhibit here, in
4 front of you here.  Let's see.  This is going to be
5 Plaintiffs' Exhibit 7.
6    (Exhibit 7 was marked for identification
7 and is attached to the transcript.
8 BY MS. DAVIDSON-WELLING:
9    Q. And let me find it.  All right.  Well, you
10 know what?  Okay.  I'm having trouble getting this
11 file to open.  So we won't be looking at that one.
12 Okay.  Sorry.  So scratch that.  I can't get the
13 exhibit to open so we'll -- maybe actually, well
14 maybe you can -- can the court videographer put
15 it -- drop into the chat, 16762?  Maybe --
16    PLANET DEPOS REMOTE TECHNICIAN: Please
17 stand by.  I can try to share it too if you want.
18    MS. DAVIDSON-WELLING: Yeah.  If you can --
19    PLANET DEPOS REMOTE TECHNICIAN: Yeah.
20    MS. DAVIDSON-WELLING: We might need you to
21 do that.
22    PLANET DEPOS REMOTE TECHNICIAN: Yeah.  I'm
23 sorry.  What was that number for the file?
24    MS. DAVIDSON-WELLING: 16762.

158

1 BY MS. DAVIDSON-WELLING:
2    Q. All right.  Okay.  Mr. Sarrao, do you see
3 Plaintiffs' Exhibit 7?
4    A. I do.
5    Q. Okay.  Have you seen this document before?
6    A. Yeah.  I don't -- I mean, I don't
7 specifically recall seeing it, but I know I saw it.
8 I mean, I know what it is and everything like that
9 so...
10    Q. Does this -- is this a press release that
11 was issued announcing the suspension of services in
12 September of 2019?
13    A. Yeah.  That's the -- when was it --
14 September 4th, so yeah -- I mean, that's what it is.
15 It's saying that services are going to be suspended
16 on that day; correct.
17    Q. Okay.  All right.  Okay.  You can set that
18 aside.  I just wanted to get --
19    A. That gives me -- that refreshes me on the
20 exact date.  I knew it was the first week of
21 September.
22    Q. Yeah, okay.  You can take that off the
23 screen now.  Thank you.  Did you have any
24 discussions with Daniel Dunmyer regarding the

159

1 suspension of services at OVMC on September 4th,
2 2019?
3    A. I'm sure I had discussions with Mr. Dunmyer.
4 I'm sure Mr. Reddy had discussions.  I don't recall
5 specific discussions, but we had a number of
6 discussions where we were all on the call together
7 or like video calls.  I think at the time we used a
8 service called Polycom.  It's like Zoom but
9 basically it's just you have a camera, and before
10 COVID, people used -- we used Polycom.
11    So we had a number of discussions about kind
12 of, since, from that August 6th or August 7th date,
13 until frankly until November, but we were almost
14 having daily discussions, so I'm sure I had
15 discussions -- I had discussions, probably
16 one-on-one discussions, and also discussions with --
17 group discussions as well.
18    Q. Did you have any specific recollections of
19 any discussions with Mr. Dunmyer about whether or
20 not to suspend services at OVMC?
21    A. I don't have any specific recollection of
22 those discussions.  I have general recollections of
23 those discussions, but not specific.
24    Q. Meaning you have a general recollection that

160

1 you had those discussions?
2    A. Yeah, and generally what the topics were
3 that were discussed, what did I say, what did
4 Mr. Dunmyer say, what did other people say, almost
5 two years ago -- almost three years ago -- I don't
6 have that specific recollection.
7    Q. Okay.  You can't tell me you said, and what
8 he said?
9    A. Correct.  I can't tell you that.
10    Q. Okay.  Do you know who from AHS communicated
11 to Mr. Dunmyer that Alecto was going to proceed with
12 the suspension of services on September 4th?
13    A. Again, Alecto willingly proceeded with the
14 suspension, but that conversation probably would
15 have, likely would have taken place in a group call
16 with Mr. Reddy and Mr. Dunmyer.
17    Q. Okay.  In 2019, whose job was it to ensure
18 that OVMC's closure complied with WARN Act
19 requirements?
20    A. Well, ultimately it would have been the CEO
21 of the hospital, with support from people from
22 Alecto, including myself, Mr. Bradshaw.  We're
23 lawyers by training.  That's whose job it would have
24 been.

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

161

1    Q. Prior to August 7th of 2019, did you have
2 any familiarity with WARN Act requirements?
3    A. Yeah, I generally knew what the WARN Act
4 requirement was. I generally knew what WARN notices
5 were. We may have, at other hospitals done, like, a
6 small rift to trigger the numbers. But, I had been
7 involved in lots and lots of hospital acquisitions
8 prior to June -- prior to this one, or sometimes,
9 WARN Act was triggered because of how the
10 transaction was structured. So I generally knew.
11 Was I an expert in the WARN Act? No, I was not an
12 expert in the WARN Act.
13    Q. Okay. But it sounds like you had -- you had
14 been involved with prior corporate acquisitions
15 where WARN Act requirements applied?
16    A. Yeah. Not -- not Alecto ones, but when I
17 was at Prime Healthcare, sometimes it was -- even
18 though we hired substantially all the employees, the
19 seller, everyone just decided to send out a notice,
20 or we didn't know when it was going to close, and
21 stuff like that. So I generally knew the WARN Act.
22 California has a little bit different one. I knew
23 the California one a little bit better than the
24 federal WARN Act but I generally knew what the WARN

162

1 Act was.
2    Q. Okay. In your understanding, what was
3 required by the WARN Act?
4    A. Generally, notice is required. There's a
5 number of exceptions to that notice, but generally a
6 60 days notice about if it's a mass layoff or a
7 plant closure. I know there's a number of
8 exceptions to the WARN Act, and is that notice
9 applicable, I know in the bankruptcy context, the
10 faltering business, all that different kind of
11 stuff, but generally 60-day notice if you trigger
12 certain things. And just, mass layoff is a defined
13 term. I think it's -- again I get confused
14 between -- California is a bit more restrictive than
15 the federal one, as far as the numbers, but there's
16 a trigger if it's so many people or a percentage of
17 the workforce. Then a plant closing is obviously a
18 plant closes.
19    So there's a trigger -- there's something
20 that if it gets triggered, there's a notice required
21 and we send notice to the employees and then
22 various -- I think like the mayor of the city, in
23 California we had the employment development
24 department. I don't know, I forget what the

163

1 West Virginia version of that was. That kind of
2 stuff.
3    Q. In your understanding, was the 60 days
4 notice that was required by the WARN Act advance
5 written notice?
6    A. I mean, I'd have to go back and look at the
7 statute. I don't have that specific level of
8 knowledge on that.
9    Q. In 2019, were employees at OVMC given the
10 full 60 days notice required by the WARN Act?
11    A. They were given WARN Act notice. Our
12 position is they continued to work. They may have
13 been TLO, based on patient volumes, but they weren't
14 terminated for the expiration of that 60-day period.
15 I think ultimately that would be for a courtroom, or
16 I guess a jury to decide. But I believe they were
17 given the proper notice under the WARN Act, subject
18 to certain exceptions as well.
19    Q. I'm not sure that you answered my question.
20 In 2019, were employees at OVMC given 60 days
21 written notice?
22    A. Yes.
23      MR. GARRISON: I'm going to object.
24      (Reporter clarification.)

164

1      MR. GARRISON: My objection is it's been
2 asked and answered and he answered. You might not
3 like the answer but he did answer.
4    A. I believe the proper notice was given
5 subject to certain exceptions, but I don't believe
6 any employee was terminated prior to the expiration
7 of the 60-day period. That's my position. And
8 ultimately, all of us can believe what we want, but
9 someone else is going to make that decision.
10 BY MS. DAVIDSON-WELLING:
11    Q. You mentioned the term TLOed. What does
12 that mean?
13    A. I call it TLOed. Some people use it as
14 temporary layoff, but in every health care facility
15 I've ever been involved with -- this is probably
16 going on 60 now -- that based on staffing, we flex
17 staff off. So if there's a certain staffing
18 expectation, so if there's five patients in a unit,
19 you're going to have one nurse. And if there's
20 seven you're going to have two nurses. So if we
21 start having seven patients, and some patients get
22 discharged and you only have four patients, you will
23 try to TLO one of those nurses, and send them home
24 early because you don't need both nurses, because

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

42 (165 to 168)

165

1  staffing is the biggest cost a hospital has.
2       If your volumes get lower, if you have ten
3  EVS workers and you're expecting to have a hundred
4  patients that rooms have to be cleaned -- I'm making
5  those numbers up -- and that number goes down, then
6  you go down to eight.  Or if you have ten scheduled
7  and you know your census is going to be less than
8  what -- you don't need all ten, you call them before
9  the shift starts, usually two hours before the shift
10 starts, say hey, we don't need you to come in today.
11      They typically use their PTO to backfill
12 that.  I forget what they -- if they had to use
13 their PTO, or not use their PTO at Ohio Valley.  But
14 that's what I mean TLO.  It's kind of flex off/TLO.
15 That's how it's kind of used.  I think the word is
16 TLO, but it could be flexing as well.
17     Q. Is there a difference between flexing off
18 and the temporary layoff?
19     A. Not that I -- not how I view it.  In theory,
20 you could have a temporary layoff like you were
21 going to do construction on a unit or something like
22 that.  Like another hospital I work with is going to
23 redo their cardiac cath lab, and it may be closed
24 for two months.  Some of those people may be laid

166

1  off for two months.  That would be a distinction.
2  The flexing is kind of a day-to-day thing,
3  week-to-week thing.  Not a, you know, we're going to
4  close this unit down for six months while we build
5  something new, kind of thing.
6      Q. What's the distinction between a layoff and
7  temporary layoff?
8      A. In my mind, the distinction is a layoff is a
9  permanent -- a permanent thing.  A temporary layoff
10 is nonpermanent.
11     Q. Did you have any role in providing
12 information or notice to employees about the WARN
13 Act, or their rights under the WARN Act?
14     A. Probably during that process, I probably saw
15 drafts of the WARN Act notice.  May have made a
16 comment or something.  But the physical part of
17 giving the notice, no, I wasn't involved in that.
18     Q. Who was responsible for -- for sending out
19 WARN Act letters?
20     A. I don't know who actually sent out the WARN
21 Act notice.  Mr. Bradshaw kind of coordinated that,
22 but I don't know how they actually were sent out.  I
23 don't know.
24     Q. Do you know whether they were sent from

167

1  California?
2      A. I don't know.  I thought they may have been
3  sent from West Virginia.  I don't know.
4      Q. What did defendants do to try to provide
5  WARN Act notice to OVMC employees?
6      A. Okay.  Well, Alecto had no obligation to
7  provide WARN notice because it never employed any of
8  those employees.  But Alecto Wheeling gave notice by
9  giving the WARN Act notice, also issuing a press
10 release and the Q&A, providing that to all the
11 employees.  Mr. Dunmyer provided that, which gave
12 the background of what was going on.  I believe
13 Mr. Dunmyer had several employee forms when that
14 press release went out.  Then it gave the WARN Act
15 notice.  I'm pretty sure it was in writing, not
16 something verbal, that there was a WARN Act notice
17 that went out as well.
18     Q. Okay.  So you've told me that AHS didn't do
19 anything to provide WARN Act notice, and Alecto
20 Wheeling sent a WARN Act letter, issued a press
21 release and a Q and A as part of its efforts to
22 provide WARN notice; right?
23     MR. GARRISON:  I'm going to object only so
24 far as you're misstating his prior testimony.  His

168

1  prior testimony is what it is.  I'm not going to
2  testify for him.  But your question misstates his
3  prior testimony.
4      A. I think what I said was, I said Alecto
5  didn't lay off any employees.  Alecto Healthcare
6  Services LLC.  So it wouldn't have given WARN Act
7  notices, Alecto Healthcare Services, because it
8  didn't lay off any employees.  Alecto Wheeling gave
9  WARN Act notice, and also gave employees -- as I
10 understand it, because again, I wasn't involved in
11 the day-to-day minutia when -- how the notices got
12 sent out, but gave the WARN Act notice, and also
13 employees had a Q and A, and they also had a press
14 release that described it even in more detail, and
15 my understanding is Mr. Dunmyer had employee forums
16 with employees both at Ohio Valley and East Ohio.
17     I didn't participate in those employee
18 forums, but my understanding is Mr. Dunmyer had
19 employee forums throughout the day when that press
20 release was issued --  the August press release was
21 issued.  And he could have had it in September as
22 well, but for sure he had them when the August press
23 release was issued.
24 BY MS. DAVIDSON-WELLING:

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

43 (169 to 172)

169

1    Q. I think you -- other than those things that
2  you just mentioned, is there anything else that you
3  contend either defendant did to provide WARN notice
4  to OVMC employees?
5    A. Well, I don't think it's my job to contend
6  anything. I'm just testifying me as a person; I
7  told you what I know that we did. I'm sure there's
8  other people -- probably other stuff that was done,
9  and those other people can tell you what was done.
10   Q. Is there anything else that you know that
11 was done?
12   A. Not that I know of specifically. That I
13 have specific personal knowledge about, no.
14     THE VIDEOGRAPHER: Is it a good time to turn
15 the tape?
16     MS. DAVIDSON-WELLING: All right. Okay.
17 Let's take a little break.
18     THE VIDEOGRAPHER: Okay. It is 3:02 p.m.
19 We go off the record.
20     (A short break was had.)
21     THE VIDEOGRAPHER: It is the beginning of
22 Media Number 4 of the testimony of Michael Sarrao.
23 It is 3:15 p.m. We are back on record.
24     MS. DAVIDSON-WELLING: Okay.

170

1  BY MS. DAVIDSON-WELLING:
2    Q. Mr. Sarrao, before the break, you had been
3  talking about flexing.
4    Do you remember that?
5    A. I do.
6    Q. Okay. For the individuals who were flexed
7  off at OVMC in September of 2019, did you have any
8  expectation that they were going to return to work?
9    A. In September of '19, there was still hope
10 that someone would take over the hospital and keep
11 operating the hospital, so yes, there was an
12 expectation that at least some of those people could
13 come back to work. I don't know all the people that
14 were flexed, but September '19, there was still hope
15 that someone would come in and reopen the hospital
16 and keep the hospital going, so yes.
17   Q. Okay. But -- but if there was no -- if
18 there was no sale, other than that possibility, you
19 had no expectation that they -- that they would
20 return to work; correct?
21   A. No, that's not true, because there could be
22 something different than a sale. There was
23 discussions with WVU about coming in and offering
24 some psych services out of that hospital. There

171

1  were discussions with Northwood Health about
2  something related to psych. So something would have
3  had to happen, but again, there were things going on
4  in September of '19. I don't know all the people
5  who were flexed off, and who was flexed off and who
6  wasn't, and what their roles were. But something --
7  something would -- there was still possibility that
8  something could happen.
9    Q. Do you mean that if there was an acquisition
10 or some other similar thing, in that instance, you
11 would have an expectation that they would return to
12 work?
13   A. Yeah, it wouldn't be -- it could be
14 something other than an acquisition. Remember, MPT
15 owns the property. They could lease space to WVU to
16 take over two floors, and they could have those
17 people come back, and they could be working. So
18 something would have to happen for them to come
19 back. Again, I don't know all the people that were
20 flexed off. In other words, people stayed beyond
21 the October time frame -- so I don't know all those
22 people who were flexed off.
23   Q. Okay. All right. So as far as you're
24 aware, did Alecto Wheeling ever inform any OVMC

172

1  employees that they were giving them less than
2  60 days advance written notice?
3    A. I'm not sure I follow your question there.
4  So maybe I'm just confused and I didn't understand
5  it. So like, some kind of notice is saying, hey,
6  we're only giving you 15 days notice, we're only
7  gonna give you 30 days notice.
8    Q. Yeah. Did they do anything like that?
9    A. I mean, I know there was that release we
10 looked at about suspending services. I don't think
11 so, but I'm not -- I don't know that 100 percent. I
12 don't think there was, like, another follow-up
13 notice saying, hey, we know we said it was 60 days,
14 now it's only going to be 10 days or 15 days or 35
15 or 40 days. I don't believe so. I know there's
16 that release that went out suspending services.
17 People reach certain conclusions. And Dan Dunmyer
18 may have done that, but I don't know one way or the
19 other.
20   Q. As far as you're aware, there was nothing
21 like that?
22   A. As far as I'm aware, there was nothing like
23 that, correct.
24   Q. And then as far as you're aware, Alecto

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

44 (173 to 176)

173

1 Wheeling never explained to any of the OVMC
2 employees why they were giving them less than
3 60 days notice?
4    A. Well, I think that -- no, I think that's
5 incorrect. I do think we gave the -- the release
6 was issued September 3rd or September 4th release.
7 And my understanding is Dan Dunmyer would have had
8 more employee forums to talk to employees after that
9 period. So Dan would be the best person to answer
10 that, but there would be explanations. People knew
11 what was going on. I mean, it's kind of common
12 sense when you see patient volume dropping, staff
13 leaving, not having coverage, not having physicians,
14 those things go together. But Dan Dunmyer was the
15 one communicating with employees at the ground
16 level.
17    Q. So if I understand you correctly, you're not
18 sure, and Dan Dunmyer is the person to ask?
19    A. Dan Dunmyer would be the person to talk to
20 about direct communications with the employees,
21 correct. I do know that that release was issued
22 about suspending services. I know that press
23 release was issued and distributed.
24    Q. Who was that press release distributed to?

174

1    A. It would be distributed to all the different
2 newspapers. It would have -- I believe it went to,
3 like, all employees. It probably would have been
4 posted. It was on every Facebook page, if I recall
5 correctly. It was everybody everywhere.
6    Q. Do you know -- did you have anything
7 personally to do with the distribution of that
8 September 4th press release?
9    A. I didn't, but I remember seeing Facebook
10 posts or texts to Facebook posts, Alecto did this,
11 Alecto did this, that kind of stuff. So it was out
12 there. There was no secret about it. I remember
13 getting a call -- people from the governor's office
14 were calling. So people knew about it.
15    Q. Were those Facebook posts that you mentioned
16 Facebook posts that you saw through your Facebook
17 page?
18    A. I don't have a Facebook page. No, people
19 would see things, and they'd take, like, a
20 screen-shot, and they send it to you. Random
21 people; I don't know who sent it to me. I don't
22 save those. But it was like, there was like a --
23 Facebook like -- all these -- different employee
24 groups have their own Facebook groups; right? And I

175

1 don't have Facebook, like, I didn't see it that way.
2 I saw it like, oh, someone said oh, look at this
3 Facebook post, or this Facebook post. I don't
4 remember when it came. But at every hospital, you
5 get those.
6    Q. Did you ever try to go and search for
7 those -- those things that were sent to you?
8    A. No. Because I don't -- I didn't keep 'em,
9 and I knew I didn't have 'em, and I didn't really
10 pay attention to them, frankly, when I see them.
11 People have the right to express their opinions, as
12 long as they're not disclosing patient information.
13 If they are, you try and tell the employee, you
14 can't post that kind of stuff, you're going to get
15 in trouble; but no, I didn't search for that.
16    Q. You mentioned your -- your getting these
17 things. Were you talking about things that you
18 received by text message?
19    A. No, it was more like people called, did you
20 see this Facebook -- someone posted on Facebook,
21 they're mad about this or they're doing that, and I
22 just -- I don't even pay attention to them, frankly.
23 Because again, my view is people can post whatever
24 they want to post, and I don't quite understand the

176

1 social media stuff.
2    Again, if someone tells me they're posting
3 about patient X, then I tell the people you need to
4 go talk to the employee, so the employee doesn't get
5 in trouble, they don't probably know that, you know.
6    Q. Okay. So these aren't posts you actually
7 saw, these are things that other people repeated to
8 you in conversations?
9    A. Yeah, people are posting things on Facebook
10 about it. Okay. Well, that's fine. That's what
11 people do. They're allowed to do that. I don't
12 have an issue with that.
13    Q. So that -- you were told that, not you
14 observed that?
15    A. Yeah, I don't think I actually saw -- maybe
16 I misspoke. I didn't think I saw an actual Facebook
17 post. I heard that people are posting things on
18 Facebook. And typically what it is, in my
19 experience in the last 25 years -- well, not
20 25 years, because Facebook hasn't been around -- is
21 some staff member will see something on their
22 Facebook, will tell some manager, then their manager
23 will tell somebody else, and somebody tells me.
24 That kind of thing. And that's why I don't give it

EXHIBIT 1

Transcript of Michael Sarrao
Conducted on May 19, 2022

45 (177 to 180)

---

177

1  a lot of credence.  Unless there's an issue with
2  HIPAA, I don't really pay attention to it.
3      Q. Okay.  So, fair to say, you don't know what
4  was or wasn't posted on any OVMC employee's Facebook
5  page?
6      A. Correct.  I don't know exactly what was
7  posted, correct.  I know it was in the newspaper
8  though, the suspension and all that.  There were
9  newspaper articles and all that about -- there was a
10 radio show, I think, about it and everything.
11     Q. Mr. Sarrao, did you have a cell phone in
12 2019?
13     A. I had a cell phone in 2019.
14     Q. Did you ever use it to text message at that
15 time?
16     A. I'm sure I sent text messages, but I
17 generally do not send text messages, especially work
18 related.  The extent of a text message I would send
19 is, hey, can you give me a call.  I don't do
20 sentences or stuff in text messages, certainly as it
21 relates to work.  My kids I might, but not work
22 related.
23     Q. Did you ever go back and search your text
24 messages to see what you might have with any of your

---

178

1  co-workers about OVMC?
2      A. I don't recall doing that.  I don't know if
3  that was a request to look for or not.  I don't
4  recall doing that personally.  And I think most of
5  those things would be privileged, anyways, but, if I
6  had them, probably with Mr. Bradshaw, and those
7  would be privileged.  But I don't recall
8  specifically looking at text messages and doing
9  that.
10     Q. Okay.  I am going to --
11     MS. DAVIDSON-WELLING:  All right.  So.
12 Would the video technician please pull up
13 Defendants' 82?
14     PLANET DEPOS REMOTE TECHNICIAN:  Please
15 stand by.
16     (Exhibit 8 was marked for identification
17 and is attached to the transcript.)
18     MS. DAVIDSON-WELLING:  I will -- let's see
19 here.  I think this will be marked as Plaintiffs'
20 Deposition Exhibit 7, is that what it's going to be
21 marked?
22     PLANET DEPOS REMOTE TECHNICIAN:  This one is
23 actually 8.
24     MS. DAVIDSON-WELLING:  8.  All right.  8.

---

179

1  Okay.
2  BY MS. DAVIDSON-WELLING:
3      Q. And, Mr. Sarrao, let me pull it up on mine
4  so that you can -- all right.  All right.  Please
5  take a look at what's been marked Plaintiffs'
6  Deposition Exhibit 8.
7      A. Okay.
8      Q. And let me know when you're ready for me to
9  scroll down.
10     A. Go ahead and scroll down.
11     Q. All right.
12     A. Go ahead.  Okay.
13     Q. Have you seen this letter before?
14     A. I don't know if I saw the final signed
15 letter.  I suspect I saw drafts of something, but I
16 don't know if I saw the final signed letter or not.
17     Q. Okay.  Now, okay.  You didn't previously
18 refer to a letter that was sent out to employees.
19     Is it your understanding that this is the
20 letter that you were referring to?
21     A. That's the letter I was referring to, the
22 final signed letter.  I don't think I -- I may have
23 saw it, but I don't remember seeing it, but that's
24 what I was referring to.

---

180

1      Q. Did you draft this letter?
2      A. I did not draft the letter.
3      Q. Do you know who did draft the letter?
4      A. Yeah, but that would be privileged, so I'm
5  not going to disclose that.
6      Q. Okay.  All right.  Let's take that.  All
7  right.  I'm going to stop sharing that.  Okay.
8      And, Mr. Sarrao, approximately how many
9  employees at OVMC were separated due to the closure
10 of the hospital?
11     A. I don't know the exact number of employees.
12 I want to say OVMC had like -- again, I don't know
13 the number between OVMC and East Ohio, but I think
14 OVMC probably had 650, 700 employees.  I don't know
15 the exact number.
16     Q. So it was hundreds, anyways?
17     A. It was certainly more than a hundred, yeah.
18 I mean, I just don't know the exact number.
19     Q. Okay.  So I'm going to bring up one more
20 exhibit here.  Let's see if I can find it.
21 Actually, before I do that, Mr. Sarrao, you had
22 previously talked about OVMC employees being flexed
23 off.
24     Do you remember that?

---

EXHIBIT 1

181
1    A. I do.
2    Q. Did Alecto Wheeling save money by not
3 scheduling its hourly employees to come to work?
4    A. At what period of time are we talking about?
5    Q. September of 2019?
6    A. It would depend whether or not the employees
7 used their PTO or not.  Generally, when you flex
8 off, you potentially save some money.  But I
9 don't -- again, I don't know who all was flexed off
10 and who wasn't flexed off, but there's a potential
11 for that, yes.
12    Q. All right.  Let's pull up the exhibit.
13 Let's find it.  Were there -- Mr. Sarrao, were there
14 discussions that you were a participant in about
15 flexing off OVMC employees in August or September of
16 2019?
17    A. I don't recall having any specific
18 discussions about flexing off.  In general, that's a
19 conversation every week, every month at a hospital
20 if the volumes are going down.  But I don't recall
21 having any specific discussions about that.
22    Q. Okay.  All right.  Let me just take a quick
23 minute, but I am very close, I think, to being done,
24 so.

182
1    A. Okay.  Can we take like five?  I just
2 need to respond -- working on a close.  I just need
3 to respond to something, like five minutes.
4    Q. Sure, five minutes is fine.
5    THE VIDEOGRAPHER:  Okay.  It is 3:32 p.m.
6 We go off the record.
7    (A short break was had.)
8    THE VIDEOGRAPHER:  It is 3:41 p.m.  We are
9 back on record.
10    MS. DAVIDSON-WELLING:  Mr. Sarrao, I have no
11 further questions for you at this time.
12    THE WITNESS:  Okay.
13    MS. DAVIDSON-WELLING:  Thank you for your
14 participation.
15    THE WITNESS:  Thank you.
16    MR. GARRISON:  Thank you.  Maureen, we don't
17 have any questions at this time, and we'll read and
18 sign.
19    THE VIDEOGRAPHER:  Okay.  So it is the end
20 of the deposition of Michael Sarrao.  It is 3:41 p.m.
21 We go off the record.
22    (Off the record at 3:41 p.m.)
23
24

183
1    ACKNOWLEDGMENT OF DEPONENT
2
3    I, MICHAEL SARRAO, do hereby acknowledge
4 that I have read and examined the foregoing
5 testimony, and the same is a true, correct, and
6 complete transcription of the testimony given by me
7 and any corrections appear on the attached errata
8 sheet signed by me.
9
10
11
12 _____        _____
13 (DATE)              (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24

184
1 CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2
3    I, Tiffany M. Pietrzyk, CSR RPR CRR, the
4 officer before whom the foregoing deposition was
5 taken, do hereby certify that the foregoing
6 transcript is a true and correct record of the
7 testimony given; that said testimony was taken by me
8 stenographically and thereafter reduced to
9 typewriting under my direction; that reading and
10 signing was requested; and that I am neither counsel
11 for, related to, nor employed by any of the parties
12 to this case and have no interest, financial or
13 otherwise, in its outcome.
14
15    IN WITNESS WHEREOF, I have hereunto set my
16 hand and affixed my notarial seal this 1st of
17 June, 2022.
18
19
20
21
22
23 My commission expires:
24 February 28th, 2024

No. 449917

Re:  Deposition of **Michael Sarrao**
     Date: 5/19/2022
     Case: Reed, et al. -v- Alecto Healthcare Services, LLC, et al.
     Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

        I, Michael Sarrao, do hereby acknowledge

that I have read and examined the foregoing

testimony, and the same is a true, correct and

complete transcription of the testimony given by me

and any corrections appear on the attached Errata

sheet signed by me.

_____              _____
        (Date)                               (Signature)

**EXHIBIT 1**

No. 449917

Re:   Deposition of **Michael Sarrao**
      Date: 5/19/2022
      Case: Reed, et al. -v- Alecto Healthcare Services, LLC, et al.
      Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 11 | 14-15 | "Ohio Medical Center" to "Ohio Valley Medical Center" |
| 11 | 15 | "Ohio Medical Center" to "Ohio Valley Medical Center" |
| 17 | 19 | "Dr. Jay Kumar" to "Dr. Jeyakumar" |
| 49 | 22 | "had to perfect the first security interest" to "had a perfected ~~secure~~ first security interest" |
| 56 | 23 | "Medical Centre" to "Medical Center" |
| | | |
| 160 | 13 | "Alecto willingly" to "Alecto wheeling" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____
7/5/22
(Date)

_____
(Signature)

**EXHIBIT 1**