*KEITH REED, ET AL vs.*

*ALECTO HEALTHCARE SERVICES, LLC, ET AL*

*KEITH REED*

*05/12/2022*



**EXHIBIT 3**

Case 5:19-cv-00263-JPB-JPM   Document 166-5   Filed 07/08/22   Page 2 of 25   PageID #: 9664

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

*********************************************************

KEITH REED, LISA DOLENCE,

ELIZABETH SCHENKEL, EMILY WINES,

MARK GARAN, and AUGUST ULLUM,

individually and on behalf of others

similarly situated,

       Plaintiffs,

v.              CIVIL ACTION NO.5:19-CV-263

               Judge Bailey

ALECTO HEALTHCARE SERVICES, LLC,

and ALECTO HEALTHCARE SERVICES WHEELING,

LLC, d/b/a OHIO VALLEY MEDICAL GROUP

and d/b/a OVMC PHYSICIANS,

       Defendants.

*********************************************************

    VIDEOTAPED VIDEOCONFERENCING DEPOSITION of

KEITH REED, taken by the Defendants in the

above-entitled action, pursuant to notice, before

Twyla Donathan, Registered Professional Reporter and

Notary Public, via Zoom Videoconferencing, on the

12th day of May, 2022, beginning at 1:00 p.m.

Page 2

A P P E A R A N C E S

APPEARING FOR PLAINTIFFS:

MAUREEN DAVIDSON-WELLING, ESQUIRE

STEMBER COHN & DAVIDSON-WELLING, LLC

The Hartley Rose Building

425 First Avenue, 7th Floor

Pittsburgh, Pennsylvania  15219

(412)338-1445

mdw@stembercohn.com

F. ALEX RISOVICH, ESQUIRE

RISOVICH LAW OFFICES, PLLC

3023 Pennsylvania Avenue

Weirton, West Virginia  26062

APPEARING FOR DEFENDANTS:

CHELSEA E. THOMPSON, ESQUIRE

SPILMAN, THOMAS & BATTLE, PLLC

Spilman Center

300 Kanawha Boulevard, East

Post Office Box 273

Charleston, West Virginia  25321-0273

(304) 340-3800

cthompson@spilmanlaw.com

ALSO PRESENT:

Greg Defibaugh, Legal Video Specialist

C O N T E N T S

Page 3

EXAMINATION OF KEITH REED           PAGE

By Ms. Thompson                 6

E X H I B I T S

(Attached to the transcript)

| DESCRIPTION OF EXHIBITS | | PAGE |
|---|---|---|
| Exhibit No. 1 | Keith Reed Discovery Responses | 25 |
| Exhibit No. 2 | Bates Defendants 33416, Email to All Mail Users, Meeting Tonight, 8/7/2019 | 30 |
| Exhibit No. 3 | Bates Defendants 6707, Forwarded email from Daniel Dunmyer to All Mail Users, August 7, 2019, re Meeting earlier this evening | 32 |
| Exhibit No. 4 | Bates Reed 41-43, Frequently Asked Questions | 34 |
| Exhibit No. 5 | Bates Reed 15 - 20, Noticed of Permanent Closure of Ohio Valley Medical Center, August 8, 2019 | 38 |
| Exhibit No. 6 | Bates Reed 21 - 22, OVMC and EORH Make Difficult Decision to Begin Closure Process | 48 |
| Exhibit No. 7 | Bates Reed 4, Keith Reed handwritten notes | 58 |
| Exhibit No. 8 | Bates Defendants 16769, Excel Spreadsheet Timecards | 68 |
| Exhibit No. 9 | Bates Reed 6-13, Facebook page of Keith Reed | 75 |

Page 4

| DESCRIPTION OF EXHIBITS | | PAGE |
|---|---|---|
| Exhibit No. 10 | Bates Reed 1-3, Email from Reed to Zachary Elerick, 9/4/2019 | 81 |
| Exhibit No. 11 | Bates Defendants 1553, Payroll Register Employee Detail | 82 |
| Exhibit No. 12 | Bates Reed 62-63, Screenshot of text message to Elizabeth Tucker | 84 |

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 5

1          P R O C E E D I N G S
2          VIDEOGRAPHER:  This is the video
3  deposition of Keith Reed in the matter of Reed, et
4  al, vs. Alecto Healthcare Services, LLC, et al,
5  Case No. 5:19-cv-263.  Today's date is March 12th,
6  2022, and the time is 1:02 p.m.  My name is Greg
7  Defibaugh, and I'm the certified legal video
8  specialist.  The court reporter is Twyla Donathan.
9          At this time will counsel please
10  introduce themselves and state who they represent.
11          MS. WELLING:  Maureen Davidson-Welling
12  on behalf of the Plaintiffs, including Keith Reed.
13          MR. RISOVICH:  Alex Risovich on behalf
14  of the Plaintiffs and Keith Reed.
15          MS. THOMPSON:  Chelsea Thompson on
16  behalf of the Defendants.  And we have no objection
17  to the deponent being sworn in remotely.
18          MS. WELLING:  Plaintiffs also have no
19  objection.
20          VIDEOGRAPHER:  Would the court
21  reporter please swear in the witness.
22          (Witness duly sworn)
23          K E I T H   R E E D
24  having been duly sworn, testified as follows:

Page 6

1          EXAMINATION BY COUNSEL FOR DEFENDANTS:
2  BY MS. THOMPSON:
3      Q   Hi, Mr. Reed.  My name is Chelsea Thompson,
4  and I am one of the lawyers that represents the
5  Defendants in this case, and I'll be conducting
6  today's deposition.  So I just wanted to talk to you
7  a little bit about how today will go so we're on the
8  same page before I jump into any substantive
9  questions.  My first question is:  Have you ever sat
10  for a deposition before?
11      A   Yes, I have.  Once before.
12      Q   Okay.  How long ago was that?
13      A   That probably was seven years ago.
14      Q   Was it something that had to do with work
15  or --
16      A   It didn't have anything to do with work.
17      Q   Okay.  So you might be a little familiar
18  with how today will go, but I'll go over the ground
19  rules regardless.  I'm going to be asking you a
20  series of questions today, and your answers to those
21  questions are going to be recorded for the record.
22  Since we are making a recording of this and a
23  transcript, we have to make sure that I am able to
24  finish my question before you start your answer, and

Page 7

1  that I make sure you are able to finish your answer
2  before I ask a new question.  Does that sound fair?
3      A   Yes.
4      Q   Since it's also being recorded and taken
5  down by the court reporter, we have to make sure that
6  all communication is verbal.  So we can't use head
7  shakes, or nuh-uhs, or uh-huhs or any sort of other
8  sounds like that.  We have to be clear and verbal,
9  okay?
10      A   Okay.
11      Q   If there is any problem with the Zoom
12  application or our Internet or there's a lag, please
13  let me know so that we can get that fixed, okay?
14      A   Okay.
15      Q   If at any point I ask a question that you
16  don't understand, please let me know that you don't
17  understand it.  Otherwise, if I ask a question and
18  then you provide an answer, I'm going to assume you
19  understood the question I asked.  Does that sound
20  fair?
21      A   Okay.
22      Q   And I don't believe we'll be here for a
23  very long period of time, but if you need a break, we
24  can take a break at any time.  I would just ask that

Page 8

1  if there's a question pending that you answer it
2  before we take that break, all right?
3      A   Okay.
4      Q   All right.  Can you please say and spell
5  your full name for the record, sir?
6      A   Keith Alan Reed, K-E-I-T-H, A-L-A-N,
7  R-E-E-D.
8      Q   And where do you currently reside,
9  Mr. Reed?
10      A   I currently live in Pittsburgh,
11  Pennsylvania.
12      Q   What is your residential address?
13      A   602 Frayne Street, F-R-A-Y-N-E, Pittsburgh,
14  Pennsylvania.  15207.
15      Q   And approximately how long have you lived
16  at that address?
17      A   Twelve years.
18      Q   Have you ever -- other than this lawsuit
19  that we're here to talk about today, have you ever
20  been a party of any other civil or criminal lawsuit?
21      A   Yes, I was -- Yes, I have.
22      Q   Okay.  Was it a civil lawsuit?
23      A   I don't know.  I'm not sure.
24      Q   Okay.  Was it a situation in which you were

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 9

1 either being sued by another person or you were suing
2 another person?
3    A    Yes.
4    Q    Okay. Were you the person that was suing
5 or the person that was being sued?
6    A    I was the person suing.
7    Q    Okay. And when did this lawsuit happen?
8    A    2015.
9    Q    Okay. And can you give me even just a
10 brief description of what you had sued this person
11 for?
12    A    Yeah. I sued them for running me over with
13 a car.
14    Q    Okay. Sorry to hear that. As part of that
15 lawsuit, did you have to provide any testimony?
16    A    Yes.
17    Q    Was it a deposition or was it at trial?
18    A    It was a deposition.
19    Q    Is that the one you told me about before?
20    A    Yes.
21    Q    Okay. So the one deposition that you had
22 was related to this lawsuit we just discussed?
23    A    Yes.
24    Q    Okay. Any other lawsuits that you've been

Page 10

1 a part of other than this car accident lawsuit in
2 2015 and the one we're talking about today?
3    A    Well, I was a juror once. Aside from that,
4 no.
5    Q    Okay. Yeah. You don't have to worry about
6 that, but thank you for letting me know. Have you
7 ever been convicted of a felony or a crime involving
8 dishonesty?
9    A    No.
10    Q    Are you on any medications today that would
11 affect your memory or prohibit you from giving
12 accurate testimony?
13    A    No.
14    Q    And do you know of any other circumstance
15 today that would affect your memory or prohibit you
16 from giving accurate testimony?
17    A    No.
18    Q    Okay. Those were all sort of the ground
19 rules we have to do. What was the date you began
20 working at OVMC?
21    A    I don't remember the exact date.
22    Q    Do you remember the month or the year?
23    A    It would have been March of 2015.
24    Q    And what position were you hired for?

Page 11

1    A    Clinical pharmacist.
2    Q    All right. And I understand at some point
3 your title changed, correct?
4    A    Correct.
5    Q    What did your title change to from clinical
6 pharmacist?
7    A    Clinical pharmacy manager.
8    Q    Is that considered a promotion?
9    A    Yes.
10    Q    Do you remember when that promotion
11 occurred?
12    A    Not exactly.
13    Q    Do you know what year it would have
14 occurred in?
15    A    I believe 2018.
16    Q    So moving forward, the time period I'm
17 going to be interested in is when you worked at OVMC
18 as the -- in the management position. So if I'm
19 asking any questions and not clarifying, that will be
20 the position I'm asking you about, okay?
21    A    Okay.
22    Q    What are some of the job duties you had as
23 the clinical pharmacist management position?
24    A    Policy development, chairing of the P&T

Page 12

1 committee, formulary maintenance, and I was still the
2 clinical pharmacist of the ICU, which was my previous
3 job. Those duties were all maintained with the new
4 title.
5    Q    Okay. So explain to me first what a P&T
6 committee is.
7    A    Pharmacist and therapeutics. So it
8 determines -- it's the committee responsible for drug
9 therapy. It's mainly run by pharmacists, physicians,
10 and a few other related disciplines.
11    Q    Is that something that is internal to a
12 hospital or amongst various pharmacies?
13    A    Every hospital generally has a P&T
14 committee.
15    Q    So this was a P&T committee specific to
16 OVMC, correct?
17    A    Yes.
18    Q    Okay. And when you said you kept your
19 duties associated with the ICU, what did that entail?
20    A    So I detailed review of all the patients
21 who were in the ICU, rounding with the
22 interdisciplinary team, responding to codes. You
23 know, when they're respiratory or cardiac arrest, I
24 would be part of the team that responded to that.

**EXHIBIT 3**

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 13

1    Q   You said you were rounding with an
2 interdisciplinary team. Who would you be rounding
3 with?
4    A   Physicians, nurses, respiratory therapists.
5    Q   Were there other clinical pharmacists who
6 were assigned to other departments like you were
7 assigned to the ICU?
8    A   Yes.
9    Q   How many departments were you aware of that
10 had a clinical pharmacist assigned to them?
11      MS. WELLING: Object to form. You can
12 answer.
13    A   Perhaps -- I believe three or four. It
14 changed over time. And it depends on whether you
15 include East Ohio Regional Hospital, which for our
16 department, for the clinical pharmacy, it covered
17 both of them together. We didn't really have
18 separate staff for the two.
19    Q   Did you have a physical location that you
20 worked out of at EORH?
21    A   Yes, I had an office there.
22    Q   Okay. And you would work at either of
23 those two sites, depending on what your job duties
24 were?

Page 14

1    A   Yes.
2    Q   How often were you at OVMC versus EORH in
3 2019?
4    A   I don't remember, but by that point I was
5 definitely spending more time at OVMC.
6    Q   Okay. Who would have been your direct
7 supervisor while you were a clinical pharmacist
8 manager?
9    A   Zachary Elerick.
10    Q   What was Mr. Elerick's job title?
11    A   Director of pharmacy.
12    Q   Is there more than one clinical pharmacist
13 manager?
14    A   No.
15    Q   Okay. Did you have any responsibilities of
16 supervising other clinical pharmacists?
17    A   None of the other -- the other clinical
18 pharmacists technically all reported to Zach as well.
19    Q   Okay.
20    A   I was kind of in charge of some of their
21 activities, but they formally reported to him.
22    Q   What kind of activities would you be
23 responsible for for the other clinical pharmacists?
24    A   Scheduling who was where and when.

Page 15

1    Q   Like their work schedules?
2    A   Yeah. We could be assigned to different
3 floors at different times.
4    Q   Okay. Any other activities you would have
5 had responsibility for in relation to the clinical
6 pharmacists?
7    A   No.
8    Q   Did Mr. Elerick have to sign off or approve
9 the work schedules that you created?
10    A   Yes.
11    Q   How often were schedules made? Were they
12 made a week in advance or two weeks in advance?
13    A   I don't remember.
14    Q   In order to create the work schedules, did
15 you have to consult with anybody in order to find out
16 what needs there were?
17      MS. WELLING: Object to form.
18 Confusing.
19      MS. THOMPSON: Fine. I'll rephrase
20 the question.
21    Q   I'm trying to figure out whether you had a
22 set schedule and you just put people's names in, or
23 whether part of your job duties was to say, oh,
24 there's more people at EORH, I'm going to assign

Page 16

1 extra people there. Do you understand the difference
2 I'm trying to say?
3    A   No, I don't.
4    Q   Okay. I'm asking if work scheduling duties
5 that you had were more like clerical, just plugging
6 names into schedules, or whether it was more complex
7 that required some more analysis of the needs of the
8 hospital?
9    A   It would have taken into account the needs
10 of the hospital as well as the availability of
11 people.
12    Q   Okay. If one of the clinical pharmacists
13 needed to have time off, would they come to you or
14 Mr. Elerick?
15    A   They would probably let both of us know.
16    Q   Okay. And how did you communicate work
17 schedules to the clinical pharmacists?
18    A   There was a shared schedule online.
19    Q   Okay. Could that be accessed off site as
20 well as on site?
21    A   Yes.
22    Q   Okay. And just so I'm clear, would your
23 job duties that related to the ICU require you to go
24 to the ICU?

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 17

1     A    They did.
2     Q    Okay.  Were there any other departments in
3  the hospital that you would work in regularly when
4  you were completing your duties as a clinical
5  pharmacist manager?
6     A    Yes.
7     Q    Okay.  What areas of the hospital would you
8  be working in regularly?
9     A    I worked on many of the patient units.
10    Q    Okay.  How many clinical pharmacists were
11 employed at OVMC to your knowledge in 2019?
12    A    I believe there were three.  We have a step
13 point.
14    Q    And then were there any -- What other job
15 titles would someone have in the pharmacy other than
16 clinical pharmacist?
17    A    Staff pharmacist, pharmacy tech, pharmacy
18 buyer.
19    Q    Do you know how many staff pharmacists you
20 had in 2019?
21    A    I don't.
22    Q    Did your position as clinical pharmacist
23 manager require you to have any of those same
24 scheduling or activities over the staff pharmacists?

Page 18

1     A    No.
2     Q    Okay.  Do you know how many pharmacy techs
3  there were in 2019?
4     A    No.
5     Q    And would your management position give you
6  any management or supervisory roles over the techs?
7     A    No.
8     Q    What about any supervisory position over
9  the buyers?
10    A    No.
11    Q    Okay.  How often would you be interacting
12 with doctors in your normal job duties?
13    A    You're referring to now as clinical
14 pharmacy manager?
15    Q    As clinical pharmacy manager, yeah.
16    A    The two roles were roughly split 50/50.  It
17 would vary a lot depending upon the patient needs and
18 other factors.  But while working as a critical care
19 pharmacist, I was interacting with doctors for most
20 of the time I was in the ICU.  So if I spent the
21 first four hours of my workday as a critical care
22 pharmacist, I would be interacting with physicians
23 for most of that time.
24    Q    Okay.  And then the other 50 percent, you

Page 19

1  said, would -- when you were doing more of the
2  management position, that would have less interaction
3  with doctors; is that what I'm understanding?
4     A    Yes.
5     Q    Okay.  Whenever you were doing the -- I
6  apologize, I can't remember the phrasing you used --
7  whenever you were in the ICU providing those
8  services, were you interacting directly with patients
9  and nurses as well?
10    A    Yes.
11    Q    Okay.  Other than your pharmacy and the ICU
12 that we've discussed, are you aware of what other
13 inpatient departments there were at the hospital?
14    A    Yes, there were numerous other inpatient
15 departments.
16    Q    What were some of the ones that you
17 remember?
18    A    The emergency department, there's the TCU,
19 there is a unit on the fifth floor.
20    Q    Any others that you recall?
21    A    That was at OVMC.  At East Ohio there was
22 also an emergency room and an ICU, as well as a
23 couple of inpatient units.
24    Q    And when you said TCU, that's the telemetry

Page 20

1  care unit, correct?
2     A    Yes.
3     Q    Okay.  Do you know of any departments at
4  OVMC that provided outpatient care?
5     A    I was not involved with the outpatient care
6  there.
7     Q    Okay.  Did you have any interactions with
8  any of the departments at the hospital that provided
9  administrative services?
10    A    Very rarely.
11    Q    So your position as clinical pharmacist
12 manager wouldn't have brought you into contact with
13 like HR regularly, correct?
14    A    Not regularly, no.
15    Q    Okay.  Did you work a pretty consistent
16 shift whenever you were a clinical pharmacist
17 manager?
18    A    Yes.
19    Q    What was your usual shift that you worked?
20    A    Usually aimed to arrive somewhere between
21 7:00 and 7:30, and then depending upon the patient
22 care needs, stay until 5:00 or 6:00, Monday through
23 Friday.
24    Q    Okay.  Were you an hourly employee, sir, or

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 21

1  salaried?
2      A    Salaried.
3      Q    What was your final salary when your
4  employment ended at OVMC?
5      A    I don't remember exactly.
6      Q    Now, as a salaried employee, were you
7  required to still clock in and out?
8      A    Our requirement under Alecto's ownership
9  was that salaried employees would have to punch the
10  clock at one point at any point during their shift
11  during each day.  It wasn't punching in or punching
12  out, it was just a punch at some point during the day
13  on the time clock.
14      Q    Okay.  So -- I understand.  So you were not
15  required to punch in and punch out whenever you began
16  or ceased working at OVMC for the time period we're
17  talking about, which is 2019?
18      A    No.
19      Q    Okay.  Have you ever heard of employment at
20  OVMC that's called casual employment?
21      A    Yes.
22      Q    Do you have personal knowledge of anybody
23  who was actually a casual employee at OVMC?
24      A    I don't remember any specifically.

Page 22

1      Q    Okay.  Were you aware that there was a per
2  diem employee classification as well?
3      A    Yes.
4      Q    Do you know of anyone at OVMC in 2019 that
5  was employed in a per diem capacity?
6      A    I don't remember anyone specifically.
7      Q    Okay.  What about a temporary employee?
8  Same question is do you -- well, let me break them
9  up.  Were you aware that there was a temporary
10  employee classification at OVMC?
11      A    No, I was not aware of that.
12      Q    Okay.  Were you aware that there is a
13  contingency basis employee at OVMC?
14      A    No.
15      Q    Were any of the clinical pharmacists that
16  you were responsible for scheduling, part time?
17          MS. WELLING:  Object to form --
18          (Crosstalk between counsel and
19  deponent.)
20          MS. THOMPSON:  I believe my question
21  was:  Were any of the clinical pharmacists that you
22  were responsible for making their work schedules,
23  part time?
24      A    Yes.

Page 23

1      Q    How many of them were part time?
2      A    2019, I believe one was.
3      Q    Were you aware of any of the other
4  pharmacies, either staff -- excuse me, staff
5  pharmacists or techs or buyers, were any of them to
6  your knowledge also part time in 2019?
7          MS. WELLING:  Object to form.
8      A    Yeah, I believe somewhere.
9      Q    Do you know who Mr. Elerick's -- am I
10  pronouncing that, correct?
11      A    It's been misspelled in some of the
12  documents.  It's Elerick, E-L-I-R-I-C.
13      Q    Okay.  Thank you.  Elerick.  Do you know
14  who his direct supervisor would be?
15      A    No.
16      Q    Okay.  Would he have had ultimate
17  responsibility for the pharmacy as the director of
18  the pharmacy?
19      A    Yes.
20      Q    Okay.  Were you responsible for dividing
21  your time between your clinical pharmacist duties and
22  your clinical pharmacist manager duties?
23      A    Yes.
24      Q    Okay.  That wasn't something that

Page 24

1  Mr. Elerick had to assign to you or tell you to do?
2      A    No.
3      Q    Okay.  When you were a clinical pharmacist
4  and not a clinical pharmacist manager, was that a
5  salaried position as well?
6      A    Yes.
7      Q    Okay.  Did you -- Do you remember if you
8  received a raise or a compensation change whenever
9  you took on the new title?
10      A    Yes.
11      Q    I just have a question.  I'm going to
12  introduce as Exhibit 1 your discovery responses.  And
13  since we're doing this by Zoom, it's a little
14  awkward, but I have documents pulled up on my
15  computer and I'll share my screen so that instead of
16  seeing anybody's face, you'll see the document.  And
17  you'll have the opportunity to read through all of
18  the documents at your own pace.  I'll just scroll
19  down when you tell me to, and then once you've read a
20  document in full, then we'll talk about it, okay?
21      A    Okay.
22      Q    It can be a little cumbersome going back
23  and forth, but technology.
24          I'm going to go ahead and share my screen

Case 5:19-cv-00263-JPB-JPM   Document 166-5   Filed 07/08/22   Page 8 of 25   PageID #: 9670

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

**Page 25**

1 with you, sir.  Let me know when you see a header
2 that says "In the United States District Court."
3          (Exhibit No. 1 was identified, marked for
4 identification, and shared to the screen.)
5     A  I see it.
6     Q  Okay.  I'm going to scroll down -- This is
7 a long document and we're only going to focus on a
8 part of it, but it has the title here that says that
9 it's "Response to Defendants' First set of
10 Interrogatories, Requests for Production of
11 Documents, and Requests for Admissions to Plaintiff
12 Keith Reed," correct?
13    A  Correct.
14    Q  And you can take your time and read through
15 all 23 pages if you want, but I prefer to skip down
16 to the one that I have a question about, which is
17 Interrogatory No. 6.  Here's the question that was
18 asked, if you would like to read it, and when you're
19 done, I'll scroll down.
20    A  I've read it.
21    Q  Okay.  And then there is the response you
22 provided.  And when you're done reading it, sir, let
23 me know and we'll talk about it.
24    A  Oh, I'm done.

**Page 26**

1     Q  Oh, okay.  Sorry.  So my question for you
2 is: In your response you listed what looks to be an
3 hourly wage rate of $58.94, but you had said that you
4 had some sort of salary, you just couldn't remember
5 what it was at the end of your employment.  So just
6 I'm trying to figure out which one would be correct.
7 Can you help me out with that?
8     A  I'm guessing that this is listed as what my
9 hourly rate would be calculated at if you were to
10 take my annual salary and base it on a 40-hour
11 workweek.
12    Q  So we can do some reverse math to figure
13 out what your salary is, you're saying?
14    A  Yes.
15    Q  Okay.  Thank you for clarifying that.  I'm
16 going to stop sharing my screen.
17        Did you elect to have health insurance
18 coverage associated with your employment at OVMC?
19    A  I think I had some.
20    Q  Okay.  Do you recall when those coverage
21 dates would have began or ended?
22    A  No.
23    Q  Do you remember receiving any
24 correspondence from your health insurance related to

**Page 27**

1 the closure of OVMC?
2     A  No.
3     Q  Do you remember whether you tried to use
4 that medical insurance or health insurance in the
5 months of August or September or October of 2019?
6     A  No.
7     Q  Do you know if you had dental or vision
8 insurance for your employment at OVMC?
9     A  Those would have been the only health
10 benefits I had.
11    Q  What do you mean?  I don't understand.  I'm
12 sorry.
13    A  Vision and dental would be the only health
14 benefits that I would have had.
15    Q  Oh, so you wouldn't have had medical
16 insurance; is that correct?
17    A  Aside from vision and dental, no.
18    Q  Okay.  Did you have medical insurance
19 through another company?
20    A  Yes.
21    Q  Okay.  And that was an election that you
22 made yourself?
23    A  Yes.
24    Q  Okay.  Understood.  As to your dental and

**Page 28**

1 vision insurance then, do you know when your coverage
2 for dental or vision would have began or ended?
3     A  No.
4     Q  Okay.  Do you remember if you got any
5 dental or vision related services in August,
6 September, or October of 2019?
7     A  I don't.
8     Q  Okay.  Did you have a 401(k) plan through
9 your employment at OVMC?
10    A  Not through my election.
11    Q  What does that mean?
12    A  I always declined.
13    Q  It was offered, but you declined to have
14 one; is that accurate?
15    A  Yes.
16    Q  Okay.  So offered, but not accepted.
17 Understood.  Do you know if you had any other kinds
18 of insurance or benefits as a result of your
19 employment at OVMC?
20    A  I believe I had a life insurance policy.
21    Q  Okay.  Any others that you recall?
22    A  No.
23    Q  Did you have a flexible spending account?
24    A  No.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 29

1    Q.   Okay.  As a salaried member, did you
2  receive any paid time off or paid days off?
3    A.   Yes.
4    Q.   Can you explain to me what paid time off
5  you were given in your position as clinical
6  pharmacist manager?
7    A.   I don't remember exactly.
8    Q.   Okay.  Were you issued any company owned
9  property, like a cell phone or laptop or iPad?
10   A.   No.
11   Q.   Were you assigned a work email to use for
12 your job duties?
13   A.   Yes.
14   Q.   Do you remember what that email address
15 was?
16   A.   No.
17   Q.   Was part of your usual job duties including
18 checking that email?
19   A.   Yes.
20   Q.   Okay.  How did you first hear that OVMC was
21 going to be closing in 2019?
22   A.   I don't remember how I first heard.
23   Q.   Okay.  Do you remember when you first heard
24 or first learned that it would be closing?

Page 30

1    A.   It would have been sometime in the summer
2  of 2019.
3    Q.   I'm getting up another document.  It just
4  takes a minute.  I'm going to introduce as Exhibit 2
5  Bates No. Defendants 33416.  I'm going to put my
6  screen up for you, sir, and you let me know when you
7  see an email.
8        (Exhibit No. 2 was identified, marked for
9  identification, and shared to the screen.)
10   A.   I see it.
11   Q.   Okay.  Go ahead and review this email and
12 I'll scroll down when you're ready.
13   A.   Go ahead.
14   Q.   That's the bottom, if you want to read the
15 confidentiality notice.
16   A.   Okay.
17   Q.   My first question is:  This email is dated
18 the 7th of August 2019, correct?
19   A.   Correct.
20   Q.   And it is addressed to what looks to be a
21 LISTSERV of AllMailUsers@OVRH.org, correct?
22   A.   Correct.
23   Q.   Do you remember receiving an email like
24 this or this email particularly?

Page 31

1    A.   I do.
2    Q.   Do you remember whether or not you attended
3  the meeting in which it references at 5:30 p.m. that
4  day?
5    A.   I believe I did attend that.
6    Q.   Okay.  Who was leading that meeting?
7    A.   I don't remember the details of it.
8    Q.   Okay.  Do you remember whether they
9  announced the closure of the hospital at that
10 meeting?
11   A.   I believe they did.
12   Q.   Do you remember if they passed out any
13 paperwork at that meeting?
14   A.   I don't.
15   Q.   Do you remember anything else about that
16 meeting that you attended?
17   A.   I don't remember the details.
18   Q.   Okay.  Down at the bottom of the email it
19 lists that -- employee forums that are the following
20 days, Thursday and Friday.  Do you recall if you
21 attended any of these employee forums?
22   A.   I believe I attended one of them.
23   Q.   What do you remember from that employee
24 forum you attended?

Page 32

1    A.   I remember employees asking questions and
2  being concerned.
3    Q.   Do you remember who was leading the meeting
4  or answering those questions?
5    A.   I believe it was Daniel Dunmyer.
6    Q.   Okay.  And to be clear, you believe it was
7  Daniel Dunmyer at the employee forum, correct?
8    A.   Yes.
9    Q.   Thank you.  I'm going to stop
10 sharing my screen and do Exhibit 3, which is going to
11 be Bates No. Defendants 6707.  I'm going to share my
12 screen with you, sir.  Let me know when you see an
13 email appear.
14       (Exhibit No. 3 was identified, marked for
15 identification, and shared to the screen.)
16   A.   I see the email.
17   Q.   Okay.  Go ahead and read it, and when
18 you're done I can scroll down if you want to read the
19 confidentiality notice.
20   A.   I've read it.
21   Q.   Okay.  Do you want to read the bottom or
22 are you good to go?
23   A.   No, that's okay.
24   Q.   I'll first ask you:  The date of this email

Page 33

1 is listed as August 7th, 2019, but later at
2 7:00 p.m., correct?
3    A   Correct.
4    Q   So this would have gone out after that 5:30
5 meeting that you attended that same day; is that
6 right?
7    A   Yes.
8    Q   Okay.  Do you recall receiving this email?
9    A   Not specifically.
10   Q   Okay.  But it is addressed to the same All
11 Mail Users LISTSERV that was on the prior email you
12 did receive, correct?
13   A   Correct.
14   Q   Okay.  And then this email, it says that it
15 attaches a first draft of FAQs.  Do you know what
16 that refers to?
17   A   Frequently asked questions.
18   Q   Do you remember receiving some employee
19 frequently asked questions in relation to the closure
20 of OVMC?
21   A   I do remember receiving that document.
22   Q   Do you remember how you received that
23 document?
24   A   I believe it was an email.

Page 34

1    Q   Okay.  I'm going to stop sharing this
2 document.
3        You had produced some documents of your own
4 in discovery, Mr. Reed, and I believe we're talking
5 about the same thing.  So I'll just use the versions
6 that you had produced.  I'm going to introduce as
7 Exhibit 4 Bates No. Reed 41 to 43.  I will share my
8 screen with you, sir.  Let me know when you see the
9 headers for EORH and OVMC.
10       (Exhibit No. 4 was identified, marked for
11 identification, and shared to the screen.)
12   A   I see it.
13   Q   Okay.  Please read through this and I'll
14 scroll down when you're ready.
15   A   You can scroll.
16       Go ahead.
17       You can scroll.
18       Go ahead.
19   Q   And that's the bottom -- no, there's a
20 little bit more.  I'm sorry.
21   A   Okay.
22   Q   Okay.  Is this the Frequently Asked
23 Questions that we were talking about earlier?
24       MS. WELLING:  Object to form.

Page 35

1    A   That's the one I remember seeing.
2    Q   Okay.  This is the one that you produced,
3 so this is one that you had in your possession,
4 correct?
5    A   Yes.
6    Q   Okay.  I wanted to ask a couple questions
7 about this document.  The first is that when -- The
8 questions are numbered, but this question here, I
9 think it's the fourth or fifth one down, it asks:
10 "Is it certain that the hospitals will close on
11 October 7th, 2019?"
12       And the answer states:  "No, if a viable
13 buyer comes forward, that date could be pushed back
14 or even canceled.  However, at this time the hospital
15 has had no offer to purchase from any party and is
16 beginning the closure process."
17       I have a couple questions.  My first one
18 for you is:  Did you personally make any efforts to
19 try to find a buyer or investor for OVMC?
20   A   No.
21   Q   Do you have any personal knowledge about
22 what efforts were made by hospital management to try
23 to find a buyer or investor?
24   A   No.

Page 36

1    Q   Did your job duties as a clinical
2 pharmacist manager encompass any sort of financial
3 aspect?
4    A   No.
5    Q   Okay.  So your job duties wouldn't entail
6 any sort of billing or collections of patient
7 accounts, right?
8    A   Actually, there once were some financial
9 aspects, but not like those.
10   Q   Tell me what financial aspects you had in
11 your job.
12   A   Determining drug use policy would often
13 take into account cost of drugs.  We were considering
14 different alternatives, our formulary.  Cost would be
15 one of the considerations.
16   Q   Okay.  Anything else you can think of, the
17 financial aspects of the job?
18   A   No.
19   Q   Okay.  It also has listed down here in a
20 portion about unemployment.  I've got it scrolled now
21 so that it's the second one down.  Did you ever apply
22 for unemployment in August, September, or October of
23 2019?
24   A   I did not.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 37

1    Q    Any reason why not?
2    A    Oh, I think I just put it off and never got
3  around to it.
4    Q    Okay.  And then some of these portions
5  would not apply to you, correct?  About the medical
6  insurance, or the 401(k) plan, those would not have
7  applied to you, correct?
8    A    Correct.
9    Q    Okay.  Were you aware prior to August 7th
10 of 2019 that the hospital was looking for an investor
11 or a buyer?
12        MS. WELLING:  Form.  You can answer.
13    A    Yes.
14    Q    How did you know that somebody was looking
15 for an investor or buyer for the hospital?
16    A    I don't remember where I specifically heard
17 that, but it was a general topic of conversation.
18    Q    Who was involved in this general topic of
19 conversation?
20    A    Various people throughout the hospital.  It
21 was common knowledge.  It was not a secret.
22    Q    Do you remember when you first learned that
23 there was a search for an investor or a buyer?
24    A    No, I don't remember when.

Page 38

1    Q    Did you -- excuse me.  After receiving this
2  employee Q and A, did you reach out to anyone at the
3  hospital with any questions you had about the
4  closure?
5    A    I don't remember doing so.
6    Q    All right.  I'm going to stop sharing my
7  screen, and I'm going to introduce as Exhibit 5 what
8  is Reed 15 through 20.  And this is another document
9  that you produced in discovery, sir.  Let me know
10 when you see the OVMC header.
11        (Exhibit No. 5 was identified, marked for
12 identification, and shared to the screen.)
13    A    I see it.
14    Q    All right.  Take a read of that and let me
15 know when to scroll down.
16    A    Go ahead and scroll.
17        Okay.
18    Q    You produced this letter, so you at some
19 point received it, correct?
20    A    Yes.
21    Q    Do you remember how you received this
22 letter?
23    A    It arrived in the mailbox of my home.
24    Q    Okay.  Do you remember when it arrived in

Page 39

1  your mailbox at your home?
2    A    No, I don't.
3    Q    Did you read the letter whenever you
4  received it?
5    A    Yes.
6    Q    The date on the face of the letter is
7  August 8th, 2019, correct?
8    A    Correct.
9    Q    And it has a subject line that says:  "Re
10 Notice of Permanent Closure of Ohio Valley Medical
11 Center," correct?
12    A    Correct.
13    Q    And then the salutation there begins with
14 "Dear Employees."  It's a little hard to make out in
15 this version, but I believe that's what it says.
16 Does that look correct to you?
17    A    That looks correct to me.
18    Q    Okay.  Having looked over this letter and
19 read it, did you understand at that time that OVMC
20 was going to be closing in its entirety?
21    A    Yes.
22    Q    Did you understand having received and read
23 this letter that that closure of OVMC was going to be
24 permanent?

Page 40

1    A    Yes.
2    Q    Did you understand having read and received
3  this letter that the scheduled closure date for the
4  hospital was October 7th of 2019?
5    A    I understood that that's what they were
6  saying.
7    Q    And did you understand, having received and
8  read this letter, that your employment would cease as
9  of October 7th, 2019?
10        MS. WELLING:  Object to form.  You can
11 answer.
12    A    I understood that's what they were saying.
13    Q    Okay.  The final sentence of the first
14 paragraph states "You will not be scheduled to work
15 after that date."  Correct?
16    A    Correct.
17    Q    And then the date it appears to be
18 referencing is in the sentence immediately prior,
19 October 7, 2019, correct?
20    A    Correct.
21    Q    Okay.  I'm going to scroll down a little
22 bit.  The second paragraph talks about positions.
23 The third paragraph I believe would not be applicable
24 to you, because it asks about hospital sponsored

EXHIBIT 3

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 41

1  health insurance. It's the fourth paragraph I wanted
2  to look at. It provides the name and contact
3  information for Dan Dunmyer and says if you need any
4  further information to please contact him.
5      Is that a fair summary of that opening
6  sentence of paragraph 4?
7  A  Yes.
8  Q  Did you at any point reach out to
9  Mr. Dunmyer to discuss this letter or the closure of
10  OVMC?
11  A  No, I did not.
12  Q  Do you remember at either the meeting you
13  attended on August 7th or the employee forum you
14  attended on August 8th whether you communicated
15  with Mr. Dunmyer?
16  A  I don't remember doing that.
17  Q  Okay. It also lists the contact
18  information for Workforce West Virginia. Do you
19  remember whether you ever contacted Workforce
20  West Virginia regarding this letter or the closure of
21  OVMC?
22  A  I don't remember doing so.
23  Q  Okay. Do you remember who you would
24  have -- strike that. Did you discuss this letter

Page 42

1  with anybody immediately after receiving it?
2  A  The letter itself? No.
3  Q  Do you remember soon after getting this
4  letter discussing the letter or the contents thereof
5  with someone?
6      MS. WELLING: Object to form.
7  A  The contents were the prime topic of
8  discussion all throughout the hospital.
9  Q  Understood. Let me rephrase it then. Do
10  you have specific memories of having conversations
11  about the closure of the hospital, say the week after
12  August 7th, 2019?
13  A  Same answer. That was the primary topic of
14  discussion throughout the hospital.
15  Q  Okay. But no specific conversations do you
16  remember?
17  A  No.
18  Q  Okay. Where do you currently work, sir?
19  A  I work at home for a company called
20  Somatus.
21  Q  What business does Somatus do?
22  A  Kidney care.
23  Q  How long have you worked at Somatus?
24  A  Since June of 2021.

Page 43

1  Q  Did you have any employment between the end
2  of your employment at OVMC and your beginning at
3  Somatus in June 2021?
4  A  Yes.
5  Q  Where did you work before Somatus?
6  A  I was working at Trinity Hospital in
7  Steubenville, Ohio.
8  Q  Do you remember when you started at
9  Steubenville -- or excuse me, at Trinity?
10  A  I don't remember the exact date. It was --
11  it was a couple of months after OVMC closing.
12  Q  Okay. And what position did you -- were
13  you hired for at Trinity?
14  A  Clinical pharmacist.
15  Q  And what led you to leave Trinity and start
16  at Somatus?
17  A  I was fired from Trinity.
18  Q  For cause or for any particular reason?
19      MS. WELLING: Object to form.
20  A  That's a long story.
21  Q  Can you give me an abbreviated version?
22      MS. WELLING: Object to form.
23  A  Yes. Management there was not -- did not
24  have patient care as their highest priority. I did

Page 44

1  not back down on patient care being maintained as the
2  highest priority. That set me at odds with
3  management.
4  Q  Okay. Do you -- Let's see. What role do
5  you fill at Somatus right now? What's your job
6  title?
7  A  Clinical pharmacist.
8  Q  And do you know the date that your
9  employment at Trinity ended?
10  A  That I don't exactly remember.
11  Q  Do you have any concept of how long you
12  worked there for?
13  A  Slightly less than a year.
14  Q  Was the Trinity job something you applied
15  for?
16  A  Yes.
17  Q  Do you remember if it was a paper or an
18  electronic application?
19  A  It's probably electronic.
20  Q  Do you remember if you had an interview as
21  part of that hiring process?
22  A  I did.
23  Q  Do you remember when you put in that
24  application to Trinity?

Case 5:19-cv-00263-JPB-JPM   Document 166-5   Filed 07/08/22   Page 13 of 25   PageID #: 9675

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 45

1    A    I don't exactly remember.
2    Q    Do you remember when you had an interview
3 at Trinity?
4    A    No, I don't.
5    Q    I know you may not exactly remember, but do
6 you remember a more general time frame of when you
7 applied to work at Trinity?
8    A    I know there are emails and there is an
9 application and an interview, and these were all
10 happening in the time period when OVMC was closing
11 and soon after.
12    Q    Okay.  Did you apply anywhere besides
13 Trinity and the time period of August, September or
14 the first week of October of 2019?
15    A    Yes.
16    Q    What other places do you recall applying
17 to?
18    A    I put out numerous applications.  I don't
19 remember to where.
20    Q    Okay.  Do you remember whether any
21 employers reached out to you about employment during
22 this time period?
23    A    No.
24    Q    Were you aware of any other employees at

Page 46

1 OVMC who were putting out applications at or around
2 the same time as you?
3    A    Yes.
4    Q    Who were you aware of?
5    A    Almost everyone.
6    Q    Were you aware of anyone who started a job,
7 a new job in August or September or the first week of
8 October of 2019?
9    A    I know many people did.  I don't remember
10 who.
11    Q    I guess another question would be:  For
12 those clinical pharmacists that you did scheduling
13 for, were you aware if any of them started a job
14 other than OVMC in August or September or the first
15 week of October of 2019?
16    A    I don't remember exactly when they started
17 their next jobs.
18    Q    Do you remember whether it was before or
19 after October 7th of 2019?
20    A    I don't remember that.
21    Q    Okay.  Do you know the date or around the
22 date in which you would have stopped making schedules
23 for the clinical pharmacists at OVMC?
24    A    I certainly wasn't once we were no longer

Page 47

1 taking care of patients, but I don't remember exactly
2 when, no.
3    Q    Okay.  After you stopped making those
4 schedules, did you have any other responsibilities in
5 terms of assigning the clinical pharmacists work?
6    A    No.
7    Q    So from the point you stopped making the
8 schedules, would you have had any personal knowledge
9 about the schedules that other clinical pharmacists
10 were working?
11    A    Everyone's schedule is on the same shared
12 document, so I would have seen what everyone was
13 scheduled for.
14    Q    Okay.  Then who started making that shared
15 document after you stopped making it?
16    A    That was still Zach's responsibility.
17    Q    Okay.  And that shared document you're
18 talking about, is that specific to the pharmacy, it's
19 not one that's over the entire hospital, is it?
20    A    It's specific to the pharmacy.
21    Q    Okay.  Do you remember receiving a press
22 release related to the closure of OVMC?
23    A    I remember seeing it at some point.
24    Q    I'm going to introduce as Exhibit 6 Bates

Page 48

1 No. Reed 21 to 22.  I'm going to share my screen with
2 you, sir.  And let me know when you see the header
3 there.
4        (Exhibit No. 6 was identified, marked for
5 identification, and shared to the screen.)
6    A    I see it.
7    Q    Okay.  Go ahead and read -- we'll read
8 through this, and then I have some questions.
9    A    You can go ahead and scroll.
10        Go ahead and scroll.
11        You can scroll.  Okay.
12    Q    Okay.  Is this the press release you recall
13 looking at?
14    A    Yes.
15    Q    Do you remember how you received a copy of
16 this press release?
17    A    I do not.
18    Q    This press release is dated August 7 of
19 2019, correct?
20    A    Yes.
21    Q    And it cites a couple of sentences -- or a
22 couple of lines down, it says:  "Losses of more than
23 37 million over the past two years."
24        My question to you is:  Do you have any

Page 49

1 personal knowledge about the financial -- the
2 financial condition of the hospital?
3    A   No.
4    Q   It also lists an exhaustive and
5 unsuccessful search for a strategic buyer or partner,
6 and I believe we had already established that you did
7 not participate or have personal knowledge about what
8 that search may have entailed, correct?
9        MS. WELLING:  Object to form.  You can
10 answer.
11       MS. THOMPSON:  You can answer the
12 question, sir.
13   A   Oh, I spoke at the same time.
14   Correct.
15   Q   Oh, okay.  Thank you for clarifying.
16       I'm going to scroll down a little bit.  It
17 gives a bullet point, a couple of different things
18 here.  It lists in the first bullet point declining
19 volumes.  In your position as clinical pharmacist
20 manager, did you notice any decline in either patient
21 volumes or business volumes in the pharmacy?
22   A   Yes.
23   Q   Can you tell me about that?
24   A   I saw the patient censuses decline.

Page 50

1    Q   Do you know when that decline first was
2 noticed by you?
3    A   It had been occurring over a period of a
4 couple years, I believe.
5    Q   Okay.  And it also cites declining
6 reimbursement.  Would you have any personal knowledge
7 about the reimbursement practices at the hospital?
8    A   No.
9    Q   And then it cites substantial harm caused
10 by conduct alleged in a certain lawsuit.  Do you have
11 any knowledge about what conduct is alleged in this
12 lawsuit?
13   A   Yes.
14   Q   Okay.  What do you know about the conduct
15 that was alleged in this lawsuit?
16   A   What was alleged was that Wheeling Hospital
17 was luring away providers.  They were doing it in an
18 illegal manner by offering salaries and other
19 benefits above their market value.  So we lost
20 providers, and those providers took their patients
21 with them.
22   Q   Is that something you would have -- well,
23 strike that.  Setting aside the allegations in the
24 lawsuit, in your role as the clinical -- excuse me,

Page 51

1 as a clinical pharmacist manager, would you have
2 known when a physician or provider left OVMC?
3    A   Yes.
4    Q   Do you remember specifically any doctors
5 that left OVMC in 2018 or 2019?
6    A   I don't remember any specific names right
7 now.
8    Q   Do you remember that it happened?
9    A   Yes.
10   Q   Do you remember even a ballpark figure of
11 how many doctors you remember this happening to?
12   A   No.
13   Q   Did Wheeling Hospital ever reach out to you
14 about employment at their hospital?
15   A   No.
16   Q   Were you following this lawsuit?
17   A   Yes.
18   Q   Why were you following the lawsuit?
19   A   It related directly to our hospital.
20   Q   Okay.  Is that -- Are those allegations in
21 this lawsuit something that was generally known
22 amongst the employees at OVMC?
23       MS. WELLING:  Object to form.
24   A   Yes.

Page 52

1    Q   Do you remember having any specific
2 discussions about this lawsuit or the allegations it
3 contained?
4    A   I know I had numerous discussions about it.
5 I don't remember specific discussions.
6    Q   Okay.  Was it ever a case if a physician
7 left that employees of the hospital that they worked
8 with also went with them?
9    A   I was not aware of that ever happening.
10   Q   Okay.  So but the allegations here were
11 about patients leaving, not employees leaving,
12 correct?
13       MS. WELLING:  Object to form.  You can
14 answer.
15   A   I mean, the two went together.  That was
16 the whole issue.
17   Q   Understood.  Okay.
18       I'm going to scroll down here.  The very
19 last bullet point notes that there were discussions
20 of more than 15 different national, regional, and
21 local healthcare system providers.  Do you know who
22 any of those 15 providers would have been?
23   A   Certainly didn't know of 15.  We knew of
24 some.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 53

1    Q   Which ones were you aware of?
2    A   WVU and Trinity.
3    Q   How were you aware of any discussions
4 between OVMC and WVU or Trinity related to investment
5 or purchase?
6    A   Just rumors and talk around the hospital.
7    Q   You didn't personally participate in any
8 discussions with Trinity or WVU about purchasing or
9 investing in OVMC, did you?
10   A   No.
11   Q   Okay.  The first sentence after the bullet
12 points states that:  "As they begin the closure
13 process, OVMC and EORH will also continue their
14 efforts to identify opportunities, alternatives and
15 options for both facilities."
16       Were you aware of any specific
17 opportunities, alternatives or options that were
18 being pursued by management at OVMC?
19   A   No.
20   Q   Did you ever talk to anyone in management
21 about any efforts to find an investor or buyer for
22 OVMC?
23   A   No.
24   Q   Okay.  After this press release was

Page 54

1 released on the 7th of August, 2019, did you see any
2 effect on patient volumes?
3       MS. WELLING:  Object to form.
4    A   Yes.
5    Q   How -- what did you see change in patient
6 volumes after August 7th, 2019?
7    A   They dropped rapidly.
8    Q   In your experience, how was this news
9 received by the employees at OVMC that the hospital
10 was closing?
11       MS. WELLING:  Object to form.  Lacks
12 foundation.  You can answer.
13   A   Badly.
14   Q   Can you elaborate on that, please?
15   A   People were very unhappy about it.
16   Q   Anything else to add to that one, or just
17 "unhappy" and "badly"?
18   A   People were very worried for their own
19 personal future and sad to be losing the hospital and
20 their co-workers.
21   Q   Did you have any discussions with any of
22 your co-workers about how you felt that the hospital
23 was closing?
24   A   Yes.

Page 55

1    Q   Do you remember any specific conversations?
2    A   No.
3    Q   Did you know if there were any job fairs
4 held at OVMC during the August/September time frame?
5    A   I vaguely recall some assistance being made
6 to find jobs, but I can't remember the details or
7 what was done.  It didn't involve me personally.
8    Q   Okay.  Can you explain what you mean by
9 that a little bit?  I was a little confused by your
10 answer.  That somebody else was making efforts to
11 help people find jobs?
12   A   I believe human resources was, but I don't
13 remember the details.
14   Q   Okay.  Did you seek any assistance from
15 human resources in putting in any applications
16 anywhere?
17   A   No.
18   Q   Did you seek any assistance from human
19 resources in trying to locate other employment?
20   A   No.
21   Q   Do you recall if there was ever any
22 meetings at OVMC's campus about unemployment?
23   A   I believe there were.  That was a big area
24 of concern.

Page 56

1    Q   Do you remember if you attended any of
2 these meetings?
3    A   I did not myself.
4    Q   Were you aware -- strike that.  Do you know
5 of any other hospitals in the area that reached out
6 to OVMC employees to try to get them to apply at
7 their facilities?
8    A   Yes.
9    Q   What facilities were making that kind of
10 outreach?
11   A   Trinity Hospital, Wheeling Hospital.
12   Q   Did either of those hospitals, Trinity or
13 Wheeling, make any contact to you?
14   A   Yes.
15   Q   Which one of those two?
16   A   Trinity.
17   Q   Okay.  Trinity initiated conversation with
18 you?  Is that what I'm understanding?
19   A   Well, actually no.  I believe -- Who
20 initiated that?  It was probably me that initiated
21 that.
22   Q   Do you specifically remember or are you
23 guessing?
24   A   I'm guessing.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 57

1    Q.   Okay.  Do you have any personal knowledge
2  of either Trinity or Wheeling reaching out to any of
3  your co-workers about jobs?
4    A.   Not specific individuals, no.
5    Q.   Do you remember whether any physicians or
6  care providers left OVMC after August 7th of 2019,
7  but before October 7th of 2019?
8    A.   Yes.
9    Q.   Which doctors or health care providers do
10 you recall leaving in that time period?
11   A.   I don't remember who left when.  I know
12 most of the residents left before that, though,
13 certainly.
14   Q.   Anyone besides the residents?
15   A.   I don't remember specifically.
16       MS. THOMPSON:  Okay.  We've been at it
17 for about an hour.  Can we take a five-minute break
18 if you don't mind?
19       MS. WELLING:  Sure.
20       VIDEOGRAPHER:  The time is 2:14.
21 We're going off the record.
22       (A recess was taken.)
23       VIDEOGRAPHER:  The time is 2:23.
24 We're back on the record.

Page 58

1  BY MS. THOMPSON:
2    Q.   Mr. Reed, you understand that you're still
3  under oath, even though we took a short break, right?
4    A.   Yes.
5    Q.   Okay.  There was a meeting held on the 3rd
6  of September of 2019 that you produced some documents
7  about.  Do you remember that meeting?
8    A.   I do.
9    Q.   How did you come to be invited to that
10 meeting?
11   A.   So Zach would have been invited to that
12 meeting as the director of pharmacy.  He wasn't able
13 to attend it that day, and so he sent me in his
14 place.
15   Q.   Was this a meeting that was only for
16 management?
17   A.   Yes.
18   Q.   Okay.  And I'm going to introduce as
19 Exhibit No. 7 some handwritten notes you produced in
20 discovery to see if this is the same meeting we're
21 talking about.  So Exhibit 7 is going to be Bates No.
22 Reed 4.  And I'm going to share my screen with you,
23 sir.  Let me know when you see those notes.
24       (Exhibit No. 7 was identified, marked for

Page 59

1  identification, and shared to the screen.)
2    A.   I see them.
3    Q.   All right.  Are these your handwritten
4  notes?
5    A.   They are.
6    Q.   Okay.  Go ahead and we'll read through them
7  before I ask you some questions.
8    A.   You can go ahead and scroll.
9        Okay.
10   Q.   Okay.  What do you remember in terms of who
11 was leading this meeting?
12   A.   That would have been Daniel Dunmyer.
13   Q.   Okay.  And having looked over your notes,
14 what do you remember being discussed at that meeting?
15   A.   I remember the things that are written
16 here, the closure of the hospital and how it
17 proceeded.
18   Q.   It has here on the side, it says, I
19 think -- does that say "WARN notice"?
20   A.   Yes.
21   Q.   And then what does that say on the bottom?
22 I can't read that out.
23   A.   "Through October 7th."
24   Q.   Okay.  Now when it says here, a notation

Page 60

1  says, "reduce staff as fast as possible," what do you
2  recall them talking about reducing staff at this
3  meeting on September 3rd?
4    A.   I remember just what's written there.
5    Q.   Do you have any independent memory of any
6  of that meeting other than what's written down on
7  this paper?
8    A.   No.
9    Q.   Do you usually take notes at meetings like
10 this?
11   A.   Yes.
12   Q.   Okay.  What did you do after you left this
13 meeting?
14   A.   I don't remember.  I mean, I would have
15 gone back to the pharmacy, I know that.
16   Q.   Okay.  It says here something about WVU and
17 psych services.  Can you tell me what that says?
18   A.   "Nothing from WVU about taking over psych
19 services."
20   Q.   Okay.  Was there any discussions at this
21 September 3rd meeting about anyone other than WVU
22 taking over services?
23   A.   I don't remember any discussion about
24 anyone else possibly taking over.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 61

1    Q    Okay. I'm going to stop sharing my screen.
2 Did you eventually communicate this information to
3 Zach?
4    A    Yes.
5    Q    Did you do that in an email?
6    A    Yes.
7    Q    I believe you produced the email as well.
8        Did you inform any of the clinical
9 pharmacists that you were responsible for about this
10 meeting -- or what you had learned in the meeting, I
11 should say?
12   A    I'm certain I talked to them about it.
13   Q    Do you have any specific recollections?
14   A    No.
15   Q    Who else do you remember talking to about
16 what you learned in this meeting?
17   A    I would have talked about it with whoever
18 happened to be in the pharmacy after I came back.
19   Q    Okay. Any specific memories of who that
20 would have been, or what that conversation would have
21 consisted of?
22   A    No. There was a staff pharmacist there,
23 but I don't remember who it was now.
24   Q    Okay. Do you remember the last day that

Page 62

1 there were patients in the ICU?
2    A    No. I don't remember what day that was.
3    Q    Did at some point you start performing any
4 sort of wind-down job duties for the pharmacy
5 department?
6    A    Yes.
7    Q    Do you know when those duties would have
8 began?
9    A    No.
10   Q    Do you know when you stopped doing things
11 like your rounding with various people? Do you
12 remember when you stopped doing like rounds with
13 people?
14   A    Not exactly.
15   Q    Did you participate in the sort of
16 wind-down, cleanup organization of the ICU?
17   A    Of the ICU itself? No.
18   Q    What about the pharmacy, did you
19 participate in like the cleanup, wind-down inventory
20 process for the pharmacy?
21   A    Yes.
22   Q    Do you remember when that process began?
23   A    I don't remember the date.
24   Q    Do you remember the last time you did those

Page 63

1 sort of organizational, inventory, wind-down duties
2 for the pharmacy?
3    A    I don't remember the date.
4    Q    Do you remember whether you helped with the
5 sort of wind-down duties of any other department
6 besides the pharmacy?
7    A    No.
8    Q    Do you know when any particular doctor
9 closed up their office?
10   A    No.
11   Q    Do you know when outpatient services ceased
12 seeing patients?
13   A    No.
14   Q    How did the scheduling in the pharmacy
15 department change at or around that time?
16        MS. WELLING: Objection. Vague.
17   A    He (indistinct) a schedule for a lot less
18 hours. Some people weren't scheduled at all.
19   Q    Was that scheduling that you were doing or
20 that Zach was doing?
21   A    Zach was doing that in the first period.
22   Q    What do you mean the first period.
23   A    So there were -- After there weren't any
24 patients there, then Zach was in charge of that. And

Page 64

1 at some point later he left, and Jennifer Hayes was
2 in charge. But actually that would have been more in
3 the East Ohio Regional Hospital phase.
4    Q    Okay. Do you remember when Zach left?
5    A    I don't remember the exact date.
6    Q    Do you know if it was in August or
7 September of 2019?
8    A    I don't.
9    Q    Do you know if he left to start another
10 job?
11   A    Yes.
12   Q    Okay. Do you know where he went to work?
13   A    Trinity.
14   Q    Oh. Did he have anything to do with your
15 getting a job there?
16   A    He was involved in that process.
17   Q    So he would have left before you?
18   A    Yes.
19   Q    Did he reach out to you after he had
20 secured employment at Trinity about working at
21 Trinity?
22   A    We were both already in communication about
23 that before he left.
24   Q    What communications did you have with Zach

EXHIBIT 3

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 65

1 about applying at Trinity?
2     A   He gave me the contact information of the
3 director of pharmacy there.
4     Q   Okay.  Did you reach out to that director
5 of pharmacy?
6     A   I did.
7     Q   Okay.  And at some point you said you
8 submitted an application and had an interview there
9 as well, correct?
10     A   Yes.
11     Q   Did you interview with Zach or did you
12 interview with the director of pharmacy that he put
13 you in contact with?
14     A   I interviewed with the director of pharmacy
15 at Trinity.
16     Q   When you had that interview, was Zach
17 already working at Trinity?
18     A   Yes.
19     Q   Did anybody else from the pharmacy
20 department at OVMC end up working in the pharmacy
21 department at Trinity?
22     A   Yes.
23     Q   Who else came to work at Trinity?
24     A   Olivia, Brady, Matt -- I feel like I'm

Page 66

1 forgetting one.  That's all I can remember.
2     Q   Do you know -- did you play any role in
3 Olivia or Brady or Matt getting a job at Trinity?
4     A   No.
5     Q   To your knowledge, did Zach play any role
6 in Olivia, Brady, or Matt getting jobs at Trinity?
7     A   He probably did, but I don't know for
8 certain any facts of that.
9     Q   Okay.  That's fair.
10     And you had said Jennifer Hayes was the
11 person who took over after he left?
12     A   Yes.
13     Q   What was Jennifer Hayes' position?
14     A   She was in charge of the pharmacy at East
15 Ohio Regional Hospital and worked under Zach until
16 Zach left.
17     Q   Okay.  At any point in August or September
18 of 2019, were you going over to EORH to work?
19     A   I was.
20     Q   Were you performing wind-up -- excuse me,
21 wind-down duties there or your normal job duties?
22     A   I was definitely involved in wind-up
23 duties.  I believe I was involved in patient care for
24 a little time during the overlap.

Page 67

1     Q   Okay.  Did you have any knowledge of
2 whether there was a help list that employees could
3 put their names on to help with wind-down in
4 departments that they weren't assigned to?
5     A   I was not aware of that.
6     Q   Were you aware that some employees were
7 working in like medical records departments, even
8 though they weren't assigned there?
9         MS. WELLING:  Object to form.  You can
10 answer.
11     A   I do remember that now, yes.
12     Q   Do you remember the last day you would have
13 swiped your badge and worked at OVMC?
14     A   I don't remember what day that is.
15     Q   Do you remember roughly when it happened?
16     A   No.
17     Q   I'm going to introduce as Exhibit No. 8
18 Bates No. Defendants 16769.  And this was produced
19 natively as an Excel spreadsheet, so it takes a
20 minute to link and load.
21     Let me ask this in the meantime.  Even
22 though you didn't have to clock your hours, you said
23 you still had to swipe in at least once a day,
24 correct?

Page 68

1     A   Correct.
2     Q   And was that something that you did -- like
3 a card that you swiped, or was it a computer program
4 you logged into?
5     A   It was a card that I swiped.
6     Q   Do you remember what program was used to
7 keep track of timecards for people?
8     A   No.
9     Q   Your duties as the clinical pharmacist
10 manager was not to review any employee clock records,
11 right?
12     A   No.
13     Q   Okay.  Just the scheduling.
14     In September of 2019, were you still
15 getting that schedule that you said had everybody's
16 shifts listed on it?
17     A   It was still available for me to view at
18 any time.
19     Q   Okay.  I'm going to share my screen with
20 you, sir, and what you'll see is a very large Excel
21 spreadsheet.  Let me know when you see it.
22     (Exhibit No. 8 was identified, marked for
23 identification, and shared to the screen.)
24     A   I see it.

Page 69

1    Q.  Okay.  I'll represent to you that this was
2  provided by a company called JBDev, who does the
3  timecard software at OVMC.  And this is a record of
4  all of the time punches of people.  I want to just
5  orient us so we know what we're looking at.
6        If you look at the bottom, the tabs include
7  dates ranges for pay periods.  So the one we have up
8  now is 12/16/2018 to 12/30/2018, so those particular
9  dates in December of 2018.  Does that make sense?
10   A    Yes.
11   Q    Okay.  I'm going to just skip ahead in time
12 here and get to -- the time period I now have up is
13 from 8/25/2019 to 9/8/2019.  And if you look at these
14 columns here, L, M, N, O, and P, these have a date,
15 an end time, an out time, and then a consecutive work
16 length period; is that correct?
17        MS. WELLING:  Object to form.  You can
18 answering.
19   A    Yes.
20   Q    Well, the headers do read day, end time,
21 out time, consecutive work length, correct?
22   A    That's what I'm reading.
23   Q    Okay.  So I'm going to -- to be simple, I'm
24 going to search for you, sir.  And then here are

Page 70

1  entries that I'm going to do a highlight on that say
2  "Keith Reed."  Do you see where I've done that in
3  those rows?
4    A    Yes.
5    Q    Okay.  So if we look at those same columns
6  that we just spoke of, but only for your name, it
7  appears according to this record that you swiped your
8  badge on the 2nd of September, correct?
9    A    Correct.
10   Q    That you swiped it on the 3rd, 6th, and 9th
11 of September?
12   A    Correct.
13   Q    You swiped your card on the 11th, 12th
14 and 13th of September?
15        MS. WELLING:  Object to form.  You can
16 answer.
17   A    Yes.
18   Q    And according to this record, you swiped
19 your card on the 16th, 17th, 18th, 19th and 20th of
20 September; is that correct?
21        MS. WELLING:  Object to form.  You can
22 answer.
23   A    Yes.
24   Q    Do you have any reason to dispute that this

Page 71

1  is not an accurate report of when you swiped your
2  card in at OVMC?
3    A    No.
4    Q    We'll jump ahead to the next section, which
5  is a time period of 9/22/2019 to 10/6/2019.  And
6  you'll see that the names are in the same spot.  And
7  I'll scroll over just a bit so that the same columns
8  for day, in time, out time, and consecutive work
9  length are visible.  And I will again find the ones
10 that are specific to you, sir.
11        This one here.  I've highlighted one that
12 is specific to Keith Reed, if you see; is that right?
13   A    Yes.
14   Q    And this one appears to be a clock-in or
15 swipe on 9/23 of 2019, correct?
16   A    Yes.
17   Q    And that appears to be the only swipe in
18 that time period right?  Specific to you?
19   A    Yes.
20   Q    Do you have any reason to dispute that you
21 swiped in on 9/23/2019?
22        MS. WELLING:  Object to form.  You can
23 answer.
24   A    No.

Page 72

1    Q    Do you remember how long the process was
2  for you to get an interview and then a job offer
3  at Trinity?
4    A    I believe it took a couple of months.
5    Q    Okay.  I'm going to stop sharing my screen
6  now.
7        Did you ever talk to Zach about how he was
8  scheduling people after he took over the scheduling
9  duties in September of 2019?
10   A    I'm sure we talked about it.  I don't
11 remember specific details or conversation.
12   Q    Okay.  You produced in discovery some text
13 messages -- or emails, I believe, with someone named
14 Elizabeth Tucker.  Who is Elizabeth Tucker?
15   A    She was another clinical pharmacist.
16   Q    Okay.  Do you know when her employment at
17 OVMC ended?
18   A    No.
19   Q    Do you know if she began another job in
20 August or September of 2019?
21   A    I don't remember when exactly she started
22 another job.
23   Q    In your discovery, you also listed that you
24 talked to someone named Kimberly Tingler.  Who is

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 73

1  Kimberly Tingler?
2      A   She was someone I communicated with
3  briefly.  I don't think I had known her before.  She
4  was in another department.
5      Q   Okay.  What did you talk to Kimberly
6  Tingler about in terms of this lawsuit?
7      A   I don't remember.
8      Q   Okay.  It also listed Carol Moscato.  Who
9  is Carol Moscato?
10     A   She was one of the charge nurses in the
11 ICU.
12     Q   What do you remember talking to Ms. Moscato
13 about in terms of the closure of OVMC?
14     A   I don't remember specifically.
15     Q   Okay.  And what about Martha Connors?  Who
16 is Martha Connors?
17     A   Martha Connors worked over at the psych
18 hospital side, and she organized a Facebook page
19 related to OVMC's closure.
20     Q   Okay.  Did you participate in this Facebook
21 page?
22     A   Yes.
23     Q   Okay.  Was this a Facebook group?
24     A   Yes.

Page 74

1      Q   Okay.  In what ways did you participate in
2  a Facebook group about the closure of OVMC?
3      A   I joined the group, I followed what was
4  posted on it, and I added comments a couple of times.
5      Q   Okay.  Do you believe that all of the
6  comments you've added have been produced in discovery
7  so far?
8      A   I produced everything I could find.
9      Q   Okay.  Do you know what the purpose of that
10 Facebook page was?
11         MS. WELLING:  Object to form.
12 Speculation.  You can answer if you can.
13     Q   Well, you listed the person who created the
14 Facebook page in your interrogatory responses as
15 someone you talked to.  So did you talk to Martha
16 Connors about why she created the Facebook page?
17     A   I never spoke directly to Martha Connors.
18     Q   How did you speak to her then?
19     A   I believe we either emailed or messaged on
20 Facebook briefly.
21     Q   Do you still have those emails or those
22 Facebook posts?
23     A   Anything I still have I would have
24 produced.

Page 75

1      Q   Okay.  The residents were responsible for
2  providing patient care, weren't they, at the
3  hospital?
4          MS. WELLING:  Object to form.  You can
5  answer.
6      A   Yes.  That's what they do.
7      Q   Okay.  I'm going to introduce as an
8  exhibit -- this is going to be Exhibit No. 9, and it
9  is going to be Reed 6 through 13, but I'm only going
10 to use one page.
11         All right.  I'm going to share a quick
12 thing with you, sir.  Some of those Facebook pages
13 you said you produced, I'm going to show you one of
14 them now.  Let me know when you see it.
15         (Exhibit No. 9 was identified, marked for
16 identification, and shared to the screen.)
17     A   I see it.
18     Q   Okay.  So the one I'm focusing on is your
19 comment here in the middle that begins with EORH is
20 definitely a marketable asset.  Can you read that
21 one?
22     A   I can read it.
23     Q   Okay.  Let me know when you finish it.
24     A   I'm finished.

Page 76

1      Q   Okay.  So before you had testified that you
2  didn't have any personal knowledge about the efforts
3  to find a buyer or investor for OVMC.  My question
4  is:  Then how do you know what prices were being
5  asked for EORH?
6      A   There were rumors and discussions that went
7  around.
8      Q   Who did you have these rumors and
9  discussions with?
10     A   I don't remember.
11     Q   Do you remember any more substance to those
12 rumors or discussion that form the basis of your
13 opinion here?
14     A   Yeah, I remember people talking about
15 specific prices that were offered.
16     Q   What prices were they saying were being
17 offered?
18     A   I don't remember.
19     Q   Do you have any knowledge about how this --
20 well, let me start with this.  Were you aware that
21 the hospital's ownership was sold in 2017?
22     A   Yes.
23     Q   Do you have any knowledge about how that
24 sale came to be?

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 77

1    A    No.

2    Q    Do you have any knowledge about any of the
3  details of that sale?

4    A    Very little.

5    Q    What do you know about that sale?

6    A    I know the hospital was sold to Alecto.

7    Q    When you say Alecto, what are you referring
8  to?

9    A    The company that bought the hospital.

10   Q    Are you aware that EORH was sold in 2020?

11   A    Yes.

12   Q    Do you know the details of that sale at
13  all?

14   A    I know a little bit about it.

15   Q    What do you know about it?

16   A    I know there was an independent buyer, a
17  physician, I believe, out of Ohio who bought that.

18   Q    Do you know if Alecto was involved in that
19  sale?

20   A    I don't know what their role in it was.

21   Q    You have a sentence here:  "They keep going
22  through the motions but keep increasing the price
23  until negotiations fall through."

24        What negotiations were you aware of in

Page 78

1  terms of the sale of either OVMC or EORH?

2    A    Only what's written there.

3        MS. THOMPSON:  Okay.  I'm going to
4  stop sharing my screen.

5        I think if we take a five-minute
6  break, I'll do my, like, review of my notes, but I
7  think I'm pretty much done.

8        MS. WELLING:  Okay.

9        VIDEOGRAPHER:  The time is 2:54.
10  We're going off the record.

11        (A recess was taken.)

12        VIDEOGRAPHER:  The time is 3:07.
13  We're back on the record.

14  BY MS. THOMPSON:

15   Q    Mr. Reed, you understand that even though
16  we took a short break, you're still under oath,
17  correct?

18   A    Correct.

19   Q    I apologize in advance if this seems
20  scattered, but this is cleanup right now.  First, I'm
21  going to share with you what was marked as Exhibit 7,
22  Bates No. Reed 4.  These were your handwritten notes
23  from the meeting that you attended on the third of
24  September.  Do you see those notes up now?

Page 79

1    A    I do.

2    Q    Okay.  The very last one -- notes, I
3  believe it says "doctors' offices until end of
4  October."  Can you explain to me what you remember
5  from that meeting about doctors' offices remaining
6  open until the end of October?

7    A    I don't remember anything about what's
8  written there about that.

9    Q    All right.  Were you aware of any -- aside
10  from this meeting and your notes, do you have any
11  personal knowledge of any doctors' offices remaining
12  open until the end of October?

13   A    No.

14   Q    I'm going to pull back up Exhibit 1, which
15  was your discovery responses.  I'm going to share my
16  screen with you once I find the specific part I
17  wanted to look at.  Bear with me a second.

18        I'm going to show you what is Interrogatory
19  No. 8, share my screen with you, sir.  Let me know
20  when you see Interrogatory 8 in front of you.

21   A    I see it.

22   Q    Okay.  Read it, and I'll scroll down so you
23  can read the entire thing and your response.

24   A    Go ahead.

Page 80

1        Go ahead.

2    Q    I believe that's the end of it, sir.

3    A    Okay.

4    Q    In your response here, you appear to be
5  describing the September 3rd meeting in which we
6  were just looking at your handwritten notes, correct?

7    A    Correct.

8    Q    Where in your handwritten notes -- and I'll
9  bring them up to you -- does it have any notation
10  that says "At the meeting Dan Dunmyer indicated the
11  closure decision had been made by Defendant AHS"?

12   A    I don't believe I wrote that.

13   Q    Okay.  Do you remember independently what
14  Dan Dunmyer said that gave you that indication?

15   A    I don't remember his specific words.

16   Q    Okay.  You also, I believe, sent an email
17  to your supervisor Zach about the meeting, correct?

18   A    Correct.

19   Q    And you produced that email here.  I'll
20  introduce it as Exhibit No. 10, which is Reed 1, 2
21  and 3.  I'll share my screen, sir, and see if this is
22  the email that you're talking about.

23        This is the email that you've produced.  Do
24  you see it?

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 81

1      (Exhibit No. 10 was identified, marked for
2  identification, and shared to the screen.)
3      A   Yes.
4      Q   It appears here that you forwarded it from
5  your work email address to another email address that
6  you have, correct?
7      A   It appears so.
8      Q   Okay.  And is this the email that you wrote
9  to Zach summarizing that meeting on September 3rd?
10     A   Yes, it is.
11     Q   Okay.  Does it anywhere in here mention
12 anything about Mr. Dunmyer making any statements
13 about AHS closing the hospital?
14     A   I don't think it does.
15     Q   Okay.  Take your time and look it over.  I
16 realize just now that I didn't give you time to read
17 in the beginning, so please read, and I'll ask the
18 question again.
19     A   Okay.  I've read it.
20     Q   Okay.  Is your answer still the same?
21     A   Yes.
22     Q   Okay.  In discovery you also produced some
23 of your compensation information, like printouts of
24 the compensation you received.  There is just a --

Page 82

1  one time period, one pay period that hadn't been
2  covered by what you had produced, so I wanted to show
3  you the records from the payroll department showing
4  that same time period.  So I'm going to share that
5  with you now.
6          Exhibit No. 11 is going to be Defendants
7  1553.  So I'm going to share my screen with you, sir.
8  Let me know when you see something that says
9  "timecard" at the top.
10         (Exhibit No. 11 was identified, marked for
11 identification, and shared to the screen.)
12     A   I see it.
13     Q   Okay.  And this is listed as Payroll
14 Register Employee Detail, correct?
15     A   Correct.
16     Q   Okay.  And it's listed "pharmacy," here
17 with the department number, correct?
18     A   Correct.
19     Q   Okay.  And if we're looking down the left
20 side you see a series of names.  Look across the rows
21 at the top, we're seeing various different types of
22 information.  We have a column for hours, correct?
23     A   Correct.
24     Q   Okay.  And then over to the right of that

Page 83

1  we have a column for rate listed out; is that right?
2      A   Correct.
3      Q   And then we have an amount of earnings
4  listed after the rate, correct?
5      A   Correct.
6      Q   And then there's a row for withholdings and
7  the amount of those withholdings?
8      A   Correct.
9      Q   Okay.  So just so we're all on the same
10 page, I'm going to scroll down here.  This is one
11 that is listed as a time period ending 10/5/2019,
12 right?
13     A   Right.
14     Q   Okay.  And here it lists your hours as
15 being eight regular hours, right?
16     A   Right.
17     Q   And then it has your rate of 58.94; is that
18 right?
19     A   Right.
20     Q   It was $471.52 as your total gross
21 earnings; is that right?  Did I read that correctly?
22     A   Yes.
23     Q   And then it has a list of different
24 withholdings that were made, correct?

Page 84

1      A   Correct.
2      Q   Okay.  Do you have any reason to dispute
3  that the compensation information contained on this
4  timecard is inaccurate?
5      A   No.
6      Q   Okay.  I'm going to stop sharing my screen
7  with you for just a second.
8          The last thing I believe I'm going to be
9  introducing is Exhibit No. 12, which is going to be
10 Reed 62 to 63.  And I'm going to share -- open this
11 up to you, sir.
12         It might have been the wrong one.  Hold on.
13 You did multiple ones.  Okay.  Yeah.  I'm going to
14 share the screen with you, sir.
15         Okay.  Do you see what appears to be a
16 screenshot, sir?
17         (Exhibit No. 12 was identified, marked for
18 identification, and shared to the screen.)
19     A   Yes.
20     Q   Okay.  Is this a screenshot that you took?
21     A   Yes.
22     Q   Okay.  So is this a text message chain you
23 would have been having with someone you have a
24 contact with named Liz?

EXHIBIT 3

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 85

1   A   Yes.
2   Q   Is this "Liz" Elizabeth Tucker?
3   A   Yes.
4   Q   Okay.  And the date listed here where this
5   screenshot begins is September 20th of 2019, right?
6   A   Yes.
7   Q   Okay.  And the one I'm interested in is
8   this last one here where you're on the right in blue,
9   correct?  This would be your text?
10   A   Yes.
11   Q   On September 20th, 2019, you texted Liz
12   that you interview at Trinity next week; is that
13   right?
14   A   Yes.
15   Q   Does that refresh your recollection of when
16   you would have put in an application to Trinity for
17   employment?
18   A   No.
19   Q   Okay.  During the course of your
20   employment, did you ever speak to someone named
21   Michael Sarrao?
22   A   I don't remember ever speaking to that
23   person.
24   Q   Okay.  During the course of your

Page 86

1   employment, do you remember having personal
2   discussions with Dan Dunmyer?
3   A   No, I don't.
4   Q   During the course of your employment at
5   OVMC, do you remember having any personal discussions
6   with a person named Roger Krissman?
7   A   No, I don't.
8   Q   During your employment with OVMC, do you
9   remember having any personal conversations with
10   someone named Lex Reddy?
11   A   No.
12   Q   Two more.  During the course of your
13   employment, do you remember having any personal
14   conversations with a gentleman named Mark Bradshaw?
15   A   No.
16   Q   And during the course of your employment,
17   do you remember having any personal conversations
18   with a woman named Jennifer Coello?
19   A   No, I don't remember.  I might have, but I
20   don't remember.
21   Q   Okay.  If you had had an issue with a
22   paycheck or your compensation, who would you have
23   gone to for that?
24       MS. WELLING:  Object to form.  You can

Page 87

1   answer.
2   A   I would have gone to human resources.
3   Q   Was that something that was located on the
4   hospital campus?
5   A   Yes.
6   Q   And Zach Elerick, he was located at the
7   hospital campus at OVMC with you, correct?
8   A   Correct.
9   Q   If you had had any questions about your job
10   duties, you would have gone, I presume, to
11   Mr. Elerick first as your direct supervisor, right?
12   A   Right.
13   Q   Do you know who you would have gone to
14   other than Mr. Elerick if you had had any issues with
15   your job duties or, say, issues with a co-worker?
16   A   Who else?  Human resources.
17   Q   Okay.  I think that was all.
18       At what point did you become aware that you
19   were not going to be scheduled to come in and work at
20   OVMC anymore?
21   A   At OVMC specifically?  It was when we made
22   plans to drive all the drugs down to Fairmont.  We
23   knew that that would be our last day of packing.
24   Q   Do you remember when that occurred?

Page 88

1   A   I don't remember the exact date.
2   Q   After that date, did you perform any work
3   at EORH?
4   A   Yes.
5   Q   Do you know when you became aware that you
6   would no longer be able to complete that work at
7   EORH?
8   A   I don't remember the exact day.
9   Q   Do you remember who -- do you remember how
10   it was communicated to you that you weren't going to
11   be scheduled to work at EORH anymore?
12   A   I searched for that communication and
13   couldn't find it, so I suspect it was a phone call.
14   Q   Do you remember -- who was the phone call
15   with?
16   A   Jennifer Hayes.
17   Q   What do you remember about that phone call
18   with Jennifer Hayes?
19   A   I don't remember that phone call.
20   Q   So are you sure that a phone call happened,
21   or are you guessing that it was a phone call because
22   you couldn't find a record of it?
23   A   By process of elimination, I don't know how
24   else that communication would have occurred without

Page 89

1 me having a record of it, but that's a guess.
2    Q.  Okay.  I just wanted to be clear if you
3 remembered a specific phone call or not.  Okay.
4        How did it come to be that you were over at
5 EORH in the first place?
6    A.  I was hired to work 50 percent of my time
7 at each hospital.
8    Q.  Okay.  Was there a point in time where you
9 were working exclusively at EORH?
10   A.  No.
11   Q.  Okay.  At EORH, do they have the same
12 requirement that you would clock in or swipe your
13 card once?
14   A.  Under Alecto's ownership, that was the same
15 at both.
16   Q.  Last two questions.  Sorry.  I found
17 another highlighted section.  Do you have any
18 personal knowledge of any OVMC employees retiring
19 from employment in August or September of 2019?
20   A.  I don't remember any specifically.
21   Q.  Okay.  And if I asked this, I apologize.
22 Do you remember if you spoke to any patients about
23 the closure of OVMC?
24   A.  I don't have any memory of doing that.

Page 90

1    Q.  Okay.  And I know you said your address is
2 listed in Pittsburgh.  Did you commute into Wheeling
3 each day?
4    A.  Yes.
5    Q.  How long of a commute is that?
6    A.  Oh, depends on how fast I drove.  An hour,
7 hour and 15 minutes.  I've done it in 45.
8    Q.  Okay.  How far are you from Steubenville?
9    A.  I don't know how many miles that is.
10   Q.  Did you have a shorter commute when you
11 went to Steubenville?
12   A.  Very slightly shorter.
13       MS. THOMPSON:  Okay.  I don't have any
14 more questions for you, sir, but your counsel might
15 have some questions for you, so I'll turn it over to
16 them.
17       MS. WELLING:  I don't think we have
18 any questions.  We'll read.
19       VIDEOGRAPHER:  With no further
20 questions, the time is 3:23.  We're going off the
21 record.  This concludes the deposition.
22       (Court reporter confirmed with counsel
23 regarding the requested transcript format.)
24       MS. WELLING:  Same format please, yes.

Page 91

1 Electronic.
2            MS. THOMPSON:  Thank you, Mr. Reed.  I
3 appreciate the time.
4            THE DEPONENT:  You're welcome.
5    (Signature having not been waived, the
6 deposition of KEITH REED was concluded at 3:24 p.m.)

Page 92

1 STATE OF WEST VIRGINIA,
2 COUNTY OF KANAWHA, to-wit:
3
4            I, Twyla Donathan, RPR, a duly commissioned
5 Notary Public for the County and State herein, do hereby
  certify that the foregoing deposition of KEITH REED was
  duly taken by and before me via Zoom Videoconferencing
6 at the time and for the purpose specified in the caption
  hereof, the said witness having been by me first duly
7 sworn.
            That the foregoing is a true, correct, and
8 full transcript of the testimony adduced, as taken by me
  in stenographic shorthand notes and thereafter
9 accurately transcribed;
            I further certify that I am neither attorney
10 or counsel for, nor related to or employed by, any of
  the parties to the action in which this deposition is
11 taken; and further, that I am not a relative or employee
  of any attorney or counsel employed by the parties or
12 financially interested in the action; and that the
  attached transcript meets the requirements set forth
13 within Article 27, Chapter 47 of the West Virginia Code.
14
15       IN WITNESS WHEREOF, I have hereunto set
16 my hand this _____ day of May, _____.
17
18 _____
19            TWYLA DONATHAN
            Registered Professional Reporter
20 My commission expires September 11, 2022.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

KEITH REED
05/12/2022

Page 93

```
 1            ACKNOWLEDGEMENT OF DEPONENT

 2

 3       I, KEITH REED, do hereby acknowledge

 4  that I have read and examined the foregoing testimony,

 5  and the same is a true, correct and complete

 6  transcription of the testimony given by me, and any

 7  corrections appear on the attached Errata sheet signed

 8  by me.

 9

10  _____

11       (DATE)                (SIGNATURE)

12

13       Subscribed to and sworn by me this _____

14  day of _____, _____.

15

16       _____

17                   Notary Public

18

19  My commission expires _____

20

21

22

23

24
```

Page 94

```
 1         E R R A T A   S H E E T

 2     IN RE:  REED, ET AL, VS. ALECTO HEALTHCARE, ET AL

 3  RETURN BY: _____

 4  PAGE      LINE    CORRECTION AND REASON

 5  _____    _____    _____

 6  _____    _____    _____

 7  _____    _____    _____

 8  _____    _____    _____

 9  _____    _____    _____

10  _____    _____    _____

11  _____    _____    _____

12  _____    _____    _____

13  _____    _____    _____

14  _____    _____    _____

15  _____    _____    _____

16  _____    _____    _____

17  _____    _____    _____

18  _____    _____    _____

19  _____    _____    _____

20  _____    _____    _____

21  _____    _____    _____

22  _____    _____

23  _____    _____

24     (DATE)                (SIGNATURE)
```

**EXHIBIT 3**