*KEITH REED, ET AL vs.*

*ALECTO HEALTHCARE SERVICES, LLC, ET AL*

*ELIZABETH SCHENKEL*

*05/13/2022*



**EXHIBIT 5**

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022



Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2
 3
   * * * * * * * * * * * * * * * * * * * * * * *
 4
   KEITH REED, LISA DOLENCE,
 5 ELIZABETH SCHENKEL, EMILY
   WINES, MARK GARAN and
 6 AUGUST ULLUM, individually
   and on behalf of others
 7 similarly situated,
 8        Plaintiffs,
 9 vs.                    CIVIL ACTION
                      NO. 5:19-cv-0263
10 ALECTO HEALTHCARE SERVICES,
   LLC, and ALECTO HEALTHCARE
11 SERVICES WHEELING, LLC d/b/a
   OHIO VALLEY MEDICAL GROUP and
12 d/b/a OVMC PHYSICIANS,
13        Defendants.
14 * * * * * * * * * * * * * * * * * * * * * * *
15
16
          Deposition of Elizabeth Schenkel taken by
17 the Defendants under the West Virginia Rules of
   Civil Procedure in the above-entitled action,
18 pursuant to notice, before Angela L. Curtis, a
   Certified Court Reporter, on the 13th day of
19 May, 2022.
20
21        REALTIME REPORTERS, LLC
          ANGELA L. CURTIS, CCR
22        713 Lee Street
          Charleston, WV  25301
23        (304) 344-8463
          realtimereporters.net
24
```

Page 3
```
 1            EXAMINATION INDEX
 2
   BY MS. THOMPSON . . . . . . . . . . . . . 6
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 2
```
 1            APPEARANCES:
 2
   APPEARING FOR THE PLAINTIFF:
 3
        F. Alex Risovich, Esquire
 4 RISOVICH LAW OFFICES, PLLC
        3023 Pennsylvania Avenue
 5      Weirton, WV  26062
 6      Maureen Davidson-Welling
        STEMBER COHN & DAVIDSON-WELLING, LLC
 7      The Hartley Rose Building
        425 First Avenue, 7th Floor
 8      Pittsburgh, PA  15219
 9
10 APPEARING FOR THE DEFENDANTS:
11      Chelsea E. Thompson, Esquire
        SPILMAN, THOMAS & BATTLE, PLLC
12      300 Kanawha Boulevard, East
        Charleston, WV  25301
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4
```
 1            EXHIBIT INDEX
 2 Exhibit 1    E-mail
 3 Exhibit 2    E-mail
 4 Exhibit 3    Schenkel 17 & 18
 5 Exhibit 4    Schenkel 52-56
 6 Exhibit 5    Press Release
 7 Exhibit 6    Schenkel 13
 8 Exhibit 7    Schenkel 19-22
 9 Exhibit 8    Bates Number 95
10 Exhibit 9    Bates Number 836
11 Exhibit 10   Bates Number 1177
12 Exhibit 11   Bates Number 1485
13 Exhibit 12   Bates Number 1731
14 Exhibit 13   Bates Number 14791
15 Exhibit 14   Bates Number 2963
16 Exhibit 15   Bates Number 16769
17
   *Exhibits were marked prior to the deposition, thus
18 are not reflected as such within this transcript.
19
20
21
22
23
24
```

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 5

1      P R O C E E D I N G S

2      VIDEO OPERATOR:  This is the

3  videotaped deposition of Elizabeth Schenkel taken

4  by the defendants in the matter of Keith Reed, et.

5  al. versus Alecto Healthcare Services, LLC., et.

6  al. being civil action number 5:19-cv-263 in the

7  U.S. District Court for the Northern District of

8  West Virginia held via Zoom on this 13th day of May

9  2022.

10      My name is Chris Leigh and I'm the

11  certified legal video specialist.  The court

12  reporter is Angie Curtis.  We're now on the record.

13  The time is approximately 10:08 a.m.  Would counsel

14  please introduce themselves and whom they

15  represent?

16      MR. RISOVICH:  My name is Alex

17  Risovich representing the plaintiffs and Elizabeth

18  Schenkel.

19      MS. DAVIDSON-WELLING:  Maureen

20  Davidson-Welling on behalf of Elizabeth Schenkel.

21      MS. THOMPSON:  Chelsea Thompson on

22  behalf of the defendants and we have no objection

23  to the deponent being sworn in remotely.

24      MR. RISOVICH:  Plaintiffs have no

objection to the deponent being sworn in remotely

Page 6

1  either.

2      VIDEO OPERATOR:  Hearing no

3  objections, would the court reporter please swear

4  in the witness?

5      E L I Z A B E T H   S C H E N K E L

6  was called as a witness by the Defendants,

7  pursuant to notice, and having been first duly

8  sworn, testified as follows:

9      EXAMINATION

10  BY MS. THOMPSON:

11      Q.  Hello, Ms. Schenkel.  My first

12  question is am I pronouncing your last name

13  correctly?

14      A.  Yes, that's correct.

15      Q.  Okay.  Thank you my name is Chelsea

16  Thompson and I am one of the lawyers that

17  represents the defendants in the lawsuit that

18  you brought that we're here to talk about

19  today and I'm going to be conducting today's

20  deposition so I'm going to be the one asking

21  the questions and it is your job today to

22  answer truthfully under oath my questions,

23  okay?

24      A.  Yes.

Page 7

1      Q.  Before we jump into any of those questions,

2  I just want to talk about some of the ground rules

3  so that we're on the same page moving forward, all

4  right?

5      A.  Yes.

6      Q.  My first question is:  Have you ever sat

7  for a deposition before?

8      A.  No.

9      Q.  Okay.  The purpose of the deposition is to

10  get your testimony down on the record.  In order to

11  do that, especially when we're doing this by Zoom,

12  we have to make sure that I'm allowed to finish my

13  question before you start an answer and I have to

14  allow you to finish your answer before I ask a

15  question, okay?

16      A.  Yes.

17      Q.  We also have to make sure that all of our

18  communication is verbal so that the court reporter

19  can take it down.  Neither of us can communicate

20  with uh-huhs or uh-uhs or head shakes or head nods,

21  anything like that.  Does that sound fair?

22      A.  Yes.

23      Q.  Since we are conducting this by Zoom, if

24  there's ever a point where the internet cuts out or

Page 8

1  there's a lag or you can't hear me, please let me

2  know immediately and we'll get it fixed, all right?

3      A.  Okay.

4      Q.  If I ask a question and then you answer it,

5  I'm going to assume that you heard me and you

6  understood the question.  Does that sound fair?

7      A.  Yes.

8      Q.  Okay and while I don't think we'll be here

9  very long, if you ever need a break where we're

10  doing the deposition, simply ask for one, we'll

11  accommodate that.  The only stipulation would be if

12  I've asked you a question you have to answer before

13  we go on break, okay?

14      A.  Yes.

15      Q.  Okay.  Are you on any medications today

16  that would affect your memory or prohibit you from

17  giving truthful testimony?

18      A.  No.

19      Q.  Do you know of any other circumstance that

20  would, sitting here today, affect your memory or

21  prohibit you from giving truthful testimony?

22      A.  No.

23      Q.  Okay.  Can you say and spell your full name

24  for the record, ma'am?

**EXHIBIT 5**

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 9

1    A.   Elizabeth D. Schenkel.  And it's
2  E-L-I-Z-A-B-E-T-H, middle initial D,
3  S-C-H-E-N-K-E-L.
4    Q.   And do you go by a shortened version of
5  your name?
6    A.   Yes, I go by Buffy.
7    Q.   Okay.  You produced some text messages and
8  e-mails and they reference Buffy and I wanted to
9  make sure that that was referenced to you.
10   A.   Yeah.
11   Q.   Okay.  What's your current address, ma'am?
12   A.   6768 Logan Thornville Road Northeast,
13  Rushville, Ohio  43150.
14   Q.   How long have you lived at that address?
15   A.   Almost one year.
16   Q.   Where did you live prior to that?
17   A.   Wheeling.
18   Q.   Okay.  Do you remember your address there
19  in Wheeling?
20   A.   465 Lodge Drive, Oglebay Park, Wheeling,
21  West Virginia.
22   Q.   And how long were you at that address in
23  Wheeling to your memory, best of your memory?
24   A.   Twenty-nine years.

Page 10

1    Q.   Other than the lawsuit we're here to talk
2  about today, have you ever been party to any other
3  lawsuit?
4    A.   No.
5    Q.   Have you ever been convicted of a felony or
6  a crime that involves dishonesty?
7    A.   No.
8    Q.   Do you remember roughly the date you began
9  working at OVMC?
10   A.   Yes, I do.
11   Q.   What is that date?
12   A.   January 7th, 1980.
13   Q.   You remember a very specific date.  That's
14  impressive.  And I know you have a long career
15  there and I just want to get an idea of it.  What
16  position were you first hired into on January 7th
17  of 1980?
18   A.   As a staff nurse.
19   Q.   Okay.  And do you remember what position
20  you held after staff nurse?
21   A.   Eventually I became a charge nurse.
22   Q.   Okay.  Do you remember when that change
23  occurred?
24   A.   Yes.

Page 11

1  went from staff nurse to charge nurse?
2    Q.   Okay.  When did that change occur where you
3    A.   That was around December of 2010.
4    Q.   Okay.  And was charge nurse the title you
5  held when your employment at OVMC ended?
6    A.   Yes.
7    Q.   Okay.  What is the difference in the job
8  duties for a staff nurse versus a charge nurse?
9    A.   There's a lot more responsibility when
10  you're a charge nurse because you're responsible
11  for all the patients on the unit, not just the
12  patients you're assigned to.
13   Q.   Okay.  Did the charge nurse position come
14  with some supervisory duties as well?
15   A.   Yes.
16   Q.   Would a staff nurse be in a position to
17  supervise other staff nurses?
18        MR. RISOVICH:  Objection to form.
19   Q.   You can still answer the question.
20   A.   Okay.  Yes, sometimes.
21   Q.   What other job duties would you have as a
22  charge nurse, ma'am?
23   A.   Communicating with doctors, you know,
24  calling for orders or calling them to tell about a

Page 12

1  patient's change in status or need for something.
2  Communicating with other departments to do
3  scheduling or call for an x-ray or lab work or that
4  sort of thing.
5       Then reviewing new orders and letting the staff
6  nurses know about those new orders and also helping
7  the staff nurses, educating them on things they
8  didn't know.  Using my expertise to help them
9  become better nurses and do better patient care.
10  Things like that.
11   Q.   Okay.  Is there more than one charge nurse?
12   A.   Yes.
13   Q.   Is there -- is there usually more than one
14  charge nurse on any given shift?
15   A.   No.
16   Q.   Okay.  Do you have any idea how many other
17  charge nurses there were?  Well, that's not a fair
18  question.  Let me ask this first:  Were you
19  assigned to a specific department at OVMC when you
20  were a charge nurse?
21   A.   Yes.
22   Q.   What department were you assigned to as a
23  charge nurse?
24   A.   Intensive care.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 13

1    Q.   Was that throughout the roughly nine years
2 that you were a charge nurse, it was always the
3 ICU?
4    A.   Correct.
5    Q.   Okay, so a better question would be do you
6 know how many charge nurses there were assigned to
7 the ICU in, say, 2019?
8    A.   Yes.
9    Q.   Okay.  How many were that?
10    A.   Three.
11    Q.   Okay, but only one of you would be working
12 at any given time; correct?
13    A.   Correct.
14    Q.   Okay.  Did you work the same shift each
15 week?
16    A.   Yes, I did.
17    Q.   What was your usual schedule in 2019?
18    A.   I was always scheduled three 12 hour shifts
19 and if we were busy I frequently worked one or two
20 extra shifts.  Plus I did payroll, so, you know, I
21 went into the hospital to do that on my, you know,
22 on a day off usually before payroll is due.
23    Q.   Okay.  Talk to me about your work with
24 payroll.  Is that something included in your duties

Page 14

1 as a charge nurse or something separate?
2    A.   That was separate.
3    Q.   Okay.  How did you come to be performing
4 payroll functions at OVMC?
5    A.   I was asked to do it by a previous ICU
6 manager just to divide up the duties and that was
7 pretty typical, you know, each charge nurse had
8 other duties that we performed in addition to our
9 clinical work.
10    Q.   Okay.  So to your knowledge were the other
11 two charge nurses that were assigned to the ICU in
12 2019 also completing payroll duties?
13    A.   No.
14    Q.   Okay.  Can you think of an example of one
15 of the non clinical duties that one of the other
16 ICU nurses might have been completing in 2019?
17    A.   Yes.  Education and scheduling.
18    Q.   Okay.  Other than the payroll duties, were
19 there any other non clinical duties that you
20 performed as a charge nurse in 2019?
21    A.   No, I don't think so.
22    Q.   Okay.  Can you explain to me what your
23 payroll duties encompassed?
24    A.   Just making sure that everyone who was

Page 15

1 working had signed in and signed out, that we
2 compensated them fairly if they did not get a lunch
3 break because of workload, that they got
4 compensated for the time they spent doing
5 continuing education.  Sometimes if they forgot to
6 sign in or out, you know, I'd have to call them and
7 say what time, things like that.
8    Q.   Okay.  And when you were performing those
9 services, was it limited to what employees?  Was it
10 across the hospital or limited to the ICU?
11    A.   Just the ICU.
12    Q.   Was it limited to the nurses in the ICU?
13    A.   It was the ICU staff so the secretaries and
14 the aides also if we had them.
15    Q.   Okay.  Did you not always have a secretary
16 or aide in the ICU in 2019?
17    A.   Not always.
18    Q.   Okay.  Did you have to submit any reports
19 as part of your payroll duties?
20    A.   No.
21    Q.   Okay.  So if someone in the ICU had a
22 question about their payroll or their paycheck,
23 were you the person they would come to to ask that
24 question?

Page 16

1    A.   Yes.
2    Q.   And do you remember roughly when you
3 started performing those payroll duties?
4    A.   No, I don't.
5    Q.   Do you know if it was before January 1st,
6 2019?
7    A.   Yes.  It was.
8    Q.   Who was responsible for creating the
9 schedules for the ICU?
10    A.   One of the other charge nurses, Carol
11 Moscato.
12    Q.   Okay and I know you said you typically
13 worked at least three 12 hour shifts.  Were those
14 the same three days a week?
15    A.   No.
16    Q.   Were those always day shifts or always
17 night shifts or mixed?
18    A.   It was always the 7:00 a.m. to 7:00 p.m.
19 shift.
20    Q.   Okay.  On that day shift, how many staff
21 nurses would usually be working with you in 2019?
22    A.   That depended on how many patients there
23 were.
24    Q.   Okay.  As a charge nurse, would you ever

**EXHIBIT 5**

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 17

1 float to other departments to work there for a
2 shift?
3    A.  Rarely.
4    Q.  Was floating something that was usually
5 reserved for staff nurses?
6    A.  Yes.
7    Q.  And when you went in to perform your
8 payroll services you would clock in for that;
9 correct?
10    A.  Correct.
11    Q.  Were you a salaried member, ma'am, or were
12 you paid hourly?
13    A.  Hourly.
14    Q.  Do you remember what your hourly wage was
15 when you -- when your employment ended at OVMC?
16    A.  I believe it was 34.45.
17    Q.  And did you have health insurance through
18 your employment at OVMC, ma'am?
19    A.  Yes.
20    Q.  Do you remember when you had health
21 insurance coverage begin or end?
22    A.  Entirely you mean?
23    Q.  No.  Let me narrow it down.  In 2019 do you
24 remember when your health insurance coverage ended?

Page 18

1    A.  Yes.
2    Q.  What was the date that your health
3 insurance coverage ended in 2019?
4    A.  The end of October 2019.
5    Q.  So until the end of October were you able
6 to use that health insurance in any way you needed?
7    A.  Yes.
8    Q.  Okay.  Did you have dental or vision
9 insurance through your employment at OVMC?
10    A.  Yes.
11    Q.  Which one?
12    A.  I know for sure I had dental.  I'm pretty
13 sure I had the vision also.
14    Q.  Okay.  Do you remember when your dental
15 insurance coverage ended in 2019?
16    A.  Yes.
17    Q.  What date was that?
18    A.  End of October.
19    Q.  Of 2019?
20    A.  Yes.
21    Q.  So you're able to use your dental insurance
22 in any way you needed through the end of October
23 2019; correct?
24    A.  Correct.

Page 19

1    Q.  Okay.  And for your vision insurance, do
2 you remember when that coverage ended in 2019?
3    A.  Yes, at the end of October also.
4    Q.  Okay.  So you also would have been able to
5 use your vision insurance through that October date
6 if you needed to; correct?
7    A.  Correct.
8    Q.  Okay.  Did you have any other types of
9 insurance through your employment at OVMC?
10    A.  No, I don't think so.
11    Q.  Did you have a 401k or retirement plan
12 through your employment there, ma'am?
13    A.  Yes.
14    Q.  Okay.  Can you explain to me what
15 retirement plan you had there?
16    A.  It was pension savings plan.
17    Q.  Was that one that you would contribute
18 money to?
19    A.  Yes.
20    Q.  And did you have that -- did you have that
21 retirement plan in 2019?
22    A.  Yes.
23    Q.  Did you have a flexible spending account
24 associated with your employment at OVMC?

Page 20

1    A.  Yes, I did.
2    Q.  Do you know the last date you were able to
3 use the funds in your flexible spending account?
4    A.  I don't remember.
5    Q.  As a charge nurse, did you have any paid
6 time of that, you know, was available to you?
7    A.  Yes.
8    Q.  Can you explain to me how that worked?
9    A.  That worked, it was time accrued based on
10 your length of service and your wages, so since I
11 had worked there for so long, I accrued at a
12 certain rate based on that length of employment.
13    Q.  And then that paid time off would be paid
14 at your current rate whenever you took that time
15 off?
16    A.  Yes.
17    Q.  What was the process for putting in paid
18 time off?
19    A.  When you wanted a vacation or you wanted
20 time off, you actually scheduled it with Carol so
21 that if you knew you were taking a vacation or you
22 knew you needed a day off you -- that went actually
23 onto the schedule and then when I did payroll, I,
24 you know, I paid the person based on what was on

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 21

1 the schedule.
2    **Q.   Okay.**
3    A.   And if they had called off sick and they
4 had paid time off, I used that to pay them for that
5 day or if they got put on call or, you know, got
6 the day off because of low census or some, you
7 know, something like that, then I gave them the
8 choice of using their time off or taking it without
9 pay.
10   **Q.   Okay.  Part of your payroll duties were you**
11 **actually, well, did they go by direct deposit or**
12 **was it still cutting live checks at that point?**
13   A.   It was the employee's choice.
14   **Q.   Okay.  How often was an employee in the ICU**
15 **being sent home because of low patient census in**
16 **2019?**
17   A.   By summer quite frequently.
18   **Q.   Okay.  What about prior to summer?**
19   A.   We would have slow periods off and on where
20 that would happen, but then we'd have very, very
21 busy periods also where we'd be calling people in.
22   **Q.   We have that in my profession too.  We call**
23 **it feast or famine.**
24   A.   Right.

Page 22

1    **Q.   Okay.  Would it be part of your duties as**
2 **charge nurse to inform the staff nurses on your**
3 **shift whether or not they were going to be staying**
4 **home due to patient census?**
5    A.   It was usually the next shift.  We were
6 calling the people from the next shift to tell
7 them.
8    **Q.   So since you worked day shift you would**
9 **have likely been calling the night shift to tell**
10 **them?**
11   A.   Correct.
12   **Q.   Okay.  Would you also have been contacting**
13 **staff nurses to tell them they would float to**
14 **another department for the shift after yours?**
15   A.   No.
16   **Q.   How far did the process for floating staff**
17 **nurses work?**
18   A.   We kept a record in a book of when people
19 were required to go to a different unit and then it
20 was a rotating, a rotating thing so that if that
21 person got pulled on a Tuesday and worked again on
22 Wednesday they did not get pulled again on
23 Wednesday, someone else got pulled on Wednesday.
24   **Q.   Okay.**

Page 23

1    A.   And that was recorded so that nobody got --
2 nobody was the one that got pulled all the time.
3    **Q.   Okay.  No, that sounds very fair.  And my**
4 **understanding is that staff nurses in the ICU would**
5 **float to other departments when patient census was**
6 **low; correct?**
7    A.   Correct.
8    **Q.   And how often in the beginning of 2019**
9 **before summer were ICU staff nurses being floated**
10 **to other departments?**
11   A.   I don't recall.  It would have been based
12 on the other department census and ours.
13   **Q.   How would you coordinate that float,**
14 **whether -- like, I'm trying to understand how you**
15 **would know that the surgery department had a lot of**
16 **people and you needed to float someone over there.**
17 **How did that process, that communication, work?**
18   A.   Via the nursing supervisor.
19   **Q.   Okay.  Who's the nursing supervisor?**
20   A.   Well, it was usually the different nursing
21 managers on day shift or a nursing coordinator.
22 That's what they called it there, not supervisors,
23 coordinators.  And then on the -- as a 3:00 p.m.
24 usually there was a scheduling nursing

Page 24

1 coordinator --
2    **Q.   Okay.**
3    A.   -- who did that.
4    **Q.   And they, for lack of a better term, would**
5 **act as a middleman between the different**
6 **departments about nursing needs?**
7    A.   Correct.
8    **Q.   Okay.  Who was the nursing manager for the**
9 **ICU?**
10   A.   Cindy Bruno was our last nursing manager.
11   **Q.   And would other departments have a separate**
12 **nursing manager?**
13   A.   Some of them.  Some shared.
14   **Q.   Would Cindy Bruno have been your direct**
15 **supervisor?**
16   A.   Yes.
17   **Q.   So if you would have had any questions or**
18 **problems with your employment, was she the first**
19 **person you would have spoken to about it?**
20   A.   Yes.
21   **Q.   Were you working along side certain people**
22 **when you were performing your payroll duties**
23        MR. RISOVICH: Object to form.  Vague.
24 You can answer.

**EXHIBIT 5**

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 25

1    A. I'm sorry?
2    Q. He made an objection. It's okay. I'll
3 rephrase my question. Was there a dedicated
4 accounting or payroll department at OVMC that
5 you're aware of?
6    A. Yes, there was.
7    Q. Okay. When you were performing your
8 payroll duties, were you doing it along side the
9 individuals in that accounting or payroll
10 department?
11    A. You mean physically along side of them?
12    Q. No, ma'am. Let me rephrase it this way:
13 Did you have a different supervisor whenever you
14 were performing your payroll duties?
15    A. No.
16    Q. If you had a question about something that
17 arose during your payroll duties, who would you
18 have gone to to ask questions?
19    A. The payroll department.
20    Q. Okay. Who's in the payroll department?
21    A. Her name was Nancy Newman.
22    Q. Okay. And she is located on the hospital's
23 complex; right?
24    A. Yes.

Page 26

1    Q. Okay. I guess this is a fair question:
2 When you're performing your payroll duties, is that
3 something you can physically do from the ICU or did
4 you have to do it from another place in the
5 hospital?
6    A. I did it from the ICU.
7    Q. How often was Cindy Bruno in the ICU in the
8 2019 time period?
9    A. She was there everyday.
10    Q. Okay. So she was available if you had any
11 questions; correct?
12    A. Correct.
13    Q. Okay. Do you know if she was responsible
14 for any departments other than the ICU?
15    A. Yes.
16    Q. What other departments was she in charge of
17 other than the ICU?
18    A. The telemetry care unit, 4th floor.
19    Q. Any others that you know?
20    A. No.
21    Q. Do you know whether or not the hospital has
22 a type of employment that's called casual
23 employment?
24    A. Yes.

Page 27

1    Q. Okay. Do you know, first, do you have any
2 personal knowledge of anyone at the hospital that
3 worked under casual employment?
4    A. Yes.
5    Q. How many people do you know that worked
6 under casual employment?
7    A. I don't recall the number.
8    Q. What was your understanding of what casual
9 employment entailed?
10    A. They worked for a higher rate of pay, but
11 no benefits and no accrued time off. No accrued
12 paid time off.
13    Q. Okay. Do you know if there was a type of
14 employment at OVMC called per diem?
15    A. No.
16    Q. Did you know if there was temporary
17 employment at OVMC?
18    A. Yes.
19    Q. What was your understanding of what
20 temporary employment meant?
21    A. Those were the travelers that we hired to
22 fill staffing needs.
23    Q. Did you ever have any of those temporary
24 employees in the ICU when you were a charge nurse?

Page 28

1    A. Yes.
2    Q. Do you remember if you had in 2019?
3    A. Yes, we did.
4    Q. How long would a traveling -- how long
5 would those temporary employees be working in the
6 ICU on average?
7    A. It was usually a 13 week commitment.
8    Q. And then after their 13 weeks ended they
9 would not be working there anymore?
10    A. Correct.
11    Q. Would you -- to your recollection, did you
12 have more than one of the traveling nurses in the
13 ICU at any given time?
14    A. Yes.
15    Q. Do you remember how many of the traveling
16 nurses you had in the ICU at the beginning of 2019?
17    A. No, I don't.
18    Q. Okay. Have you heard of the term
19 contingency employment at OVMC?
20    A. Yes.
21    Q. What's your understanding of what
22 contingency employment is?
23    A. That I sort of think of as interchangeable
24 with the casual.

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 29

1   Q.   Okay.  Were you aware if there was an
2 employment category where they only called in
3 people when they were needed and they didn't have
4 any guaranteed hours?
5         MR. RISOVICH:  Object to the form.
6 Compound.  You can answer the question.
7   A.   I don't recall that.
8   Q.   Okay.  Do you recall working any overtime
9 in 2019, ma'am?
10   A.   I did work overtime.  I can't tell you
11 when.
12   Q.   Okay.  Maybe a better question is:  Do you
13 remember how often you would be working overtime as
14 a charge nurse?
15   A.   That depended on census and workload.
16   Q.   As an hourly employee, were you required to
17 clock in and clock out somehow?
18   A.   Yes.
19   Q.   Okay.  How did that process work?
20   A.   We had a time clock on our, on the ICU and
21 we either used a fingerprint or a password to get
22 in and indicate, you know, that we were arriving or
23 leaving.
24   Q.   Okay.  Was this done -- so this wasn't

Page 30

1 something you had to log in on a computer and do;
2 is that right?
3   A.   Not at the end.
4   Q.   What do you mean at the end?  What time
5 period are you talking about?
6   A.   When Alecto came we got the JBDev system.
7 Before that it was logging on a computer.
8   Q.   Okay and when you were describing the
9 fingerprint or the log in, you were talking about
10 the JBDev system?
11   A.   Correct.
12   Q.   Okay and you, I'm assuming the JBDev system
13 is also what you were looking at when you were
14 doing your payroll duties; is that right?
15   A.   Yes.
16   Q.   Okay.  How did you first come to learn that
17 OVMC was going to be closing?
18   A.   Through the announcement on August 7th.
19   Q.   Break that down a little bit.  Do you
20 remember who told you that the hospital would be
21 closing on August 7th?
22   A.   I don't remember the person, the exact
23 person, no.
24   Q.   Okay.  Let's try this:  Were you in a

Page 31

1 meeting whenever you learned this with other OVMC
2 employees, let me put it that way?
3   A.   I was actually on my way to the meeting and
4 apparently it was already over and so I was on the
5 elevator and people got on the elevator and told
6 me.
7   Q.   Okay.  Let's try this:  I'm going to
8 introduce as Exhibit 1 defendants' Bates Number
9 33416.  Ma'am, the way this going to work is I'm
10 going to pull up a .pdf on my screen and share it
11 with you so you're able to read the document we're
12 talking about on the computer, okay?
13   A.   Okay.
14   Q.   And I'm going to let you read through each
15 document entirely and then when you're done let me
16 know and then we can talk about it.
17   A.   Okay.
18   Q.   So let me pull this up real quick.  I'm
19 going to share my screen with you, ma'am.
20   A.   All righty.
21   Q.   Let me know when you see what looks to be
22 the start of an e-mail.
23   A.   I see that.
24   Q.   Okay.  Please read through this and let me

Page 32

1 know and I'll scroll down to the last little bit so
2 that you can read it all.
3   A.   Okay.  I can't see the very, very edge of
4 the top two sentences where it says "I realize if
5 there's any --"
6   Q.   Let me see if I can --
7   A.   It might just be one word missing like --
8   Q.   Here, if I zoom out, does that help at all?
9 Let me see if I can zoom out.
10   A.   Okay.  "I realize it is short notice," yes.
11   Q.   There you go.
12   A.   Okay.  I'm done.
13   Q.   Okay.  If you want to you can read -- oh,
14 I'm sorry, I'm zooming out more.  Hold on.  That
15 was awful.  Okay.  If you want you can read the
16 bottom of this.  It's just a confidentiality
17 notice.  You're free to read it before we talk
18 about it.  It's up to you, but I won't ask any
19 questions about that.
20   A.   Okay.
21   Q.   All right.  My first question, ma'am, is:
22 Do you remember receiving an e-mail like this?
23   A.   Yes, I do.
24   Q.   Okay.  Were you assigned an e-mail address

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 33

1 from OVMC to use for work?
2     A.   Yes.
3     Q.   Do you remember what that e-mail address
4 was?
5     A.   I do not.
6     Q.   Do you remember whether it would have had
7 the same ending here, @ovrh.org?
8     A.   Yes.
9     Q.   And this e-mail is addressed to all mail
10 users at ovrh.org; correct?
11    A.   Correct.
12    Q.   Okay.  Is this the meeting you said -- do
13 you believe that this 5:30 meeting that's explained
14 in this e-mail was the one you were heading to when
15 you spoke of it earlier?
16    A.   Yes.
17    Q.   Okay and I believe you said you were in the
18 elevator and someone told you the meeting was over?
19    A.   Yes.
20    Q.   Okay.  Tell me what you remember about that
21 discussion in the elevator.
22    A.   Well, it was a very full elevator.  I was a
23 little late getting there because I was driving
24 from Pittsburgh and so I got on the elevator, went

Page 34

1 up to the correct floor and when the elevator
2 opened, a whole lot of people got on very glum
3 faced and said we're both closing, meaning both
4 hospitals.
5     Q.   Anything else you remember from that
6 conversa -- well, those conversations in the
7 elevator?
8     A.   Just how shell shocked everyone looked.
9     Q.   Okay.  What did you do then since you had
10 missed the meeting?
11    A.   I went -- I stayed on the elevator and went
12 back to ICU.
13    Q.   What did you do when you got to the ICU
14 that day?
15    A.   Just sort of commiserated with the people
16 that were there working.
17    Q.   Do you remember any specific discussions?
18    A.   No, only that it was closing.
19    Q.   Did you have any understanding, based on
20 your discussions with those employees, when the
21 closure was scheduled to occur?
22    A.   Sixty to ninety days.
23    Q.   And based on those conversations, did you
24 understand that it was going to permanently close

Page 35

1 the hospitals?
2     A.   Yes.
3     Q.   Okay.  I'm going to stop sharing my screen
4 with you, ma'am, and I'm going to show you another
5 e-mail that comes later that day.  It's going to be
6 Exhibit 2 is Bates Number defendants' 6707.  I'm
7 going to pull up a new e-mail for you to look at,
8 ma'am, okay?
9     A.   All right.
10    Q.   Bear with me while it loads.  All right.
11 I'm going to share my screen with you again and
12 you'll see an e-mail pop up.  Can you see that?
13    A.   Yes.  I can't read the end of the sentences
14 though, so if you could --
15    Q.   Yes, ma'am, I'll zoom out once.
16    A.   Zoom it one time.
17    Q.   Is that enough?
18    A.   Just zoom it more time, please.
19    Q.   Is that all right?
20    A.   There we go.  Yes.
21    Q.   All right.  Here, I'll scroll down.  That's
22 the e-mail I'm going to ask you about so please
23 read it and when you're done reading all of it
24 we'll talk about it.

Page 36

1     A.   Okay.
2     Q.   My first question is:  Do you remember
3 receiving this e-mail?
4     A.   Yes.
5     Q.   Okay and it's listed as the date of August
6 7th as well but later that day at 7:00 p.m.;
7 correct?
8     A.   Correct.
9     Q.   Okay.  And it has here the same information
10 you just testified to with the closure process
11 usually takes 60 to 90 days; right?
12    A.   Yes.
13    Q.   And it says that attached to this e-mail
14 will be the first draft of frequently asked
15 questions.  Do you remember receiving a copy of
16 some frequently asked questions for employees?
17    A.   Yes.
18    Q.   Do you remember receiving the press release
19 that's referenced here in this e-mail?
20    A.   I don't remember if I received it or saw it
21 in the newspaper.
22    Q.   Okay.  That's fair.  I'll stop sharing my
23 screen.  I have one more question for you.  I'm
24 sorry.  I'm going to pull up that first e-mail we

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 37

1 looked at, Exhibit 1.
2     I know you said you missed the 5:30 meeting on
3 August 7th, but I'm going to share my screen with
4 you real quick so we can be on the same page. The
5 e-mail that came that day on 1:07 p.m., do you see
6 it on your screen now, ma'am?
7     A.   Yes.
8     Q.   Okay. It lists out some other times the
9 next two days that there would be employee forums;
10 correct?
11     A.   Correct.
12     Q.   Do you remember if you attended any of
13 those employee forums?
14     A.   Yes.
15     Q.   Okay. Do you remember who was leading the
16 meeting at that employee forum?
17     A.   I do not.
18     Q.   Do you remember any of the topics that were
19 discussed at the employee forum that you attended?
20     A.   Not specifically, no. It's mostly just
21 people asking questions.
22     Q.   Did you ask any questions during that
23 employee forum?
24     A.   I don't believe I did.

Page 38

1     Q.   Do you remember if you received any
2 documents at that employee forum?
3     A.   I don't recall.
4     Q.   Okay. I'll stop sharing my screen now. In
5 this lawsuit we traded documents and information
6 back and forth and I want to talk to you about a
7 couple of the documents that you produced so that
8 we can talk about them.
9     The next exhibit I'd like to introduce is going
10 to be Schenkel 17 to 18. That's going to be
11 Exhibit 3. I'll go ahead and zoom out for you a
12 little bit, ma'am. I'm going to share my screen
13 with you and you let me know when you see the
14 headers for EORH and OVMC.
15     A.   Okay.
16     Q.   Can you see those words fully or do I need
17 to zoom out some?
18     A.   It looks like I can read it completely.
19     Q.   Okay. I want you to go ahead and read
20 this. I'll scroll down as you tell me and when
21 you've read it completely we can talk about it.
22     A.   Okay. Okay, you can scroll down, please.
23     Q.   Yes, ma'am.
24     A.   Okay, you can scroll down. Okay.

Page 39

1     Q.   There is a second page so I'll go ahead and
2 pull that up.
3     A.   Okay. Okay. Okay.
4     Q.   And that's the bottom.
5     A.   Okay.
6     Q.   All right. I'm going to scroll back to the
7 top. I want to talk to you about a couple of the
8 things in this document. The first is you had
9 produced this in discovery. Do you remember how
10 you got this document?
11     A.   I think they were mailed to us. Or given
12 at the meeting. I don't recall how I got it, but I
13 do remember getting it.
14     Q.   Okay. Do you remember reading it when you
15 got it?
16     A.   Yes.
17     Q.   Okay. I'm going to scroll down here to
18 look at one of these. They're not numbered, but
19 the question I'm looking at here says "Is it
20 certain the hospitals will close on October 7th,
21 2019?"
22     And the answer states "No. If a viable buyer
23 comes forward, that date could be pushed back or
24 even cancelled. However, at this time the

Page 40

1 hospitals have no offer to purchase from any party
2 and is beginning the closure process." Did I read
3 that correctly?
4     A.   Yes.
5     Q.   My question for you is: Do you have any
6 personal knowledge about any efforts to find a
7 buyer for the hospital in 2019?
8     A.   No.
9     Q.   Did you ever talk to a member of management
10 about whether -- trying to find a buyer for OVMC in
11 2019?
12     A.   No. Well, it was something that was
13 discussed frequently in the hospital just among
14 employees.
15     Q.   Okay. Okay. But is it fair to say then
16 that upper management of the hospital was not
17 someone you were talking to about potential buyers
18 or investors; right?
19     A.   Not personally.
20     Q.   Okay. I'm going to scroll down here to
21 another section where it asks about unemployment
22 compensation. Did you apply for unemployment at
23 any point in August, September or October of 2019?
24     A.   Not in those months, no.

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 41

1    Q.  Okay.  When did you apply for unemployment?
2    A.  I believe it was in November.
3    Q.  Do you remember why you applied for
4 unemployment in November of 2019?
5    A.  As opposed to earlier?
6    Q.  Yeah, why that date?  Why was it November
7 instead of December or October 2019?
8    A.  Well, we had a family vacation in October
9 and so I know I wouldn't have done the application
10 until after we got back from that, so it could have
11 been in late October, but I think it was November.
12   Q.  Okay.  When were you on that family
13 vacation in October?
14   A.  From maybe October 5th until the -- it was
15 about two weeks, so maybe the 16th, 17th, 18th,
16 somewhere in there.
17   Q.  Where did you go for that vacation?
18   A.  Hilton Head.
19   Q.  Still never been there.  Someday.  Okay.
20 So when you applied for unemployment in November of
21 2019, that would have been for total unemployment;
22 correct?
23   A.  Correct.
24   Q.  Okay.  I'm looking on the second page,

Page 42

1 ma'am, do you see that?
2    A.  Yes.
3    Q.  Do you see it asks a question about health
4 insurance coverage?  "What happens to my health
5 insurance coverage?"
6    A.  Yes.
7    Q.  And the answer states that "Medical, dental
8 and vision insurance coverage continues until the
9 end of the month that you separated employment from
10 the hospital;" correct?
11   A.  Correct.
12   Q.  Okay and I believe you stated earlier that
13 those all ended at the end of October of 2019;
14 right?
15   A.  Correct.
16   Q.  Okay.  And then I'm going to scroll up a
17 little bit.  It has a question here that asked
18 "What if I choose to quit my job?"  And then it has
19 an answer.
20   My question for you is:  After this date of
21 August 7, 2019, were you aware of any employees at
22 OVMC who left their jobs and started a new job in
23 August of 2019?
24   A.  Yes.

Page 43

1    Q.  Who do you specifically remember starting a
2 a new job in August of 2019?
3    A.  Off the top of my head I don't remember.  I
4 would have to look at the schedule and to see who
5 it was, but people did leave.
6    Q.  And are these people in the ICU or are
7 there people beyond the ICU?
8    A.  It was throughout the hospital.
9    Q.  As a charge nurse, would any of the staff
10 nurses or secretaries or aides in ICU have to come
11 to you and report to you if they were starting a
12 job elsewhere?
13   A.  They didn't have to, no.
14   Q.  Did anybody come and tell you that though?
15   A.  Yes.
16   Q.  Okay.  Who came to you and said that they
17 were starting a job elsewhere in August of 2019?
18   A.  Again, I don't remember exactly who.  I
19 would have to look at a list of employees to jog my
20 memory.
21   Q.  Okay.  Do you remember a number, was it one
22 or more than one?
23   A.  I'm pretty sure it was more than one.
24   Q.  Do you have any idea what number it was,

Page 44

1 even a ballpark?
2        MR. RISOVICH:  Object to form.  Vague.
3 You can answer.
4    A.  I do not, not off the top of my head.
5    Q.  Okay.
6        MR. RISOVICH:  Chelsea, is there any
7 way we could take like a five minute break?
8        MS. THOMPSON:  Yeah, I don't think I
9 have a question out.
10       MR. RISOVICH:  Okay.
11       MS. THOMPSON:  Yeah, it's 11:00
12 o'clock.  You need only five minutes?
13       MR. RISOVICH:  Five or ten.  How about
14 ten?  Is that okay?
15       MS. THOMPSON:  Sure.  We'll come back
16 at 11:10.
17       MR. RISOVICH:  Thanks.  Appreciate
18 that.
19       MS. THOMPSON:  Thank you all.
20       VIDEO OPERATOR:  Time is 11:02 a.m.
21 We're off the record.
22       (A brief recess was taken after which
23 the deposition continued as follows:)
24       VIDEO OPERATOR:  The time is

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 45

1 11:12 a.m.  We're on the record.
2 BY MS. THOMPSON:
3    Q.  Ma'am, do you understand you're still under
4 oath even though we took a short break?
5    A.  Yes.
6    Q.  Okay.  I believe just before the break you
7 had said if you had a schedule or a list of the
8 employees it might help refresh your memory.  You
9 did produce one or two schedules in discovery and
10 I'd like to show those to you now to see if that
11 will help you remember, okay?
12    A.  Okay.
13    Q.  So my Exhibit Number 4 is going to be Bates
14 number Schenkel 52 to 56 and I'm going to share my
15 screen with you, ma'am.  You let me know when you
16 see a schedule pop up.
17    A.  All right.
18    Q.  Do you see that?
19    A.  Yes, but not in the entirety.
20    Q.  Okay.  I'll zoom out.  Is that better?
21    A.  Yes.  I think you need to make it a little
22 smaller, please.
23    Q.  How's that?
24    A.  Okay.

Page 46

1    Q.  Okay.  This is a schedule that you produced
2 in discovery and I want to ask you a couple
3 questions.  The first is:  Do you see in the sort
4 of upper left corner I think it says 8-11?
5    A.  Yes.
6    Q.  Is that for -- is that the date of
7 8-11-2019?
8    A.  I don't see the 2019 there, but I'm -- that
9 looks like it would be.
10    Q.  Okay.  And you -- I want you to look over
11 the list of RNs that are listed here and tell me if
12 that refreshes your memory about who you -- who
13 left their employment at OVMC in 2019, specifically
14 August, to start a new job?
15    A.  Caitlyn Barbarosso, Nikala Bugay, Morgan
16 Dowler, Bianco White, Jess Cunningham, Chris
17 Frankart, Natasha Grant.  The other people below,
18 Jazzy Haloszka, were people who worked in the ICU
19 when we needed them.  They weren't actually ICU
20 employees.  They worked regular ICU staff.
21    Q.  Okay.  So you said from Jazzy Halo -- how
22 do you say the last name, I'm sorry?
23    A.  Haloszka.
24    Q.  -- Haloszka down were people who may be

Page 47

1 assigned to work in the ICU, but were not there all
2 the time.  Is that fair?
3    A.  Correct.
4    Q.  Were those people from her name down
5 assigned regularly to other parts of the hospital?
6    A.  Some of them.
7    Q.  The ones who were not assigned to other
8 parts of the hospital, how did their employment
9 work?
10       MR. RISOVICH:  Object to form.  Vague.
11    A.  They were contingent.
12    Q.  Okay.  Those were the contingent you talked
13 about.  Okay.  Do you recognize, do you know out of
14 those names who was a contingent employee?
15    A.  Patrick Quinlin, Shannon Quinlin, Anna
16 Trubiano and Melissa Houck.
17    Q.  Okay.  And previously you listed off people
18 who had left employment in August of 2019.  You
19 would likely know that also because of your payroll
20 duties; right?
21    A.  Yes.
22    Q.  You would be accessing timecards and
23 therefore would know when people either did or did
24 not clock in?

Page 48

1    A.  Correct.
2    Q.  Was any of your payroll duties to go into
3 the timecards and note that someone had left their
4 job?
5    A.  No.
6    Q.  Okay.  And was the schedule like this
7 passed out to everybody; right, so they would see
8 what everybody's schedule was for those days?
9    A.  Correct.
10    Q.  And this is specific to the ICU; right?
11    A.  Yes.
12    Q.  I just want to ask you what some of the
13 things here mean.  Next to your name the first week
14 it says 8-11 it has an A with a star next to it.
15 What does that mean?
16    A.  That I was in charge.
17    Q.  Okay and does the A mean an a.m. shift?
18    A.  Correct.
19    Q.  Okay, so if you go up I see Julie McDonald
20 has a P with an asterisks.  Does that mean she was
21 in charge on the night shift?
22    A.  Correct.
23    Q.  I assume V means vacation?
24    A.  Yes.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 49

1    Q.  What does PO mean?  Looking particularly at
2  Caitlyn Barbarosso.  She has AO and PO and I don't
3  know what that means.
4    A.  Those are orientation days.
5    Q.  Okay and then if it's a P or an A without
6  an asterisks, I'm assuming that's a staff nurse
7  that's not in charge, but working either the day or
8  night shift?
9    A.  Correct.
10   Q.  Okay.  What does it mean if there's a D
11 there?  I'm looking at like Shelly -- yeah.
12   A.  That she's just working the day shift,
13 7:00 a.m. to 3:00 p.m.
14   Q.  Okay, so she's not work --
15   A.  Instead of 12 hours.
16   Q.  Okay.  And what would an R mean?  I'm
17 looking at -- I'm sorry?
18   A.  That's a request.
19   Q.  A request for someone to work or request to
20 not work?
21   A.  It's that employee's request to not work on
22 a certain day.
23   Q.  Okay.  Okay.  Thank you.  You clarified a
24 lot of that for me.  I appreciate it.  Oh, wait,

Page 50

1  here at the bottom, is this a tally where it says
2  up on the column it's like 7:00 A to 11:00 A and
3  then it has a row of numbers, a lot of 2s or 3s.
4  Do you see where I'm referencing?
5    A.  Yes.
6    Q.  Is that how many nurses would be working
7  for that particular shift?
8    A.  Correct.
9    Q.  So where it says, like, 8-11, the 7:00 a.m.
10 to 11:00 a.m. shift looks like it had two nurses.
11 The 11:00 a.m. to 3:00 p.m. shift had two nurses
12 and the 3:00 p.m. to 7:00 p.m. shift also had two
13 nurses.  Am I reading that right?
14   A.  Correct.
15   Q.  Okay.  Thank you very much.  That was very
16 helpful.  Okay.  I'm going to show you, I'm going
17 to introduce as Exhibit 5 a press release and see
18 if you've ever seen it before.  So Exhibit Number 5
19 is going to be Bates number defendants' 67011.  Let
20 me get this pulled up for you, ma'am, okay?
21   A.  Okay.
22   Q.  Let me know when you see the hospital
23 headers there.  Do you see that?
24   A.  Yes.

Page 51

1    Q.  I'm going to zoom out one more.  Can you
2  see the entire page?
3    A.  Yes, I can.
4    Q.  Okay.  Please read through this and I'll
5  scroll down when you're ready so we can talk about
6  it when you finished the document?
7    A.  All right.  Okay.
8    Q.  I'm going to scroll down.
9    A.  Okay.
10   Q.  And that's the last.
11   A.  Okay.
12   Q.  Okay.  I'm going to scroll back up, ma'am.
13 My first question is:  Do you remember receiving
14 this press release?
15   A.  Yes.
16   Q.  Do you remember how you received it?
17   A.  I don't remember how I received it.
18   Q.  Do you remember reading it when you
19 received it?
20   A.  Yes.
21   Q.  Okay.  Correct me if I'm wrong, but I
22 believe your payroll duties were limited to the ICU
23 staff; right?
24   A.  Yes.

Page 52

1    Q.  So you didn't have any responsibilities for
2  payroll for any other department of the hospital?
3    A.  Correct.
4    Q.  Would your payroll duties have included any
5  sort of patient billing or collections?
6    A.  No.
7    Q.  Would your payroll duties have brought you
8  into contact with any other financial aspects of
9  the hospital?
10   A.  No.
11       MR. RISOVICH:  Object to form.  Vague.
12   Q.  As part of your payroll duties, were you
13 looking at any documents other than the JBDev
14 timecards?
15   A.  No.
16   Q.  Okay.  That's a better question.  It states
17 here in this press release that it's dated August
18 7, 2019; correct?
19   A.  Correct.
20   Q.  And the press release states "The hospital
21 sustained losses of more than 37 million dollars
22 over the past two years;" is that right?
23   A.  That's right.
24   Q.  Do you have any personal knowledge about

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 53

1 the losses of the hospital from, say, 2018 to 2019?
2     A.   No.
3     Q.   Do you have any personal knowledge of the
4 financial condition of the hospital in any aspect
5 from 2018 to 2019?
6     A.   No.
7     Q.   Were you aware that the hospital had
8 sustained any losses or had any financial troubles
9 prior to 2018?
10     A.   Yes.
11     Q.   Tell me what you know about that.
12     A.   Well, that was the reason given for wanting
13 to find a strategic partner or sell it which
14 resulted in the sale to Alecto eventually, you
15 know, because it was having financial difficulty.
16     Q.   Okay.  Do you remember who you were talking
17 to or how you became aware of that information you
18 just told me?
19     A.   It was the kind of thing people just talked
20 about in the hospital.
21     Q.   Among coworkers?
22     A.   Yes.
23     Q.   Okay.  So were employees talking about the
24 hospital having financial troubles prior to 2018?

Page 54

1     A.   Yes.
2     Q.   Were employees having discussions about the
3 hospital having financial troubles prior to 2017?
4     A.   Yes.
5     Q.   Okay.  Let's keep going and see how far
6 back we can go.  Do you remember employees having
7 discussions about the financial trouble of the
8 hospital in 2016?
9     A.   I don't remember the dates.
10     Q.   Okay.  Do you remember roughly when those
11 kind of conversations started circulating among the
12 employees?
13     A.   Only that it was prior to 2017 because in
14 2017 is when the sale to Alecto took place.
15     Q.   Okay and you didn't play any role in that
16 sale to Alecto in 2017; correct?
17     A.   Correct.
18     Q.   Okay.  This press release also lists it had
19 an exhaustive and unsuccessful search for a
20 strategic buyer or partner.  Was that something in
21 this time period of August 2019 that management was
22 talking to employees about?
23     A.   Not really.
24     Q.   But the search for a strategic buyer or

Page 55

1 partner, wasn't that part of the employee questions
2 and answers we just looked over?
3     A.   It was.
4     Q.   Okay.  I want to scroll down here a little
5 bit to look at this first bullet point.  It says
6 the hospital also "struggled to overcome declining
7 volumes."  Do you see where I read that?
8     A.   Yes.
9     Q.   With your long career there, did you notice
10 any declining volumes in the ICU prior to, let's
11 say, 2017?
12     A.   At times.  You know, there were
13 fluctuations in census periodically.
14     Q.   Okay.  Did you notice any declining patient
15 volumes in the ICU between 2017 and the hospital's
16 closure?
17     A.   Yes.
18     Q.   Can you explain to me what you experienced
19 in terms of declining volumes of patients?
20     A.   Well, there were less patients coming to
21 OVMC and sometimes we had to transfer patients out
22 that had certain diagnoses if we could not offer
23 them the service they needed.  So that resulted in
24 declining census.

Page 56

1     Q.   Okay.  I'm going to ask you a couple follow
2 up questions on there.  Why were there certain
3 treatments, I guess, that could no longer be
4 provided to patients, do you know?
5         MR. RISOVICH:  Object to form.  Vague.
6 You can answer.
7     A.   Some of the doctors had left that provided
8 certain services.
9     Q.   Do you remember which doctors would have
10 left?
11     A.   The neurosurgery group left.
12     Q.   Do you remember when that happened?
13     A.   I do not remember an exact date.
14     Q.   Do you remember if it was 2018 or 2019?
15     A.   I don't remember.
16     Q.   Okay.  Do you remember if that happened
17 when Alecto, as you say, owned the hospital?
18     A.   I don't remember, no.
19     Q.   Okay.  Okay.  Do you know of any other
20 specific doctors or departments that left the
21 hospital?
22     A.   Yes.
23     Q.   Tell me about that.  Sorry.  Go ahead.
24     A.   Yes.  We no longer had a thoracic surgeon

**EXHIBIT 5**

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 57

1  so we could not do that kind of surgery anymore.
2      Q.   Do you remember when the thoracic surgeon
3  left OVMC?
4      A.   I do not.
5      Q.   Even a year?
6      A.   No, I don't.
7      Q.   Okay.  Okay.  Any other doctors or
8  departments that you remember leaving OVMC?
9      A.   Not specifically, no.
10     Q.   Okay, but you said you remember having to
11 transfer out patients who would require specific
12 care; correct?
13     A.   Correct.
14     Q.   Do you remember when those transfers
15 occurred?
16     A.   Do you mean like years?
17     Q.   In what year, yeah.  Do you remember what
18 year you started having to transfer out patients
19 because the hospital couldn't offer certain
20 services they needed?
21     A.   Definitely in 2018 and 2019.
22     Q.   Okay.  Do you remember how often that
23 happened?
24     A.   I couldn't give you a number, no.

Page 58

1      Q.   Do you remember if this was something that
2  happened regularly or was it rare?
3      A.   It was regular.
4      Q.   And when either the neurosurgery or the
5  thoracic surgeon left, did they take patients with
6  them or, yeah, that was right, did they take
7  patients with them when they left?
8           MR. RISOVICH:  Object to form.  Vague.
9  You can answer.
10     A.   I'm not -- I'm not sure I understand the
11 question.
12     Q.   Okay.  So you had explained to me how
13 people would come into the ICU and then have to be
14 transferred out of the hospital because they
15 couldn't get certain services; correct?
16     A.   Correct.
17     Q.   My question is:  Is that, is the
18 neurosurgery group having regular outpatient
19 services outside of the ICU or inpatient services
20 other than the ICU?
21     A.   No.
22     Q.   Okay.  Did you notice a change in the
23 patient volumes after August 7th of 2019?
24     A.   Yes.

Page 59

1      Q.   Can you explain to me what you experienced
2  in terms of patient volume after August 7, 2019?
3      A.   We had less admissions to the ICU.  We just
4  had a lower census.
5      Q.   Lower than it had been prior to August 7,
6  2019?
7      A.   Yes.
8      Q.   Were there circumstances after August 7,
9  2019 before, say, September 1st of 2019 where there
10 were no patients in the ICU?
11     A.   I don't remember if there were any of those
12 days.
13     Q.   Okay.  I want to draw your attention back
14 to the press release that we're looking at.  After
15 it talks about declining volumes it also says
16 declining reimbursement.  Do you see that?
17     A.   Yes.
18     Q.   The question, ma'am, is:  Do you have any
19 personal knowledge about the reimbursement or
20 billing or collections aspect of OVMC's business?
21     A.   No.
22     Q.   Did you have any understanding in August of
23 2019 whether there was any declining reimbursement
24 for the hospital?

Page 60

1      A.   Only because of this.
2      Q.   Okay.  And then after it cites declining
3  reimbursement, this press release notes substantial
4  harm that is detailed in a certain lawsuit there.
5  Are you aware of what this lawsuit is about?
6      A.   Very loosely, yes.
7      Q.   What's your understanding of what this
8  lawsuit is?
9      A.   That it was a whistle blower regarding the,
10 I guess, unethical practices of Wheeling Hospital.
11     Q.   Did you have, either then or now, any
12 understanding of what unethical conduct was being
13 alleged against Wheeling Hospital?
14     A.   Yes.
15     Q.   Okay.  In August of 2019 what was your
16 understanding of what unethical conduct was being
17 alleged against Wheeling Hospital in this lawsuit?
18     A.   That they were billing Medicare unfairly
19 and asking and reimbursing their doctors at a
20 higher rate than was normal.
21     Q.   Do you know if that neurosurgery group you
22 talked to me about went to Wheeling Hospital?
23     A.   They practiced there.  That's not where
24 they were based.

EXHIBIT 5

Case 5:19-cv-00263-JPB-JPM    Document 166-7    Filed 07/08/22    Page 17 of 33    PageID #: 9726

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 61

1    Q.  Where were they based?
2    A.  At WVU.
3    Q.  Okay, so did the neurosurgery group leave
4  OVMC and go to WVU?
5    A.  They were from WVU.
6    Q.  Okay.  Were you aware of any doctors or
7  medical practices leaving OVMC and going to
8  Wheeling Hospital in 2018 or 2019?
9    A.  Yes.
10    Q.  Okay.  Tell me what you remember.
11    A.  I just remember that doctors did leave.  I
12  don't remember how many or who exactly except for
13  the neurosurgeons and Doctor Shackelford.
14    Q.  Is Doctor Shackelford the thoracic surgeon
15  you spoke of?
16    A.  Yes.
17    Q.  And to your memory did these doctors leave
18  OVMC prior to August 7, 2019?
19    A.  I don't remember.
20    Q.  Okay.  I'm going to scroll down here a
21  minute, ma'am, and ask you one more question.  The
22  last bullet point here talks about discussions
23  before the 15 different national regional local
24  healthcare systems or providers.  Do you see where

Page 62

1  I'm reading there?
2    A.  Yes.
3    Q.  Okay.  Having read through that, do you
4  know which, if any, of those 15 healthcare systems
5  or providers would have been?
6    A.  Yes.
7    Q.  Okay.  How did you know which ones were
8  being -- were in discussions about being a
9  strategic partner or buyer?
10    A.  One of the other press releases actually
11  said that they had talked to Wheeling Hospital
12  about using the facilities.
13    Q.  Okay.  Any others that you recall?
14    A.  WVU also, I believe.
15    Q.  And how did you know about WVU discussions?
16    A.  I believe that was in the other press
17  release -- press release.
18    Q.  Okay.  I understand.  Any others that you
19  recall other than Wheeling Hospital and WVU?
20    A.  No.
21    Q.  Okay.  Do you remember if you spoke to any
22  patients about the closure of the hospital?
23    A.  Not specifically.
24         VIDEO OPERATOR:  I'm sorry to

Page 63

1  interrupt.  The court reporter just lost
2  connection.  Could we go off the record?
3         MS. THOMPSON:  Absolutely.
4         VIDEO OPERATOR:  The time is
5  11:39 a.m.  We are off the record.
6    (A brief recess was taken after which the
7  deposition continued as follows:)
8         VIDEO OPERATOR:  The time is
9  11:45 a.m.  We're on the record.
10  BY MS. THOMPSON:
11    Q.  Before we get started again, ma'am, we
12  believe to have lost connection with the court
13  reporter for a brief period of time and my
14  understanding is she's going to review the official
15  video to make sure there was no transcription lost.
16         MS. THOMPSON:  And I wanted to check
17  with opposing counsel if they were okay with that
18  with no objections.
19         MR. RISOVICH:  No objections.
20    Q.  Ma'am, you understand that even though we
21  took a break that you're still under oath right
22  now; right?
23    A.  Yes.
24    Q.  Okay.  I want to show you a different

Page 64

1  document now.  Do you remember receiving a letter
2  in the mail called a WARN notice?
3    A.  Yes.
4    Q.  Okay.  I'm going to introduce as my next
5  exhibit, which I'm hoping is Number 6, Bates Number
6  Schenkel 13 and I'm going to bring something up for
7  you to look at, ma'am, okay?
8    A.  Okay.
9    Q.  I'm going to share my screen.  Let me know
10  when you can see the header of OVMC?
11    A.  I see it.
12    Q.  Okay.  Do you need it to be zoomed out any
13  so you can see it fully?
14    A.  It looks like it's completely there.
15    Q.  Okay.  Please read through this --
16         MR. RISOVICH:  I would object to
17  calling this a WARN notice.
18         MR. THOMPSON:  Sure.  Fine.  I'll call
19  it a letter.
20    Q.  Can you please read through this letter and
21  I'll scroll down whenever you're ready so you can
22  read it in full.
23    A.  Okay.  Okay.  You can scroll down.
24    Q.  Yes, ma'am.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 65

1    A.   Okay.

2    Q.   All right. That's the end of it. There's
3 nothing else there except Bates number. This was a
4 document you produced in discovery, ma'am, so you
5 received a copy of this letter; correct?

6    A.   Yes.

7    Q.   What's the date of this letter?

8    A.   August 8, 2019.

9    Q.   How did you receive a copy of this letter?

10    A.   In the mail.

11    Q.   Do you remember the date that you received
12 this letter in the mail?

13    A.   I do not.

14    Q.   It has a subject line. I believe it says
15 "Re: Notice of permanent closure of Ohio Valley
16 Medical Center;" correct?

17    A.   Correct.

18    Q.   And looks to me like the salutation says
19 "Dear Employee;" is that right?

20    A.   Yes.

21    Q.   So is it your understanding you received
22 this letter because you're an employee at OVMC?

23    A.   Yes.

24    Q.   Okay. Did you read this letter when you

Page 66

1 received it in the mail?

2    A.   Yes.

3    Q.   Okay and after receiving and reading this
4 letter, did you understand that OVMC was going to
5 be closing entirely?

6    A.   Yes.

7    Q.   Did you understand that the closure of OVMC
8 was going to be permanent?

9    A.   Yes.

10    Q.   And did you understand that the schedule
11 date of that closure was October 7th, 2019?

12    A.   Yes.

13    Q.   And did you understand that your employment
14 at OVMC would end as of October 7, 2019?

15    A.   Yes.

16    Q.   I'll scroll down so you can see the
17 specific paragraph I'm looking at. It addresses
18 hospital sponsored health insurance; correct?

19    A.   Yes.

20    Q.   And this letter states that your coverage
21 would continue through the end of the month in
22 which you were terminated; right?

23    A.   Yes.

24    Q.   Okay. The very last paragraph it lists out

Page 67

1 contact information for Dan Dunmyer with address
2 and telephone. Do you see where I'm looking there?

3    A.   Yes.

4    Q.   Did you at any point contact Dan Dunmyer
5 with any questions regarding this letter?

6    A.   No.

7    Q.   Did you know that you had the option to do
8 so?

9    A.   Yes.

10    Q.   Did you ever reach out to Dan Dunmyer with
11 any questions about the closure of the hospital
12 generally?

13    A.   No.

14    Q.   Did you know you had the option to do so?

15    A.   Yes.

16    Q.   It also lists the contact information for
17 WorkForce West Virginia; correct?

18    A.   Yes.

19    Q.   Do you remember if you reached out to
20 WorkForce West Virginia prior to I think you said
21 you applied for unemployment in November of 2019?

22         MR. RISOVICH:  Objection. Vague.

23    A.   I did not reach out before that.

24    Q.   Okay. Do you remember whether there were

Page 68

1 any job fairs held at OVMC in August or September
2 or October of 2019?

3    A.   I don't recall.

4    Q.   Do you remember whether any other employers
5 came to OVMC to interview employees for new jobs in
6 August, September, October of 2019?

7    A.   I don't recall that.

8    Q.   Do you remember if there were any meetings
9 at OVMC in August, September, October of 2019 to
10 educate employees about unemployment options?

11    A.   Yes.

12    Q.   Do you remember if you attended any of
13 those meetings?

14    A.   Yes.

15    Q.   What do you remember about that meeting?

16    A.   I went to one that was done by WorkForce
17 West Virginia just as an info meeting.

18    Q.   And at this meeting did they discuss
19 options for you for unemployment?

20    A.   They did.

21    Q.   Did they discuss anything like how to write
22 a resume or how to apply for a job?

23    A.   I don't recall that.

24    Q.   Do you remember approximately when that

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 69

1 meeting took place that you attended?

2     A.  I do not.

3     Q.  Do you remember if it occurred after August
4 7th of 2019 when the hospital's closure was
5 announced?

6     A.  Yes.

7     Q.  Okay.  Do you remember if you went to one
8 meeting or more than one?

9     A.  I went to one meeting.

10     Q.  Did you apply for any other jobs in August
11 or September of 2019?

12     A.  No.

13     Q.  Why or why not?

14     A.  Mostly because I was not in a hurry to get
15 a job.  The staff that needed jobs needed -- really
16 needed to get a job and I did not.

17     Q.  Okay.  So were you aware of other employees
18 putting in applications for jobs in August and
19 September of 2019?

20     A.  Yes.

21     Q.  What employees at OVMC were you aware
22 putting in applications for other jobs in August
23 and September of 2019?

24     A.  All of them that were left except for --

Page 70

1 there's three of us that I know did not apply for
2 jobs in that amount of time.

3     Q.  Who were the other two besides you?

4     A.  Carol Moscato and April Azallion.

5     Q.  Do you know their motivation for not
6 applying for jobs?

7         MR. RISOVICH:  Object to form.  Calls
8 for speculation.

9     Q.  You can still answer.  Do you know their
10 motivation for not applying for jobs?

11     A.  Carol was also near retirement age and
12 April was just sort of gob smacked by the whole
13 thing.  She just wasn't ready to go somewhere else
14 I guess.

15     Q.  I understand.  And when you -- I believe
16 you -- when we were talking about people applying
17 for jobs except for you and Ms. Moscato and April,
18 are you talking about just the ICU or are you
19 talking about other people as well?

20     A.  I only have direct knowledge of ICU staff.

21     Q.  Okay.  Did you have any awareness -- well,
22 strike that.

23         Did you know anybody in the payroll department
24 that would have been applying for jobs in August or

Page 71

1 September of 2019?

2     A.  Not directly, no.

3     Q.  So your knowledge about people applying or
4 getting new jobs would have been limited to the
5 ICU; correct?

6     A.  For specifics, yes.

7     Q.  Okay.  Do you have any non specifics?

8     A.  Well, I -- yes.

9     Q.  Tell me what you're referring to there.

10     A.  Well, everyone that needed to work was
11 applying for a job no matter what department they
12 worked in.

13     Q.  Are you aware of any specific employee
14 outside of the ICU that left to start a new job in
15 August or September of 2019.

16     A.  I don't recall names.

17     Q.  Okay.  That's fair.  Do you remember if you
18 discussed this August 8th letter that I have up
19 with anyone, its specifics?

20     A.  Yes.

21     Q.  Who did you discuss this letter with?

22     A.  My husband for sure.

23     Q.  What's your husband's name?

24     A.  Chris.

Page 72

1     Q.  I'm sorry.  Okay.  Continue.  I didn't mean
2 to interrupt you.  I'm sorry.  Who else did you
3 discuss this letter with besides your husband
4 Chris?

5     A.  These sort of things were the kind of
6 things that people talked about at work, you know,
7 when we were at break and so forth.

8     Q.  Based on those discussions, did the
9 employees you were talking to understand that the
10 hospital was going to permanently close?

11     A.  Yes.

12         MR. RISOVICH:  Object to form.
13 Speculation.

14     Q.  Do you remember discussing with any
15 employees in August or September of 2019 that the
16 closure of the hospital would be permanent?

17     A.  Yes.

18     Q.  Do you remember having discussions with
19 employees in August or September of 2019 that the
20 entire hospital would close?

21     A.  Yes.

22     Q.  Do you remember having discussions with
23 other employees in August or September of 2019 that
24 employment would end as of the closure of the

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 73

1 hospital?
2     A.  Yes.
3     Q.  And do you remember having discussions with
4 other employees in August or September of 2019 that
5 the scheduled closure date for the hospital was
6 August 7th, 2019?
7     A.  No.
8     Q.  Okay.  I want to -- I'm going to show you
9 one other document, ma'am.  We looked over one
10 employee frequently asked questions, but my
11 understanding is that there was a second employee
12 frequently asked questions that was circulated.  Do
13 you remember that?
14     A.  Yes, I do.
15     Q.  Okay and you produced it in discovery so I
16 want to introduce it now.  Exhibit number 7 is
17 going to be Bates Number Schenkel 19 to 20.  I
18 believe it's 19 to 22.  Yes, ma'am.  I'm going to
19 share my screen with you and you let me know when
20 you can see it.
21     A.  All right.  I can see it.
22     Q.  Can you see it fully from left to right?
23     A.  Yes, I can.
24     Q.  Okay.  Go ahead and read through this and

Page 74

1 I'll scroll as you direct.
2     A.  Okay.
3     Q.  Okay.
4     A.  Okay.  Okay.  Okay.  Okay.  Okay.
5     Q.  And I believe that's the last of the
6 document, ma'am.  I have a couple questions for
7 you.  The first is:  Do you remember when you
8 received this second set of employee frequently
9 asked questions?
10     A.  No.
11     Q.  Do you remember reading it when you
12 received it?
13     A.  Yes.
14     Q.  The last two questions here are about
15 bankruptcy.  Were employees asking whether or not
16 the hospital was going to file for bankruptcy?
17     A.  Yes.
18     Q.  Is it your understanding that that was an
19 option?
20     A.  I had no understanding of that one way or
21 the other.
22     Q.  Okay.  What's your understanding of
23 bankruptcy?
24     A.  You don't have enough money to do what you

Page 75

1 need to do.
2     Q.  Okay.  I'm going to scroll up to the top.
3 The first question has to do with whether there's
4 an offer to purchase the hospitals; correct?
5     A.  Correct.
6     Q.  It states that as of the date of this
7 second set of employee questions that several
8 parties have expressed interest in getting further
9 information; right?
10     A.  Yes.
11     Q.  As of the date of the second set it says
12 that "We are communicating with all interested
13 parties in effort to find a suitable buyer or
14 buyers;" correct?
15     A.  Correct.
16     Q.  Okay and then the next couple questions are
17 about potential sale of the hospital or hospitals;
18 correct?
19     A.  Correct.
20     Q.  And this is all information that was being
21 provided to the employees; right?
22     A.  Yes.
23     Q.  Okay.  At what point did you become aware
24 that the hospital was going to be suspending

Page 76

1 emergency and acute services?
2     A.  On September 3rd.
3     Q.  Okay.  Do you remember how you learned
4 that?
5     A.  A telephone call.
6     Q.  Who called you or did you call someone
7 else?
8     A.  Carol Moscato called me.
9     Q.  Okay.  What do you remember about that
10 telephone conversation?
11     A.  She told me that there had just been an
12 announcement that the hospital would no longer be
13 seeing or no longer accepting patients as of the
14 next day, September 4th.
15     Q.  Okay.  Do you remember where you were when
16 you received that phone call from Ms. Moscato?
17     A.  Yes.
18     Q.  Where were you?
19     A.  In my car.
20     Q.  Okay.  Were you traveling to or from
21 somewhere?
22     A.  I was traveling, yes.
23     Q.  Was this travel for work or for fun?
24     A.  For fun.

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 77

1    Q.  Were you going on a vacation then?
2    A.  A long weekend.  Well, middle of the week,
3  yeah, couple days.
4    Q.  Okay.  I believe in your discovery you said
5  you were heading to Maryland.  Does that sound
6  right?
7    A.  Yes.
8    Q.  Okay.  Did you take some time off in order
9  to take that long weekend?
10   A.  I believe I did.
11   Q.  Okay.  Do you remember any of your response
12 to Ms. Moscato when she told you that information
13 over the phone?
14   A.  Yes.
15   Q.  Okay.  Tell me what you remember saying
16 back to Ms. Moscato?
17   A.  I don't remember the exact words, but I
18 remember I was very surprised because it's not what
19 we had been told.  We had been told we would have
20 60 days.
21   Q.  Do you remember the last day you saw a
22 patient in ICU?
23   A.  I don't remember the date.
24   Q.  Do you remember the last date the ICU had

Page 78

1  any patients in it, regardless of whether you saw
2  them or someone else?
3    A.  Yes.  I believe it was September 6th.
4    Q.  Okay.  Do you know if you worked September
5  6th?
6    A.  I did not.
7    Q.  Did you participate in any sort of
8  organizational cleaning or wind up efforts with
9  ICU?
10   A.  Yes.
11   Q.  Can you describe those to me a little bit?
12   A.  Yes.  We had to pack up all our supplies
13 and equipment.  We had to inventory certain things
14 and move them to where we were directed within the
15 hospital.  But mostly it was packing and cleaning
16 things up and, you know, throwing out old books
17 that were, you know, that had been there forever
18 and things like that.  Everything else we packed.
19   Q.  Okay.  Do you remember when you started
20 doing those types of activities?
21   A.  Yes.
22   Q.  When was that?
23   A.  It was the Monday after Labor Day.
24   Q.  Okay.  Do you have any personal knowledge

Page 79

1  of when any other department in the hospital had
2  its last patient?
3    A.  No.
4    Q.  Do you have any personal knowledge about
5  when any department that didn't provide inpatient
6  care would have last seen a patient?
7    A.  No.
8    Q.  Do you know of any of the departments at
9  the hospital that do provide outpatient care?
10   A.  Yes.
11   Q.  What departments at the hospital were you
12 aware of that provided outpatient care?
13   A.  Physical therapy did.
14   Q.  Any others?
15   A.  Not that I recall.
16   Q.  Did you participate in those same kind of
17 cleaning or packing duties for any department other
18 than ICU?
19   A.  Not the cleaning and packing.
20   Q.  Okay.  Did you participate in other wind
21 down activities in other department besides the
22 ICU?
23   A.  Yes.
24   Q.  What department would that have been?

Page 80

1    A.  I worked one day in accounts and several
2  days in medical records.
3    Q.  All right.  How did you come to work in the
4  accounts department that day?
5    A.  I was assigned there.
6    Q.  Who assigned you?
7    A.  The nursing coordinator.
8    Q.  Is that Cindy Bruno or someone else?
9    A.  It was Cindy Bruno.
10   Q.  Do you have any understanding of how Cindy
11 Bruno was assigning ICU nurses to work in other
12 departments?
13   A.  She was checking with other departments
14 what they needed in order to wind up their own
15 affairs and if somebody could help them with it,
16 you know, they would accept help.
17   Q.  Okay.  Did you have to communicate
18 availability to do that with Ms. Bruno?
19   A.  Yes.
20   Q.  Do you remember how you were communicating
21 whether you were available or not to Ms. Bruno?
22   A.  Yes.
23   Q.  How were you communicating with her about
24 that?

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

Case 5:19-cv-00263-JPB-JPM   Document 166-7   Filed 07/08/22   Page 22 of 33   PageID #:
9731

ELIZABETH SCHENKEL
05/13/2022

Page 81

1    A.   Either verbally, face to face or by text.

2    Q.   Okay.  Is the same true of when you went to

3 work in the medical records department?

4    A.   Yes.

5    Q.   That was also arranged by Ms. Moscato,

6 excuse me, Ms. Bruno?

7    A.   Yes.

8    Q.   Okay.  Do you remember when those days

9 occurred that you worked in either the accounting

10 or the medical records departments?

11   A.   I don't recall the exact dates.

12   Q.   During the period in which you were

13 cleaning, packing or winding down the ICU, did you

14 still have a regular schedule?

15   A.   No.

16   Q.   How was that schedule communicated to you?

17   A.   It was based on whether Cindy said we could

18 work or not when we said we could work.  You know,

19 we told her when we could work.  She told us

20 whether there was a place for us.

21   Q.   Okay.  Do you remember how many times you

22 told Ms. Bruno that you were available to work and

23 she said there was none available for you?

24   A.   I do not.

Page 82

1    Q.   Do you remember when those communications

2 with Ms. Bruno about your availability began?

3    A.   I don't remember an exact date.

4    Q.   Okay.  Do you have any personal knowledge

5 about scheduling of any department beyond the ICU

6 in 2019?

7    A.   No.

8    Q.   And I'm assuming at some point, we looked

9 at one of the schedules you produced, at some point

10 those types of schedules ceased to be rotated;

11 correct?

12   A.   Correct.

13   Q.   Once those sort of entire ICU schedules

14 ceased to be circulated, did you have any personal

15 knowledge of what shifts or hours anybody else in

16 the ICU was working?

17   A.   No.

18   Q.   Do you remember when those schedules

19 stopped being circulated?

20   A.   No.

21   Q.   At what point were you told that you

22 couldn't come in and do anymore work at OVMC?

23   A.   That was September 30th.

24   Q.   Do you remember how that was communicated

Page 83

1 to you?

2    A.   By text.

3    Q.   Who texted you?

4    A.   Cindy Bruno.

5    Q.   And prior to that September 30th date were

6 you still coming in and doing some of the work in

7 those other departments like we discussed?

8    A.   Yes.

9    Q.   But after September 30th of 2019 you were

10 not scheduled to go in and do any work in any

11 department; correct?

12   A.   Correct.

13   Q.   Do you remember how much PTO you had as of

14 September 3rd, 2019?

15   A.   No, I don't remember an exact amount.

16   Q.   Do you remember using PTO after September

17 3rd of 2019?

18   A.   Yes.

19   Q.   How would you communicate the use of that

20 PTO after September 3rd, 2019?

21   A.   Either face to face with Cindy or by text.

22   Q.   I believe you previously testified that at

23 least one of the reasons you hadn't applied for

24 jobs in August or September of 2019 was other

Page 84

1 people who needed jobs were applying.  Is that

2 fair?

3    A.   Yes.

4    Q.   My question is:  Were you using PTO in

5 August and September of 2019 so that other

6 employees could take up work?

7    A.   No.

8    Q.   Okay.  During August and September of 2019

9 did you continue to do those payroll duties we

10 spoke of?

11   A.   Yes.

12   Q.   At what point did you stop performing those

13 payroll duties that we spoke of?

14   A.   I don't remember the exact date.

15   Q.   Were you still performing those payroll

16 duties after, say, September 3rd of 2019?

17   A.   Yes.

18   Q.   Okay.  Ma'am, I'm going to show you a

19 series of exhibits for us to talk about, okay?

20   A.   Okay.

21   Q.   Next one I have on my list I think is

22 Number 8.  So I'll introduce as Exhibit Number 8

23 defendants' Bates Number 95.  I'm going to share my

24 screen with you, ma'am.  Let me know when you see

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 85

1 it pop up. Do you see that?
2     A.   I see it.
3     Q.   Can you see --
4     A.   I don't think I see it completely.
5     Q.   All right. Let me zoom out and you tell me
6 how much is enough. Do you see that?
7     A.   Yes.
8     Q.   Okay. I want to, before we discuss it, I
9 want you to be able to look over this and I will
10 first point it to the top here, it says "Payroll
11 Register Employee Detail;" correct?
12     A.   Yes.
13     Q.   I'll represent to you that this is a
14 payroll timecard summary that has been produced in
15 discovery. If you look across the top there is a
16 series of different column headers. Do you see
17 they're bolded?
18     A.   Yes.
19     Q.   The one on the far left says name; correct?
20     A.   That's right.
21     Q.   If you go over, across it will say earning
22 and then hours; correct?
23     A.   Yes.
24     Q.   And then if you go over a little bit

Page 86

1 further there's a column that has a rate.
2     A.   Yes.
3     Q.   And then if you go over a little bit
4 further there's columns that have to do with
5 withholdings and the amount of those withholdings;
6 correct?
7     A.   Yes.
8     Q.   Okay and it says this timecard date is as
9 of 8-10-2019; correct?
10     A.   Correct.
11     Q.   And then it has the department code and
12 says ICU; correct?
13     A.   I am looking for that.
14     Q.   Right under it says timecard date 8-10-19,
15 the second line right beneath it says ICU. If you
16 can see my pointy hand, look there.
17     A.   Oh, okay, yes. I was looking under a
18 different -- yes, I see that.
19     Q.   Okay. Okay. You see Carol's name there,
20 she was the charge nurse that you worked with;
21 correct?
22     A.   Correct.
23     Q.   Okay. I'm going to scroll down until we
24 get to your name, ma'am. Do you see your name at

Page 87

1 the bottom?
2     A.   Yes, I do.
3     Q.   Okay. In those columns that said hours, it
4 says here that for this pay period you worked 40
5 regular hours, 39.6 regular hours and then 8.9
6 overtime hours; correct?
7     A.   Correct.
8     Q.   Do you have any reason to dispute that
9 that's the hours you worked for that pay period?
10     A.   No.
11     Q.   Okay and then it has here shift
12 differentials listed. I believe that's what that
13 refers to. Can you explain to me how shift
14 differentials work in the ICU?
15     A.   Yes. There was a shift differential for
16 the 3:00 to 11:00 shift so at 3:00 p.m. your rate
17 changed a little bit and then there was a different
18 shift differential for the night term shift that
19 started 11:00 p.m. until 7:00 a.m.
20     Q.   Okay and would part of your payroll duties
21 be to calculate and confirm that those shift
22 differentials were either earned or paid?
23     A.   The JBDev system did that. I did not have
24 to do that by myself.

Page 88

1     Q.   Okay. Okay and then if you keep going to
2 the right after you looked at those regular and
3 overtime hours, the regular hours rate is listed
4 32.47; correct?
5     A.   I'm not sure where you're looking.
6     Q.   Okay. Do you see where if your name goes
7 over there's a column here where my hand is?
8     A.   Yes.
9     Q.   See that says 32.45; correct?
10     A.   Yes.
11     Q.   And if we look at that column and we scroll
12 up, we see that it has the title of rate.
13     A.   Yes.
14     Q.   Okay. Was that your final rate of pay when
15 you were at OVMC?
16     A.   Yes.
17     Q.   Okay. Then if we scroll over here, it has
18 a list of withholdings and I believe we talked
19 about how you had vision and dental insurance;
20 correct?
21     A.   Correct.
22     Q.   And there's withholding for that. I also
23 see a withholding for a 401k; right?
24     A.   Yes.

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 89

1   Q.   Okay.  Do you have any reason to dispute
2 that this is the compensation that you received for
3 this pay period?
4   A.   No.
5   Q.   Okay.  I'm going to stop sharing.  I'm
6 going to introduce as Exhibit 9 defendants' Bates
7 Number 836.  I know this part is tedious, ma'am, I
8 apologize, but we're going to do this a couple more
9 times.  Let me know when you can see that or if I
10 need to zoom it out.
11   A.   Zoom it a little bit, please.
12   Q.   How's that?
13   A.   That's fine.  Thank you.
14   Q.   And if you'll look at the top, this is a
15 timecard date 9-7-2019; correct?
16   A.   Yes.
17   Q.   Okay and it's set up the same as the prior
18 one; correct, with the columns at the top and the
19 names down the side?
20   A.   Yes.
21   Q.   Okay.  I want to scroll down to your name
22 here and it lists for this pay period that you
23 worked 24 regular hours and then you took PTO of 12
24 and 36 hours; correct?

Page 90

1   A.   Yes.
2   Q.   Now, for the pay period that would have
3 ended on 9-7-2019, would that have included the
4 time off you took to go to Maryland?
5   A.   Yes.
6   Q.   Do you have any reason to dispute that
7 those are the hours, the PTO you used for that pay
8 period?
9   A.   No.
10   Q.   Do you have any reason to dispute that this
11 is the compensation you received for that pay
12 period?
13   A.   No.
14   Q.   Okay.  Stop sharing and I'll introduce as
15 Exhibit 10 Bates Number defendants' 1177.  I'll
16 share my screen with you, ma'am.  I'll go ahead and
17 zoom out once.  Let me know if you need more.
18   A.   Okay.
19   Q.   Let me know if that does it for you.
20   A.   That's perfect.
21   Q.   Okay.  And at the top of this, this is a
22 timecard dated 9-21-19; correct?
23   A.   Correct.
24   Q.   And this is set up the same as the prior

Page 91

1 timecards you looked at; right?
2   A.   Yes.
3   Q.   So if we scroll down to your name here,
4 it's the last one, ma'am.  It says for this pay
5 period you worked 16.8 regular hours, 15.9 regular
6 hours and then and it lists out 40 PTO hours;
7 correct?
8   A.   Correct.
9   Q.   Do you know if any of those PTO hours were
10 the same vacation to Maryland?
11   A.   They were not.
12   Q.   Okay.  Were they another type of vacation
13 you would have taken?
14   A.   No.
15   Q.   Okay.  Do you have any reason to dispute
16 that this is the hours and PTO you used for that
17 pay period?
18   A.   No.
19   Q.   Do you have any reason to dispute that this
20 is the compensation you received for this pay
21 period?
22   A.   No.
23   Q.   Okay.  Exhibit 11 will be defendants' 1485.
24 Ma'am, I'm going to zoom out for you.  Can you see

Page 92

1 that one completely?
2   A.   Yes.
3   Q.   Okay and this is a timecard, it's dated
4 10-5-2019; correct?
5   A.   Correct.
6   Q.   Okay and if I scroll down to your name here
7 it lists your regular hours as 15 and your PTO is
8 21 and 36; correct?
9   A.   Correct.
10   Q.   Do you have any reason to dispute that
11 that's the hours of PTO you used for that period?
12   A.   No.
13   Q.   Do you have any reason to dispute that this
14 is the compensation you received in this pay
15 period?
16   A.   No.
17   Q.   Almost done.  We only have two more.
18 Exhibit 12 will be defendants' Bate Number 1731.
19 Let me know if you can see this one, ma'am.
20   A.   I can see it.
21   Q.   Okay.  And this is a timecard dated
22 10-19-19; correct?
23   A.   Correct.
24   Q.   And on this one it looks like you were paid

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 93

1 out PTO in 158 hours and a little bit more;
2 correct?
3    A.  Correct.
4    Q.  Okay.  Would this have been the final pay
5 out of all of your outstanding PTO?
6    A.  I believe so.
7    Q.  Okay and do you have any reason to dispute
8 that this is the PTO you received or the
9 compensation you received for this pay period?
10   A.  No.
11   Q.  Last one.  Exhibit 13 is going to be Bates
12 Number defendants' 14791.  Share the screen with
13 you, ma'am.  Can you see this one fully?
14   A.  Yes, I can.
15   Q.  Okay.  And --
16   A.  Make it just a tad smaller, please.
17   Q.  Yes, ma'am.
18   A.  I'm missing one number at the end.  Okay.
19   Q.  How's that?
20   A.  That's fine.  Thank you.
21   Q.  Okay.  And if you look at the top, this is
22 a pay date timecard for 8-30-19; correct?
23   A.  Correct.
24   Q.  Okay and for this pay period you're listed

Page 94

1 as having 37.6 and 24 regular hours; correct?
2    A.  Correct.
3    Q.  And it lists PTO as 12 hours?
4    A.  Yes.
5    Q.  Okay.  When did your trip to Maryland
6 start?
7    A.  After Labor Day.
8    Q.  Okay, so would it have been -- any of this
9 PTO -- could any of this PTO have been that
10 vacation to Maryland you discussed?
11   A.  No.
12   Q.  Okay.  Do you have any reason to dispute
13 that these are the hours and PTO that you worked in
14 2019, I mean, for this pay period, excuse me?
15   A.  No.
16   Q.  Do you have any reason to dispute that this
17 is the compensation you received for this pay
18 period?
19   A.  No.
20   Q.  Okay.  Stop sharing here, ma'am.  Do you
21 know the last date you went into OVMC and performed
22 work?
23   A.  September 29th.
24   Q.  29th?  What do you remember doing that day?

Page 95

1    A.  I worked in medical records.
2    Q.  And that was something you would have
3 coordinated through Ms. Bruno?
4    A.  Yes.
5    Q.  Do you know what other employees Ms. Bruno
6 was coordinating that kind of work for?
7    A.  Yes.
8    Q.  All right.  Who was your understanding of
9 who else she was coordinating that type of work
10 for?
11   A.  I know that Carol Moscato was working some
12 days and Terri Sonnenfeld.
13   Q.  Okay.  Is Terry -- oh, sorry, go ahead.
14   A.  I don't remember.  I don't remember other
15 names now.  I don't remember who.
16   Q.  Ms. Sonnenfeld someone who works in the
17 ICU?
18   A.  Not at that time.
19   Q.  Do you know where she worked, which
20 department?
21   A.  Yes.
22   Q.  Which department was she working in at that
23 time?
24   A.  She was outpatient services manager.

Page 96

1    Q.  I want to introduce as Exhibit 14
2 defendants' Bates Number 2963 and let me know, I'll
3 go ahead and zoom it out and I'll show it to you.
4 Let me know when you see an e-mail on your screen,
5 ma'am?
6    A.  Okay.
7    Q.  Can you see that e-mail fully?
8    A.  Not fully.
9    Q.  How about now?
10   A.  Yes.
11   Q.  Okay.  Please read through this and then I
12 have some questions about it.
13   A.  Okay.  Okay.
14   Q.  My first question is:  Do you remember
15 receiving this e-mail?
16   A.  Yes, I do.
17   Q.  Okay.  Do you remember if you responded to
18 be placed on the help list?
19   A.  Yes.
20   Q.  Okay.  Do you recognize any of the other
21 people that this e-mail is addressed to?
22   A.  Yes.
23   Q.  Which of these do you recognize?
24   A.  Pam Brown, Evelyn Schultz, Dolly Holt,

Case 5:19-cv-00263-JPB-JPM   Document 166-7   Filed 07/08/22   Page 26 of 33   PageID #: 9735

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 97

1 Carla Harris, Augustine Valentino, Carol Moscato,
2 April Azallion and Emily Wines.
3     Q.  Are any of the people that this e-mail is
4 addressed to not work in ICU?
5     A.  I'm sorry, say that again.
6     Q.  Yeah.  Are any of the people this e-mail is
7 addressed to not regularly working in the ICU, like
8 they were assigned to a different department?
9     A.  Right.  The only ICU people on here are
10 myself, Carol Moscato, April Azallion and Emily
11 Wines.
12    Q.  Are the other people also nurses, they just
13 don't work in ICU?
14    A.  They were nurses -- some are nurses and
15 some, a couple are nurses aides and I don't know
16 about the people whose names I don't recognize.
17    Q.  Okay.  Were you aware whether any other
18 managers in the -- well, strike that.
19    Cindy Bruno here you said was the nurse manager
20 for telemetry care unit and ICU; correct?
21    A.  Correct.
22    Q.  Were there any nursing managers over the
23 other departments?
24    A.  Yes.

Page 98

1     Q.  Were you aware whether any of the nursing
2 managers over the other departments, not the TCU or
3 ICU, were doing similar other help lists?
4     A.  I am not aware of that.
5     Q.  Are you aware of any other manager, even if
6 it wasn't a nurse manager, having a sort of help
7 list for their employees they supervised?
8     A.  No.
9     Q.  What departments do you remember the
10 hospital having other than the TCU and ICU?
11        MR. RISOVICH:  Object to the form.
12 Vague.
13    Q.  In 2019 what departments do you remember
14 the hospital having other than the TCU and ICU?
15    A.  There was a patient care unit on the 5th
16 floor.  TCU was on the 4th floor.  Outpatient
17 services, OR and PACU.
18    Q.  What does PACU stand for, ma'am?
19    A.  Post anesthesia recovery or post anesthesia
20 care unit.
21    Q.  Okay.
22    A.  Recovery room.
23    Q.  Okay.  That makes sense.  Any other others
24 that you remember in the hospital during 2019?

Page 99

1     A.  The ER.
2     Q.  Okay.  Any admin -- sorry.
3     A.  Are you asking me just about -- a needy
4 cat.  Are you asking just about nursing units or?
5     Q.  All departments that you were aware of.
6     A.  Okay.  The ER, x-ray, maintenance, dietary,
7 pharmacy and then the nursing units off the top of
8 my head.
9     Q.  Okay.  Were you aware of any departments at
10 the hospital that did not provide any patient
11 services?
12    A.  Yes.
13    Q.  What departments like that were you aware
14 of?
15    A.  Maintenance did not.
16    Q.  Any others that you can recall?
17    A.  No.
18        MS. THOMPSON:  I think if we take a
19 ten minute break I'm pretty close to being done,
20 guys.
21        MR. RISOVICH:  Okay.  Sounds good.
22        MS. THOMPSON:  Give me a couple
23 minutes and I'll be back.  So do you want to do
24 quarter till?

Page 100

1        MR. RISOVICH:  Yeah, that's fine.
2        MS. THOMPSON:  All right.  Thank you.
3        VIDEO OPERATOR:  Time is 12:37 p.m.
4 We are off the record.
5        (A brief recess was taken after which
6 the deposition continued as follows:)
7        VIDEO OPERATOR:  Time is 12:51 p.m.
8 We are on the record.
9 BY MS. THOMPSON:
10    Q.  Hello, ma'am.  Do you understand you're
11 still under oath even though we took a break?
12    A.  Yes.
13    Q.  I just have a few other questions and if
14 they appear scattered I apologize, I'm batting
15 clean up here.  My first question is:  You said you
16 worked with the JBDev program; correct?
17    A.  Yes.
18    Q.  Okay.  I want to show you a document that's
19 been produced in this case for you to look at.  I
20 believe it's Number 15 and it's going to be
21 defendants' Bates Number 16769.  Excuse me, it
22 should be 15.  I don't know what I said.  All
23 right.  It's thinking about it.  It's loading.
24 Okay.  Let me share my screen with you, ma'am.  Let

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 101

1 me know when you see an Excel spreadsheet up.
2    A.  I see it.  I'm not sure I see the whole
3 thing.
4    Q.  No, it's a big thing.  We'll move around
5 and orient ourselves, I promise.  First I'll
6 represent to you that this is an Excel spreadsheet
7 that was produced in this case and provided to us
8 by JBDev and I want us to take a look here.  If you
9 look across the top you'll see in red letters
10 different column titles; is that correct?
11    A.  Yes.
12    Q.  You'll see in Column C there's first names
13 and Column F there's last names.
14    A.  Yes.
15    Q.  And then if we scroll over to here, you'll
16 see a column that says "Day;" correct, Column M?
17    A.  Yes.
18    Q.  And then Column N is in time?
19    A.  Yes.
20    Q.  Column O is out time?
21    A.  Yes.
22    Q.  And then Column P is the consecutive work
23 week in hours and minutes; correct?
24    A.  Yes.

Page 102

1    Q.  So this purports to show the clock in and
2 clock out times according to the JBDev software,
3 okay?
4    A.  Okay.
5    Q.  If you look at the bottom of the Excel
6 spreadsheet, each of the tabs is for a different
7 reporting period.  So if you look at the one I have
8 opened on the bottom left corner it says 12-16-2018
9 to 12-30-2018.  Do you see that?
10    A.  Yes.
11    Q.  Okay, so this is -- all of the entries in
12 this particular tab of the Excel spreadsheet are
13 for this time period and I want to just move
14 forward in time here.  So now I'm at the
15 spreadsheet that is for 8-25-2019 to 9-8-2019.  Do
16 you see that?
17    A.  Yes.
18    Q.  Okay.  Now, I'm going to cheat a little bit
19 and search for your name so we can find the ones
20 that have to do with you.  I'm going to stop
21 sharing my screen while I find yours.
22    A.  Okay.
23    Q.  Part of your payroll duties you had to
24 approve people's time?

Page 103

1    A.  Yes.
2    Q.  Okay.  That's why when I search your name
3 comes up.  Let me find the ones I'm looking for.
4 Share my screen again with you, ma'am.  Do you see
5 what I'm looking at now?
6    A.  I do.
7    Q.  Okay.  One second.  Sorry.  Okay.  Thank
8 you for your patience.  All right.  Do you see
9 what's on the screen now, ma'am?
10    A.  Yes, I do.
11    Q.  I'm going to highlight here the rows, if
12 you see them turn gray, that have your first and
13 last name.  Do you see them there?
14    A.  Yes.
15    Q.  So your first and last name are listed in
16 the Columns C and F and if we scroll over here to
17 where we saw the clock in clock out times, those
18 are listed here as well; right?
19    A.  Yes, although I can't see them entirely.
20 There we go.
21    Q.  Is that better?
22    A.  That is.
23    Q.  Okay, so according to this timecard report,
24 it looks like you took PTO on the 3rd, 4th, 7th and

Page 104

1 8th of September; correct?
2    A.  Yes.
3    Q.  Okay.  Was that the trip to Maryland you
4 talked about?
5    A.  Yes.
6    Q.  Okay.  And then it appears to me that you
7 clocked in on September 9th and worked actual
8 hours; right?
9    A.  Yes.
10    Q.  And then it looks like you used PTO on the
11 10th of September; correct?
12    A.  I don't -- I don't know if that's PTO or
13 working hours.
14    Q.  If you see where it says 9-10-2019 and you
15 look over it says 8 hours.  If you keep going over
16 into Row S it says PTO.  Do you see that, Row S?
17    A.  Okay.  Row S isn't there.
18    Q.  Can you not see Row S?
19    A.  No.
20    Q.  All right.  Let me keep scrolling.  Can you
21 see Row S now that says PTO --
22    A.  I do now.
23    Q.  Okay.  Thank you for letting me know.
24 Okay, so look again at that date of September 10th

EXHIBIT 5

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 105

1  and it says you used certain PTO time; right?
2    A.  Yes.
3    Q.  Okay.  My question is:  For the dates
4  listed in this timecard, do you have any reason to
5  dispute that this is either when you clocked in
6  worked or when you used PTO for this time period?
7    A.  No.
8    Q.  Okay and I'll use the second tab here.
9  Well, do you see now I've switched to another time
10 period?  It says 9-22-2019 to 10-6-2019; correct?
11   A.  Correct.
12   Q.  I'm going to stop sharing just for me to do
13 this search.  Won't go through all of those.  I'm
14 not going to make you go through all of those.
15 We'll move on from that line of questioning.  I'm
16 not going go do the entire thing right now.
17   Okay.  I know we spoke briefly about your
18 rationale between applying and not applying for
19 jobs.  Do you remember whether you ever did put in
20 an application for a job after your employment at
21 OVMC ended?
22   A.  Yes, I did.
23   Q.  Do you remember when that happened?
24   A.  I don't remember the date.

Page 106

1    Q.  Okay.  Do you remember what month it
2  occurred in?
3    A.  No.
4    Q.  Okay.  Do you know if it occurred in 2019?
5    A.  Yes.
6    Q.  Okay.  Do you remember where you put that
7  application in at?
8    A.  Yes.
9    Q.  Where was that application to?
10   A.  A company called Family Medical in
11 Wheeling.
12   Q.  Did the company issue you any property to
13 use, anything like a cell phone or a laptop or an
14 iPad?
15   A.  Which company?
16     MR. RISOVICH:  Object to form.
17 Compound.
18   Q.  Okay.  Did OVMC issue you a work cell
19 phone?
20   A.  No.
21   Q.  Did OVMC issue you a work laptop?
22   A.  No.
23   Q.  Did OVMC issue you a work iPad?
24   A.  No.

Page 107

1    Q.  Did OVMC issue you any other property that
2  I haven't listed?
3    A.  No.
4    Q.  Okay.  Thank you.  Did you have to use a
5  name badge as part of your job at OVMC?
6    A.  Yes.
7    Q.  Did you have to return that badge at any
8  point?
9    A.  No.
10   Q.  Whenever you were communicating with
11 Ms. Bruno about working in either the accounting or
12 medical department, medical records department, did
13 you provide her with specific dates that you were
14 available or did you provide her, tell her whenever
15 she had time available to schedule you?
16   A.  I provided her with dates.
17   Q.  Okay.  Do you remember how many days a week
18 you were providing her with your availability, like
19 how many days -- how many days you said you were
20 available in a week?
21   A.  I don't remember how many I told her at the
22 time.
23   Q.  Do you have any personal knowledge of any
24 OVMC employee retiring in August or September of

Page 108

1  2019?
2    A.  No.
3    Q.  Do you remember if you had any
4  conversations with patients about the closure of
5  OVMC?
6    A.  No.
7      MR. RISOVICH:  Objection.  Asked and
8  answered.
9    A.  No, I don't remember any specific ones.
10   Q.  Thank you.  Do you remember if you had any
11 personal conversations with Dan Dunmyer in 2019?
12   A.  No.
13   Q.  Do you remember if you had any personal
14 conversations with Jennifer Quello at any time
15 during your employment at OVMC?
16   A.  No.
17   Q.  Do you remember if you had any personal
18 conversations with Michael Serou during your
19 employment at OVMC?
20   A.  No.
21   Q.  Couple more.  Do you know, did you have any
22 personal conversations with Lex Reddy during your
23 employment at OVMC?
24   A.  Yes.

EXHIBIT 5

Case 5:19-cv-00263-JPB-JPM  Document 166-7  Filed 07/08/22  Page 29 of 33  PageID #: 9738

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 109

1  Q.  Okay.  When did you have a personal
2  conversation with Lex Reddy?
3  A.  He used to make rounds sometimes and come
4  to the units so it was just a, you know, he would
5  come, say hello, how is everything and leave.
6  Q.  Okay.  Did you ever discuss anything
7  related to this lawsuit with Mr. Reddy?
8  A.  No.
9  Q.  Do you remember the last time you would
10  have spoken to him?
11  A.  No.
12  Q.  During your OVMC career did you ever speak
13  to a man named Mark Bradshaw?
14  A.  No.
15  Q.  During your OVMC career did you ever speak
16  to a man named Roger Chrisman?
17  A.  No.
18  Q.  Did your direct supervisor change from --
19  well, let me strike that.
20  Let me put it this way:  Do you know how long
21  Cindy Bruno had been the nursing manager?
22  A.  No, I don't remember the exact amount of
23  time.
24  Q.  Do you remember if she was the nursing

Page 110

1  manager before 2018?
2  A.  I don't remember when she took over.
3  Q.  Okay.  Who was there in that nursing
4  manager position before her?
5  A.  Anita Howard.
6  Q.  You don't remember when Anita would have
7  left?
8  A.  No, I don't.
9  Q.  Okay.  Okay, ma'am, I don't have anymore
10  questions for you, but your counsel might have some
11  questions for you so I'll turn it over to them.
12  A.  Okay.
13  MR. RISOVICH:  Chelsea, if we can take
14  like a ten minute break, is that all right?
15  MS. THOMPSON:  Yeah.  Sure.
16  MR. RISOVICH:  Okay.  Thank you.
17  VIDEO OPERATOR:  Time is 1:06 p.m.  We
18  are off the record.
19  (A brief recess was taken after which
20  the deposition continued as follows:)
21  VIDEO OPERATOR:  The time is 1:14 p.m.
22  We are on the record.
23  MR. RISOVICH:  We don't have any
24  questions.  We would like to the read the

Page 111

1  transcript though.
2  MS. THOMPSON:  I have nothing further.
3  VIDEO OPERATOR:  We need to get orders
4  on the record before we sign off if that's okay.
5  MS. THOMPSON:  Sure.  I'd like a paper
6  and an electronic copy of the transcript and a CD of
7  the video, synched if possible.
8  VIDEO OPERATOR:  Okay.  Thank you.
9  MR. RISOVICH:  We would as well.
10  VIDEO OPERATOR:  Do you need a copy of
11  the video?
12  MR. RISOVICH:  Yes, please.
13  VIDEO OPERATOR:  Do you also need it
14  synched or just want standard?
15  MR. RISOVICH:  I would actually defer to
16  Molly on this, how she would prefer it.
17  MS. DAVIDSON-WELLING:  Yeah, I don't
18  think we need it synched.
19  VIDEO OPERATOR:  Okay.  Thank you.  The
20  time is 1:16 p.m. and this concludes the deposition.
21  (Having indicated she would like to read
22  her deposition before filing, further this deponent
23  saith not.)
24
25

Page 112

1  STATE OF WEST VIRGINIA,
   COUNTY OF KANAWHA, to wit;
2
   I, Angela L. Curtis, a Notary Public within
3  and for the County and State aforesaid, duly
   commissioned and qualified, do hereby certify that
4  the foregoing deposition of Elizabeth Schenkel was
   duly taken by me and before me at the time and place
5  and for the purpose specified in the caption hereof,
   the said witness having been by me first duly sworn.
6
   I further certify that the attached
7  deposition transcript of Elizabeth Schenkel meets the
   requirements set forth within article twenty-seven,
8  chapter forty-seven of the West Virginia Code to the
   best of my ability.
9
   I do further certify that the said deposition
10 was correctly taken by me in shorthand notes, and
   that the same were accurately written out in full and
11 reduced to typewriting and that the witness did
   request to read her transcript.
12
   I further certify that I am neither attorney
13 or counsel for, nor related to or employed by, any of
   the parties to the action in which this deposition is
14 taken, and further that I am not a relative or
   employee of any attorney or counsel employed by the
15 parties or financially interested in the action.
   My commission expires August 23, 2022.  Given
16 under my hand this 21st day of May 2022.
17
18
19
20
21
22
23
24
25

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

Page 113

```
 1                    ERRATA SHEET
 2
           I, Elizabeth Schenkel, do hereby certify that
 3   the foregoing is a true and correct transcript of my
     deposition with the exception of the following
 4   corrections:
 5   PAGE  LINE  CORRECTION
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17             _____
               DEPONENT'S SIGNATURE
18
     STATE OF _____,
19   COUNTY OF _____,
20       Sworn to before me, _____,
     Notary Public, this ____ day of _____,
21   20__.
22             _____
                 NOTARY PUBLIC
23
24
25
```

EXHIBIT 5

ELIZABETH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ELIZABETH SCHENKEL
05/13/2022

1

2                               ERRATA SHEET

3              I, Elizabeth Schenkel, do hereby certify that
       the foregoing is a true and correct transcript of my
4      deposition with the exception of the following
       corrections:

5      PAGE   LINE   CORRECTION

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____**See Attachment**_____

12     _____

13     _____

14     _____

15     _____

16     _____

17                              _____
                               DEPONENT'S SIGNATURE

18     STATE OF Ohio,                    ,
19     COUNTY OF Fairfield               ,

20          Sworn to before me, Heather Yontz        ,
       Notary Public, this 24th day of June          ,
21     2022.

22                              _____
                                     NOTARY PUBLIC

23                             HEATHER YONTZ
                               Notary Public, State of Ohio
24                             My Commission Expires 01/2/2025

25

                    Realtime Reporters, LLC
              schedulerealtime@gmail.com 304-344-8463

                                              **EXHIBIT 5**

**ERRATA SHEET**

Re:   Reed, et al. v. Alecto Healthcare Services, LLC, et al.
Civil Action No. 5:19-CV-00263 (N.D. W. Va.)

Deposition of Elizabeth Schenkel, taken May 13, 2022

| Page No. | Line No. | Description of what needs to be changed | Reason for Change |
|---|---|---|---|
| 13 | 22 | Please put a coma after "usually" | Flow of sentence |
| 15 | 7 | Change "say" to "ask" | Clarification |
| 17 | 16 | Change "34.45" to "$32.45" | I misspoke — corrected as per p. 88, line 9 |
| 19 | 23 | Add "healthcare" after "flexible" | Clarification |
| 20 | 3 | Add "healthcare" after "flexible" | Clarification |
| 23 | 23 | "coordinators. And then on the – as a 3:00 p.m." should read "coordinators. And then on the -- at 3:00 p.m." | Correcting transcription |
| 23 | 24 | Change "scheduling" to "scheduled" | Clarification |
| 28 | 21-24 | Contingent employees filled in the gaps on our schedule. They got the standard rate of pay for their position and no benefits. Casual employees got a higher rate of pay in lieu of benefits. They were scheduled as any other regular employee. | Clarification due to additional recollection. |
| 47 | 16 | Change "Melissa" to "Marisa" | Correcting transcription |
| 87 | 18 | Change "term" to "turn" | Correcting transcription |
| 103-104 | 24-5 | I took PTO on Saturday, September 7, 2019 and Sunday, September 8, 2019 because the hospital was already closed. So, I could not work my scheduled shifts. I returned from my trip to Maryland on Friday, September 6, 2019 as originally planned. | Clarification |

**EXHIBIT 5**

| Page No. | Line No. | Description of what needs to be changed | Reason for Change |
|---|---|---|---|
| 24 | 10, 14 | All references to "Cindy" should be changed to "Cindi" | Correcting spelling |
| 26 | 7 | | |
| 80 | 8, 9, 10 | | |
| 81 | 17 | | |
| 83 | 4, 21 | | |
| 97 | 19 | | |
| 109 | 21 | | |

**EXHIBIT 5**