**In the Matter of:**

# KEITH REED

vs

# ALECTO HEALTHCARE SERVICES, LLC

# DANIEL DUNMYER

*June 08, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

**EXHIBIT 8**

```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
                     AT WHEELING


 KEITH REED, LISA DOLENCE,
 ELIZABETH SCHENKEL, EMILY
 WINES, MARK GARAN and AUGUST
 ULLUM, individually and on behalf of
 others similarly situated,

          Plaintiffs,

 vs.              Case No. 5:19-CV-00263-JPB

 ALECTO HEALTHCARE SERVICES, LLC,
 and ALECTO HEALTHCARE SERVICES
 WHEELING, LLC, d/b/a OHIO VALLEY
 MEDICAL GROUP and d/b/a OVMC PHYSICIANS,

          Defendants.




            DEPOSITION OF DANIEL DUNMYER
                 BY VIDEO CONFERENCE


    The deposition of Daniel Dunmyer was
 taken on June 8, 2022, at 1:00 p.m.,
 at 5010 Dempsey Drive, Cross Lanes,
 West Virginia.



            ELITE COURT REPORTING, LLC
                 5010 Dempsey Drive
        Cross Lanes, West Virginia  25313
                   (304) 415-1122

              Martha Fourney, CSR
```

**EXHIBIT 8**

## Page 2

```
 1        A P P E A R A N C E S
 2
     Bren Pomponio
 3   Attorney at Law
     Mountain State Justice, Inc.
 4   1217 Quarrier Street
     Charleston, West Virginia  25301
 5   (By video conference)
 6
     Michael S. Garrison
 7   Chelsea E. Thompson
     Attorneys at Law
 8   Spilman Thomas & Battle, PLLC
     P.O. Box 615
 9   Morgantown, West Virginia  26507
     (By video conference)
10
11   Maureen Davidson-Welling
     Attorney at Law
12   Stember Cohn & Davidson-Welling, LLC
     The Hartley Rose Building
13   425 First Avenue, 7th Floor
     Pittsburgh, Pennsylvania  15219
14   (By video conference)
15
     Timothy F. Cogan
16   Attorney at Law
     Cassidy, Cogan, Shapell & Voegelin, LC
17   The First State Capitol Building
     1413 Eoff Street
18   Wheeling, West Virginia  26003
     (By video conference)
19
20
21
22
23
24
```

## Page 3

```
 1              I N D E X
 2
     Witness
 3
         Daniel Dunmyer
 4
     Examination
 5
         by Mr. Pomponio         Page 04
 6
 7
     Exhibits
 8
         Number 1                Page 29
 9       Number 2                Page 42
         Number 3                Page 47
10       Number 4                Page 55
         Number 5                Page 57
11
12
13
14
15
16
17
18
19   Reporter's Certification    Page 64
     Errata Sheet/Signature Page  Enclosed
20
21
22
23
24
```

## Page 4

 1      DANIEL DUNMYER,
 2  called as a witness, first being duly
 3  sworn by the Court Reporter/Notary Public,
 4  testified as follows, to wit:
 5           EXAMINATION
 6  BY MR. POMPONIO:
 7      Q.  Good afternoon.  This is -- I'm Bren
 8  Pomponio.  I represent the plaintiffs in this
 9  case.  Thank you for being here.
10          Could you state and spell your name for
11  the record?
12      A.  Yes.  It's Daniel Charles Dunmyer;
13  D-A-N-I-E-L, C-H-A-R-L-E-S, D-U-N-M-Y-E-R.
14      Q.  Have you ever been deposed before?
15      A.  Yes, I have.
16      Q.  About how many times?
17      A.  Between five and ten.
18      Q.  And so I take it you're somewhat
19  familiar with this process, correct?
20      A.  Somewhat familiar, yes.
21      Q.  Okay.  Well, if you need a break for
22  anything at any time -- we're scheduled to only
23  go two hours, so we're obviously not going to
24  be here all afternoon.  But if you need a break

## Page 5

 1  for any reason, just let me know.  Okay?
 2      A.  Thank you.
 3      Q.  Are you taking any medications or
 4  having any physical ailments that would affect
 5  your ability to testify truthfully today?
 6      A.  No.  I'm not taking anything.  Thank
 7  you.
 8      Q.  All right.  I want to just talk a
 9  little bit before we get started here about --
10  definitions about the various entities that
11  we'll be talking about today.  If I refer to
12  Alecto Healthcare Services, LLC -- I may refer
13  to them as Alecto or AHS.  Is that okay?
14      A.  That's fine.
15      Q.  And if I refer to Alecto Healthcare
16  Services Wheeling, LLC -- I will frequently use
17  Alecto Wheeling.  Is that okay?
18      A.  That's fine as well.
19      Q.  All right.  And I may refer to both
20  Alecto or AHS and Alecto Wheeling collectively
21  as defendants.  All right?
22      A.  That's fine.  Thank you.
23      Q.  Sometimes I'll refer to the Ohio Valley
24  Medical Center as OVMC, and refer to East Ohio

Page 6

1  Regional Hospital as EORH. Okay?
2     A.  I understand.
3     Q.  All right. Could you tell us your home
4  address, please?
5     A.  It is 11103 Laughton Circle,
6  L-A-U-G-H-T-O-N, Circle, Fort Myers, Florida
7  33913.
8     Q.  I'm going to be out your way next
9  month. I'm getting together with my father's
10 side of the family at -- I think it's called
11 Lake June-in-Winter. Are you familiar with
12 that?
13    A.  I don't know where that is. But if
14 it's towards the coast, it might be near Fort
15 Myers then.
16    Q.  I think it's more in the central -- you
17 know, it's more central. Kind of east of Tampa
18 or south --
19    A.  Yeah. Tampa is about two hours north
20 of Fort Myers.
21    Q.  All right. What's your home phone
22 number?
23    A.  I have two cell phones that I use.
24    Q.  Okay.

Page 7

1     A.  I'll give you both. Area code
2  304-312-0142. And area code 704-964-9613.
3     Q.  Without disclosing any communications
4  you may have had with your lawyer, did you do
5  anything to prepare for this deposition?
6     A.  No. I have not.
7     Q.  Did you bring any notes or any other
8  documents with you to this deposition?
9     A.  No notes from talking with my
10 attorneys. And I never brought anything with
11 me. I have nothing from my stay with Wheeling
12 or Alecto. I have nothing here. So I couldn't
13 review anything anyway.
14    Q.  Okay. And where are you physically
15 right now?
16    A.  I'm in my hospital at Lehigh Acres,
17 Florida.
18    Q.  Could you give me your date of birth?
19    A.  12/10/1957.
20    Q.  All right. Are you married?
21    A.  I am.
22    Q.  What's your spouse's name?
23    A.  Nancy M. Dunmyer. Same spelling.
24    Q.  Can you just briefly describe your

Page 8

1  educational background?
2     A.  High school in Pittsburgh; college --
3  Bethany College, Bethany, West Virginia.
4        I don't know if you heard that, but
5  we're having our typical afternoon
6  thunderstorm.
7        But Bethany College, Bethany, West
8  Virginia. Then University of Pittsburgh.
9  Graduate school of public health --
10    Q.  What --
11    A.  -- is the education.
12    Q.  I apologize.
13       What did you get your degree in in
14 undergrad?
15    A.  A major in communication and a minor in
16 economics.
17    Q.  Are you currently employed?
18    A.  I'm currently employed with Landmark --
19 one word -- Landmark Hospital of Southwest
20 Florida.
21    Q.  Okay. What is your current position?
22    A.  CEO.
23    Q.  Okay. Let's turn to the facts of this
24 case, please. When did you first become

Page 9

1  affiliated in any capacity with AHS?
2     A.  I'll give you a guess. I think it was
3  around December 17th of 2018, I believe.
4     Q.  Okay. And how did that -- what was
5  that affiliation?
6     A.  Well, I was hired to be the CEO of OVMC
7  in East Ohio.
8     Q.  Okay. And -- I'm sorry. I didn't mean
9  to cut you off.
10    A.  I was going to give you my whole
11 history. Back when I was a kid, I was in
12 Charleston, South Carolina, at the time, and I
13 relocated to Wheeling.
14    Q.  How did you get selected for that
15 position?
16    A.  I was -- I don't know how my name got
17 to these folks. I guess maybe people in
18 Wheeling -- I knew people in Wheeling anyway.
19 But they put Lex Reddy and Ron Bingham in touch
20 with me. I talked with them on the phone
21 several times over several months. I can't
22 tell you more specific than that. I don't know
23 what the time frame was.
24       But then along about October, November,

Page 10

1  they asked me to come up for an interview. I
2  came up in person. I met with some folks, and
3  then was offered the position. And again, I
4  think it was around the 17th of December.
5  Q. 2018, correct?
6  A. 2017.
7  Q. Right. Okay. Very good.
8     And when was it that Alecto acquired
9  OVMC? If you can recall.
10  A. I don't recall. It was before I got
11  there. I think it was the same year, but I
12  can't recall. It was -- yeah. It must have
13  been that same year. Maybe around June. But I
14  do not know.
15  Q. Between 2017 and the beginning of 2019,
16  how would you describe the condition of OVMC's
17  physical infrastructure and equipment?
18  A. Overall, very -- it was poor. There
19  were sections of the building that were in
20  decent shape. But instead of knocking
21  buildings down over the years, they just kept
22  building on. So there were many parts of the
23  hospital that were in disrepair.
24     Equipment was satisfactory. But some

Page 11

1  needing replaced. There was some new
2  equipment. I can't remember whether the
3  equipment was new or old. But it would take
4  some money to get it all repaired. Certainly,
5  the building. The infrastructure was not in
6  great shape.
7  Q. During this same time frame, how would
8  you describe OVMC's financial condition?
9  A. Not very strong. In fact, I believe
10  that's how Alecto got involved. Again, I
11  wasn't there, so I don't know who talked to
12  whom. But it was not very strong.
13  Q. Did the office -- I mean the hospital,
14  suffer operating losses in 2017, '18, '19?
15  A. Yes. I cannot tell you the degree. I
16  can't recall. But I believe -- again, I only
17  want to deal with facts. So I don't know what
18  it was before I got there. But I believe they
19  were close to closing the place at least
20  according to conversations with different folks
21  at the time.
22  Q. Did OVMC have a pension plan?
23  A. Yes. There was a pension plan.
24  Q. Do you know whether it was underfunded?

Page 12

1  A. I'm going to say I can't recall. I
2  don't think it was, but I'd better stick with I
3  don't recall.
4  Q. How would you describe the market
5  conditions during this time period, 2017 to
6  2019?
7  A. May I ask on what level? Do you mean
8  for patients? For staff?
9  Q. Both.
10  A. Competition?
11  Q. All of that goes into the --
12  A. Okay.
13  Q. -- financial impact of the hospital.
14  And so if you could just expound on all of
15  those, that would be great.
16  A. We were fighting for patients. There
17  were decisions made long before I came in. One
18  major example, I used to meet with former CEOs
19  and people that were involved with both OVMC
20  and Wheeling and, heck, Reynolds as well, about
21  the past. I think the lack of working with --
22  or having a contract with the Upper Ohio Valley
23  Health Band might have been -- maybe not the
24  first nail, but it was maybe going towards the

Page 13

1  last nail of driving their market down.
2     So our patient market was not very
3  strong before I got there. And sadly, I wasn't
4  able to strength it. But we were finding it
5  difficult to find certain staff members --
6  certain qualified staff. But the employees
7  were always strong. They were committed to
8  OVMC. It was trying to find physicians as
9  well.
10     We had Wheeling Hospital that was
11  exceptionally strong, or at least appeared to
12  be, and came across to be and were aggressive.
13  We had Reynolds below us about 15 miles, part
14  of WVU. That was a solid competitor. And even
15  some hospitals in Ohio reaching down towards
16  the Martins Ferry area.
17     So we found it difficult to find
18  physicians. We found it difficult to get
19  patients. And we did lose some staff, but the
20  staff -- we had a lot of staff as I recall that
21  were there for many, many years.
22  Q. At some point, did Alecto decide to try
23  and sell OVMC?
24  A. I think that was the intention, sell --

Page 14

```
 1  have it joint ventured, whatever it may be.
 2  But, yes.
 3       Again, I'm going to talk to you in
 4  generalities because I can't remember specific
 5  dates. But certainly by the turn of 2019, it
 6  was recognized that we weren't going to be able
 7  to survive the way we were. So probably -- if
 8  somebody gave you a different date, then
 9  they're right. I'm going to say somewhere
10  around January, February of '19.
11    Q.  And did you have any role in trying to
12  find a buyer for OVMC?
13    A.  Yes, I did. Keep in mind, whatever
14  that role may be, I wasn't going to go out and
15  find -- and do it myself. But I talked with
16  representatives from Prime Healthcare. I was
17  not involved with the discussions with Steward
18  Healthcare. But I know we talked with Steward.
19  I talked with Wheeling. I talked with WVU. I
20  talked with the State of West Virginia. I
21  talked to some politicians from Ohio trying to
22  connect us with Ohio companies. We even
23  reached out to Cleveland Clinic without any
24  true interest.
```

Page 15

```
 1       Now, we reached out to folks. There
 2  wasn't a whole lot of interest by anyone. But
 3  we reached out to a number, and I was involved
 4  in that.
 5    Q.  Do you recall approximately how long
 6  Alecto spent trying to sell the hospital, OVMC?
 7    A.  Again, I can recall basic -- I think it
 8  was January and February when I was involved.
 9  So I'm going to say at least seven months,
10  eight months. There probably was phone calls
11  before I knew it, back in '18 maybe.
12       I may have even told -- I don't recall
13  it, sir, but I do know that in January and
14  February, I believe that time frame, I was more
15  involved and -- so that's the only part I can
16  speak to.
17    Q.  Okay. And do you know if there was any
18  offer to buy received during this time?
19    A.  I do not know of any offer that was
20  made. There was discussions I'm sure. But,
21  no, I never saw, nor was involved in the
22  receipt of any offer.
23    Q.  Did you have any opinion by about the
24  summer of 2019 whether or not Alecto would be
```

Page 16

```
 1  able to sell the hospital? OVMC, that is.
 2    A.  Actually, I thought that it could be
 3  sold -- not the building. There had to be
 4  special negotiations about buildings and
 5  whatnot. But East Ohio was in okay shape. As
 6  I said, the part of OVMC that was built in
 7  1980, we had problems. We had leaks and things
 8  that hospitals have. But I was believing that
 9  Prime Health and/or Steward Health was going to
10  step up to the plate. Just because in my
11  mind -- I had no inside knowledge. That's even
12  an inappropriate way to say it.
13       But Prime has a hospital, East
14  Liverpool. Steward was trying to grow. So I
15  assumed that they would be interested. But
16  obviously, it did not happen.
17    Q.  And was that in -- I'll just put a fine
18  point on it. I'm going now to the summer of
19  2019. Did you still hold that belief in the
20  summer of 2019, that they would be able to sell
21  the hospital?
22    A.  I'm not going to fib to you. I'm not
23  going to talk out of both sides of my mouth. I
24  still thought that Prime would probably come
```

Page 17

```
 1  back only because of some of the past
 2  relationships, not that I had, but they had,
 3  that there would be some interest. But along
 4  about probably June or July realized -- I think
 5  we were told Steward was not interested. And
 6  after Prime came in, I suspect -- if I was told
 7  that Prime wasn't interested, I'll accept that.
 8  I don't recall being told that. But probably
 9  around July -- June or July, we knew that there
10  was not much coming down the pike, at least not
11  at that point.
12       But again, no reasons for it. But you
13  would think maybe WVU or Wheeling -- there was
14  some value in having that building -- that
15  service to someone is what my thought was. But
16  about June or July, it certainly wasn't looking
17  favorable.
18    Q.  Okay. And did you ever participate in
19  any efforts to apply for financing to keep OVMC
20  open longer?
21    A.  I think I understand what you're
22  asking. I never submitted an application
23  myself or never went to a capital company. But
24  I'm sure some of the information I gave to
```

Page 18

1 people was used for that. But I personally did
2 not.
3      I did talk to the state though. I
4 talked with politicians of West Virginia, not
5 Ohio. I talked to them about trying to seek
6 dollars or relief for those types of things.
7 Even the City of wheeling -- trying to reduce
8 what we owed them, that kind of stuff. But
9 not -- I never went through an application
10 myself, no.
11    Q. Okay. Were you ever a participant in
12 discussions with Alecto about trying to obtain
13 additional financing to keep the hospital open?
14    A. Tangentially, I was. Say, hey, we need
15 to buy this, we need to do this, we need to
16 repair that while we're reaching out and we're
17 trying to get it. So I was aware that -- at
18 least I was told they were looking at that. I
19 did not participate in that.
20    Q. Okay. And when you say you were told
21 that, who were you referring to generally that
22 would tell you this?
23    A. It would probably be the Lex Reddys or
24 Mike Sarraos or maybe Jeremy Redin, those

Page 19

1 folks. I talked to them quite often.
2    Q. These are managers, directors, that
3 kind of thing, of Alecto, correct?
4    A. Of Alecto, yes.
5    Q. At some point the decision was made to
6 announce the closure of OVMC and EORH, correct?
7    A. That's correct.
8    Q. When were you told that that decision
9 had been made? Do you recall?
10      MR. GARRISON: I'm going to object to
11   the form of the question.
12    A. I recall certain things specifically.
13 I was part of the discussion of what can we do,
14 how can we make it work. So I was part of the
15 decision to do what we did, but my date might
16 be off. But I think the final decision was
17 made with me on Monday, August 6th. Maybe it
18 was Monday, August 5th.
19      On Tuesday, August 6th or Tuesday
20 August 7th, whatever those dates were -- I
21 talked with staff the evening -- on that
22 Tuesday I believe. So it was about 24 hours.
23      Now, the week before we were trying to
24 put different ideas of what could possibly

Page 20

1 work. But given our financial condition and
2 the shape of the building and equipment, none
3 of those options probably would have fared
4 well. But we, for a good number of weeks, were
5 trying to figure out how we could make it work.
6 And then on that Monday --
7    Q. Okay. Now let's unpack a little bit of
8 that. You said at the beginning that that
9 decision was made with me on you believed
10 August 6th. Explain to me the setting, what
11 you mean -- how that decision was made.
12    A. I apologize for cutting you off.
13      It was a phone call. I was in my
14 office. It was 2:00-ish, three o'clock in the
15 evening, or afternoon. Maybe it went into the
16 evening. I can't recall that exact time. But
17 there was folks from Alecto, the same people I
18 was talking about on the phone -- talking about
19 what options we had.
20      And about six o'clock that evening --
21 and again this is not 100 percent. I believe
22 it was that date. The gist of the conversation
23 was, we can't do some of the options; keep one
24 hospital open or close the other, keep the

Page 21

1 other one open, close that, drive them both
2 down as to what their services are, whatever it
3 may be. Or keep going the way we were going,
4 that certainly could have been an option too I
5 guess. But the result was -- the only way was
6 to close them both.
7    Q. Okay. And did you make a
8 recommendation to that group about the options
9 that should be followed out?
10    A. We talked about them all, but the
11 option I said that -- the only one that could
12 work other than closing -- and not even say
13 could work. The only one that potentially was
14 feasible was closing OVMC and keeping East Ohio
15 Regional open because it was a better building.
16      But they still -- there was still
17 renovations and money that had to be put into
18 it. Quite frankly, there was a bunch of bills
19 that had to be paid. So although I thought
20 that was a good idea at the time probably, I
21 also realize I don't think that would have
22 worked.
23    Q. Who would you say -- if I asked you to
24 answer this question, who would you say made

Page 22

1 the decision to close OVMC and EORH on the 6th,
2 this conversation we've been talking about?
3   MR. GARRISON: I'm going to object to
4 the form, that it presumes that it's a
5 singular person. His testimony has
6 clearly indicated it was a collective
7 decision.
8   But go ahead.
9   THE WITNESS: Actually, Mike, I
10 appreciate that.
11   A. But my answer was going to be, we all
12 reached that conclusion. Was I pursued more
13 than I pursued them? We talked about every
14 option. I didn't say either we keep East Ohio
15 open or, you know, I quit. We looked at all
16 the options, and I think we came to a
17 consensus.
18   Q. Okay.
19   A. And so was one of the others driving
20 their thought? Maybe so. But during the
21 conversation, it was an open discussion about
22 every option. And it looked like -- well, it
23 didn't look like -- the one that came to be was
24 reached by those on the phone.

Page 23

1   Q. Now, on this telephone call that we've
2 been talking about, you mentioned that there
3 were representatives, managers, whatever, of
4 Alecto on that call. Were there any local
5 management like yourself on there?
6   A. Just me. I don't believe I had anybody
7 from my staff on that phone call. And there
8 weren't any other community representatives,
9 physicians or staff members.
10   Q. What about from EORH, like Ms. Coello?
11   A. Well, Jennifer may have been on -- I
12 don't think she was with me. Now, she --
13 again, as impactful as this was, you would
14 think I would remember every little detail, but
15 I do not.
16   Q. That's fine.
17   A. Jennifer and I talked. So I believe I
18 talked to her afterwards. But she may have
19 been on the phone because she was one of the
20 ones who helped me come up with different
21 scenarios.
22   Q. Okay. You mentioned that you spoke to
23 various state officials. Tell me something
24 about that. I take it that you talked to state

Page 24

1 officials before the decision to close, and
2 after, correct?
3   A. Well, I talked to them before and
4 after, but different topics.
5   Q. So let's talk about the state officials
6 that you talked to after the decision.
7   A. Okay. I won't say I talked to Governor
8 Justice. I talked to Governor Justice's
9 office. I can't remember who. I can't even
10 tell you who his chief of staff was. But it
11 was probably chief of staff or others.
12   I talked to David McKinley --
13 Congressman McKinley. His wife worked at OVMC
14 for many years. A very fine guy. I hope he
15 wins his re-election.
16   I talked with Bill Crouch at different
17 times. He is the secretary of health. And
18 there may have even been others. I talked
19 probably inappropriately so -- or not for any
20 downside benefit, but I talked with the
21 president of the West Virginia Hospital
22 Association as well, Joe Letnaunchyn. I don't
23 know how you say Joe's last name. He and I
24 became buddies. So I used him as a sounding

Page 25

1 board, that kind of stuff.
2   Then we talked with Congressman Jackson
3 or Johnson -- or, no. I'm sorry -- senator --
4 state senator for Ohio. He's from the Martins
5 Ferry area. I can't remember his name. It's
6 either Johnson or Jackson I believe. There's a
7 couple of others -- just asking for help.
8   Q. You were asking for help?
9   A. Well, we were closing the hospital. We
10 needed help to find jobs. We needed help to do
11 anything we could to get the closure completed,
12 bills paid, all reimbursement in, whatever it
13 could be. I never had substantive
14 conversations about those types of things, but
15 we did talk about those.
16   Q. What type of help were you hoping to
17 get from these state officials?
18   A. Well, Governor Justice was clear he was
19 going to keep it open. He was going to come
20 back -- keep OVMC open. He promised that. He
21 promised a number of things. He promised that
22 WVU would get involved. Lots of things that
23 I'm sure he meant, but it didn't come to
24 fruition.

Page 26

1  In fact, even after the fact, I met
2  with Albert Wright several times about at least
3  taking over the behavioral health part, keeping
4  the ER open, those kind of things. So it was
5  to try and keep the hospital -- you know, keep
6  it from closing, even though it was announced
7  to be closed.
8  Q. Okay.
9  A. It was also, what else can we do? Are
10 there any other options that can be unearthed,
11 so to speak.
12 Q. Did you feel like during this time when
13 you were talking to the state officials that
14 the announcement that you were closing OVMC
15 was -- made it difficult or impossible for you
16 to have fruitful discussions along the lines
17 that you've been testifying about?
18 A. I don't think it made it impossible.
19 Obviously, that made -- when the decision was
20 made, that's -- in a negotiation, you've got
21 some leverage I guess. But, no. There's a lot
22 of people that -- Justice and McKinley -- even
23 Ihlenfeld, the -- local senators, they all
24 wanted to figure out how they could keep it

Page 27

1  open.
2       Because it was a shock -- or an
3  announcement that not too many people -- no one
4  was involved in. Everyone had to expect it
5  because we were having difficulties. But
6  everybody tried to figure out, how can we keep
7  it open? So was it impossible? No. I think
8  there's a lot of genuine and earnest in getting
9  it done, but we weren't able to do it.
10 Q. Right. So is it fair to say that the
11 announcement you don't think really made it
12 more difficult for you to communicate with
13 these state officials about keeping it open?
14 A. Not more difficult to communicate. I
15 think there was a sense of urgency made. But
16 again, when they understood the breadth of the
17 issue, I believe it was difficult anyway.
18 Q. Right.
19 A. We had companies that do this for a
20 living, Prime, Steward, Cleveland Clinic. I
21 can't remember if we talked to Ohio first --
22 what is it -- Ohio Health or whatever. We
23 talked to a number of places, and they weren't
24 interested at all.

Page 28

1  Heck, we even talked with UPMC about
2  working with the cancer program -- trying to
3  protect the cancer program. Those are all
4  companies that -- or businesses that said no as
5  well. So to say it made it difficult or
6  impossible, no. I think everybody came to the
7  same realistic opinion, was that we could not
8  continue.
9  Q. Right. So the announcement didn't
10 really have an impact on that, that had been
11 going on, correct?
12 A. In my opinion, it did not
13 significantly. Others may have a different
14 opinion.
15 Q. Okay. When this announcement was
16 made -- the decision we've been talking about
17 on or about August 6th, the announcement made
18 on August 7th, when was the target date to
19 close the hospital?
20 A. I know there's legal ramifications. We
21 talked about that, the WARN Act or whatever.
22 I'm not real familiar with that. Other than
23 the fact we established the expectation that it
24 would meet that time frame. I assume that's 60

Page 29

1  days because for some reason I'm thinking
2  October 7th. That would have been probably
3  60 days. So I'm thinking we forecasted that
4  October 7th would be the date of closing.
5       MR. POMPONIO: Martha, could you
6  please pull up the document I sent you?
7  It's Defendants' 16762 through 16763.
8  This is a document that we're going to
9  mark as Deposition Exhibit Number 1.
10      (Exhibit 1 was marked.)
11 Q. Mr. Dunmyer, do you recognize this?
12 A. I know we did it. So I'll say, yes, I
13 recognize that.
14 Q. Okay. If you could, take a moment --
15 if --
16      MR. POMPONIO: Martha, if you could
17 kind of slowly scroll down so that
18 Mr. Dunmyer has an opportunity to sort of
19 skim it or read it as much as you like.
20      (Witness reviews document.)
21 A. Okay.
22 Q. So do you recall this document?
23 A. I do.
24 Q. And who prepared it? If you know.

Page 30

1  A. I do not know who -- I know I reviewed
2  it and approved my quotes and things. I do not
3  know who wrote it. I assume it was maybe Mike
4  Sarrao or Lex or both. But I do not know.
5  Q. Do you feel -- sorry.
6  A. On a side note -- I probably shouldn't
7  say this. But this letter here is what kept me
8  from having a job anywhere in West Virginia
9  according to Mr. Wright. He said that because
10  I blamed things on Wheeling Hospital and
11  Mr. Violi, that he would not hire me at any --
12  in any position, he would keep me from finding
13  a job in West Virginia because of it.
14     That sounds harsh. And the way he said
15  it was kind of harsh too. But I understand the
16  way it was written. But it was my hospital, so
17  it was my quote, and that's why I said I
18  authored it.
19  Q. And so we're talking about I think the
20  very last bullet point here?
21  A. Correct.
22  Q. Is it fair to say that those were
23  your -- I understand that it's your quote and
24  it was your hospital. But did you hold that

Page 31

1  personal belief?
2     THE WITNESS: Scroll back down,
3  please, all the way to page 2.
4  A. Quite frankly, I still hold that
5  belief, that we were harmed by Mr. Violi and
6  how they did business, yes.
7  Q. Fair enough.
8  A. I filed a petition with Wheeling
9  Hospital that came out that they did stuff with
10  physicians that were our physicians. I still
11  hold that belief, yes.
12  Q. Okay. Now, in this press release, it
13  indicates that the hospital is going to
14  discontinue acute care and emergency services
15  at the beginning of September, correct?
16  A. That's what it says, September 7th, I
17  think.
18  Q. So we just talked about the target date
19  for the closure of the hospital being in
20  October. What precipitated this decision to
21  discontinue the acute care and emergency
22  services?
23  A. I don't want to sound too altruistic,
24  but it was to protect the patients. We had

Page 32

1  staff, but we didn't have staff in all the
2  areas. We didn't have doctors to take care of
3  them. Sure, on Monday, we might. But on
4  Tuesday, we might not. Thursday, we could. So
5  it was really to protect the quality of care
6  being provided.
7     I can argue with myself whether we
8  should have done it earlier or later. But to
9  protect the patients we were losing. Our
10  doctors had started to go to the Wheeling
11  Hospital or resign. We had staff, but not in
12  every department. We were struggling with OB
13  anyway. And the ED -- most of the ED -- I
14  believe 60, 70 percent - I'm ballparking it -
15  of our admissions came through the ED. We
16  couldn't admit because we didn't have some of
17  the docs.
18     Ten percent of the ED volume -- maybe
19  12, 13 percent, ended up being admitted. Those
20  are two different percentages -- of the volume.
21  So in order to protect the patients.
22     Go ahead and have at it. That was
23  premature. But my driving part was to protect
24  that patient who walks in or by ambulance --

Page 33

1  comes in and won't be able to be treated. Or
2  they could have been treated and then
3  transferred. But that too added a step to the
4  process.
5  Q. And so who would you say -- let me ask
6  this. Was there any meeting or e-mail
7  communications where the decision to suspend
8  these services as reflected in this press
9  release --
10  A. Not that I can recall, sir. I don't
11  know if we sent out e-mails or whatnot. I
12  don't recall.
13  Q. What about -- I'm talking about the
14  decision to do this -- the decision to suspend
15  these services. How was that decision made?
16  A. As with most of the decisions, I'm sure
17  it was on the phone.
18  Q. And who would be involved in that
19  decision?
20  A. Similar people. Maybe a few others.
21  Sylvia was nursing. There's -- I wish I would
22  have taken notes. I wish I would have kept
23  track of the decisions. But I was trying to --
24  trying to get through a difficult time. So I

Page 34

1  can't recall who all was on those calls. But
2  the same people that were on most of the calls
3  - the Lexes, the Mikes, the Jeremys. Probably
4  Sylvia in nursing. We had a quality person. I
5  can't even remember her name right now. They
6  probably were all on the phone calls at
7  different times.
8    Q. Okay. So how would you describe -- you
9  know, we went into how the decision was made on
10 August 6th to close OVMC. What about the
11 decision to suspend services in September of
12 2019, was it similar decision-making, or was it
13 different than -- some other way?
14   A. It was similar decision-making. Again,
15 boy, as I told Mike -- my wife swears I've lost
16 three years of my life because of this. You
17 would think I would remember every detail. But
18 we were getting resignations. We had people
19 leaving. So I would communicate that. We
20 would discuss, and then we decided.
21     I can't remember whether it was the day
22 before this was written, three days before this
23 was written. And if you're being told from
24 others -- great. They have a better memory

Page 35

1  than me. They know who's involved, but I can't
2  recall.
3    Q. And let me just say, I don't expect you
4  to have any knowledge aside from your own
5  recollection. So that's fine -- whether you
6  recall it or not, that's perfectly acceptable
7  to me for sure.
8      All right. Do you know whose job it
9  was to ensure that the closure of OVMC complied
10 with the WARN Act?
11   A. It was discussed by us all. One would
12 argue it was my responsibility to make sure of
13 that. But we had legal representation and HR
14 folks involved in that; you know, attorneys and
15 whatnot. So I suspect in a court of law, it's
16 mine. But I think I listened to our legal
17 opinion.
18   Q. Did you have any -- in this time
19 period, 2019, did you have any familiarity with
20 the WARN Act requirements aside from -- don't
21 tell me things that your lawyer told you. I
22 was wondering --
23   A. No. Actually, I've never -- I've known
24 of the WARN Act -- to be honest, I was never

Page 36

1  sure if it was the Warn, W-A-R-N, or Warren
2  Act. I never had to use it. Never been
3  involved in it. Didn't really read up on it.
4  Because, like I said, I was listening to legal
5  opinions or direction. So I still couldn't
6  tell you all the interworkings of the WARN Act.
7     MR. POMPONIO: Martha, you can take
8  this screen share down whenever you want.
9    Q. All right. Were you aware that a
10 letter was sent to the employees of OVMC on
11 August 8th providing them some ostensibly or
12 allegedly notice that the hospital was going to
13 be closed?
14   A. I'm sure I did. In fact, I know I was.
15 I can't recall the date or what was in it.
16 But, yes.
17   Q. And do you know who prepared that
18 letter?
19   A. It probably came under my signature.
20 Again, I'm assuming. But it was prepared most
21 likely by some of the legal team of our
22 company.
23   Q. Okay. Do you know how it was mailed
24 out to employees, who handled -- physically

Page 37

1  mailing those letters?
2    A. Yeah. I believe my office probably
3  handled that. I don't think we mailed them
4  from California. I think we mailed them from
5  OVMC.
6    Q. Okay. And do you know if it was
7  Mr. Bradshaw who prepared the letter?
8    A. Well, I know I keep guessing. I
9  shouldn't guess. I don't know.
10     MR. GARRISON: Yeah. I'm going to
11 caution the witness to not guess. But go
12 ahead and answer if you recall.
13   A. I do not recall.
14   Q. But do you recall approximately how
15 many letters were sent out?
16   A. I don't recall. But again, to all the
17 employees of both hospitals, whatever that
18 number was.
19   Q. About how many employees if you recall
20 were terminated as a result of the closure of
21 the hospital? That being OVMC employees.
22   A. Well, I heard Mike's voice -- I don't
23 know. It was more than 100. I don't want to
24 guess. But it was -- I don't recall the

Page 38
1  number. I'm sorry.
2     Q. Do you have a recollection when it
3  was -- the date that they were terminated?
4     A. I do not. I didn't see any letters.
5  I've talked with my attorneys. I was -- we did
6  not go over any piece of paper. And I don't
7  have those with me, so I could not remember
8  that.
9     Q. So there's documents that have been
10 produced in connection with this case that
11 refer to something called flexing. Are you
12 familiar with that term?
13    A. With what?
14    Q. Flexing.
15    A. Flexing? Flexing of staff or flexing
16 of hours?
17    Q. Right.
18    A. I'm familiar with that.
19    Q. I'm talking about flexing of staff.
20    A. Well, I've used that term in every
21 hospital I've been in. If it means the same --
22 without the context -- if you show me the
23 letter that says it, I will tell you. But we
24 do that currently. If census drops, you flex

Page 39
1  your team, you drop hours. So I'm familiar
2  with the term. I'm familiar for -- what it
3  does for us. But without a copy of the letter
4  or the context of the letter, I don't know how
5  to answer you.
6     Q. Okay. That's fair enough. And you
7  obviously -- I just wanted to know, first of
8  all, if you were familiar with it --
9     A. Yeah.
10    Q. -- the term, and would like you to --
11 and you started to do this -- explain to me
12 what it is. And you started to explain it.
13 And you said that if the census drops, then you
14 flex the staff out. Is that -- am I saying it
15 --
16    A. I didn't say it quite that way. But,
17 yes, if census drops, you call people off.
18    Q. Okay. And what's the census?
19    A. The number of patients in the hospital;
20 number of patients coming into different
21 departments for services.
22    Q. Okay. So how was the staffing at OVMC
23 handled after it was announced that the
24 hospital was going to close?

Page 40
1     A. I can't recall how we did it. I want
2  to answer your questions, but I've got to have
3  more facts I guess. But we reduced staff
4  because of reduced activities.
5     Q. Okay. And so if -- was staff permitted
6  to come to work if there was not any work for
7  them to do after August 7th?
8     A. If there was no work to be done, I
9  assume we said stay home. Or we could -- if we
10 were short in another department -- if they had
11 the credentials, we could move them to another
12 department. But I can't remember how we
13 handled different days there.
14       So in general terms, yeah, we could --
15 we'd call them off, send them home, have them
16 work half days, work in other departments -
17 this is any hospital - in order to get the job
18 done, take care of the patients, but also be
19 aware of reducing costs where you can. So I
20 don't recall how we did it those days. I can't
21 even tell you what the census was on
22 August 7th. I have no recollection.
23    Q. Well, certainly after September 3rd
24 when the acute care and emergency services were

Page 41
1  suspended, the census presumably dropped
2  dramatically?
3     A. To zero, yeah.
4     Q. After that date, how was the staffing
5  handled? What you're saying is that the
6  paperwork told us not to come in?
7     A. I guess that's true, yes. We had some
8  that did. We still had to collect the bills --
9  or patients -- yeah, we had the bills for the
10 services. We had to support and record medical
11 records. Those types of things went on
12 afterwards. So there were some that were still
13 working. But if their job was not required,
14 they would have been called off, yes.
15    Q. Okay. And do you have a recollection
16 about -- sort of the percentage of the
17 workforce there -- percentage of employees at
18 OVMC that -- after that September 3rd closure
19 were still coming to work?
20    A. I can't -- I have no idea. There were
21 some. It was not a large percentage, but there
22 were some. I don't know what percentage was
23 still coming.
24    Q. Is it fair to say by October 1st most

Page 42

1  of the employees were not working, correct?
2      A.  If you want me to use logic, the answer
3  is yes.  But I can't recall the date.  I'm
4  trying to answer your questions because I don't
5  like not answering.  But I don't -- certainly
6  by August 1st a significant number were not
7  coming in.  But I don't know those numbers.
8      Q.  Did Alecto or AHS or managers of that
9  organization have any involvement in the
10  flexing of staff after the closure on
11  September 3rd?
12      A.  They were knowledgeable of it.  We
13  would communicate everything that we were doing
14  with them.  Not to get necessarily their
15  approval, but certainly get their buy-in or
16  agreement or ideas.  Yeah.  They were made
17  aware of it.  That would be my normal process
18  with them.  I can't tell you what days and how
19  many people, but I do know that's how we
20  communicated.
21          MR. POMPONIO:  Martha, could you pull
22      up and share the screen with Defendants'
23      Bates stamped 25373?
24              (Exhibit 2 was marked.)

Page 43

1          MR. POMPONIO:  Thank you.
2      Q.  I'm showing you, Mr. Dunmyer, what has
3  been marked as Deposition Exhibit Number 2.
4      A.  Okay.
5      Q.  It appears to be an e-mail chain.  You
6  can see at the bottom, there's an e-mail from
7  you to Lex Reddy, Mike Sarrao, Mr. Bradshaw and
8  Mr. Redin and some others.
9      A.  Redin, yeah.
10      Q.  Some other individuals, including
11  Ms. Coello.  Let me ask you this first.  Do you
12  remember this e-mail?
13      A.  I don't, but I wish I would have
14  spellchecked it.
15      Q.  Well, we're not going to get on you for
16  spelling errors.
17      A.  I can't remember specifics.  But it
18  makes sense that I sent something like this,
19  yes.  That's on September 30th.
20      Q.  Does this refresh your recollection
21  about the staffing levels at the hospital on or
22  around October 1st?
23      A.  Well, the response back, yes, it tells
24  me the numbers.

Page 44

1      Q.  And so is your recollection refreshed
2  after reading this e-mail that the majority --
3  or large majority of employees of OVMC by
4  October 1st were not working?
5      A.  Yeah.  I understand why you asked it
6  the way you did.  But if you would have shown
7  this to me first, I would have agreed with it.
8  But, yes.
9      Q.  Okay.  And you have Mr. Bradshaw's --
10  yeah, Mr. Bradshaw's -- you forwarded your
11  e-mail, it looks like, and you're not on that
12  forwarding -- forwarded e-mail it appears at
13  the top.
14      A.  You're right.
15      Q.  There is an attachment, a post-closure
16  employees spreadsheet.  Do you see that there?
17      A.  Yes.
18      Q.  And Mr. Bradshaw indicates that you're
19  going to reduce the figure from --
20      A.  200 to 70.
21      Q.  -- 200 down to 70 or less on that day,
22  and will continue to reduce it further.
23          And you see here in the paragraph
24  before it -- let me ask you this before I go

Page 45

1  on.  Do you recall Mr. Bradshaw -- was he
2  correct, that you were tasked with reducing
3  that figure down to 70 or less in the coming
4  days and then reducing it further?
5      A.  No, I don't recall that.  But I'm sure
6  he didn't make it up either.  So I was trying
7  to reduce as quickly and as efficiently as I
8  could.
9      Q.  Okay.  And who -- was there anybody --
10  any of these folks that are on this e-mail that
11  had requested that you reduce this as quickly
12  and efficiently as possible?
13      A.  No.  I think it was discussed.  Whether
14  it was my idea and they supported it, I can't
15  recall that.  Or if it was our idea, and said,
16  okay, let's drop that number.
17          As you said, I'm not on that e-mail.
18  So somewhere between 150 on September 30th, and
19  at 11:30 on October 1st, I had a discussion
20  with at least Mark about this is what I want to
21  do -- not want to do.  I hope you and everybody
22  else understands, this is nothing anybody
23  wanted to do.
24      Q.  Right.

Page 46
1  A.  We had to reduce the hours.  So I'm not
2  going to say Mark or Lex told me I had to do
3  it, and I didn't want to do it.  I was trying
4  to do what my job was, whether it was my idea
5  or supporting a consensus.  Either way, I
6  suspect I was trying to get to 70 or less.  I
7  do not recall.
8  Q.  I'm sorry.  The end of that -- I missed
9  that.  You said you suspect that you were --
10  A.  I suspect I was trying to get it down
11  from 200 to 70 or less.
12  Q.  Okay.
13  A.  I don't recall where that came from,
14  but I don't doubt that was discussed.  So I'll
15  accept that as being said.  It was -- what I
16  was trying to do was get us through the end of
17  this.
18  Q.  Let's go to the paragraph before that.
19  It says, Total employees on the roster is over
20  800, but the total who are actually working
21  productive hours is approximately 200.
22      Do you recall that being the case at
23  this time period, that there were people that
24  were on the roster, but the large majority of

Page 47
1  them were not working?
2  A.  I believe that to be true, yes.  They
3  hadn't resigned.  They hadn't been terminated.
4  But they're using their PTO to work out -- I
5  suspect that's correct.  Trying to -- you know,
6  at that time -- I can't recall when East Ohio
7  closed, the official day.  But this is for both
8  hospitals, I believe.  So it makes sense.
9  Q.  Did you have any discussions with
10  anybody at Alecto during this time when you
11  were reducing the staff about the impact of
12  scheduling -- stop scheduling these people in
13  connection with the WARN Act?
14  A.  I don't recall that at all.  In fact,
15  as I've told you, my exposure to the WARN Act
16  was in that letter that we sent -- some letter
17  that WARN was mentioned, I thought.  I didn't
18  study it.  So, no.  They never called and said,
19  hey, reduce these, but be careful, is it in
20  accordance with or not in accordance with the
21  WARN Act.  No, I never had discussions.
22      MR. POMPONIO:  Martha, could you pull
23  up Defendants' 3099, please?
24      (Exhibit 3 was marked.)

Page 48
1  Q.  I'm showing you what's been marked as
2  Deposition Exhibit Number 3.  It's another
3  e-mail chain.  The first e-mail is from you.
4  We're talking about winding down -- you were
5  talking about winding down and limiting the
6  number of staff.
7  A.  Okay.
8  Q.  Do you recall this e-mail?
9  A.  I don't recall it, but it's me.  So,
10  yes -- no one created it for me.  So, yeah.
11  Q.  And this e-mail that was sent, who --
12  it looks like it's to department managers of
13  both hospitals and human resources?
14  A.  That's correct.
15  Q.  What's your -- is this a typo -- this
16  is not important here.  Just out of
17  curiosity -- you say that you want to thank
18  them for their hard work over the past 129
19  years.
20  A.  That's how long the hospital was open,
21  I believe.
22  Q.  I see.
23  A.  Obviously nobody is 129 years old.
24  Q.  Right.

Page 49
1      MR. POMPONIO:  If you could, scroll
2  back up, Martha, please.
3  Q.  This up here is a follow-up that --
4  Ms. Coello's e-mail following up on your
5  e-mail, correct?
6  A.  Yeah.
7  Q.  Do you recall this specifically?
8  A.  I'll say the same thing.  I believe she
9  sent it.  So I must be aware of it.  I don't
10  recall it.
11  Q.  But you see that you're cc'd there, so
12  you believe you received this; is that fair?
13  A.  Yes, that's fair.
14  Q.  She says here, We have been asked to
15  severely limit the folks we have coming in for
16  the remainder of the week.  Unless you are
17  specifically contacted by me, Lisa or Dan or
18  any other member of the senior leadership team,
19  do not come in to work tomorrow or going
20  forward.
21      Correct?
22  A.  That's correct.
23  Q.  She says there, We have been asked to
24  severely limit the folks we have coming in for

Page 50

1  the remainder of the week. And just previously
2  you were talking about how you were trying to
3  do this staffing reduction efficiently. I was
4  asking you about how that -- you know, those
5  communications with Alecto, and you couldn't
6  recall specifically.
7       Does this refresh your recollection
8  whether anybody from Alecto was communicating
9  with you and what is referred here as the
10 senior leadership team about carrying out the
11 staffing reductions?
12   A.  Actually, it doesn't refresh my memory.
13 I know that I was part of the decision. I was
14 making -- taking action. Jennifer wouldn't
15 make things up, I suspect. So she may have put
16 that in there. But I don't recall anyone
17 saying you have to cut people out now. If it
18 was, it was me supporting that or saying it
19 myself. But she does say, we have been. But I
20 don't recall anyone from Alecto telling us
21 that.
22       Was it part of a conversation when we
23 were on the phone? Yeah. I'm sure we were.
24 But I don't recall anything differently than

Page 51

1  what I've told you.
2       MR. POMPONIO:  Martha, could you pull
3    up Defendants' 25373?
4       THE WITNESS:  That's the other one we
5    were looking at before.
6       THE COURT REPORTER:  That was
7    Number 2, Bren.
8       MR. POMPONIO:  This is a duplicate of
9    Number 2?  Sorry for the confusion.
10   Q.  If you could, scroll down to the
11 bottom. Right here at the end of this -- this
12 is an e-mail to Mike Sarrao. And you say you
13 have a meeting tomorrow at 9:00 a.m., and you
14 know that's early for California time, and you
15 offer 12:30. Basically, what I understand you
16 to be doing here -- and you tell me if I'm
17 wrong about this -- is that you want some
18 direction from Mr. Sarrao. And you say, if you
19 can't talk -- and you want to talk on the
20 phone, and if you can't, simply let me know
21 what positions you want us to have and I will
22 make sure the rest are directed not to come in.
23       Is that --
24   A.  Yeah. I'm not reading it the same way

Page 52

1  you are I suspect. I'm thinking who -- I don't
2  know all the positions they need to have to
3  wind down. If I want to eliminate the director
4  of facilities, I want to know if they need that
5  person there.
6       But I understand what you're saying. I
7  wanted some input as to what they would have to
8  do after we're gone, who they have to have in
9  the building. But I understand -- I do say,
10 make sure the rest are directed not to come in.
11 But that's my way of saying we're -- I'm
12 getting input from you, but not necessarily a
13 decision. But I'll take it for what it's
14 worth.
15       I remember medical records -- we had to
16 keep medical records open and stuff like that.
17 Who they needed to have is what I believe I was
18 asking. It certainly doesn't come across that
19 way.
20   Q.  Do you recall during this time, when
21 you were trying to reduce the staffing, about
22 any direction to the employees to take their
23 PTO time?
24   A.  I'm sure I did say that they could do

Page 53

1  that, yes.
2    Q.  And when you said -- when you say you
3  told them that -- or you're sure that you told
4  them they could do that, was there any request
5  made of the employees to use up their -- to not
6  come in to work and use up their PTO?
7    A.  It's interesting how you phrased it. I
8  probably said, why don't you use up PTO so you
9  can get a paycheck. It wasn't, use it up.
10       I'll give you an example here, or at
11 every other hospital I've been at. We talked
12 about flexing. There are some paid positions
13 that cannot flex. They're salaried positions.
14 They get paid. Well, I instruct my managers to
15 take a day off. We're telling other folks to
16 take off because of census. So I'm asking you
17 to, and you can use PTO. So I always --
18       It's curious how you said it. But it
19 wasn't to use it up. It was, hey, use PTO so
20 you can get a paycheck. But either way, it's
21 the same result.
22    Q.  I wasn't intending to lace that with
23 any judgment or anything like that. I just
24 wanted to know two things about this. One, did

Page 54

1  you tell people that they should use their PTO
2  in this time period? And we've answered that.
3      And two, was there any communications
4  with the managers from Alecto about suggesting
5  that people use their PTO in this context?
6    A. I can't recall any of that. But I know
7  I probably said that. Not that they should or
8  had to. But certainly said -- we're calling
9  you off, use your PTO.
10      I know you're not making a big deal of
11 it. I don't want to make a big deal of it.
12 It's word choice at best, or semantics. Yes,
13 I'm sure I did say that. I don't recall anyone
14 from Alecto saying, hey, get all of these
15 people to use up all of their PTO. I guess
16 that would be a benefit. I don't know if it
17 would or if it would not. They have to pay it
18 out at some point.
19      I don't recall ever having anybody from
20 Alecto telling me that. They could have, but I
21 don't recall it. And I'm sure I did suggest it
22 to people.
23      MR. POMPONIO: Martha, could you
24   scroll up to the top again, please, on

Page 55

1  Exhibit 2?
2    Q. Well, you've answered the question.
3  I'm not going to belabor that.
4      MR. POMPONIO: Martha, could you pull
5   up Defendants' 017440? This will be
6   Exhibit Number 3 or 4?
7      THE COURT REPORTER: This will be
8   four.
9         (Exhibit 4 was marked.)
10   Q. This is another e-mail chain or
11 correspondence back and forth between -- we're
12 going to start here at the bottom where Martha
13 has it cued up. This is from you to Himanshu
14 Handa and Jeremy.
15   A. Okay.
16   Q. So that's Redin and Handa, correct?
17   A. Himanshu Handa, yeah.
18   Q. All right. Do you want to --
19   A. Give me a second to read it.
20   Q. Let me know when you're finished.
21         (Witness reviews document.)
22   A. Okay.
23   Q. Now, I recognize that this was a
24 difficult period for you and for others. I

Page 56

1  don't try to minimize that. But is it fair to
2  say that you're expressing some frustration
3  here to the Alecto folks about some decisions
4  that were made regarding the wind-down of OVMC?
5    A. It's fair enough to say. I'd like to
6  use other words. But, yeah, I'll say
7  frustration.
8    Q. Would those other words be less
9  diplomatic?
10   A. Yeah. Maybe perhaps so.
11   Q. Okay.
12   A. Was there a response to this? Because
13 I was frustrated.
14      MR. POMPONIO: Scroll up --
15   A. There we go. Okay. So that tells me
16 that, yes, I was making some of those decisions
17 or all of those decisions, and that showed
18 where I was frustrated, and I was not -- or
19 perceived to not. I got -- yes. I got
20 extremely angry if somebody was making a
21 decision or saying something that I was not
22 involved with.
23      It was a horrible time. And the
24 further away -- I've said this a thousand

Page 57

1  times. The further you're away from a patient,
2  the more the decision is on finance than
3  anything else. That's why I insisted on being
4  part of the decisions. I was even at the
5  bedside, or close to it. I was getting
6  comments -- they were wrong. I was getting
7  comments that we're not allowed to order this
8  and that. And that wasn't how I operate. I
9  wanted to be able to make those decisions.
10 This is me reinforcing that. Yeah. I was
11 extremely upset. That was just August 23rd, I
12 see.
13   Q. Right.
14   A. Himanshu and I had a love-hate
15 relationship. He's a good guy. Jeremy is a
16 fine gentleman. Jeremy Redin. It looks like
17 Redden (phonetic) but he pronounces it Redin.
18      I remember that day. But I was getting
19 hot just reading it again.
20      MR. POMPONIO: Can we pull up,
21   Martha, Defendants' 5150 through 5152,
22   please?
23         (Exhibit 5 was marked.)
24   Q. I'm showing you what's been marked as

Page 58

1  Deposition Exhibit Number 5, Mr. Dunmyer. Can
2  you take a second and sort of read through
3  this? We didn't receive this e-mail or send
4  it, I don't think. So if you don't know
5  anything about it, that's fine.
6      A. Well, I don't. I'm not even sure who
7  Brandon is. I assume he's at West Liberty, but
8  also does E-squad or something. I don't know
9  anything about this. I do assume -- he said,
10 hey, transfer everybody to East Ohio if you
11 can. But I don't recall -- or never -- I don't
12 believe I saw that.
13     Q. Okay. Did you read through it all?
14     A. Well, I did.
15     Q. Do you know if it's accurate as to what
16 was going on at this time, around
17 September 3rd, 2019?
18     A. I'm going to answer it this way. It
19 says, Acute services after September 3rd,
20 11:59. I guess that is true. I don't know if
21 that's factual. You probably know that. I
22 probably should know that, but I don't recall
23 the date. I do recall going to the ED on some
24 evening -- the evening that we ended ED

Page 59

1  services and spent time with a number of
2  employees and all the E-squads. What date that
3  was, I have no idea. There was no commitment
4  from WVU to take the psych patients, or take
5  over the psych services. We tried to work on
6  that. And as of September 3rd, it wasn't
7  completed.
8         I do remember working with David Hess
9  at Reynolds. And I think they ultimately took
10 our -- a lot of our staff and hopefully the
11 patients. I hope -- mental health is such a
12 big issue anyway.
13        Employees will not be laid off at this
14 time, but most will have their hours reduced to
15 zero. I suspect that's right if we're saying
16 don't come in to work. But I don't know about
17 the low-earnings slips, and they can't be laid
18 off during the warn notice. I don't know if
19 that's true or not. That didn't come from me.
20 Again, I don't know who Brandon is.
21        During this period, PTO can be used.
22 There may be a required resignation to get the
23 lump sum. I guess it did. But even at the
24 end -- I think it was on the end. And then a

Page 60

1  small number of staff will remain. That's
2  true. Yeah, we had a small number of staff. I
3  think a lot of it is true. I can't tell you
4  any of it is true. But I'm sure a lot of it
5  is.
6      Q. Okay.
7         MR. POMPONIO: I'd like to take a
8  short break here and go through my notes.
9      Q. Well, actually, I do have one short
10 line of questions I want to go over real quick.
11 You mentioned that you have those two cell
12 phones. Did you have both of those phones in
13 2019?
14     A. Yeah, I guess I did.
15     Q. Did you use either of those phones or
16 both at any time to send or receive text
17 messages with anybody at Alecto?
18     A. Oh, I'm sure I did. I can look and see
19 what I have.
20     Q. Okay. I appreciate that.
21     A. I won't destroy anything. I'll
22 certainly share with Mike.
23        MR. POMPONIO: Oh, great. So if we
24 could go off the record for a couple of

Page 61

1  minutes while I confer, we should be done.
2            (Break in proceedings.)
3  BY MR. POMPONIO:
4      Q. Mr. Dunmyer, we were talking earlier
5  about the WARN Act. I believe you testified
6  that you consulted with your lawyers regarding
7  the WARN Act requirements. Do you recall that
8  testimony? Am I saying that correctly?
9      A. Actually, I didn't consult them about
10 the WARN Act. The WARN Act was a discussion.
11 I went with it. I didn't ask them to explain
12 it. But, yeah, we talked about that at one
13 time.
14     Q. Okay. And who exactly are the -- is
15 your lawyer or lawyers that you were talking to
16 about that?
17     A. I'll answer the question who they are.
18 I don't know which one was on, or both. But
19 you know the names. Mike Sarrao and Mark
20 Bradshaw are the two attorneys that I used for
21 everything.
22     Q. Okay. All right. Do you have any
23 affiliation, financial or otherwise, with
24 Alecto currently?

Page 62

1  A. No, sir, not at all.
2  Q. Do you have any affiliation with -- at
3  your hospital or hospitals that you've worked
4  at since 2019 with an outfit called MPT
5  Financing?
6  A. No, sir.
7  Q. Are any of the players -- to your
8  knowledge, any of the players that were
9  involved at OVMC, are they involved in any of
10 your other current hospitals in the positions
11 that you held?
12 A. No. This is the only hospital. When I
13 left, I came here. None of them moved to
14 Florida. Everybody else seems to be moving to
15 Florida, but no one up there moved. So, no,
16 I'm not with anyone -- affiliated with anyone.
17    MR. POMPONIO: Well, that's all the
18 questions I have.
19 A. Can I ask you --
20    MR. GARRISON: You can't ask any
21 questions, Dan. You can ask me later,
22 but -- sorry to be blunt.
23    But we don't have any questions. And
24 we'll read and sign.

Page 63

1    MR. POMPONIO: For the record, I'd be
2  happy to answer your questions.
3    MR. GARRISON: I'm sure you would.
4  (Deposition concluded at 2:50 p.m.)
5        * * * * *

Page 64

1    I, Martha Fourney, Certified Court
2  Reporter and Notary Public, do hereby certify
3  that the foregoing deposition of the
4  above-named witness, was duly taken by me in
5  machine shorthand, was recorded via Zoom, and
6  that the same were accurately written out in
7  full and reduced to computer transcription.
8    I further certify that I am neither
9  attorney or counsel for, nor related to or
10 employed by, any of the parties to the action
11 in which this deposition is taken, nor do I
12 have a financial interest in the action.

16 My commission expires May 27, 2027

       *Martha Fourney* (signature)
       _____
       Martha Fourney
19     Certified Court Reporter/Notary Public

Elite Court Reporting, LLC
DANIEL DUNMYER, 06/08/2022

**EXHIBIT 8**

Page 62

1   A.  No, sir, not at all.
2   Q.  Do you have any affiliation with -- at
3   your hospital or hospitals that you've worked
4   at since 2019 with an outfit called MPT
5   Financing?
6   A.  No, sir.
7   Q.  Are any of the players -- to your
8   knowledge, any of the players that were
9   involved at OVMC, are they involved in any of
10  your other current hospitals in the positions
11  that you held?
12  A.  No.  This is the only hospital.  When I
13  left, I came here.  None of them moved to
14  Florida.  Everybody else seems to be moving to
15  Florida, but no one up there moved.  So, no,
16  I'm not with anyone -- affiliated with anyone.
17       MR. POMPONIO:  Well, that's all the
18  questions I have.
19  A.  Can I ask you --
20       MR. GARRISON:  You can't ask any
21  questions, Dan.  You can ask me later,
22  but -- sorry to be blunt.
23       But we don't have any questions.  And
24  we'll read and sign.

Page 63

1       MR. POMPONIO:  For the record, I'd be
2   happy to answer your questions.
3       MR. GARRISON:  I'm sure you would.
4   (Deposition concluded at 2:50 p.m.)
5            * * * * *

Page 64

1   I, Martha Fourney, Certified Court
2   Reporter and Notary Public, do hereby certify
3   that the foregoing deposition of the
4   above named witness, was duly taken by me in
5   machine shorthand, was recorded via Zoom, and
6   that the same were accurately written out in
7   full and reduced to computer transcription.
8        I further certify that I am neither
9   attorney or counsel for, nor related to or
10  employed by, any of the parties to the action
11  in which this deposition is taken, nor do I
12  have a financial interest in the action.

My commission expires May 27, 2027

*Martha Fourney*
Martha Fourney
Certified Court Reporter/Notary Public

*Daniel C Dunmyer*
*July 4, 2022*
*two corrections noted*

Elite Court Reporting, LLC
DANIEL DUNMYER, 06/08/2022