# KEITH REED, ET AL vs.
# ALECTO HEALTHCARE SERVICES, LLC, ET AL

## ROGER KRISSMAN
## 05/26/2022



**EXHIBIT 9**

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 2 of 15   PageID #: 9811

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ROGER KRISSMAN
05/26/2022

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
* * * * * * * * * * * * * * * * * * * * * * * * * *
KEITH REED, LISA DOLENCE,
ELIZABETH SCHENKEL, EMILY WINES,
MARK GARAN and AUGUST ULLUM,
individually and on behalf of
others similarly situated,
    Plaintiffs,
v.               Civil Action No.: 5:19-cv-00263
ALECTO HEALTHCARE SERVICES,
LLC, and ALECTO HEALTHCARE
SERVICES WHEELING, LLC d/b/a
OHIO VALLEY MEDICAL GROUP and
d/b/a OVMC PHYSICIANS,
    Defendants.
* * * * * * * * * * * * * * * * * * * * * * * * * *

    The remote deposition of ROGER KRISSMAN was taken by the Plaintiffs in the above-entitled action before Cheryl G. Munson, a Certified Court Reporter and Notary Public within and for the State of West Virginia, via Zoom videoconferencing, at 11:30 AM on the 26th day of May, 2022, pursuant to notice and to the Federal Rules of Civil Procedure.

CHERYL G. MUNSON, CCR
REALTIME REPORTERS
713 Lee Street
Charleston, WV 25301
(304) 344-8463
www.realtimereporters.net

Page 2

APPEARANCES:
(All participants appearing via Zoom)
APPEARING FOR THE PLAINTIFFS:
    Timothy F. Cogan, Esquire
    CASSIDY, COGAN, SHAPELL & VOEGELIN, L.C.
    1413 Eoff Street
    Wheeling, WV 26003-3582
APPEARING FOR THE DEFENDANTS:
    Michael S. Garrison, Esquire
    SPILMAN THOMAS & BATTLE, PLLC
    48 Donley Street, Suite 800
    Morgantown, WV 26501
    Chesea E. Thompson, Esquire
    SPILMAN THOMAS & BATTLE, PLLC
    300 Kanawha Boulevard, East
    Charleston, WV 25301
ALSO PRESENT:
    CHRIS LEIGH
    Certified Legal Video Specialist
    Bren J. Pomponio, Esquire
    MOUNTAIN STATE JUSTICE
    1217 Quarrier Street
    Charleston, WV 25301
    Maureen Davidson-Welling, Esquire
    STEMBER COHN & DAVIDSON-WELLING, PLLC
    The Hartley Rose Building
    425 First Avenue, 7th Floor
    Pittsburgh, PA 15219

Page 3

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| ROGER KRISSMAN | |
|   By Mr. Cogan........................................ | 6 |
|   By Mr. Garrison.................................... | 52 |
| Court Reporter's Certificate....................... | 55 |

Page 4

E X H I B I T S

| | ID |
|---|---|
| KRISSMAN EXHIBIT 1 | |
|   8-page document beginning | |
|   Transition/Restructuring Plan for | |
|   Alecto Healthcare Systems | 14 |

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 3 of 15 PageID #: 9812

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ROGER KRISSMAN
05/26/2022

Page 5

1       (May 26, 2022)
2       THE VIDEOGRAPHER:  We are now on the
3   record.  This is a videotaped deposition of Roger
4   Krissman, taken by the Plaintiffs in the matter of Keith
5   Reed versus Alecto Healthcare Services, LLC, et al.,
6   being Civil Action No. 519-cv-00263-JPB in the U.S.
7   District Court for the Northern District of West
8   Virginia, held via Zoom on this 26th day of May, 2022.
9       My name is Chris Leigh, and I'm the
10  certified legal video specialist.  The court reporter is
11  Cheryl Munson.  We are now on the record.  The time is
12  approximately 11:31 AM.
13      Would all counsel please introduce
14  themselves and whom they were represent, and also
15  confirm that they have no objections to the witness
16  being sworn in remotely today?
17      MR. COGAN:  This is Timothy Cogan for the
18  Plaintiffs.  No objection.
19      MR. GARRISON:  Mike Garrison and Chelsea
20  Thompson with Spilman, Thomas & Battle for the
21  Defendants.  No objection.
22      MR. COGAN:  Court Reporter, could you
23  swear the witness, please?
24      (Witness sworn.)

Page 6

1       R O G E R   K R I S S M A N
2   having been duly sworn to tell the truth, testified as
3   follows:
4       EXAMINATION
5   BY MR. COGAN:
6   Q.  Mr. Krissman, my name is Timothy Cogan.  You
7   can call me Mr. Cogan; you can call me Tim.  But I'm
8   here to take your deposition.
9       What is your address, Mr. Krissman?
10  A.  1541 Spyglass Drive, Upland, California.
11  Q.  And what about your cell phone?
12  A.  714-931-3565.
13  Q.  And your home phone?
14  A.  909-982-8805.
15  Q.  Now you're aware, I assume, that you cannot
16  send or receive electronic communications such as texts
17  or emails while testifying?
18  A.  Correct.
19  Q.  Okay.  And you're aware there are penalties
20  for testifying falsely at a deposition?
21  A.  I'm aware of that, yes.
22  Q.  Okay.  What did you review for your
23  deposition?
24  A.  I met with my attorneys.

Page 7

1   Q.  Okay.  What documents did you review?
2   A.  None.
3   Q.  Did you bring any notes or other documents
4   with you to the deposition?
5   A.  I have not.
6   Q.  Okay.  I'm going to use today, Alecto or AHS
7   as Alecto Healthcare Services of Irvine, I assume -- I
8   understand, Glendale, and Alecto Wheeling as Alecto
9   Healthcare Services Wheeling, a.k.a. OVMC.  You
10  understand those descriptions?
11  A.  I do.
12  Q.  Okay.  Taking any medications that affect your
13  ability to testify today?
14  A.  No.
15  Q.  And you agree to tell me if you don't
16  understand any of my questions?
17  A.  I agree.
18  Q.  Okay.  If you want to take a break, just let
19  me know; just please answer any pending questions prior
20  to taking that break.  Okay?
21  A.  Okay.
22  Q.  What's your education and training that
23  relates to your job at Alecto?
24  A.  Education, have a master's degree.  I have,

Page 8

1   let's see, at the time, 40-plus years of experience in
2   the healthcare industry.  Started with HCA, Hospital
3   Corporation of America, in 1977.  Worked for Friendly
4   Hills Healthcare Network.  Started that job in about
5   1988.  Then I went to work for Prime Healthcare
6   Services, 2002.  Left Prime Healthcare in 2012, and then
7   started with Alecto, I believe it was later on in 2012,
8   and then to my retirement in 2019.
9   Q.  What were your -- you're retired now, sir;
10  correct?
11  A.  I am retired, yes.
12  Q.  What were your titles with Alecto and its
13  affiliates?
14  A.  (Audio glitch) officer for Alecto Healthcare
15  Services.
16  Q.  I'm sorry; you froze for a moment.
17  A.  I was the chief financial officer for Alecto
18  Healthcare Services.
19  Q.  Did you have any titles with the affiliates?
20  A.  No.
21  Q.  And what were your duties as CFO of Alecto
22  Healthcare Services?
23  A.  My job was to handle the financials for Health
24  -- for Alecto Healthcare Services, LLC.  I would also

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 4 of 15   PageID #: 9813

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL
ROGER KRISSMAN
05/26/2022

Page 9

1  coordinate the audits with our outside audit firms, and
2  file the required taxes, audits. I would coordinate
3  audits for the facilities through the local management
4  teams, things of that nature. You know, so go out and
5  find -- try to find financing, work with Medical
6  Properties Trust on financing the, the facilities, or if
7  we found a facility that we wanted to acquire, work with
8  the local team there to put together projections, and
9  then -- and then present the package to Medical
10 Properties Trust.
11     Q.  Did Medical Properties Trust finance other
12 facilities than OVMC and East Ohio Regional Hospital?
13     A.  They did.
14     Q.  Okay. Which ones, do you recall?
15     A.  They financed Olympic -- Olympia Medical
16 Center in Los Angeles. They financed Fairmont Regional
17 Hospital in West Virginia. And they financed Wilson N.
18 Jones in Sherman, Texas.
19     Q.  Would you agree with the statement that the
20 Alecto senior leadership team consisted of Mr. Sarrao,
21 you, and Lex Reddy?
22     A.  I would agree with that, yes.
23     Q.  How'd you happen to leave Prime and join
24 Alecto?

Page 10

1      A.  Could you restate that, please?
2      Q.  Well, it was -- what was the gap of time
3  between when you left Prime and when you joined Alecto?
4      A.  It was approximately seven months.
5      Q.  And what did you do in the interim?
6      A.  I was -- at that time, I -- I tried to retire,
7  is what I tried to do, but didn't work out that way.
8      Q.  At one time, you were on the board of managers
9  for Alecto; correct?
10     A.  For Alecto Healthcare Services, yes.
11     Q.  And when did you retire -- when did you resign
12 from that?
13     A.  July, 2019.
14     Q.  Do you remember a date in July?
15     A.  I don't recall if it was my last day, which
16 would have been July 31st. All I know, it was in July,
17 2019.
18     Q.  Do know why you weren't replaced on the board
19 of managers?
20     A.  I have no knowledge to that.
21     Q.  Okay. Would you agree that after your
22 resignation, your family trust kept an ownership
23 interest in Alecto?
24     A.  I am.

Page 11

1      Q.  We've been advised that it was ten percent
2  before; was it any change after that?
3      A.  No change.
4      Q.  Okay. So it's still ten percent?
5      A.  Yes.
6      Q.  Could you give me a sense of how much you have
7  learned -- or how much you have earned from Alecto and
8  its affiliates? For example, in 2019, could you give me
9  any sense of your salary, wages, bonus?
10     A.  In 2019, approximately $300,000.
11     Q.  And you didn't have any salary or wages or
12 anything like that after that from them?
13     A.  Correct.
14     Q.  What about dividends, interest, return of
15 capital? Did you get any earnings from, any of those
16 earnings from Alecto or its affiliates?
17     A.  On the Alecto Healthcare Services K-1, I
18 receive what we call the phantom income of minor
19 interest amount, less than $30,000 a year. No cash, but
20 I get the benefit of, great -- great benefit of paying
21 taxes on that money anyways.
22     Q.  And what do you mean by "phantom income"?
23     A.  It's, it's recorded as interest income, but I
24 receive no dollars. So I have to report it on my taxes

Page 12

1  -- on my taxes, and pay taxes on that.
2      Q.  And what is the point of that?
3      A.  That's part of the -- I'm not working with the
4  K-1's any longer, so I don't know what the -- what the,
5  you know, the current CFO and the tax advisers have done
6  with the K-1's. All I know is, I get a K-1 and they
7  have, it reflects about, less than $30,000 in interest.
8      Q.  When you were working for Alecto, what offices
9  would you work out of?
10     A.  At the time, I worked from -- from home, and
11 then also from the office in Irvine, California.
12     Q.  Have you been deposed before?
13     A.  I have.
14     Q.  How many times?
15     A.  In my career?
16     Q.  Sure.
17     A.  Probably more than seven times.
18     Q.  And how many of those were involved or related
19 to Alecto?
20     A.  I don't recall.
21     Q.  Why did you retire when you did?
22     A.  I made the decision to retire because I was
23 approaching my 70th birthday, and I just decided that it
24 was time for me to, to move on.

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 5 of 15   PageID #: 9814

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ROGER KRISSMAN
05/26/2022

Page 13

1  Q. Did it relate in any way to the closure of
2  OVMC?
3  A. I wasn't there when that decision was made.
4  Q. One of the documents stated that Alecto was
5  entitled to management fees in the amount of four
6  percent of the collective net revenue of OVMC. Can you
7  give me a sense of how much money OVMC paid Alecto in
8  management fees?
9  A. Yes. For the time that I was there, OVMC paid
10 zero in management fees.
11  Q. So there was no remuneration paid by OV to
12 Alecto when you were there?
13  A. I wouldn't -- I wouldn't characterize that as
14 being correct.
15  Q. Okay.
16  A. You asked me about management fees. They,
17 they did not pay management fees.
18  Q. Okay. What other remuneration did they pay?
19  A. Well, as example, we have intercompany
20 accounts where I would work with the insurance carriers
21 and make sure that all the properties were properly
22 insured, et cetera. And to the extent that we had a
23 corporate, if you will, premium that covered all the
24 hospitals, OVMC would need to pay at least a portion,

Page 14

1  their portion of that insurance. Now, whether they did
2  that on a consistent basis, I can tell you that they did
3  not. But at the same time, there were occasions where
4  dollars would flow to OVMC, or dollars would be taken
5  out of their -- out of their allotment to pay for those
6  overhead costs.
7        MR. COGAN: Do you have this? Yeah.
8        Court Reporter, could you share the
9  screen with the document entitled Transition
10 Restructuring Plan?
11       THE COURT REPORTER: Will the videographer
12 do that, please?
13       THE VIDEOGRAPHER: Okay. Can we go off
14 the record for just a moment?
15       MR. COGAN: Yes, we can, but it's, let me
16 say that it's on my screen.
17       THE VIDEOGRAPHER: Oh, okay.
18       (A brief discussion was had off the
19       record.)
20       THE VIDEOGRAPHER: The time is 11:45 AM.
21 We are back on the record.
22 BY MR. COGAN:
23  Q. Okay. Can you identify this document, Mr.
24 Krissman?

Page 15

1  A. I can -- I can see that it's a -- by the
2  header, it's a restructuring plan for Alecto Healthcare
3  Services, which involves Ohio Valley Medical Center and
4  East Ohio Regional Hospital. But I don't recall it,
5  until I've just now seen it. But that's -- that's what
6  it's labeled as.
7  Q. Okay. In it, it describes certain duties for
8  you and Sarrao -- and I apologize if I'm mispronouncing
9  his name. Do you see those under "owner"?
10  A. Say again, please.
11  Q. Okay. In the spreadsheet that says, action
12 plan, then owner, then deadline, under "owner", there
13 are certain items. The top item is, communicate action
14 plan to local management team, owner, Krissman/Sarrao,
15 deadline 3/25/19. Do you see that?
16  A. I do, yes.
17  Q. Did you -- as you look at these -- and you can
18 take whatever time you need to look at them -- did you
19 perform these functions that are listed here?
20       MR. GARRISON: Hey, Tim, this is Mike.
21 Is there any way you could make the font bigger? Or...
22 I know I'm having trouble reading.
23       MR. COGAN: Okay.
24       MR. GARRISON: Yeah, I can see it, but

Page 16

1  just make it a little bigger for us. Thank you.
2        Roger, are you able to read that?
3        THE WITNESS: I am, and -- and I don't
4  recall if I did every one of those, but I do remember
5  doing some of them.
6  BY MR. COGAN:
7  Q. Okay. Which of those do you recall doing?
8  A. In particular, communicating action plan to
9  MPT. I remember doing that. I remember working with
10 Mike Lane at H2C.
11  Q. And let me interrupt you for a second. What
12 is H2C?
13  A. It's a -- it's a company that, it's a broker
14 that goes out and tries to find interested parties in
15 the healthcare industry, to see if they want to either
16 purchase a property and/or, you know, maybe affiliate
17 with a, with a company as far as one of their properties
18 in their portfolio.
19  Q. And that was with Mr. Lane?
20  A. Yes.
21  Q. And when did you do that?
22  A. I don't recall the exact date, but probably --
23 I just don't recall the exact date.
24  Q. Okay. Most of the items here in the first

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 6 of 15 PageID #: 9815

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL
ROGER KRISSMAN
05/26/2022

Page 17

1 range of things are in March of 2019. Do you think
2 that's when it occurred?
3  A. Once again, I don't -- I don't recall.
4  Q. Okay. So in these first range of things, you
5 don't recall whether you did any of them after, let's
6 say, March 29th of 2019?
7  A. No, I, I don't.
8  Q. Okay. It says, secure funding for transition
9 restructuring plan, 3/25/19. Did you do that?
10  A. We did not. We, we attempted to, to talk to
11 MPT about a restructure program. I know that there was
12 -- there was some movement from MPT on, on the
13 lease/sale (audio glitch) for Ohio.
14  Q. So, I'm sorry. You froze up for a moment.
15  A. Oh, I'm sorry.
16  Q. Could you just repeat what you said?
17  A. Sure. We -- I know that we -- that we talked
18 to MPT, and that there was some movement on the
19 sale/lease-back arrangement that we had with MPT, and
20 what we wanted to do.
21  Q. What was that movement?
22  A. Pardon me. Say it again.
23  Q. What was the movement from MPT?
24  A. Well, one of the things MPT was able to do for

Page 18

1 us, was that they deferred the rent, and so they -- so
2 they were able to do that. I remember, distinctly
3 remember asking them about the $20 million capital
4 improvement loan, or funds that were available for
5 capital improvements to Ohio Valley and, or should I
6 say, Alecto Healthcare Services Wheeling. But -- and we
7 asked if we could -- if they could move that into a
8 working capital bucket for us, for our availability, and
9 the answer was no, they could not do that.
10  Q. And when did they tell you that, the best you
11 recall?
12  A. I want to say -- well, we -- we approached
13 them several times about it, so it wasn't one particular
14 date. But we, we had broached that subject with them on
15 several occasions, and each time it was no.
16  Q. Do you recall -- well, I want to ask about
17 your involvement in discussions about closing OVMC.
18 Please tell me about the first one of those that you can
19 recall.
20  A. Well, I don't recall dates or specific
21 timeframes, but I do know that -- that Lex Reddy, Mike
22 Sarrao, and myself had a discussion about it, and then
23 we also talked with the, with Dan Dunmyer at the local
24 level and had a conversation about that, as well.

Page 19

1 But at that point in time, as I recall, we
2 were still going down the road of trying to see if we
3 could find a partner, or if there was somebody else that
4 would be interested in purchasing the property.
5  Q. You can't date for me at all this discussion
6 between you, Mr. Reddy, and Mr. Sarrao about closing?
7  A. Pardon me? Say again.
8  Q. And you can't date at all for me, the
9 discussion between you, Mr. Reddy, and Mr. Sarrao about
10 closing the facility?
11  A. I cannot give you a date. All I know is that
12 we had been talking about that for, for days and weeks
13 before I left.
14  Q. 33066.
15    Can you see, Mr. Krissman, a document, starts
16 out, Mike Sarrao, George Carlis, Emmett E. McLean, from
17 Lou Cohen, 7/30/2019? Can you see that?
18  A. I do.
19  Q. Okay. If you go down to the next page where
20 it says, "Emmett & George". This seems to be a, a email
21 thread of 7/30/19, and it states that, on the second
22 page, "we are proceeding under the assumption that we
23 will need to close both OVMC and EO" -- "EORH in short
24 order." You see that?

Page 20

1  A. I do.
2  Q. That refreshes your recollection about when
3 the discussions occurred?
4  A. Well, they obviously were occurring, but then
5 again, I wasn't there for the final decision. I don't
6 recall being on this call, because I might point out in
7 this email as well, this, Lex -- and the call is going
8 to be with "Lex, Jeremy Redin" -- my replacement -- "and
9 myself", so I was not included in the call.
10    I was gone the next day, and I was not going
11 to be involved in any decisions, one way or the other,
12 and have somebody else live with a decision that I made.
13 I would be no -- no longer be there. So what they
14 decided to do on that call, or after that call, I'm not
15 aware.
16  Q. Okay. So they may have made the decision
17 prior to the time before you left, but you just weren't
18 involved in it; the decision to close the facility?
19    MR. GARRISON: I'm going to -- I'm going
20 to object to the form of the question, but go ahead.
21  A. I have no idea.
22  Q. Okay. Would you agree that in the spring of
23 2019, Alecto was articulating plans to close OV if it
24 couldn't sell it?

Page 21

1  A. I wouldn't -- I would say that we were -- we
2 were looking at alternatives. Our first goal was to, to
3 sell the facility. That was -- that was our intent, and
4 that was mainly our focus. And so, do you set up
5 contingency plans? Of course you do. But at the same
6 time, our number one priority was to try to, to sell
7 and/or partner with somebody.
8  Q. Well, certainly, by July 29th, the assumption
9 was that they were going to close OVMC in short order;
10 correct?
11      MR. GARRISON: I'm going to object to the
12 form of the question.
13  A. Once again, I wasn't -- I wasn't there for
14 that decision, whether they were going to close or not
15 close.
16  Q. You don't know.
17  A. I don't know.
18  Q. Do you have a position or contention on
19 Defendants' compliance with WARN, regarding a closure of
20 the building?
21      MR. GARRISON: Objection. Calls for
22 speculation.
23      THE WITNESS: Could you restate that?
24  Q. Sure. Do you have a position or a contention

Page 22

1 with Defendants' compliance with WARN, regarding the
2 closure of OVMC?
3  A. I know that -- are you asking -- I'm sorry.
4 I'm kind of missing your question here. I'm not sure
5 what you mean.
6  Q. Do you believe that Defendants complied with
7 the WARN Act regarding its closure of OVMC?
8  A. I have no idea.
9  Q. Have you ever expressed the opinion or
10 contention that the Defendants did not comply with, with
11 WARN regarding the closure of OVMC?
12  A. I have no thought one way or the other on
13 that. I have no idea.
14  Q. Okay. Do you recall when you were there, any
15 discussions about WARN compliance?
16  A. Yes, I recall that there was a discussion
17 about WARN.
18  Q. All right. When did this occur?
19  A. It'd have to be around -- it would be a guess
20 on my -- on my behalf, so I wouldn't know the exact
21 date.
22  Q. Well, as best you can date it today, it was
23 prior to July 30th of 2019; correct?
24  A. It would be, yes, prior to July 30th, 2019.

Page 23

1  Q. All right. Who was involved in the
2 conversation?
3  A. I can't say if it was a conversation, or if
4 there was an email or whatever. I just recall that
5 there was -- that was something that had to be handled,
6 and I know that Mike Sarrao and I usually handled those
7 things.
8  Q. Okay. Who else was involved in the discussion
9 or email?
10  A. I don't recall.
11  Q. Well, tell me what you do recall, please.
12  A. I just, I just know that as part of the, part
13 of our backup plan, that there would be a discussion
14 about all the regulatory items that we would have to
15 address. And it would not only just center on WARN; we
16 would -- we would also say, okay, what do we have to do
17 with, with MPT?
18      So if you're -- if you're setting up your
19 contingency plan, you want to go through and make sure
20 that, you know, that you're, you know -- you know,
21 hitting all of the parties, at least, and doing the
22 notifications. But beyond that, I don't recall a lot
23 about, about WARN or, you know, anything in particular.
24 It was just part of a process.

Page 24

1  Q. Are you saying that it would have been
2 discussed, or you recall that it was discussed?
3  A. I'm saying it -- it, it was probably, and
4 would have been discussed, but not, but I don't recall
5 with specific on that, on that item. Once again, the,
6 the decision to close and to, you know, proceed, was,
7 was done after I left. So I can't testify one way or
8 the other on that.
9  Q. Well, certainly, prior to your leaving, there
10 was an assumption that it was going to close. Correct?
11      MR. GARRISON: I'm going to object to the
12 form of the question, and it's been asked and answered,
13 you know.
14  Q. Okay. You can answer, sir.
15  A. Once again, I wasn't there when that decision
16 was made, so I have no knowledge about when they decided
17 to close.
18  Q. Well, I'm not -- that's not my question. My
19 question is, you've said several times that a decision
20 was made after you were -- after you left. My question
21 is whether there was some operating assumption prior to
22 your leaving that OV was going to close in short order?
23      MR. GARRISON: Same objection.
24  A. Once again, our goal was, we were focused on,

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 8 of 15   PageID #: 9817

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL
ROGER KRISSMAN
05/26/2022

Page 25

1  on sale, and either a joint venture or some other
2  arrangement to keep the facility open.
3      Q.  Had you had any experience with WARN notices?
4      A.  I don't recall, but, but once again, that's
5  not something that I would be involved in.  That would
6  be Mike Sarrao, so I know very little about WARN notice.
7      Q.  Are you aware of anything that happened
8  between the date of July 29th, when it was stated that
9  this was an assumption, and the date in August, August
10 7th, I believe, that the WARN notice were dated?
11 Anything happen to improve OVMC then?
12     A.  Not -- not to my knowledge, but once again, I
13 wasn't there, so I have no idea what they were -- what
14 the decision was and why they decided to do what they
15 did.
16     Q.  Do you have any knowledge about a policy of
17 flexing out employees in August and September at OVMC?
18     A.  No.  As a general rule, even before that, I
19 never got involved in the day-to-day staffing.  That's
20 the local people who would make decisions about, about
21 staffing and running their own operation.  So anything
22 that happened with, with staffing, either at, you know,
23 Alecto Healthcare Services Wheeling, or any of the other
24 hospitals, that, that's up to the local folks that run

Page 26

1  the hospitals.  My job was to, you know, to handle the,
2  if you will, the Alecto Healthcare Services corporate
3  things.
4      Q.  What is your basis for saying that the
5  decision to close OVMC was made after you -- after you
6  retired?
7      A.  Because I wasn't involved.
8      Q.  That's your entire basis?
9      A.  My entire basis is, I walked out the door
10 after 40-plus years of working in the healthcare
11 industry, and I was, I was looking forward to a new
12 chapter in my life.  And actually, the last, I would
13 say, 30 to 45 days, I was winding down and handing
14 things off to my -- to Jeremy Redin and other people on
15 projects that I had been working on and things like
16 that, so I was winding down.  I was not ramping up; I
17 was winding down.
18     Q.  Why did Defendants decide not to put Alecto
19 Wheeling into bankruptcy?
20     A.  I have -- I have no idea.
21     Q.  Any discussions about that?
22     A.  I'm sure there were, but probably -- but I
23 don't recall specifics.
24     Q.  You did -- someone prepared a budget, did they

Page 27

1  not, for bankruptcy?
2      A.  Possibly.  I don't recall it.
3      Q.  Do you have any sense of how many days' notice
4  was actually given of the closing -- of the closing of
5  OVMC?
6      A.  I have no idea.
7      Q.  The WARN notices, do you know where they were
8  mailed from?
9      A.  I do not.
10     Q.  Let me show you some answers to
11 interrogatories that refer to approaches that you have
12 indicated about potential partners or joint ventures
13 with, regarding OVMC.  There's a reference to ongoing
14 discussions with WVU.
15         First of all, do you recognize this document?
16     A.  If you're asking me if I remember it, no, but
17 you know, it's been two-and-a-half years or more since I
18 left.  So I, I don't recognize it, no.
19     Q.  Well, you talked about MB-- MPT, excuse me.
20 You and Mr. Sarrao had a phone call in June, 2019 with
21 Steve Hamner about additional money from MPT, or buying
22 OV.  Correct?
23     A.  We had discussions.  I don't know the exact
24 date, but we did have discussions with MPT.

Page 28

1      Q.  Okay.  Well, do you recall a time when Mr.
2  Hamner was emphatic in his rejection?
3      A.  Oh yes, I recall that.
4      Q.  Okay.  Tell me about that.
5      A.  Sure.  We -- we, I believe Mike Sarrao and
6  myself talked to Steve Hamner.  We discussed with him
7  the situation at OVMC.  We approached the subject of,
8  you know, getting additional funding, that there was
9  some leeway as far as moving the $20 million of capital
10 bucket or, you know, the funds that were earmarked for
11 capital into a working capital line.  And he was fairly
12 emphatic that no, that was not going to happen, that you
13 know, he had -- you know, MPT is a publicly traded
14 company, and he has to do what's best for his
15 stockholders, plus as a real estate investment trust, he
16 -- he has limits on what he was able to do.  But he was
17 -- he was fairly emphatic that that was not going to
18 happen.
19     Q.  Well, it's clear, is it not, after that
20 conversation with Mr. Hamner, that you had no chance of
21 getting additional funds or a purchase of OVMC from MPT?
22     A.  From that discussion, we knew that MPT was not
23 going to help us from a, from a funding standpoint.  But
24 also, they had other clients that they could put us in

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 9 of 15   PageID #: 9818

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL
ROGER KRISSMAN
05/26/2022

Page 29
1  contact with, and -- and use some of their contacts to
2  see if they could help us out.
3      Additionally, we were, you know, we were
4  looking at, at other means there. You know, I know that
5  there was discussions, or at least then, some of the
6  folks that would talk, went out to the governmental
7  agencies, if there were grants or other additional
8  funding available for us. So, but MPT was, was a closed
9  door from a financial standpoint.
10     Q.  And who were the leads that you got from MPT
11 about other places you could approach?
12     A.  Well, let's see. Well, in particular, Steward
13 was one of them, you know, that we could talk to. Plus,
14 because we had been in the industry, I know that we
15 approached my former employer, Prime Healthcare.
16     Q.  Okay.
17     A.  I know that there was discussions with
18 Wheeling Hospital, and I know Lex Reddy met with the
19 archdiocese to talk about partnering with, with Wheeling
20 Hospital. And then, and I believe that there was a
21 company in Steubenville that, that we were talking to,
22 but their name escapes me at the moment.
23     Q.  Well, that would be Trinity.
24     A.  Okay.

Page 30
1      Q.  Does that refresh your recollection?
2      A.  All I know, it was in Steubenville, and that
3  they -- there was -- I remember there was a thought that
4  they could extend their reach down in through East Ohio
5  and up into OV -- OV as well. So.
6      Q.  Okay. And those discussions occurred with
7  Trinity in April of 2019; correct?
8      A.  I don't -- I don't -- once again, I don't
9  recall the date, but I would assume that it was, you
10 know, in 2019.
11     Q.  Okay. Well, if Mr. Sarrao says in his answers
12 to interrogatories as amended by his handwriting here,
13 that those discussions were in April of 2019, do you
14 have any evidence that he's wrong?
15     A.  No.
16     Q.  Okay. Regarding all the Steward, Prime,
17 Wheeling Hospital, et cetera, that you had discussions
18 with about them acquiring OVMC, how would a WARN notice
19 have made it less likely that they would be interested
20 in acquiring the assets of OVMC?
21          MR. GARRISON: I'm going to object to the
22 form of the question and to the suggestion that he has
23 testified to this. Go ahead.
24     Q.  Okay. Do you understand my question?

Page 31
1      A.  I understand your question, but I would just
2  look at it from the standpoint of the opposite way. If
3  I was a party interested in looking at a -- at a
4  hospital and acquiring a hospital, and WARN notices had
5  gone out, much of the staff would probably leave. And
6  so then you have a, a situation that's just getting
7  worse.
8      Q.  Any other basis for your opinion that a WARN
9  notice would have made it less likely they would be,
10 that the approached buyers or copartners would be less
11 interested in acquiring OVMC, if the WARN notice had
12 been issued earlier?
13     A.  Well, I think that would probably be the -- in
14 my opinion, that would be the, the major one, because
15 you're, you're trying to have a workforce in place, so
16 you can, you can move forward. And it depends on, in
17 particular, as you know, there's a nursing shortage, and
18 you start to lose nurses, and then you're going to --
19 you're going to have a very difficult time recruiting
20 nurses into, into your open positions.
21     Q.  Mr. Sarrao says there were discussions in
22 summer of 2019 with UPMC. Do you recall when those
23 were?
24     A.  I would have to say that if -- if Mr. Sarrao

Page 32
1  has given a date, then that's -- that's the date. I
2  wouldn't have any reason not to -- not to believe those;
3  that's the correct date.
4      Q.  Mr. Sarrao also says that there were
5  discussions -- if you look at No. 1 -- with WVU in late
6  2019 about WVU leasing certain buildings and operating
7  psychiatric services at OVMC. Tell me what you recall
8  of that.
9      A.  M-mm, I -- I know that, on that in particular,
10 I don't know about that, because in August, 2019, I
11 wasn't there, so I wouldn't know anything about, you
12 know, that.
13         I know that, I can add that one of the things
14 that we, we had talked about also was expanding the
15 psychiatric services on our own, but you know, but I
16 don't recall if we were going to partner with somebody.
17 There was any number of people that approached us, so,
18 you know, when I was there about the psychiatric
19 programs and things along those lines. But as far as,
20 you know, us having a discussion with WVU about the
21 psychiatric services, that was in August, 2019, I wasn't
22 there.
23     Q.  Okay. Who approached you about acquiring the
24 psychiatric services?

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 10 of 15   PageID #: 9819

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL
ROGER KRISSMAN
05/26/2022

Page 33

1  A.  I don't -- I think it was -- you know, and I
2 believe there was a, you know, a group of providers at
3 the local level, that wanted to expand it and maybe, and
4 maybe take it over. And that's one of the things I kind
5 of recall, but beyond that, I don't recall any formal
6 names or anything like that.
7  Q.  Well, you do recall, do you not, that your, at
8 the time, there was a group called Northwood Health
9 System that was in one of your buildings?
10  A.  It seems that we have a -- I apologize. We
11 have a, a gardener. Hold on just a minute.
12      I'm not sure about -- about Northwood Health
13 Systems.
14  Q.  Well, if your -- do you recall -- I don't mean
15 to interrupt you; were you finished with your answer to
16 the question?
17  A.  Yes.
18  Q.  Okay. Do you recall that you had a building,
19 and on a couple floors of it was Northwood and a couple
20 floors of it, there was Hillcrest, which belonged to
21 OVMC. Do you recall that?
22  A.  I recall there was a building, and that there
23 was a, kind of the bane of my existence, was that there
24 was a, there was a lease or some kind of an arrangement

Page 34

1 with the tenants, that they were paying well below
2 market rate for, for their space, as far as a, the space
3 that they were in. And I think it was part of a
4 settlement that had been entered into some years prior
5 to our involvement. But that's about all I recall.
6  Q.  Well, if Northwood had two floors of a
7 building, and Hillcrest had the other two floors, and
8 Hillcrest took over that building, that would still
9 leave hundreds of employees not working in that building
10 who would be affected by any possible closure of OVMC;
11 correct?
12      MR. GARRISON: I'm going to object. It
13 calls for speculation.
14  A.  You know, I honestly don't recall the, the,
15 you know, the ins and outs of that particular psych
16 service and who was there and who wasn't. I, I just
17 don't recall it.
18  Q.  Well, Northwood would hardly be one of the
19 candidates to take over the entire operation of OVMC,
20 would it?
21      MR. GARRISON: Objection. Same
22 objection.
23  A.  Once again, I don't recall the size of
24 Northwood or Hillcrest or anybody else. I, I just

Page 35

1 don't. I really have nothing more that I can give you
2 on that, because I just don't recall it.
3  Q.  You mentioned presentation, or you mentioned
4 approaches to Prime. You did make a -- Alecto did make
5 a presentation in the spring of 2019 to try and sell
6 OVMC's assets to Prime and were rebuffed. Correct?
7  A.  I know that we worked with -- with Prime on
8 that, and they eventually said no.
9  Q.  Okay. You -- did they say no prior to your
10 leaving or after?
11  A.  Oh, they -- it was prior to my leaving that
12 they said no.
13  Q.  Okay. So after the presentation that you
14 made, and being rebuffed, there was no reason to think
15 of Prime as an option, was there?
16  A.  Prime, because I know all the people at Prime,
17 and all the senior managers at Prime and in particular,
18 Dr. Reddy, (audio glitch) I had anyways, that they may
19 come at the 11th hour, so I just wasn't sure if that --
20 if "no" was truly no, or "no" was just, no right now,
21 and maybe we'll come back later.
22      (Court reporter clarification.)
23      THE WITNESS: Okay. Hold on. I wish
24 this guy would quit blowing off the leaves.

Page 36

1      Anyways. When I dealt with Prime,
2 knowing the senior management at Prime, I was hopeful
3 that they would come back to the table, because knowing
4 the senior managers and in particular, Dr. Reddy,
5 sometimes "no" just meant no for right now, and they may
6 come back at the 11th hour. So I never really truly
7 closed the door on Prime.
8  Q.  You had no reason to believe, but you did have
9 some hope. Is that fair?
10  A.  That is correct.
11  Q.  Okay. Now, Mr. Sarrao also indicates their
12 discussions with Steward occurred from October, 2018
13 through April, 2019. Do you have anything to dispute
14 that?
15  A.  I do not.
16  Q.  Okay. So after April of 2019, there was no
17 chance that you're aware of today, that Steward was
18 going to be a buyer or partner or invest money in OVMC?
19  A.  No.
20  Q.  There's also Neuro Psychiatric, based in
21 Indiana. You remember them?
22  A.  I do not.
23  Q.  Okay. It says on the, the restructuring plan,
24 that Mr. Sarrao was going to approach them in April of

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 11 of 15   PageID #: 9820

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

ROGER KRISSMAN
05/26/2022

Page 37

1  2019. And do you have any discussion -- do you have any
2  evidence today that there was any approach to Steward at
3  any point after that?
4      A.  No, not to my knowledge.
5      Q.  There was also a -- give him a little bit more
6  of this.
7          At the bottom, it says No. 6. During the
8  summer of 2019 with System F, one of the largest
9  Catholic healthcare systems in the country, and its
10 senior executives regarding OVMC, System F ultimately
11 passed on the opportunity.
12         And then there was something written in there,
13 that it looks like, Common Spirit. Are you familiar
14 with that?
15     A.  No, I'm not familiar with Common Spirit at
16 all.
17     Q.  Okay. Are you familiar with any approach to a
18 large healthcare system in 2019?
19     A.  No, I am not, other than the archdiocese that
20 I had previously testified to.
21     Q.  There is an approach listing on the transition
22 restructuring plans to SNF Operator in April of 2019.
23 Do you have any evidence today of any approach to them
24 beyond or after April, 2019?

Page 38

1      A.  I do not. I don't recall.
2      Q.  What about Dignity and Trinity? You don't
3  have any evidence of approach to them after April, 2019?
4      A.  I don't -- I don't recall.
5      Q.  Okay. So you don't have any evidence today
6  that there was an approach after April of 2019?
7      A.  I have no evidence, but I don't recall,
8  either.
9      Q.  Okay. The approach to Wheeling Hospital --
10 all these, WVU, Prime, Wheeling Hospital, Dignity, Ohio
11 Health, Mon General, Steward, Neuro Psychiatric, SNF
12 Operator, and Psychiatric Operator were all indicated as
13 having a deadline of an approach of 4/12/19. Do you
14 have any evidence today that there were any approaches
15 to any of these places after 4/12/19?
16     A.  I have no knowledge, but at the same time,
17 knowing how the industry works, or any deal works, is
18 that you can approach people and then on a certain date,
19 they could say yes, we're interested, you know, send us
20 some information. And so that, that process doesn't
21 just start and end on one day. It's a, it's a continual
22 process and, you know, from a particular date into the
23 future.
24     Q.  My question is whether you have any evidence

Page 39

1  of any approaches to them or any -- any approaches to
2  them after April of 2019? Do you have any evidence
3  today?
4      A.  I do not.
5      Q.  Okay. There is evidence of a prepared --
6  preparation of teasers through H2C Lane. Were you
7  involved in that at all?
8      A.  Yes, I would review a document, as long as it
9  was prior to my leaving, yes.
10     Q.  What do you recall for reviewing these
11 teasers?
12     A.  A teaser, they would -- they would put
13 together a brief, a brief summary of the, the
14 opportunity of the property, the opportunity. There'd
15 be some very high preliminary financial information,
16 which I would provide, so that's about it.
17     Q.  In the spring and summer of 2019, were you
18 involved in making any loan applications to any entity
19 for capital for OVMC?
20     A.  Not that I recall.
21     Q.  Given all the capital problems and needed
22 repairs and improvements to the plant, requiring, and
23 declining accounts receivable, how likely is it that any
24 recently anticipated strategic partner could have saved

Page 40

1  OVMC?
2          MR. GARRISON: I'm going to object to the
3  extent it calls for speculation. You can answer if you
4  know.
5      A.  I wouldn't -- you know, it would depend on how
6  much money they wanted to put into the facility, or
7  maybe they had a different vision of what they wanted to
8  do with the facility. But I can't answer beyond that.
9      Q.  There were declining accounts receivable in
10 2019 at OVMC; correct?
11     A.  That is correct.
12     Q.  And there were needed repairs and improvements
13 that had been delayed for a long time at OVMC. Talking
14 about to the physical plant itself; correct?
15     A.  That is correct.
16     Q.  Okay. These were significant problems, the
17 needed repairs; correct?
18     A.  That is correct.
19     Q.  And the decline in the accounts receivable,
20 that was a significant problem at OV? You agree with
21 that?
22     A.  I agree, yes.
23     Q.  Okay. Do you have any knowledge about the
24 press release about the closing that was sent out in

Page 41

early August?
A. I do not.
Q. You don't know whether there was a delay while MPT reviewed and eventually approved the press release?
A. I do not.
Q. Were you with -- well, why did Alecto buy OVMC's assets?
A. We thought that -- at the time, we thought that OVMC would be a good addition to our portfolio. Give us another footprint in West Virginia, along with Fairmont Regional. And that we saw an opportunity, because the OVMC, not just the hospital, but it also had a related medical group, and that we felt that there was some opportunities within the medical group to, to kind of work with the doctors, increase productivity and increase the, the reimbursement in the medical group, and then thus also supply a stream of patients to the, to the facilities.
Q. And what were those opportunities to work with the medical group?
A. The, it was an owned medical group. We found that there were -- there were some physicians that were not seeing very many patients a day, and had limited office hours, and we looked at that as an opportunity to

Page 42

expand their office hours and expand the number of patients that they're seeing on a daily basis.
Unfortunately, we were in a very competitive arena with, with Wheeling Hospital, and Wheeling Hospital subsequently started to recruit and retain some of the physicians over OVMC, that were with OVMC, over at Wheeling Hospital so those physicians left, and then we started a downward spiral, with our, our census.
Q. And when did that occur?
A. It occurred over a period of time from, from the, actually from the, from the day that, that we took over until the, you know, probably the day I left. And I just recall that, that Wheeling Hospital was accused of overpaying, above market rates for physicians, which eventually turned out to be true. But by then the damage had been done.
Q. In the transition restructuring plan for Alecto Healthcare Services, it states that the first objective, immediately divest out-of-state facilities and preserve value of Olympia, and use bankruptcy as necessary to effectuate divestiture through a sales process or closure.
Were you aware of that as an objective, to immediately divest out-of-state facilities?

Page 43

A. Well, we wanted to -- we wanted to either sell or joint venture with somebody on our out-of-state facilities.
Q. And by out-of-state, that means out of California?
A. That would be correct.
Q. Okay. And it says preserve the value of Olympia. That's Olympia Hospital?
A. That is correct.
Q. Did Senator Manchin have any role in the decision to buy OVMC?
A. I'm not aware of, if he had a role or not. I'm not aware of that.
Q. What about at Fairmont General Hospital?
A. I'm not aware if he was involved or not.
Q. So you would agree, would you not, that the financial -- this financial posture of OVMC at the time Alecto bought its assets can be characterized as bleak?
MR. GARRISON: I'm going to object to the use of the term, but you can go ahead and answer, if you can.
A. I would characterize it as, as challenging, but at the same time, we did have a plan that we wanted to execute.

Page 44

Q. And when that plan involves getting the doctors to see more patients?
A. That was part of the plan, yes.
Q. When did it become clear that that plan was going to be unsuccessful?
A. Well, it was -- it was a degradation of the, of the financials over a period of time. I don't know if there's a particular date, but you're looking at -- I was looking at trends and could see that, that each month, it would, seemed like we would take a step forward and then two steps back. And so the trend was, was on a downward spiral, because of the -- because of the census and because of other operational issues.
We had -- as a reminder, through the sale, we took on the liabilities, and so we had vendor issues. We had any, any number of, of issues at the facility, that, that were just very difficult to overcome.
Q. Was this trend clear in 2017?
A. No, I don't think it was -- it was clear in 2017, only because we had -- we had taken over -- there was a lot of optimism; we felt that there, you know, there were certain things that we could do, and we -- and with, with hospitals, it takes a little while to, you know, hit the ground running and try to figure out

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 13 of 15   PageID #: 9822

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL
ROGER KRISSMAN
05/26/2022

Page 45

1 what needs to happen, as far as, or executing a plan.
2 It's not something that just happens overnight. So
3 you're constantly monitoring trends in the facility and
4 seeing, you know, what you could do better.
5    Q.  Was this trend clear in 2018?
6    A.  It was -- it was getting -- from my
7 perspective, it was getting very concerning in 2018,
8 because -- because of the length of time we had been
9 working at this, and it was impacting (audio glitch) and
10 we had --
11        (Court reporter clarification.)
12        THE WITNESS: It was impacting the
13 company overall. So, we were having to fund, use funds
14 from, from other facilities to support OVMC.
15   Q.  And why would these other facilities be
16 agreeable to that?
17   A.  Well, as part of the financing -- and I
18 wouldn't say -- well, I don't think you should
19 characterize it as agreeable. The other facilities we
20 would look at, Alecto Healthcare Services, LLC, and then
21 you look at each one of the facilities and their
22 individual organizations.
23        But what we put in place was a accounts
24 receivable line, and that enabled us to go ahead and

Page 46

1 use, on a consolidated basis, dollars, and flow dollars
2 from where they were needed throughout the organization.
3 So the dollars were then allocated according, you know,
4 according to the needs of each facility. So that's what
5 we did.
6    Q.  Was the trend that you spoke of, degradation,
7 the -- and also what you didn't necessarily speak of,
8 the decline of patient days, that was clear in 2018, was
9 it not? Let me withdraw that question.
10       The decline of patient days was clear in --
11 clearly significant in 2018; correct?
12   A.  That's correct, yes.
13   Q.  The trend of degradation of the financials,
14 that was clear by, let's say, June 1st of 2019?
15       MR. GARRISON: I'm going to object.
16   Q.  Do you understand my question, sir?
17   A.  Could you restate it again, please?
18   Q.  Sure. You spoke about a trend that was
19 becoming clear. My question is whether that trend was
20 clear by January, or by June 1st, 2019.
21   A.  Yes, it was.
22   Q.  Do you have a projection of when the OVMC
23 would run out of funds to operate?
24   A.  Well, if -- I don't have a specific projection

Page 47

1 that I recall, but I know that because the other
2 hospitals were supporting OVMC, that if OVMC had to
3 maintain its operations based on just their collections
4 alone, if it was siloed, the receivables for OVMC were
5 siloed, and they were living off of, essentially, their
6 collections, they would have been in serious trouble
7 much earlier.
8    Q.  Okay. How much earlier?
9    A.  Probably, I would say, nine months to twelve
10 months earlier.
11   Q.  Were you failing to make statutory required
12 payments in 2019?
13   A.  Could you --
14   Q.  Sure.
15   A.  -- expand on that?
16   Q.  Sure. You're aware that you have statutory
17 requirements to make payments for unemployment
18 compensation and Workers' Compensation; correct?
19   A.  Correct.
20   Q.  Okay. Were you making them in 2019?
21   A.  As I recall, no.
22   Q.  Were you making them in 2018?
23   A.  '18, I know that we were late on some of them,
24 and that we had made up, and then I believe that we had

Page 48

1 fallen behind again.
2    Q.  You don't know anything about seeking
3 financing after you were gone?
4    A.  I do not.
5    Q.  Okay. Mr. Sarrao testified that the credit
6 was maxed out every day with two exceptions. What
7 exceptions were those?
8    A.  Could you -- when you say the credit, are you
9 talking about the accounts receivable line?
10   Q.  Yes.
11   A.  Okay. The few exceptions would be if we
12 received a settlement payment and maybe a lump sum of
13 cash for either a Medicare settlement cost report or
14 something of that nature.
15   Q.  Are there any other topics you expected to be
16 asked about today that I did not ask you about?
17   A.  No.
18   Q.  Are there any other topics you expect to
19 testify at trial in this matter about?
20   A.  No.
21   Q.  Okay. Let me think about a 10-minute break.
22 I want to confer with Mr. Pomponio if he's still
23 available, because I'm just about done.
24   A.  Okay. Thank you.

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL

Case 5:19-cv-00263-JPB-JPM   Document 166-11   Filed 07/08/22   Page 14 of 15   PageID #: 9823

ROGER KRISSMAN
05/26/2022

Page 49

1   THE VIDEOGRAPHER: The time is 12 -- the
2 time is 12:42 PM. We are off the record.
3       (A short break was taken, after which the
4       following proceedings were had:)
5       THE VIDEOGRAPHER: The time is 12:56 PM.
6 We are on the record.
7 BY MR. COGAN:
8   Q.  I have a few more questions, Mr. Krissman.
9       Why didn't AHS use the money for capital
10 improvements that MPT had committed to, contributed in
11 the acquisition agreement?
12  A.  Well, one of the reasons we didn't draw down
13 is -- well, there were a couple reasons. One is, as I
14 recall, at OVMC there was -- there was a building that
15 we wanted to tear down and consolidate. And I believe
16 the building was built either in the late 1800s or early
17 1900s. And the difficulty that we had with that
18 particular building, as I recall, is that it housed some
19 utilities for the, for the main campus, and it would
20 require us to either duplicate that infrastructure --
21 and so we, we hesitated on that, while we kind of
22 planned that out.
23      The second thing is that, is that we were
24 already in to MPT for 40 million, and we were looking at

Page 50

1 this and telling ourselves, look, we, you know, we're
2 reaching a decision point here, so we're either going to
3 have to sell and/or partner with somebody. But we
4 weren't willing to draw down on the other, the
5 additional 20 million and make a bad situation worse.
6 So we, we held back on that until we had a more clear
7 understanding of where we were going.
8   Q.  Did you, as an owner, or as a representative
9 of the trust, get updates after you left OV?
10  A.  I have not.
11  Q.  Did you -- did AHS sell Olympia Hospital?
12  A.  They did, yes.
13  Q.  Do you know when that occurred?
14  A.  I believe it was, it's rather embarrassing,
15 but I believe it was 2020, 2021, I'm not sure.
16  Q.  And do you know what the proceeds of that sale
17 went to or towards?
18  A.  I do not.
19  Q.  I assume that you were asked to search for
20 emails regarding communications regarding the substance
21 of discovery requested?
22  A.  I did not.
23  Q.  Okay. You weren't -- you weren't asked as
24 part of discovery to provide emails that you were

Page 51

1 involved in, related to the subject of the lawsuit?
2   A.  I have no email account with Alecto, so
3 anything that -- when I left, I had no email account or
4 anything like that. So I can tell you that in the past
5 instances where we, we had requests, Mike Sarrao would
6 handle those requests, and he would search everybody's
7 emails.
8   Q.  Okay, what --
9   A.  So he'd work with IT to do that.
10  Q.  What about texts? Did you ever communicate by
11 text, regarding AHS?
12  A.  No, I don't. I didn't use texts. I used
13 mainly emails, because that's how we communicated.
14  Q.  Did you search for texts regarding the subject
15 of the lawsuit?
16  A.  I did not, no.
17  Q.  In this transition restructuring, you were
18 charged with evaluating market response to teaser. Do
19 you recall doing that?
20  A.  I don't recall what, what responses or formal
21 responses we received.
22  Q.  And it says that there was a deadline of
23 4/26/19. Do you recall that being a deadline for
24 evaluating the market response to teaser?

Page 52

1   A.  I don't recall.
2   Q.  It also says, if no interested party's
3 identified, proceed to bankruptcy and close of OVMC and
4 EORH. And that has the deadline of 4/26/19. Do you
5 recall anything about that?
6   A.  I do not.
7   Q.  It also charges you, along with Sarrao and
8 H2C, with evaluating initial offers, and the deadline
9 for that is 5/10 of '19. Do you recall doing that?
10  A.  I don't recall doing it. If we received an
11 official offer, I'm sure we would evaluate it and
12 discuss it.
13  Q.  Do you recall receiving any official offers
14 whatsoever?
15  A.  I do not.
16  Q.  It also says you were charged with, 3.13 on
17 the second page, identify buyers and finalize APA and
18 agreements with MPT. Do you recall doing that?
19  A.  I don't recall doing that, no.
20      MR. COGAN: Okay. I don't believe I have
21 any questions of this witness at this time. Thank you.
22              EXAMINATION
23 BY MR. GARRISON:
24  Q.  Roger, just one question for you as a follow-up.

Case 5:19-cv-00263-JPB-JPM Document 166-11 Filed 07/08/22 Page 15 of 15 PageID #: 9824

KEITH REED, ET AL vs.
ALECTO HEALTHCARE SERVICES, LLC, ET AL
ROGER KRISSMAN
05/26/2022

Page 53

1  Earlier, and just in this segment after the
2  break, Mr. Cogan asked you whether you had been asked to
3  search for any emails. Let me just put a finer point on
4  it. Do you believe you possess any emails related to
5  Alecto?
6     A.  No.
7          MR. GARRISON: Okay. Thank you. I don't
8  have any further questions, Tim, and we'll read and
9  sign.
10         MR. COGAN: Thank you, Mr. Krissman.
11         THE WITNESS: Okay. Thank you.
12         THE VIDEOGRAPHER: Before we get off the
13 record, we need to get orders, if you wouldn't mind.
14         THE COURT REPORTER: Yes. Mr. Cogan,
15 what would be your preferred?
16         MR. COGAN: Yes, one electronic with an
17 index.
18         THE VIDEOGRAPHER: And do you need the
19 video synced, or just standard?
20         MR. COGAN: Standard.
21         THE VIDEOGRAPHER: Okay.
22         MR. COGAN: I need it synced.
23         THE COURT REPORTER: Mr. Garrison, did
24 you want a copy?

Page 54

1          MR. GARRISON: Yeah, we'll, we'll take
2  one copy, condensed, electronically.
3          THE VIDEOGRAPHER: And do you need a copy
4  of the video, sir?
5          MR. GARRISON: No, sir, but thank you.
6          THE COURT REPORTER: And any of the other
7  attorneys requesting copies? I don't hear any.
8          I have one other question for you. We
9  can go off the record, Chris, and then I have a
10 question.
11         THE VIDEOGRAPHER: The time is 1:04 PM,
12 and this concludes the deposition.
13         (Having indicated he would read the
14         deposition transcript prior to filing,
15         further this deponent saith not.)
16
17
18
19
20
21
22
23
24

Page 55

STATE OF WEST VIRGINIA,
To-wit:
    I, Cheryl Munson, a Certified Court Reporter within and for the State aforesaid, duly commissioned and qualified, do hereby certify that the foregoing remote deposition of ROGER KRISSMAN was duly taken by me and before me via Zoom videoconferencing at the time and place and for the purpose specified in the caption hereof, the said witness having been by me first duly sworn.
    I do further certify that said deposition was correctly taken by me in voice writing, and that the same were accurately transcribed out in full and true record of the testimony given by said witness, and that the witness did request to read his transcript.
    I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which these proceedings were had; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action, and that the attached transcript meets the requirements set forth within Article 27, Chapter 47 of the West Virginia Code.
    My commission expires the 24th day of February, 2023.
    Given under my hand this 31st day of May, 2022.

_____
Cheryl G Munson, C.C.R.