**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**KEITH REED, ELIZABETH SCHENKEL,**
**EMILY WINES, MARK GARAN and**
**AUGUST ULLUM, individually and on**
**behalf of others similarly situated,**

      **Plaintiffs,**

**v.**                                                     **Civil Action No.: 5:19-cv-263**
                                                          **(Judge John P. Bailey)**

**ALECTO HEALTHCARE SERVICES LLC,**
**and ALECTO HEALTHCARE SERVICES**
**WHEELING, LLC d/b/a OHIO VALLEY**
**MEDICAL GROUP and d/b/a OVMC**
**PHYSICIANS,**

      **Defendants.**

**DEFENDANTS' RESPONSE IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendants Alecto Healthcare Services LLC ("AHS") and Alecto Healthcare Services Wheeling ("AHSW") (collectively, the "Defendants") hereby oppose "Plaintiffs' Motion for Summary Judgment." [CM/ECF Doc. No. 163] (the "Motion"). The Motion is predicated upon demonstrably incorrect facts regarding the acquisition, operation, and closure of Ohio Valley Medical Center ("OVMC"). Relying upon these incorrect facts, Plaintiffs' argument fails as a matter of law. Additionally, Plaintiffs do not satisfy their burden of proving several key elements of their sole WARN Act claim, including single employer status, noncompliant notice, or that Plaintiffs suffered "employment loss" or a "plant closing" prior to October 7, 2019.

<u>RESPONDING TO "FACTS" IN THE MOTION</u>

The Defendants provide a detailed recitation of facts, supported by citations to the record, in their own motion for summary judgment, which is incorporated herein by reference. [CM/ECF

Doc. No. 165]. The Motion's "facts" section, however, is really legal argument full of mischaracterizations and demonstrably false "facts." The Defendants address each below.

1.    AHS Is The Grandparent Entity Of AHSW, Not A Direct Parent.

In February 2017, AHSW was formed as a Delaware LLC as reflected on the West Virginia Secretary of State's website. AHSW has one member named Alecto Healthcare Services Ohio Valley LLC ("AHSOV"), and pursuant to its operating agreement, ASHW is member managed by AHSOV. [CM/ECF Doc. No. 166-2 Bates No. 2212-2226].[1] AHSOV is also a Delaware LLC, as reflected on the West Virginia Secretary of State's website. Until 2022, AHSOV had two members: MPT of Wheeling-Alecto Hospital LLC (20%) and AHS (80%). Pursuant to its operating agreement AHSOV was and is manager managed by General Manager AHS, with MPT of Wheeling-Alecto Hospital LLC serving as a Special Manager with certain defined authority. *See* Exhibit 1 [Bates No. 16449-16526]. AHS is a Delaware LLC where all of its members are individuals or trusts in benefit thereof domiciled outside of West Virginia. Given this structure, AHS is the grandparent entity of AHSW, and was not the only member of AHSOV during the critical 2019 time period. Therefore, to the extent Plaintiffs seek to "pierce the LLC veil" and/or hold AHSW and AHS as a single employer, there are intervening third parties non-litigants (AHSOV and MPT of Wheeling-Alecto Hospital LLC) that cannot be ignored.

2.    AHSW—And Only AHSW—Purchases The Assets of OVMC In 2017.

Prior to 2017, OVMC was facing severe financial issues under the ownership and operation of Ohio Valley Health Services and Education Corporation and Ohio Valley Medical Center, Inc. Financial documentation submitted to the West Virginia Healthcare Authority[2] in early 2017

---

[1] Exhibits used in "Defendants' Motion for Summary Judgment" [CM/ECF Doc. No. 166-2] are cited bates number but are not reattached in order to streamline briefings. Any new exhibits are attached hereto as Exhibit 1.

[2] Under state law, all nonexempt health care providers must obtain a Certificate of Need ("CON") before acquiring new health care facilities. W. Va. Code § 16-2D-1 *et al.* In February 2017, AHSW and AHSOV applied for a CON to

shows that OVMC had a deficit of cash totaling $5.6 million in 2015 alone, and had defaulted on its loan to Opus Bank (which was secured by substantially all of the hospital's assets) under which the hospital owed nearly $40,000,000. *See* Exhibit 1 (Bates No. 16352-3); [CM/ECF Doc. No. 166-2 Bates No. 16435-16440]. Based on these financials and others submitted as part of the application for Certificate of Need, the Healthcare Authority deemed OVMC "financially distressed" under state law in early 2017. *See* Exhibit 1 (Bates No. 16421); W.Va. Code §16-2D-10(6). In light of its poor financial condition, the prior owners of OVMC were considering bankruptcy and been marketing the hospital for sale. [CM/ECF Doc. No. 166-2 at Bates No. 16435-16440]. The prior owners found a way to keep OVMC open by selling it to AHSW. *Id.*

To effectuate this sale, on January 26, 2017, the prior owners entered into an Asset Purchase Agreement ("APA") by which they collectively sold the real estate and assets of OVMC to AHSW and Alecto Healthcare Services Martin's Ferry LLC ("AHSMF"), respectively. [CM/ECF Doc. No. 166-2 at Bates No. 2022-2130]. This sale would take effect June 1, 2017. *Id.* The purchase price AHSW and AHSMF paid under the APA was "an amount equal to the amount required to pay in full all indebtedness, obligations and other liabilities" of the prior owners under their loan with Opus Bank. *Id.* To be absolutely clear and to highlight what is expressly stated on the first page of the APA, AHS joined in the APA for Section 12.20 <u>only</u>, in which AHS guarantees the performance of AHSW and AHSMF through and including the Closing but expressly excludes any post-Closing obligations. *Id.* AHS does not, in any way, assume ownership of either the real estate or assets of OVMC in the APA and did not acquire any ownership of any of the assets of OVMC. *Id.* This is confirmed by the effectuating deeds. *See* Exhibit 1 (Bates No. 16574-16715).

---

acquire OVMC. *See* Exhibit 1 (Bates No. 16142-16429). While pending, the statute changed to add an exemption for "financially distressed" facilities. W. Va. Code § 16-2D-10(6). In August 2017, the WV Hospital Authority contacted counsel for AHSW to inform them that OVMC qualified as "financially distressed" and the exemption applied. *Id.* (Bates No. 16421). The original application, however, provides data on OVMC prior to AHSW's acquisition.

AHSW and AHSMF secured funding for the APA purchase price with a sale/leaseback transaction with subsidiaries of Medical Properties Trust Inc. *See* Exhibit 1 (Bates No. 16142-16429). This type of transaction is common for hospitals, and an alternative to more traditional bank financing. A sale/leaseback occurs when an entity sells an asset to another, and leases it back long term—in doing so, the entity receives an influx of cash as consideration for the sale, but maintains the use of the asset.  Here, the sale/leaseback operated as follows:

- On the closing date of the APA, Ohio Valley Health Services and Education Corporation, River Health Enterprises, Inc., and Ohio Valley Medical Center, Inc. executed deeds in which they transferred all real property and assets of OVMC exclusively to AHSW. *See* Exhibit 1 (Bates No. 16651-16655; 16656-16684).

- Immediately thereafter, AHSW transferred the real property of OVMC to MPT of Wheeling-Alecto LLC[3], the full consideration for which was deposited into escrow  and used  to fund the purchase price under the APA by way of a payment from escrow to Opus Bank to pay off Sellers' defaulted loan with Opus Bank. *Id.* (Bates No. 16685-16715).

- Simultaneous to its acquisition of the real property, MPT of Wheeling-Alecto, LLC leased the real property to MPT of Wheeling-Alecto Hospital LLC and MPT of Wheeling-Alecto Hospital, LLC entered into a lease with AHSW in which AHSW leased the real property upon which OVMC sits. *Id.* (Bates No. 16574-16602).

- As part of the same transaction, AHSW joined a credit line with White Oak which was secured by all patient and other receivables at OVMC. This credit line provided the operating capital with which ASHW ran OVMC. As a result, White Oak had a perfected first priority security interest in the AR owned by AHSW. [CM/ECF Doc. No. 166-2 Bates No. 36435-36444].

- As part of the same transaction, MPT of Wheeling-Alecto Hospital LLC received a 20% membership interest in AHSOV.

Thus, under the sale/leaseback, AHSW and AHSMF paid the purchase price of the APA using the consideration it received from the MPT subsidiaries for sale of the real estate of OVMC

---

[3] At the same time that AHSW sold the real property of OVMC to this MPT subsidiary, AHSMF sold the real property of EORH in Martins Ferry, Ohio to MPT of Martins Ferry-Alecto, LLC. To be exceedingly transparent, the MPT subsidiaries paid $40 million in consideration to AHSW and AHSW for this real property. Exhibit 2 (Bates No. 16574-16729). After paying off the Opus Bank loan held by prior ownership, only $3,288.381.25 remained. Of that, $500,000 was paid to Alecto to reimburse it for the deposit it had advanced to AHSW and AHSMF pre-closing, and the remaining $2,788,381.25 was used exclusively to fund operations at OVMC and EORH. AHS made no money.

and EORH. Accordingly, as of June 1, 2017: MPT of Wheeling-Alecto Hospital LLC owned the real estate of OVMC; AHSW owned substantially all of the other assets of OVMC which were subject to perfected first priority security interests; AHSW exclusively operated the hospital under the terms of the lease with Wheeling-Alecto Hospital LLC; and AHS had fulfilled the small, specific role it played in the APA as guarantor up through the June 1, 2017 closing. Additionally, the prior owners had avoided bankruptcy and paid off the defaulted Opus Bank loan. [CM/ECF Doc. No. 166-2 at Bates No. 16435-16440].

      3.      <u>The Leaseback Transaction Benefitted AHSW and Kept OVMC Open</u>.

The Plaintiffs claim, without any citation or authority, that the sale/leaseback "allowed AHS to buy the hospitals without investing its own money but encumbered the already struggling hospitals with additional debt and expensive long-term leases." [CM/ECF Doc. No. 164, p. 4]. The lack of evidence may be because the statement is patently untrue.

First, despite Plaintiffs' insistence otherwise, <u>AHS did not purchase any part of OVMC</u>— only AHSW did and the APA, deeds, and lease cited above all prove it. Second, to say AHS did not invest its own funds into OVMC ignores: (a) the half a million dollars that AHS deposited in escrow prior to the closing of the APA; (b) the nearly $9,000,000 that AHS paid out of its own funds on behalf of AHSW to keep the hospital afloat from 2017-2019; (c) the value of its guarantee under the APA; (d) the waiver of payment for AHS' provision of management services to AHSW under the Management Services Agreement; (e) AHS and AHS' other subsidiaries were co-borrowers under the credit line from White Oak (and later CNH) and their accounts receivables also served as collateral for the credit line and this collateral, essentially, subsidized OVMC's operational losses; (f) AHS guaranteed the lease with MPT; and (g) AHS caused certain of its subsidiaries to pledge their assets as collateral to affiliates to MPT so that they would enter into

the sale/leaseback transaction related to a distressed hospital. *See* [CM/ECF Doc. No. 166-2 at Bates No. 16142-16429, 36419 & 36424-36426]; Exhibit 2 (Michael Sarrao Depo. 23:20-25:6 (July 1, 2022). All of this funding is in addition to the time and man-hours that AHS dedicated to looking for funding or a buyer, investor, or strategic partner, which are detailed in "Defendants' Motion for Summary Judgment" and incorporated herein by reference. [CM/ECF Doc. No. 166 §IV]. In short, AHS dedicated significant amounts of its own time and money to support OVMC.

Third, instead of taking out a <u>loan</u> with a bank for the APA's purchase price, the sale/leaseback ended with a <u>lease</u> with an MPT subsidiary—one the Plaintiffs somehow deem "expensive" and "long-term" without providing any of its actual terms. In reality, the lease benefitted AHSW, particularly as AHSW stopped paying rent in October 2018 and MPT of Wheeling-Alecto Hospital LLC permitted AHSW to continue to operate OVMC on the real estate, thereby providing another type of financial subsidization. *See* Deposition of Roger Krissman 17:23-18:9 [CM/ECF Doc. No. 166-9]; Sarrao 40:21-41:14 [CM/ECF Doc. No. 166-1]. The lease, therefore, was not the financial burden that Plaintiffs describe it as.

Fourth, the sale/leaseback that provided the funding for the APA purchase price permitted the hospital to avoid bankruptcy and closure, pay off the nearly millions in defaulted long term debt the prior owners owed to Opus Bank, and pay nearly $17 million dollars in past due invoices to hospital vendors after June 1, 2017. [CM/ECF Doc. No. 166-2 at Bates No. 16435-16440]. Thus, the sale/leaseback actually relieved the hospital of a substantial amount of debt that it had been operating under for years. To the extent Plaintiffs' vague allegation of "additional debt" refers to the credit line secured by AR, they are again mistaken. AHSW was always a net borrower under that agreement. In fact, from June 1, 2017 through December 2021, AHSW borrowed nearly $11.5 million more than it ever paid back through its account receivables from OVMC. *See* [CM/ECF

Doc. No. 166-2 at Bates No. 36419]. Thus, AHSW received funds well and above its security without penalty, which permitted it to operate longer.

Taken together, the sale/leaseback was an appropriate financing vehicle that permitted OVMC to move on to new ownership with ASHW in 2017 instead of bankruptcy or closure. Plaintiffs' claim in the Motion is therefore contrary to these facts and documents.

4.    AHS Did Not Direct Or Unilaterally "Propose" Closure of OVMC.

In the Motion, Plaintiffs claim (again, without a citation to the record) that "in late July, AHS senior leadership proposed closing one or both hospitals." [CM/ECF Doc. No. 164 p. 5]. This once again incorrectly attributes collaborative efforts to a single entity. Leading up to that date, both AHSW and AHS were considering and brainstorming all options, including closing one or both OVMC and EORH if a buyer, investor, or strategic partner could not be found. *See* Deposition of Dan Dunmyer 19:5-22:24 [CM/ECF Doc. No. 166-8]; Exhibit 3 (Deposition of Lexman Reddy 34:8-14); Krissman 24:18-25:25:2; Sarrao 93:14-94:3. In the weeks leading up to the public announcement of OVMC's closure on August 7, 2019, Dunmyer and his management team, including COO Jennifer Coello, had discussions amongst themselves and with AHS regarding available options and different "ideas of what could possibly work" to keep OVMC open. Dunmyer 19:5-22:24; Reddy 39:8-19 ("it was a collaborative effort to see what other options existed . . . with the local management"). Other management at OVMC participated in discussions with Dunmyer, Coello, and AHS regarding potential closure in order to provide information or input. [CM/ECF Doc. No. 166-10].[4] Dunmyer described these discussions as "open" and on "about

---

[4] During this process, AHS consulted with certain non-litigants regarding the potential effects of OVMC's closure, including (a) CNH, the primary lender to AHSW/OVMC, to confirm it would continue to provide financing if closure was announced, and (b) MPT, both member of AHSOV (who, in turn was sole member of AHSW) and owner/lessor of OVMC's real property, to confirm it would not restrict access to the hospital's real estate if closure was announced. Sarrao 115:17-117:14. Sarrao and Reddy handled both the MPT and CNH consultations for strategic reasons, namely because they had the best, longest relationship with MPT and CNH. This is not evidence of AHS control over AHSW.

every option." Dunmyer 19:5-22:24. After going through those options and discussions, however, Dunmyer came to believe that the only viable options were to either (a) close both OVMC and EORH, or (b) close OVMC and try to keep EORH open because it had a better building. *Id.* Ultimately, the Defendants agreed that OVMC was "not going to be able to survive the way we were" and jointly decided on August 5-6 to close both hospitals. Dunmyer 13:23-15:4; Reddy 27:18-29:5 (decision to close OVMC was a "joint effort between the local management and the executives at [AHS]"); Sarrao 134:9-135:14. Even after the closure announcement, there were continued efforts to find a buyer or other solution to keep all or part of either OVMC or EORH open, which are discussed in detail below. Given this uncontroverted testimony, Plaintiffs' contention that AHS ordered closure of OVMC is incorrect.

    5.    <u>AHS Did Not Act Alone In Searching For Buyers, Investment, or Funding.</u>

Plaintiffs claim that AHS was single-handedly making efforts to secure a buyer, investment or funding is again incorrect—for example, the Motion claims "AHS executives met with West Virginia Secretary of Health and Human Resources, Bill Crouch." [CM/ECF Doc. No. 164 p. 5]. In reality, both AHSW and AHS communicated with Secretary Crouch and held meetings with him. For example, Dunmyer testified that he spoke to Secretary Crouch multiple times, the Governor' staff and office, applicable congressmen, and West Virginia Hospital Association, in addition to potential buyers/investors. Dunmyer 14:10-18:10; 24:5-26:11. After the closure announcement, both AHSW and AHS continued to meet with potential buyers and elected officials to work on ways of keeping the hospitals open. *See infra* FN 7-8 (efforts in August and September 2019, respectively); *see also* Dunmyer 14:11-17:17 & 58:15-59:7; Sarrao 98:2-100:9. Employees were updated regarding these post-announcement efforts. [CM/ECF Doc. No. 166-2 at SCHENKEL_000019-22]. Given this testimony and documentation, there is no basis for claiming

8

or insinuating that AHS was single-handedly communicated with politicians or buyers without AHSW's input or participation.

      6.    <u>Plaintiffs' Claims About AHSW Starting The "Closure Process" Before 60 Days Passed Mischaracterizes WARN Act Requirements And Misstates Cited Records.</u>

In the Motion, the Plaintiffs also claim that "[i]nstead of waiting 60 days, Defendants began the "closure process" immediately." [CM/ECF Doc. No. 164 p. 6]. This claim is problematic for several reasons. First, it ignores that closing a mid-sized hospital like OVMC, which offers a variety of medical services, is a complex process that takes time—both patient safety and logistics demand a slower pace. That is why, for example, the draft timeline regarding OVMC closure that Plaintiffs continually cite had over 80 lines of different draft dates for closure of services or notices to third parties. *See, e.g.*, Exhibit 1 (Bates No. 7-11). Thus, starting the "closure process" before the target "closure date" makes logistical sense. Second, the WARN Act does not require an employer to start a "closure process" only after 60 days advanced notice is provided—the statute only requires notice before a "plant closure," which is a defined term. 29 U.S.C. §2101 *et seq.* Thus, even if AHSW may have started its "closure process" within 60 days of providing notice does not mean it violated the WARN Act. Third, the listed examples that Plaintiffs provide to support this contention that the "closure process" began early are largely false or mischaracterized:

- Plaintiffs claim "OVMC stopped accepting new patients after August 21." [CM/ECF Doc. No. 164 p. 6]. However, the cited letter was the <u>draft</u> timeline sent to Office of Health Facility Licensure & Certification with target deadlines for certain events, including the last date new patients would be accepted. *See infra* §I(4)). It expressly states that the listed dates are drafts only and subject to "physician and staffing coverage." Thus, the cited authority does not support the statement that new patients were actually, in reality, not accepted after August 21. *See* Exhibit 1 (Bates 7-11).

- Plaintiffs claim OVMC "cut offered services (e.g., MRIs by August 19")." [CM/ECF Doc. No. 164 p. 6]. As testimony (including the Plaintiffs) clearly states, both before and after the closure announcement, OVMC's offered services had to be curtailed due to the departure of staff and medical providers. *See e.g.*, Deposition of Elizabeth Schenkel 56:1-57:24 & 60:2-61:19 [CM/ECF Doc. No. 166-5]; Deposition of Keith

Reed 57:5-13 [CM/ECF Doc. No. 166-3]; Dunmyer 31:18- 33:4; Sarrao 79:11-87:15. Interestingly, Plaintiffs specifically claim that AHSW cut MRI services. The cited email clearly states, however, this decision was not up to OVMC. *See* Exhibit 1 (Bates No. 17589). In that email, Dunmyer states that "[w]e have received notification from the MRI company they are going to remove the MRI truck today. We have failed to pay them a few times under our agreement and they have elected to remove it." *Id.* Thus, OVMC did not voluntarily "cut" its MRI services. This is merely another example of the difficulties OVMC faced from vendors after the closure announcement.

- Plaintiffs claim that OVMC "terminated medical office leases by August 30" and point to an email about a leased spaced in the "Romano building." [CM/ECF Doc. No. 164 p. 6]; Exhibit 1 (Bates No. 15138). This building, however, is in Martins' Ferry, Ohio and was associated with EORH—not OVMC. Thus, Plaintiffs are incorrect. In fact, medical providers were terminating the leases they held with AHSW (i.e. AHSW was lessor) prior to October 7. *See, e.g.*, Exhibit 1 (Bates 6901, leasee Dr. Mark T. Vollenger terminated lease at OVMC). OVMC could not force providers to stay and work through a lease term.

- Plaintiffs claim that the Defendants "reduced inventory and told patients in mid-August 15 that OVMC could close anytime before October 7." [CM/ECF Doc. No. 164 p. 6]. The cited authority, however, is a <u>draft</u> letter specific to the pharmacy about reducing stockpiles of prescription medication in anticipation of OVMC's closure "on or before October 7." *See* Exhibit 1 (Bates No. 33025). Thus, this was not a letter representing hospital-wide policy, and the fact that the pharmacy was not ordering or storing more prescription medication that it could reasonably dispense in the 60 or so days before October 7 does not warrant a finding that OVMC closed on an earlier date, particularly as storage, dispensation, and transfer of prescription medications is highly regulated.

- Plaintiff claim the "Defendants reduced employee hours to save themselves money" but the assigned motivation has been refuted in testimony. As all deponents agreed, flexing off staff when patient census was low was a routine practice at OVMC (and the hospital industry generally) prior to the closure announcement. *See, e.g.*, Dunmyer 38:9-39:5; Sarrao 163:-166:10; Deposition of Mark Garan 42:3-7 [CM/ECF Doc. 166-4]; Schenkel 21:14-21; Deposition of Emily Wines 12:3-7 [CM/ECF Doc. No. 166-6]. Furthermore, given the financial documents for OVMC showing losses in tens of millions, flexing staff off during this 30-60 day time period would not have "saved" AHSW a meaningful amount of money—as Plaintiffs suggest—in light of the tens of millions it had already lost. Additionally, AHSW and OVMC management encouraged staff to use PTO to get larger paychecks faster and organized "help lists" to get employees hours working in other departments, both of which negates a motivation to simply "save money." [CM/ECF Doc. No. 166-2 Bates No. 2963]; Schenkel 96:1-98:8 (responding to direct supervisor's e-mail request for help in other departments); Exhibit 1 (Bates No. 2963, 3543); Sarrao 181:2-11; Dunmyer 52:20-53:21.

Thus, Plaintiffs' claims about AHSW staring the "closure process" mischaracterize what the WARN Act requires and the cited record only further demonstrate how, after the announcement of closure was made in August 2019, operations at OVMC were becoming untenable.

7.    Certain Services Are Suspended Due to Concerns With Patient Safety, Though Hope Remained A Buyer or Investor Would Step Forward.

After the announcement on August 7, 2019 that OVMC would close, the hospital's problems grew significantly worse. The already declining patient volumes plummeted. *See, e.g.*, Schenkel 55:9-24; 59:1-7; Garan 46:10-15; Reed 53:24-54:7; Sarrao 153:23-155:5. Staff were resigning to start new positions, making it increasingly difficult to safely staff the remaining patients. Wines 56:16-22; Deposition of August Ullum 47:4-13 [CM/ECF Doc. No. 166-7]; Sarrao. 153:23-155:5. Doctors, residents, and health care providers left, further limiting the medical services that OVMC could provide. *See, e.g.,* Schenkel 56:1-8; Reed 57:5-13; Dunmyer 31:18- 33:4 ("[w]e had staff, but we didn't have staff in all the areas. We didn't have doctors to take care of [patients]"); Sarrao 152:2-155:5. Vendors refused to provide services or desperately needed medical supplies fearing nonpayment. *See, e.g.,* Sarrao 154:14-155:5; Krissman 44:4-18. Given these problems, there were reasonable concerns whether OVMC could continue to offer quality patient care. *See* Dunmyer 31:18- 33:4; Sarrao 152:2-155:5; Reddy 44:22-45:3. Thus, AHSW announced on September 3, 2019 that it would suspend its acute and emergency medical services at OVMC as of midnight on September 4th. *Id*.; [CM /ECF Doc. No. 166-2 at Bates No. 16762-16763]. This decision was also made jointly by AHSW and AHS after lengthy discussion. *See* Dunmyer 19:5-22:24; Sarrao 90:17-91:23; 134:1-135:14; 156:2-157:2; Reddy 44:15-47:3.

8.    Conclusion On "Facts" In The Motion.

As detailed above, many of the recited "facts" in the Motion are demonstratively inaccurate, are not supported by the citations, mischaracterize the record, or are contradicted by

the sworn testimony in this matter—in fact, the Motion fails to cite a single deposition taken in this case. Accordingly, the Motion is entirely without merit, and must be denied in its entirety.

<u>OTHER LEGAL ANALYSIS</u>

The "Legal Analysis" portion of the Motion is also riddled with inaccurate factual statements, mischaracterizations, and meritless legal argument, and the Defendants address each.

I.    <u>Plaintiffs' Fail to Prove Single Employer Status.</u>

The Plaintiffs' argument in the Motion that AHS and AHSW are a single employer contains only 3 sentences, all of which are without merit for the reasons detailed below.

1.    <u>Plaintiffs' Ignore Four Of The Five DOL Factors They Cite</u>.

Plaintiffs cite the five factors the DOL has issued regarding single employer status, but cites non-binding cases holding these factors are merely "guideposts." [CM/ECF Doc. No. 164 p. 12]. Plaintiffs then offer three-sentences of analysis supporting their claim for single employer status. In the first of these sentences, Plaintiffs' claim that "[here], each of the DOL factors supports a finding that AHSW and ASHW were a single employer." *Id.* However, Plaintiffs provide no citation to the record to support this assertion, and fail to actually analyze or expand on the first (common ownership), second (common directors/officers), fourth (unity of personnel policies emanating from common source), or fifth (dependency of operations) DOL factors. Plaintiffs' argument on this issue therefore appears to rest on the third "de facto control" factor. Their failure to meaningfully analyze or engage with the DOL regulations that expressly govern single employer status demonstrates they are not entitled to summary judgment on this issue.

2.    <u>Plaintiffs Ignore State Law On The Same Subject Of LLC Veil Piercing</u>.

Additionally, if we are to assume that this Court and the Fourth Circuit also consider the DOL factors to be merely "guideposts" as Plaintiffs suggest, then Plaintiffs fail to point to any

other law that supports their attempt to hold AHS accountable. This includes Plaintiffs' ignoring the already-developed state law in West Virginia on piercing the veil of an LLC. The West Virginia Supreme Court of Appeals has held that the LLC veil may pierced only if "(1) there exists such unity of interest and ownership that the separate personalities of the business and of the individual member(s) or managers(s) no longer exist and (2) fraud, injustice, or an inequitable result would occur if the veil is not pierced." *Kubican v. The Tavern, LLC*, 232 W. Va. 268, 282, 752 S.E.2d 299, 313 (2013). Plaintiffs have not addressed this precedent or sufficiently proven either element.

Additionally, in *Kubican*, the West Virginia Supreme Court of Appeals acknowledged that it had previously issued a list of 19 factors to be considered in such veil piercing analysis that were still helpful. *Id.* (citing *Laya v. Erin Homes, Inc*., 177 W.Va. 343, 347-8 S.E.2d 93 (1986). However, Plaintiffs do not cite or address any of these 19 factors, further demonstrating that single employer status or piercing the veil to hold AHS accountable is not warranted.

Furthermore, a recent 2022 legislative amendment to the West Virginia LLC statute states that the "corporate veil piercing" analysis adopted in *Kubican* only applies to an LLC where "the company is not adequately capitalized for the reasonable risks of the corporate undertaking" and "the company does not carry liability insurance coverage for the primary risks of the business, with minimum limits of $100,000 liability insurance, or such higher amount as may be specifically required by law." W.Va. Code §31B-3-303(a), (d). Though not retroactive, this statute is relevant given Plaintiffs' unsupported assertion that AHSOV was undercapitalized. [CM/ECF Doc. No. 164 at fn. 2]. Under this new provision, AHS would, yet again, not be found liable for AHSW because ever since June 1, 2017, both AHSW and AHSOV have been additional named insureds under an insurance policy which provides liability limits above the statutory threshold. *See, e.g*., Krissman 13:18-14:6; Exhibit 2 (Sarrao 27:9-29:11); [CM/ECF Doc. No. 166-2 Bates No. 36424-

36426] (intercompany insurance). Thus, under both *Kubican* and the new LLC statute, there is no basis under state law to pierce the LLC veil <u>of both AHSW and AHSOV</u> to hold AHS accountable.

Taken together, though Plaintiffs claim the DOL factors on single employer status are merely "guideposts," they fail to meaningfully engage with any other law on the subject, including West Virginia state law on piercing the LLC veil. This demonstrates that Plaintiffs have not sustained their burden and are not entitled to summary judgment on this issue.

 3. <u>Plaintiffs' Cite to A Dunmyer E-mail But Ignore the Vast Weight of Evidence.</u>

The second sentence of Plaintiffs' single employer analysis states that "the evidence shows that AHS owned, managed, and heavily controlled AHSW," citing an e-mail from OVMC CEO Dan Dunmyer. [CM/ECF Doc. No. 164 p. 12]. To be clear, this e-mail that Plaintiffs continually cite as evidence of AHS' "high degree of control" over AHSW was merely a one-time, frustrated e-mail borne of a misunderstanding. In this email, Dunmyer claims that he "got an email that we are not able to order anything else since we are winding down services" and believes that was a directive from AHS. *Id.* Himandshu Honda responds by clarifying that "I have not asked Purchasing [department] to stop ordering. I have only asked them to consolidate and do collective ordering. Is there anything in particular that is not being ordered? I can check with the staff, but again I have not given any instruction or suggestion to stop ordering." *Id.* Thus, there was a misunderstanding as to how the Purchasing Department at OVMC had been <u>asked</u> to consolidate their orders. When directly questioned about this e-mail at deposition, Dunmyer clarified that "yes, I was making some of those decisions or all of those decisions" and that he got "extremely angry" when he believed Honda left out of this decision. Dunmyer 55:10-57:12. Dunmyer admitted he was "frustrated" when he wrote the e-mail to Honda, with whom he had a "love hate" relationship. *Id.* Thus, this e-mail is not the "smoking gun" of de facto control that Plaintiffs' purport it to be,

considering (a) the entire e-mail exchange, (b) Dunmyer's testimony that he was actually the one making these decisions, and (c) the fact that there are no other e-mails in which Dunmyer (or anyone else at AHSW) complain about being "left out" of decisions. It is, instead, a single frustrated e-mail among the more than 33,100 other e-mails between representatives of AHSW and AHS during those critical months in 2019. Furthermore, Dunmyer testified extensively regarding his daily operation of OVMC, and his active participation in the process of its eventual closure, including brainstorming options to save OVMC, discussing those options with both his OVMC team and AHS, making the decision to close OVMC or suspend services, meeting with public officials, and communicating with potential buyers or financiers, etc. *See, generally* [CM/ECF Doc. No. 165-8]. Thus, this solitary e-mail is contrary to the vast weight of evidence showing Dunmyer was operating OVMC as a CEO ordinarily would, and was not being denied decision-making authority. Accordingly, their assertion that the "evidence shows that AHS owned, managed, and heavily controlled AHSW" is contrary to the cited e-mail, record, and testimony.

4. Legal Work Is Not Evidence Of De Facto Control.

Finally, the third sentence of Plaintiffs' legal argument on single employer status is that "AHS developed the notices, timelines and policies, and made the decision to close OVMC without 60 days' notice." [CM/ECF Doc. No. 164 p. 12]. This is partly inaccurate and partly mischaracterization. As stated more fully in "Defendants' Motion for Summary Judgment," the testimony in this case is consistent: AHSW and AHS jointly made the decision to close OVMC and to suspend certain services. *See, e.g.,* Dunmyer 19:5-22:24; Sarrao 90:17-91:23; 134:1-135:14; 156:2-157:2; Reddy 39:8-47:3. Plaintiffs have provided no evidence otherwise.

Furthermore, Plaintiffs' characterization of AHS "developing" the notices and timelines associated with the closure ignores a critical point: it was not just anyone at AHS that was allegedly

"developing" these notices and timelines, it was <u>counsel for AHSW</u>, and that distinction is critical. Plaintiffs continually point to a <u>draft timeline</u> prepared by Michael Sarrao (General Counsel and Executive Vice President of AHS; Executive Vice-President and Secretary of AHSW) as evidence of AHS dictating closure of OVMC and other nefarious misdeeds. [CM/ECF Doc. 164 p. 6]. The document in question is a first draft of a timeline requested from Office of Health Facility Licensure & Certification ("OHFL&C") that listed the many statutory and regulatory notice requirements triggered by the announcement of OVMC's closure, and listed <u>tentative</u> target dates for certain events. *See* Exhibit 1 (Bates Nos. 7-11 & 31922). A first draft had a September date for hospital closure (Bates No. 31922), but that changed after Sarrao solicited input on realistic closure dates for clinical services from a wide array of individuals at AHSW including Dunmyer (CEO), Coello (COO), and Lynette DeBertrand (Chief Nursing Officer), in addition to individuals at AHS (Bates Nos. 7-11). Then, the final letter to the OHFL&C specifically stated that the timeline was a "draft" and welcomed that office's input as to dates, further indicating those dates <u>were not final</u>. *Id*. Similarly, the attached timeline that Plaintiffs' continually point to lists the target closure date for OVMC to be October 1, 2017, and that "all dates assume physician coverage and staffing." *Id.* Taken together, the change from the first draft to the version provided to the OHFL&C was the result of collaboration between AHSW and AHS regarding realistic dates for closure of clinical services. Furthermore, the timeline and letter it accompanies both strongly express that dates are tentative and dependent upon adequate staffing. *Id.* As the deponents consistently testified, the suspension of services at OVMC was announced when staffing, patient, and service issues became so great that patient safety became a concern. *See, e.g.,* Dunmyer 31:18- 33:4; Sarrao 152:2-155:5; Reddy 44:22-45:3. Accordingly, the letter and timeline presented to OHFL&C was, in all ways and at all times, a list of expressly <u>tentative</u> dates, drafted by counsel with the input of AHSW and

AHS teams. Thus, this letter and timeline do not demonstrate that AHS controlled AHSW, or that there was some sort of "scheme" to thwart WARN Act liability.

The Plaintiffs also assert AHS controlled AHSW because Mark Bradshaw (Corporate Counsel of AHS) issued and sent out WARN letters to employees under the name Dunmyer's signature. [CM/ECF Doc. No. 164 p. 6] [5] This is factually false. Dunmyer signed all of the WARN letters to OVMC employees' after reviewing and approving them. He also testified that he reviewed documents like this, which may have been prepared by others, prior to public circulation. Dunmyer 25:24-30:4. Additionally, beyond the privilege log, there is ample testimony about how outside counsel of Spilman Thomas & Battle PLLC participated in the creation and distribution of those employee WARN letters. *See* Exhibit 2 (Sarrao 51:2-54:17). The consistent involvement of undersigned's firm in these matters is reinforced by the three different privilege logs that Defendants have provided to Plaintiffs. Thus, Plaintiffs' characterization of Bradshaw being the sole creator and facilitator of WARN letters is inaccurate.

This brings us to an important point: Plaintiffs point to Sarrao's and Bradshaw's actions during this time (particularly their drafting of documents) as evidence of AHS control. In reality, it is merely evidence of legal work. Both Sarrao and Bradshaw are legal counsel who could and did provide legal advice and legal work to AHSW free of charge under the MSA. *See, e.g.,* Dunmyer 35:3-37:13; Reddy 47:4-49:5; [CM/ECF Doc. No. 166-2 Bates No. 2021]. Sarrao and Bradshaw acted within their scope as legal counsel when drafting the documents relating to

---

[5] Plaintiffs also point to a draft WARN letter circulated by Bradshaw in July 2019. At and around the same time, however, AHSW and AHS had numerous meetings, discussions, and information sharing with potential buyers/investors, community leaders, and elected officials including, but not limited to, WVU Medicine (July 1); Access Ohio (July 2); Allergy Services of America LLC (July 12, 2019); Cleveland Primecare Belmont (July 13); West Virginia DHHR (July 15); WV Healthcare Authority (July 15-17); Wheeling community leaders, local business leaders, and elected officials (July 15-17); and Acadia Healthcare (July 16). *See* Bates No. 34110; 34115; 34980-2; 35071-2; Dunmyer 24:5-25:7. This further supports the Defendants' faltering business exception, specifically that there was reasonable belief that providing earlier notice would have prevented such meetings/opportunities.

OVMC's closure—in fact, both of the documents Plaintiffs point to in the Motion (WARN letter and OHFL&C letter) demonstrate legal analysis of statutes/regulations and legal opinion regarding what notice is required and when. Exhibit 1 (Bates No. 7-11); [CM/ECF Doc. 166-2 Bates No. 82 & 31922]. Importantly, Sarrao and Bradshaw (a) solicited input and consent from AHSW regarding legal services provided or documents drafted, and (b) did not exclusively provide legal services to AHSW, as testimony and the privilege logs demonstrate that the firm of Spilman Thomas & Battle PLLC were also involved in providing legal analysis and legal counsel on these very issues. *See, e.g.,* Dunmyer 25:24-30:4; Sarrao 22:15-23:14. In short, the actions Plaintiffs complain of is not AHS imposing control over AHSW. It is ASHW receiving ordinary legal counsel from one of its varied sources.

     5.    <u>Ordinary LLC Member Management Is Not Evidence Of De Facto Control.</u>

     The Plaintiffs' claim that AHS exercised de facto control over AHSW by virtue of AHSW's and AHSOV's operating agreement. [CM/ECF Doc. No. 164 p. 4]. Specifically, they claim AHS exerted de facto control over AHSW because AHSW is member managed by AHSOV, who is in turn manager managed by Manager AHS. *Id.* Plaintiffs' assertion of de facto control, however, is a misstatement of basic LLC law. The fact that AHSW is member-managed by AHSOV, and AHSOV is manager managed by AHS does not, in and of itself, mean that (a) AHS exerted de facto control over AHSW sufficient to constitute joint employer status under the WARN Act, or (b) that AHS and AHSW jointly operated OVMC. Every LLC is either member-managed, or manager-managed. W. Va. Code §31B-4-404. The operating agreements of AHSW and AHSOV just demonstrate that, of the two management options available to LLCs, AHSW chose the former and AHSOV chose the latter. Importantly, <u>neither</u> of the operating agreements grant extraordinary control to the applicable manager or member—instead, the operating agreements

both limit themselves to the authority granted by applicable LLC laws (AHSOV's grant authority is "in accordance with public laws, regulations" and AHSW's is "subject to the limitations of the [Delaware Limited Liability Company Act]"). [CM/ECF Doc. No. 166-2 Bates No. 2212-2226]; Exhibit 1 (Bates Nos. 16449-6526). Additionally, Plaintiffs ignore the role that the Special Manager (held by a third party nonlitigant) could play in the management of AHSOV, which is also expressly outlined in its operating agreement. *Id.* Thus, the operating agreements of AHSW and AHSOV do not evidence de facto control by AHS. They are just standard LLC operating agreements that, as required, designate a form of management whose authority is limited by law.

Importantly, decisions of the Fourth Circuit and district courts clearly hold that the "de facto exercise of control" WARN Act factor is not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of membership or ownership. *See, e.g., Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987) (noting parent company "retains the benefits of limited liability even if it exercised *some* control over the . . . subsidiary"); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 503 (3d Cir. 2001); *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997) (holding only a "significant departure from the ordinary relationship between a parent and its subsidiary" is sufficient to pierce the corporate veil). As the Fourth Circuit has noted, "if members or managers were liable whenever they exercised their rightful control, then limited liability" inherent to limited liability companies would be a "meaningless fiction." *Johnson*, 814 at 980. As stated above, the actual terms of the LLC operating agreements for AHSW and AHSOV are limited by law to the authority usually granted to a member or manager. Thus, they demonstrate nothing more than the "ordinary" management terms common to LLC agreements, all of which is insufficient to establish single employer liability. Taken together, Plaintiffs' reliance upon the LLC agreements to show de facto control is contrary to (a) the terms

of those LLC agreements, and (b) Fourth Circuit law that ordinary parental control of a subsidiary is not de facto control warranting single employer status.

6.      The Management Services Agreement is Not Evidence of De Facto Control.

The Plaintiffs also point to the mere existence of a Management Services Agreement ("MSA") between AHS, AHSOV, and AHSW as evidence of extraordinary or de facto control. [CM/ECF Doc. No. 164 p. 4]. A close reading of that the MSA, however, shows that it does not grant AHS unfettered or extraordinary control over AHSOV, AHSW or OVMC. The MSA with AHSW expressly states that AHSW "shall at all times retain control over [OVMC's] assets and operation," that "all medical and professional matters shall be the responsibility of [AHSW]," that AHSW retains "sole control" over the hire and termination of OVMC employees, and that AHSW "shall have authority and responsibility to oversee the provision of health care services for [OVMC] and to conduct, supervise and direct the day-to-day operations of [OVMC]." [CM/ECF Doc. No. 166-2 at Bates No. 2190-2211). Additionally, the MSA requires AHS to secure AHSW's prior written authorization before making any "major decisions" like selling the company, making a material change to the scope of services, or entering into transactions that could terminate the hospital. *Id.* Thus, AHSW expressly retained the authority to control both "day-to-day operations" and "major decisions" regarding OVMC under the MSA. Importantly, AHS waived any payments it could receive from AHSW under the MSA. Exhibit 2 (Sarrao 23:20-25:6). Thus, the MSA did not grant AHS extraordinary or de facto control over AHSW and Plaintiffs' reliance is misplaced.

7.      Conclusion On Single Employer Status.

Plaintiffs cannot hold AHS liable under the WARN Act unless it satisfactorily proves that AHS was a single employer of the Plaintiffs along with AHSW. In doing so, Plaintiffs rely exclusively on the allegation that AHS exerted de facto control over AHSW, ignoring all other

DOL factors or state law. This alone warrants denial of the Motion as to AHS. Even if Plaintiffs were permitted to pin single employer liability on only de facto control, however, all of the alleged evidence of such control is misplaced or mischaracterized. Plaintiffs merely point to a standard LLC agreement, an MSA that expressly reserves control to AHSW, a single frustrated e-mail that goes against the weight of the evidence, and typical legal services. Thus, they have failed to sustain their burden and the Motion should be denied in its entirety as to AHS.

II.   ASHW's WARN Notice To Employees Complied With The Applicable Regulations.

Plaintiffs claim AHSW's WARN notice to Plaintiffs was noncompliant, and demand 60 days of damages. The Defendants explain why AHSW's notice was compliant in section II of "Defendants' Motion for Summary Judgment" and incorporate that section herein by reference. [CM/ECF Doc. No. 166 § II]. Further, the Motion's specific claims of noncompliance fail as:

- Plaintiffs look solely at the August 8, 2019 letter to employees and none of the other writings provided to employees regarding closure of OVMC, including the August 7 email, press release, or employee Q&A; or September 3 email about suspension of services. *See, e.g., In re AE Liquidation, Inc.*, 522 B.R. 62, 70 (Bankr. D. Del. 2014) ("The Court must consider whether the communications to employees, read together, satisfy the WARN Act."); [CM/ECF Doc. No. 166-2 Bates No. 82, 3135, 6707-6712).

- Plaintiffs all testified that they read at a minimum the August 8, 2019 letter and understood that their employment would cease as of October 7, 2019. Ullum 32:18-21; 32:22-33:1 & 44:4-18; Garan 32:6-9; 32:22-33:15; Schenkel 66:3-15; Reed 39:18-40:20. Thus, the Motion's claim that the August 8, 2019 letter failed to indicate employment would end is erroneous in light of Plaintiffs' own testimony.

- Any failure to reference to bumping rights is not a basis for finding inadequate notice, particularly when the hospital had no seniority or bumping policy. *See, e.g.*, 20 C.F.R. § 639.7(a)(4) ("[i]t is not the intent of the regulations, that . . . minor, inadvertent errors are to be the basis for finding a violation of WARN."); *Nagel v. Sykes Enterprises, Inc*., 383 F. Supp. 2d 1180, 1198 (D.N.D. 2005) (finding no violation of WARN Act for failing to include mention of bumping rights); 54 Fed.Reg. 16042, 16060 (1989)).

- Plaintiffs claim the August 8 letter included a "false" date of closure of October 1, 2019. First, the Defendants clearly dispute that it was a "false" date either now or when written. Second, Plaintiffs provide no legal support for the notion that WARN notice is entirely invalid if the purported date subsequently changes. Third, in the alternative,

AHSW updated that date in the September 3 email to all employees. [CM/ECF Doc. No. 166-2 Bates No. 3135].

Taken together, valid notice was provided by AHSW and there is no basis for liability or damages for a 60 day period.

III.     There Was No "Scheme" To Avoid WARN Act Liability.

Plaintiffs accuse the Defendants of participating in a "scheme" to "evade" WARN Act liability by "listing employees on the books (as if they were still working)." [CM/ECF Doc. No. 164 p. 8-9]. To be clear, the Defendants deny any "scheme" or false bookkeeping. The Defendants also deny any efforts to "evade" WARN Act liability other than compliance with that statute. Plaintiffs were on the books until October 7 because that is when their employment ended, for the reasons stated more fully in Section III of the "Defendants' Motion for Summary Judgment," which is incorporated herein by reference. [CM/ECF Doc. No. 166 §III]. From the outset, AHSW's and AHS' goal was to find a buyer or investor so that OVMC would not close on October 7 like it was noticed to. *See, e.g.* Dunmyer 27:6-7 ("But everybody tried to figure out, how can we keep it open?); Krissman 24:18-25:2 ("our goal was, we were focused on, on sale, and either a joint venture or some other arrangement to keep the facility open"); Reddy 31:12-34:2 (goal was to "keep hospital alive"); Sarrao (170:6-171:22). That is why when the Employee Q&A provided to Plaintiffs via email August 7 asked "[i]s it certain that the hospitals will close on October 7, 2019" and the answer was "No. If a viable buyer comes forward that date could be pushed back or even cancelled. However, at this time the hospitals have no offer to purchase from any party and is beginning the closure process." [CM/ECF Doc. No. 166-2 Bates 6708-9]. When Sarrao was directly asked whether there was any "expectation" that employees flexed to fewer hours due to patient census in September 2019 "were going to return to work," Sarrao was emphatic and clear: during that time period, there was "still hope" that a sale, acquisition, partnership or other

arrangement with a third party to "reopen the hospital and keep the hospital going." Sarrao 170:6-171:22. That hope is also why certain services were "suspended" as opposed to "closed"—because "suspended" services are more attractive to potential partners or buyers. To this end, AHSW and AHS continued to exhaustively seek buyers, investors, and funding after both the August closure announcement[6] and the September suspension of certain services.[7] [CM/ECF Doc. No. 165 §IV]; Sarrao 98:18-99: ("We did more and more in August, and September, and October, different options"). At no time did ASHW or AHS simply give up on finding a solution to keep OVMC open. The optimism in the summer of 2019 that a buyer, investor, or funding would come forward to keep OVMC open was shared amongst leadership for AHSW and AHS. *See, e.g.,* Dunmyer 15:23-17:17; Reddy 31:12-32:4 ("very confidant" a buyer would come forward); Sarrao 99:11-100:6 ("I still thought there was an opportunity to sell OVMC, or do something with somebody including WVU, or Wheeling Hospital, as it relates to OVMC."). This was also shared by staff at OVMC, as reflected in the "huddle highlights" e-mail Plaintiffs cite in the Motion, which says that staff are encouraged "to continue to do what we can to strengthen what we offer and continue to show people we are viable" for sale or investment. *See* Exhibit 12 (Bates No. 2730-1). Taken together, AHSW was not "scheming" to try and avoid WARN Act liability—it continued to employ Plaintiffs and other OVMC employees through October 7 (unless the employee voluntarily

---

[6] In August 2019, there were discussions, meetings, data sharing and/or site visits between AHSW and AHS and at least a dozen potential buyers, investors, or partners: Trinity Health, Wheeling Hospital, Northwood Health, WVU Medicine, Prime Healthcare, GR&W, Inc., Firm Healthcare System LLC, a physicians group based in Atlanta, and Universal Health Services, and City of Wheeling/Redevelopment Partnership. [CM/ECF Doc. No. 166-2 at Bates No. 34942; 34927-8; 34972; 34991-2; 35012-3; 35071-2; 35078-80; 35103-4]; Dunmyer 14:11-17:17 & 58:15-59:7; Sarrao 98:2-100:9. There were also discussions with UPMC, CommonSpirit, Monarch Health Services Group, Allergy Services of America LLC, Access Ohio, Cleveland Primecare Belmont who all signed an NDA just before in July. [CM/ECF Doc. No. 166-2 at Bates Nos. 34110, 34115, 34980-2, 35536].

[7] In September 2019, there were discussions, meetings, data sharing and/or site visits between AHSW and AHSW and Trinity Health, Prime Healthcare, interested buyer represented by John Scott Law, Diamond Health, WVU Medicine, and ICA Group. [CM/ECF Doc. No. 166-2 at Bates Nos. 34173; 34991-2; 35624-5; 34927-8, 35581]. That month, teasers were also sent out to 14 medical groups regarding EORH, which would in turn have also eased the burden on OVMC. Letters seeking aid were also provided to the WV Governor and Most Reverend Mark E. Brennan, Bishop of the Catholic Diocese of Wheeling-Charleston. *Id.* (Bates No. 16430-16432 & 16435-16440); Dunmyer 23:22-25:1.

left earlier) in hopes that a third party buyer, investor, or strategic partner would permit (a) the hospital to remain open and (b) Plaintiffs' hours to resume before that date.

IV.    <u>In the Alternative, The Faltering Business Exception Applies And There Is No Violation.</u>

In the alternative, even if Plaintiffs have satisfied their burden of proving AHSW provided inadequate notice (which they have not), it qualifies for the faltering business exception. This exception permits AHSW to give less than 60 days' notice if the employer "was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business." 29 U.S.C. § 2102(b)(1). AHSW's qualification for this exception—including a recitation of the exhaustive efforts of AHSW and AHS to find a buyer, funding, or investor—is detailed in Section IV of "Defendants' Motion for Summary Judgment," which is incorporated herein by this reference [CM/ECF Doc. No. 166 §IV]. For the reasons articulated therein and herein, AHSW may provide less than 60 days' notice and there is no violation of the WARN Act.

V.    <u>In The Alternative, The Good Faith Exception Applies To Reduce Or Eliminate Damages.</u>

In the alternative, even if AHSW is found to have violated the WARN Act, the Court should use its discretion to reduce the amount of liability or penalty pursuant to the good faith exception. 29 U.S.C. § 2104(a)(4). AHSW's qualification for this exception is detailed in Section V of "Defendants' Motion for Summary Judgment," which is incorporated herein by this reference [CM/ECF Doc. No. 165]. For the reasons articulated therein and herein, there is sufficient evidence of AHSW's good faith to warrant reduction—if not elimination—of any damages award for a violation of the WARN Act.

<u>CONCLUSION</u>

For the many reasons stated above, Plaintiffs' Motion is riddled with factual inaccuracies, and mischaracterizations of record documents. Given the Motion is based upon the same, it must be denied in its entirety. Further, Plaintiffs provide, at best, threadbare legal analysis that fails to meet their burden as to the many aspects of a WARN Act violation. Accordingly, the Motion should be denied.

**ALECTO HEALTHCARE SERVICES LLC and ALECTO HEALTHCARE SERVICES WHEELING LLC**

By Counsel,

**SPILMAN THOMAS & BATTLE, PLLC**

<u>/s/ Kevin L. Carr</u>
Kevin L. Carr (WV Bar # 6872)
Chelsea E. Thompson (WV Bar #12565)
Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard, East
Charleston, WV  25301
Telephone: 304.340.3800
Fax: 304.340.3801
E-mail: kcarr@spilmanlaw.com
E-mail: cthompson@spilmanlaw.com

Michael S. Garrison (WV Bar # 7161)
48 Donley Street, Suite 800 (Zip: 26501)
P. O. Box 615
Morgantown, WV 06507-0615
Telephone: 304.291.7920
Fax: 304.291.7979
E-mail: mgarrison@spilmanlaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**KEITH REED, ELIZABETH SCHENKEL,
EMILY WINES, MARK GARAN and
AUGUST ULLUM, individually and on
behalf of others similarly situated,**

      **Plaintiffs,**

**v.**                                  **Civil Action No.: 5:19-cv-263
(Judge John P. Bailey)**

**ALECTO HEALTHCARE SERVICES LLC,
and ALECTO HEALTHCARE SERVICES
WHEELING, LLC d/b/a OHIO VALLEY
MEDICAL GROUP and d/b/a OVMC
PHYSICIANS,**

      **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

     I, Kevin L. Carr, certify that, on July 22, 2022, I served the forgoing "**DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**" on the parties via ECF E-Filing as follows:

| | |
|---|---|
| Timothy F. Cogan, Esquire<br>tfc@walslaw.com<br>Cassidy, Cogan, Shapell & Voegelin, L.C.<br>The First State Capitol Building<br>1413 Eoff Street<br>Wheeling, WV  26003 | Maureen Davidson-Welling, Esquire<br>mdw@stembercohn.com<br>John Stember, Esquire<br>jstember@stembercohn.com<br>Stember Cohn & Davidson-Welling, LLC<br>The Hartley Rose Building<br>425 First Avenue, 7th Floor<br>Pittsburgh, PA  15219 |
| Laura Davidson, Esquire<br>laura@ourfuturewv.org<br>Bren Pomponio, Esquire<br>bren@msjlaw.org<br>Mountain State Justice, Inc.<br>1217 Quarrier Street<br>Charleston, WV 25301 | F. Alex Risovich, Esquire<br>alex.risovich@risovichlaw.com<br>Risovich Law Offices, PLLC<br>3023 Pennsylvania Avenue<br>Weirton, WV  26062 |

                              /s/Kevin L. Carr
                              Kevin L. Carr (WV State Bar # 6872)