IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

AT WHEELING

\* \* \* \* \* \* \* \*

KEITH REED, LISA DOLENCE, ELIZABETH \*

SCHENKEL, EMILY WINES, MARK GARAN   \*

and AUGUST ULLUM, individually and  \*

on behalf of others similarly       \*

situated,                           \*

    Plaintiffs                      \*   Case No.

    vs.                             \*   5:19-cv-00263-JPB

ALECTO HEALTHCARE SERVICES, LLC and \*

ALECTO HEALTHCARE SERVICES WHEELING,\*

LLC d/b/a OHIO VALLEY MEDICAL GROUP \*

and d/b/a OVMC PHYSICIANS,           \*

    Defendants                      \*

\* \* \* \* \* \* \* \*

DEPOSITION OF

LEXMAN REDDY

May 31, 2022

Any reproduction of this transcript is prohibited without

authorization by the certifying agency.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

EXHIBIT 3

2

1                          DEPOSITION

2                              OF

3    LEXMAN REDDY, taken on behalf of the Plaintiffs herein,

4    pursuant to the Rules of Civil Procedure, taken before

5    me, the undersigned, Michael G. Sargent, CVR, a Court

6    Reporter and Notary Public in and for the State of West

7    Virginia, Via Videoconference, on Tuesday, May 31, 2022,

8    beginning at 1:05 p.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT 3

3

1                         A P P E A R A N C E S

2

3      BREN J. POMPONIO, ESQUIRE

4      Mountain State Justice, Inc.

5      1217 Quarrier Street

6      Charleston, WV  25301

7           COUNSEL FOR PLAINTIFFS

8

9      MICHAEL S. GARRISON, ESQUIRE

10     Spilman, Thomas & Battle, PLLC

11     48 Donley Street, Suite 800

12     Morgantown, WV  26501

13          COUNSEL FOR DEFENDANTS

14

15     CHELSEA E. THOMPSON, ESQUIRE

16     Spilman, Thomas & Battle, PLLC

17     300 Kanawha Boulevard, East

18     Charleston, WV  25301

19          COUNSEL FOR DEFENDANTS

20

21

22

23

24

EXHIBIT 3

4

1                           I N D E X

2

3     WITNESS: LEXMAN REDDY

4     EXAMINATION

5        By Attorney Pomponio                    7 – 57

6     DISCUSSION AMONG PARTIES                   57 – 58

7     CERTIFICATE                                    59

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 3**

5

1                          EXHIBIT PAGE

2

3                                                        PAGE

4    NUMBER      DESCRIPTION                         IDENTIFIED

5    Exhibit 1  Loan Agreement                          18

6    Exhibit 2  Management Services Agreement           22

7    Exhibit 3  E-mails                                 35

8    Exhibit 4  E-mails                                 38

9    Exhibit 5  E-mails                                 --

10   Exhibit 6  Letter to State                         41

11   Exhibit 7  Press Release                           43

12   Exhibit 8  Letter to Employees                     48

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT 3

6

1                            OBJECTION PAGE

2

3     ATTORNEY                                        PAGE

4     Garrison                                      21, 40

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 3**

7

1          S T I P U L A T I O N
2   ------------------------------------------------------------
3   (It is hereby stipulated and agreed by and between counsel
4   for the respective parties that reading, signing, sealing,
5   certification and filing are not waived.)
6   ------------------------------------------------------------
7          P R O C E E D I N G S
8   ------------------------------------------------------------
9                    LEXMAN REDDY,
10  CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
11  HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
12  FOLLOWS:
13                       ---
14                  EXAMINATION
15                       ---
16  BY ATTORNEY POMPONIO:
17      Q.    Hello, Mr. Reddy.
18            My name is Bren Pomponio.
19            I represent the Plaintiffs in this matter and
20  I'll be taking your deposition today.
21            Would you please state your full name for the
22  record?
23      A.    My name is Lexman, L-E-X-M-A-N.  Last name
24  Reddy, R-E-D-D-Y.  But I go by Lex Reddy.

EXHIBIT 3

27

1     A.    It was in collaboration with the local

2   management team.

3     Q.    Okay.

4           And what form did that take?

5     A.    Communications between AHS and OVMC and the

6   management teams.

7     Q.    And what communication --- what was the

8   communication?  What specific communication?

9     A.    I don't recall the specifics.

10    Q.    Was it e-mail?

11    A.    Yes, it's one form of communication.

12    Q.    So are you testifying that there was an e-mail

13  that provided OVMC prior written authorization for the

14  suspension of activities at the hospital?

15    A.    Oh, there were discussions.  There were

16  different forms of communication.  That's what I'm

17  referring to.

18    Q.    Okay.

19          But all of the communication that we're

20  discussing here was written?

21    A.    We have written communications too.

22    Q.    You have written communications with the

23  hospital from AHS providing authorization, prior

24  authorization.

EXHIBIT 3

28

1          Is that the way your testimony is?

2     A.    No.   I'm testifying that there were written

3  communications, constant meetings held, and as I said to

4  you today, I don't have the specific documents with me.

5     Q.    Are you aware of any existence, as you sit here

6  today, the existence of any written document describe ---

7  providing authorization to the hospital prior to the

8  closure of OVMC?

9     A.    I don't recall.

10    Q.    Between 2017 and the beginning of 2019, how

11  would you describe the condition of OVMC's physical

12  infrastructure and equipment?

13    A.    Good.

14    Q.    How would you describe its financial condition?

15    A.    Not so good.

16    Q.    Okay.

17          After the Defendants acquired OVMC, did the

18  hospital suffer operating losses in 2017?

19    A.    To the best of my recollection, yes.

20    Q.    What about 2018?

21    A.    Yes.

22    Q.    2019?

23    A.    Yes.

24    Q.    Did you recall whether OVMC performed worse

**EXHIBIT 3**

29

1   financially than other AHS-owned hospitals?

2        A.   I don't have anything in front of me to say

3   that.

4        Q.   Do you have any recollection as you're sitting

5   here today whether OVMC was performing worse financially

6   than AHS' other hospitals?

7        A.   I don't know.

8        Q.   Do you know if OVMC had a pension plan?

9        A.   Yes.

10       Q.   Do you know whether it was underfunded?

11       A.   Yes.

12       Q.   Do you know --- do you recall by how much it

13   was underfunded?

14       A.   No, I do not.

15       Q.   So at some point in 2019, did AHS decide it was

16   going to try and sell the hospital, OVMC?

17       A.   Yes.

18       Q.   Why did you decide --- and were you involved in

19   those decisions to sell the hospital?

20       A.   Yes.

21       Q.   And why did you first decide to try to sell the

22   hospital?

23       A.   Conditions had changed dramatically from the

24   time of acquisition.  Providers had left the competition

EXHIBIT 3

31

1      Q.    How long did you --- do you recall how long you
2  spent trying to find a buyer for OVMC?
3      A.    On and off quite a few times, a few months,
4  including from the date of announcing the closure.
5      Q.    And did you receive any interest in --- from
6  any buyer at any time?
7      A.    People had expressed an interest but could
8  never come to the conclusion of such discussions of them
9  buying the hospital.
10     Q.    Any offers?  Any formal offers?
11     A.    No formal offers, but discussions.
12     Q.    By the summer of 2019, what was your view on
13 whether you would be able to sell the hospital?
14     A.    Very confident.  Hoping that they would find a
15 suitable buyer and keep the hospital alive for the
16 community.
17     Q.    So you would describe the months --- after the
18 months of trying to find a buyer, not receiving any
19 formal offers, you yet still had a very confident opinion
20 that you were going to ultimately sell the hospital?
21     A.    Yes.
22     Q.    What informed that?
23     A.    I'm sorry.
24     Q.    What informed that optimism?

EXHIBIT 3

32

1      A.     Training in healthcare just in general and

2  having a community hospital being there, that someone

3  would step up to the plate and work with the community

4  hospitals.

5      Q.     In 2019, during this time when you're trying to

6  sell the hospital, did you apply for any financing to try

7  to keep it open longer?

8      A.     Yes, we had approached entities, including HUT,

9  to see if they have ability to get refinancing done

10 through the HUT mechanism.  Then approached the

11 congressman to see if they could help us out, along with

12 reaching out to other bankers to see if it would get the

13 refinancing done.

14     Q.     Let's talk about the refinancing.  What was

15 your role, if any, in seeking the refinancing for OVMC?

16     A.     Talking to the various lenders, the bankers

17 that might have a potential interest in working with the

18 package of refinancing.

19     Q.     Okay.

20            So you spoke specifically with these lenders

21 that you are referring to?

22     A.     Yes.

23     Q.     And how many different lenders did you speak

24 with about refinancing?

**EXHIBIT 3**

33

1     A.    I don't have specific numbers in my head as I
2   sit here today.
3     Q.    Do you recall any specific --- the identity of
4   any specific lender that you recall approaching for
5   financing in 2019?
6     A.    We had engaged Tycoon by the name of Tanter to
7   obtain the discussions to various bankers.
8     Q.    And any other lenders that you recall
9   approaching about refinancing in 2019?
10    A.    I don't recall the specific names.
11    Q.    Okay.
12          And tell me about those discussions with
13  Tanter.  Was there a written, formal loan application
14  provided through Tanter?
15    A.    I don't remember specifics now.
16    Q.    Do you remember the specifics of any
17  discussions that you had with Tanter?
18    A.    No.   Just to see if there were potential
19  opportunities for any of the bankers that would be
20  interested in refinancing, that they would do that.
21    Q.    Do you recall any formal application for credit
22  that you undertook at this time?
23    A.    I don't recall specifics.
24    Q.    Do you recall whether there was any written

EXHIBIT 3

34

1   request for funds in 2019 to keep OVMC open?

2       A.   I don't recall.

3       Q.   Was there discussions among the managers at AHS

4   about obtaining additional financing for OVMC in 2019?

5       A.   Yes.

6       Q.   Did you participate in those discussions?

7       A.   Yes.

8       Q.   And what were the major --- what was the

9   substance of those discussions?

10      A.   To explore various options, to get funding for

11  the hospital, to see if we could get lower cost of

12  financing, and how we would get additional funds to

13  continue the operations, hoping they would turn around

14  operations.

15      Q.   Did you have any reservations or concerns about

16  --- about taking out more funds and financing the fund

17  OVMC operations?

18      A.   No, we thought we could make a successful

19  operation.  So we believed in the facility.  We believed

20  in the operations, and we thought we would give it all

21  that we had.

22      Q.   Did you --- did anybody at --- any of the other

23  managers express concerns or reservations about taking

24  out more funds to fund the continued operation?

**EXHIBIT 3**

39

1     Q.   Do you recall when the plan to close OVMC was

2  publicly announced in 2019, the date?

3     A.   No, I do not recall the date.

4     Q.   If I represent to you that it was publicly

5  announced on August 7th, 2019, would you have any reason

6  to dispute that?

7     A.   I don't.

8     Q.   And this decision to close the hospital that

9  was announced on August 7th, 2019, who specifically made

10  that decision?  Provided I understand what you were

11  saying that consent was needed from MPT, but who made the

12  additional decision?

13     A.   It was a joint effort between the local

14  management and the executives at Alecto.  And we had to,

15  like you said, get approval of the bankers involved.  It

16  was not a unilateral decision.  It was a collaborative

17  effort to see what other options existed and before we

18  came to the conclusion and saw a lot of things, but with

19  the local management.

20     Q.   That meeting on July 29, 2017, when --- with

21  MPT that was Deposition Exhibit Number 4 describes, was

22  the local management involved in those meetings to your

23  recollection?

24                ATTORNEY GARRISON:

EXHIBIT 3

40

1            Object.  He's testified that he doesn't

2     recall the specifics of the meeting.

3     BY ATTORNEY POMPONIO:

4         Q.    You can answer, Mr. Reddy.

5         A.    No, like you said, it's 2017.  So I don't know

6     what meeting you're referring to.

7         Q.    No, I'm sorry.  It was July 29, 2019.

8         A.    I don't recall the specifics.

9         Q.    I'm not asking --- I'm not asking you for the

10    specifics.  I'm asking you if you recall whether or not

11    any local managers were involved in that meeting with

12    you, Mr. Redin and Mr. Carlis and Mr. McLean and Mr.

13    Sarrao?

14        A.    I don't know.

15        Q.    Do you ever recall a meeting that you had with

16    MPT in which the local managers, as you described them,

17    would have attended?

18        A.    Yes.

19        Q.    What was your role in --- your job duties in

20    the closure of OVMC?

21        A.    Communicating with the local management team.

22    Communicating with the bankers involved.  Looking for

23    various options to see if we could continue to find

24    buyers even at the last minute.  Continue to explore

EXHIBIT 3

41

1   various options of making sure that the patients were

2   being cared for and the resources that the local folks

3   needed were available at all times.

4            And the local folks were actively engaged

5   because most of the activities are done at the local

6   levels.  And so making sure that --- being accessible and

7   available to the local management team were my

8   priorities.

9        Q.   Did you contact any of the West Virginia State

10  officials regarding the decision to close OVMC?

11       A.   Yes, I do recall having conversations, but do

12  not remember the dates or the specifics of them.

13       Q.   And do you recall what particular --- what

14  specific West Virginia State official you had discussions

15  with regarding the closure of OVMC?

16       A.   No, I do not recall.

17       Q.   You don't remember one name or one state

18  official?

19       A.   No.

20                         ---

21                  (Whereupon, Reddy Deposition

22                  Exhibit 6, Letter to State, was

23                  marked for identification.)

24                         ---

**EXHIBIT 3**

42

1                    ATTORNEY POMPONIO:

2               Okay.

3               Could you pull up Deposition Exhibit

4     Number 6, please?  Now, if you scroll down to the

5     attachments?  Well, let's stop here for a second.  I'm

6     sorry.  It will be just to identify this to Mr. Reddy

7     first.

8     BY ATTORNEY POMPONIO:

9          Q.    You're looking at what's been marked as

10    Deposition Exhibit 6.  It's a letter dated August 8,

11    2019, to the director of Office of Health Facility

12    Licensure and Certification in Charleston, West Virginia.

13                   ATTORNEY POMPONIO:

14              And if you go down a little bit ---

15    BY ATTORNEY POMPONIO:

16         Q.    --- I'll represent to you that this letter

17    attaches a signed timeline schedule of events.

18                   ATTORNEY POMPONIO:

19              And so if we go right here to the second

20    page, can you rotate the view so that it's straight up?

21    BY ATTORNEY POMPONIO:

22         Q.    While we wait for this, I'll represent to you

23    that it states here closure timeline for OVMC.

24              Do you recall having reviewed this closure

EXHIBIT 3

43

1   timeline for Ohio Valley Medical Center?

2        A.    I don't recall.

3        Q.    All right.

4              Do you recall that --- there's an October 1st,

5   2019 date on this timeline.  Do you recall that date as a

6   target date for closure of the hospital?

7        A.    I'm sorry.  I'm waiting for something to see.

8   I'm not sure.

9        Q.    I'm just asking you, you see right here at the

10  top it says October 1st, 2019?

11       A.    No.

12       Q.    The left-hand side?  Do you see that date, Mr.

13  Reddy?

14       A.    Yes.  Yes, I do.

15       Q.    Do you recall that being the target date for

16  completing closure of the hospital?

17       A.    Yes.

18                              ---

19                     (Whereupon, Reddy Deposition

20                     Exhibit 7, Press Release, was

21                     marked for identification.)

22                              ---

23                     ATTORNEY POMPONIO:

24                     Okay.

EXHIBIT 3

44

1              Could you please pull up Exhibit 7?  I

2    think that's what we're on now.

3              Right?  Yeah.

4    BY ATTORNEY POMPONIO:

5        Q.    Okay.

6              I'm showing you what's been marked as

7    Deposition Exhibit 7.  Have you --- do you recall seeing

8    this press release sometime before?

9        A.    Yes, I do.

10       Q.    Okay.

11             And it says that acute and emergency medical

12   services will be suspended on September 4th, 2019.

13             Correct?

14       A.    Yes.

15       Q.    When was the --- if you recall --- well, let me

16   ask you this first.  Do you recall when this decision was

17   made to suspend those services?

18       A.    No, I don't remember the dates.

19       Q.    Were you involved in the decision to suspend

20   these services?

21       A.    Yes, I was.

22       Q.    Who else was involved in that decision?

23       A.    All the teams, the local management team

24   because it had a lot to do with the accessibility of

EXHIBIT 3

45

1    staff services available and the ability to care for the

2    patients and making sure that the patient's safe came

3    first.

4        Q.    Do you --- did you have any discussions with

5    the local managers in September of 2019, about this

6    suspension of services?

7        A.    We had constant communication when we decided

8    we were going to close down the services.  There was

9    constant communication at the local management team, the

10   local clinical staff, and the local medical staff

11   involved in the process.

12       Q.    Okay.

13             And so you recall that you had personally

14   constant communications during this time with all those

15   individuals we just described?

16       A.    Yes.

17       Q.    What do these constant communications look

18   like?

19       A.    What services they had available, discussed the

20   path that we're to take, and giving other options

21   available, how do we get the staffing that's needed,

22   making sure that there is constant communication with the

23   physicians and other providers involved.

24             So this --- these are ongoing discussions that

Sargent's Court Reporting Service, Inc.
1-800-727-4349

**EXHIBIT 3**

46

1    you need to have through this process.

2         Q.    Do you recall any discussions specifically with

3    Daniel Dunmyer on September 3rd or September 4th, 2019?

4         A.    I don't remember the dates.

5         Q.    Do you have a specific recollection of any

6    discussions with Daniel Dunmyer about the suspension of

7    services at OVMC in September of 2019?

8         A.    I don't remember the specifics.  But like I

9    said, there were constant communications about the

10   process.

11        Q.    Do you know whether --- do you know how from

12   AHS communicated to Mr. Dunmyer that these services were

13   going to be suspended?

14        A.    It was a joint effort.  I can't remember the

15   specifics, but sometimes two or three executives were

16   involved in communicating.  We had calls scheduled to

17   communicate.  So there's nothing specific about one or

18   two individuals, but it's a joint effort that we all had

19   to make.

20        Q.    And when these services were discontinued,

21   suspended, pardon me, do you recall your discussions with

22   the other members of AHS?

23        A.    As I said, nothing specific I remember, but we

24   had constant communications because it was an important

Sargent's Court Reporting Service, Inc.
1-800-727-4349

EXHIBIT 3

47

1    aspect to coordinate with the local management team and

2    with us involved to make sure that the communication was

3    clear.

4         Q.    Do you have any familiarity with the WARN Act?

5         A.    Yes, I do.

6         Q.    Okay.

7               What is your understanding of the WARN Act?

8         A.    There are seven guidelines established that

9    need to be followed when it comes to laying off employees

10   or replacing employees, to the best of my knowledge.

11        Q.    And in 2019, when OVMC was closed, whose job

12   was it at AHS to ensure the closure complied with the

13   WARN Act?

14        A.    As I said, we had legal advice.  Attorneys were

15   involved in the process.  And it was up to the leaders

16   constantly to follow the protocols established.

17        Q.    What's your understanding of the notice

18   requirements of the WARN Act?

19        A.    I don't know specifics of it.

20        Q.    Do you have any knowledge about what, if

21   anything, AHS did to provide notice, WARN Act notice, to

22   the Ohio Valley Medical Center employees?

23        A.    To the best of my knowledge, I believe we

24   followed the protocols established under the --- under

Sargent's Court Reporting Service, Inc.
1-800-727-4349

EXHIBIT 3

48

1    the other guidelines.

2        Q.    But you don't have any personal knowledge about

3    notice requirements under the WARN Act.

4            Correct?

5        A.    No.

6        Q.    And so you can't really testify as to whether

7    legal Counsel for AHS followed those notice requirements.

8            Correct?

9        A.    Well, to the best of my knowledge, we followed

10   the guidelines.  That's all I know.

11                        ---

12                    (Whereupon, Reddy Deposition

13                    Exhibit 8, Letter to Employees,

14                    was marked for identification.)

15                        ---

16                    ATTORNEY POMPONIO:

17                    Okay.

18                    Can we bring up Exhibit 8, please?  Okay.

19                    Can you scroll down a little bit?  Okay.

20   You can stop there.

21   BY ATTORNEY POMPONIO:

22       Q.    Mr. Reddy, I'm showing you what's been marked

23   as Deposition Exhibit 8.  It's a letter to the employees

24   of Ohio Valley Medical Center.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

**EXHIBIT 3**

49

1          Do you recall seeing this letter at some other

2    time?

3        A.    Yes, I do recall.

4        Q.    Do you know who drafted this letter?

5        A.    Legal Counsel involved.

6        Q.    And do you know who was responsible for

7    physically mailing these letters out?

8        A.    I don't.

9        Q.    Do you recall reviewing this letter prior to it

10   being sent?

11       A.    I could have been involved, but I don't recall

12   specifics.

13       Q.    Do you recall anybody else besides legal

14   Counsel who was --- I assume you mean Mr. Sarrao was

15   involved in drafting and mailing of this letter?

16       A.    There would have been from the local management

17   team, from local HR, from the local executives involved.

18       Q.    And what about AHS?  Do you know of anybody

19   besides Mr. Sarrao that was involved in the drafting or

20   mailing of this letter?

21       A.    Mark Bradshaw might have been involved.

22       Q.    Do you have any knowledge about how many of

23   these letters were sent?

24       A.    No, I don't.

EXHIBIT 3

59

```
 1   STATE OF WEST VIRGINIA           )

 2                   CERTIFICATE

 3           I, Michael G. Sargent, Certified Verbatim

 4   Reporter and a Notary Public in and for the State of

 5   West Virginia, do hereby certify:

 6           That the witness whose testimony appears in

 7   the foregoing deposition, was duly sworn by me on said

 8   date, and that the transcribed deposition of said

 9   witness is a true record of the testimony given by said

10   witness;

11           That the proceeding is herein recorded fully

12   and accurately;

13           That I am neither attorney nor counsel for,

14   nor related to any of the parties to the action in

15   which these depositions were taken, and further that I

16   am not a relative of any attorney or counsel employed

17   by the parties hereto, or financially interested in

18   this action.

19           I certify that the attached transcript meets the

20   requirements set forth within article twenty-seven, chapter

21   forty-seven of the West Virginia Code.

22

23                                   _____
                                     Michael G. Sargent

24                                   Certified Verbatim Reporter
```

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Michael G. Sargent
Sargent's Court Reporting Service, Inc.
Southpointe Towne Center, Suite 1234
Morgantown, WV 26505
My commission expires July 9, 2025

Sargent's Court Reporting Service, Inc.
1-800-727-4349

**EXHIBIT 3**