```
 1           IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 3   ---------------------------------X
 4   KEITH REED, LISA DOLENCE,         :
 5   ELIZABETH SCHENKEL, EMILY WINES,  :
 6   MARK GARAN, CHRISTINA LUCAS, AND  :
 7   AUGUST ULLUM, INDIVIDUALLY AND    :
 8   ON BEHALF OF OTHERS SIMILARLY     :
 9   SITUATED,                         :
10                Plaintiffs,          :
11        v.                           : CASE NO.:
12   ALECTO HEALTHCARE SERVICES LLC,   : 5:19-CV-00263-JPB
13   AND ALECTO HEALTHCARE SERVICES    :
14   WHEELING, LLC D/B/A OHIO VALLEY   :
15   MEDICAL GROUP AND D/B/A OVMC      :
16   PHYSICIANS,                       :
17                Defendants.          :
18   ---------------------------------X
19                     CONFIDENTIAL
20   Deposition of ALECTO HEALTHCARE SERVICES LLC, AND
21    ALECTO HEALTHCARE SERVICES WHEELING, LLC D/B/A
22       OHIO VALLEY MEDICAL GROUP AND D/B/A OVMC
23                      PHYSICIANS
24            (Caption continued on next page)
```

EXHIBIT 2

```
 1         (Caption continued from previous page)
 2
 3      By and through its designated representative
 4                    MICHAEL SARRAO
 5                  CONDUCTED VIRTUALLY
 6                 Friday, July 1, 2022
 7                      11:16 a.m.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22  Job No.: 455057
23  Pages: 1 - 156
24  Reported by: Kelly Walters, RVR, CVR
```

```
 1            Deposition of MICHAEL SARRAO, conducted
 2   virtually.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15            Pursuant to agreement, before Kelly
16   Walters, RVR, CVR, and Notary Public in and for the
17   State of Ohio.
18
19
20
21
22
23
24
```

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        TIMOTHY F. COGAN, ESQUIRE
 5        CASSIDY, COGAN, SHAPELL & VOEGELIN, LC
 6        The First State Capitol Building
 7        1413 Eoff Street
 8        Wheeling, West Virginia 26003
 9        (304) 232-8100
10
11   ON BEHALF OF THE PLAINTIFF:
12        MAUREEN DAVIDSON-WELLING, ESQUIRE
13        STEMBER COHN & DAVIDSON-WELLING, LLC
14        The Hartley Rose Building
15        425 First Avenue
16        7th Floor
17        Pittsburgh, Pennsylvania 15219
18        (412) 338-1445
19
20
21
22
23
24
```

```
 1            A P P E A R A N C E S  (Continued)
 2
 3      ON BEHALF OF THE DEFENDANTS:
 4           CHELSEA E. THOMPSON, ESQUIRE
 5           MICHAEL S. GARRISON, ESQUIRE
 6           SPILMAN THOMAS & BATTLE, PLLC
 7           300 Kanawha Boulevand, East
 8           Charleston, West Virginia 25301
 9           (304) 357-4475
10
11
12
13
14
15
16   ALSO PRESENT:
17   JESSIKA BLANK, Technician
18
19
20
21
22
23
24
```

```
 1                    C O N T E N T S
 2   EXAMINATION OF MICHAEL SARRAO                       PAGE
 3       By Ms. Davidson-Welling                           7
 4
 5                     E X H I B I T S
 6              (Attached to the transcript)
 7   MIKE SARRAO DEPOSITION EXHIBITS                     PAGE
 8    EXHIBIT 1    Deposition Notice AHS                   10
 9    EXHIBIT 2    Deposition Notice AHS Wheeling          13
10    EXHIBIT 3    Intercompany Transfer Report            33
11    EXHIBIT 4    WARN Act Notice                         53
12    EXHIBIT 5    Employee Spreadsheet                    55
13    EXHIBIT 6    2019 Benefit Booklet                    78
14    EXHIBIT 7    Code Dictionary                         82
15    EXHIBIT 8    Employee Census Report                  90
16    EXHIBIT 9    Employee List                          107
17    EXHIBIT 10   Clock Punch Report                     112
18    EXHIBIT 11   Payroll Register                       138
19
20
21
22
23
24
```

```
1                P R O C E E D I N G S
2     Whereupon,
3                    MICHAEL SARRAO,
4     being first duly sworn or affirmed to testify to
5     the truth, the whole truth, and nothing but the
6     truth, was examined and testified as follows:
7         EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
8     BY MS. DAVIDSON-WELLING:
9         Q    All right.  Good morning or good
10    afternoon, as the case may be.
11        A    Good morning.
12        Q    All right.  So would you please state
13    your full name for the record?
14        A    Michael Joseph Sarrao, S-A-R-R-A-O.
15        Q    All right.  And who is your current
16    employer, Mr. Sarrao?
17        A    I am self-employed.
18        Q    Okay.  All right.  And before we go any
19    further -- so this is a corporate deposition.  You
20    understand that, correct?
21        A    I do.  I understand it's 30(b)(6), and
22    I'm designated as a person most qualified.  Yes, I
23    do.
24        Q    Okay.  And you've been designated by two
```

1   made by Alecto Wheeling to AHS for other services?
2        A    There were no payments made, and they
3   weren't for service.  There were intercompany
4   entries for certain expenses, but not for other
5   services.  Some of those expenses relate to travel
6   expenses for people to come out there that were at
7   another hospital, but they were never paid.  They
8   were reflected in the intercompany account, but
9   they were never paid.  There was actually no
10  payments made.
11       Q    Were there any payments that were owed
12  by Alecto Healthcare Services Wheeling to AHS for
13  management services?
14       A    Not for management services because we
15  -- in the management services agreement, Alecto
16  has the right to defer or not accrue those
17  management -- those fees that would be due, and
18  Alecto never accrued those and no payments are due
19  for that.
20       Q    Okay.  So basically AHS waived any
21  payments that were due?
22       A    Correct.  For management services,
23  correct.
24       Q    For management services.  Who made the

```
 1   decision that AHS would waive the management fees?
 2        A    Myself, Mr. Reddy, and Mr. Krissman.
 3        Q    And when was that decision made?
 4        A    June 1, 2017.
 5        Q    And that decision, that stayed the same
 6   throughout the time that OVMC was in operation?
 7        A    Correct.  Alecto has never accrued any
 8   receivable fees under the management services
 9   agreement from Alecto Wheeling from the day Alecto
10   Wheeling was formed until present.
11        Q    What was the reason that AHS decided to
12   waive any management fees?
13        A    Because Alecto -- well, for two reasons
14   -- well, I guess three reasons.  One, it had a
15   right to.  Two, Alecto Wheeling didn't have
16   sufficient cash to support the payment -- free
17   cash to support the payment of fees under the
18   management services agreement.  I guess there's
19   four reasons.  The third reason would be that
20   there is a subordination agreement in place
21   between MPT and Alecto Healthcare Services that
22   the payment of the management fees would be
23   subordinated to the payment of obligations of MPT,
24   so we don't want to trip that up.  And forth, if
```

1   we accrued the management fees, certain financial
2   covenants would be triggered even worse.  But end
3   of the day, Alecto Wheeling didn't have the money
4   to pay the management fees, so we elected not to
5   collect the management fees -- the management
6   services fees.
7       Q   Okay. All right. Okay.  With respect
8   to little I(2), do you see that asks specifically
9   about payments for distributions made by Alecto
10  Wheeling to AHS for any other reason?  Do you see
11  that?
12      A   Yes.  I see that.
13      Q   Okay. All right.  And were there any --
14  let's break down payments and distributions into
15  two different questions.  So with respect to
16  payments, were there any payments made by Alecto
17  Wheeling to AHS for any other reason in the 2017
18  through 2019 period?
19      A   Actual payments, no.  There were things
20  accrued back and forth in the intercompany
21  account, but no payments were made for anything to
22  Alecto Healthcare Services.
23      Q   And what about distributions?  Were
24  there any distributions that were made by Alecto

**EXHIBIT 2**

```
 1   Wheeling to AHS?
 2       A    Well, first off, distributions -- if
 3   Alecto Wheeling was making distributions, it
 4   wouldn't make them to Alecto Healthcare Services.
 5   It would make them to Alecto Ohio Valley.  But
 6   more importantly, there was never any
 7   distributions made.
 8       Q    Okay.  So if Alecto Wheeling had been in
 9   a position to make distributions, it would've made
10   them to Alecto Healthcare Services Ohio Valley,
11   which -- but in fact, there weren't any
12   distributions during that time period, correct?
13       A    Correct.  There were no distributions,
14   but if there would've been, it would have been
15   made to Alecto Wheeling's member, which was Alecto
16   Ohio Valley.
17       Q    Okay.  And so Alecto Ohio Valley is,
18   sort of, a shorthand name for Alecto Healthcare
19   Services Ohio Valley LLC, correct?
20       A    That's correct.  Yes.
21       Q    Okay.  And sometimes that same entity is
22   referred to as AHSOV, correct?
23       A    Yeah.  I think in this litigation -- I
24   always think of it as Alecto Ohio Valley, but I
```

1    know in this litigation it is.  It's the same
2    entity we're talking about.
3         Q    Okay.  Okay.  All right.  So then
4    turning back to this first topic here.  Number 3
5    asked about payments made by AHS on behalf of a
6    AHSW, right?  Is it fair to say there were
7    payments that were made by AHS on behalf of AHSW?
8         A    There were payments that were made, yes.
9         Q    Okay.  What kinds of payments were made,
10   just, sort of, general category?
11        A    General categories.  Certain -- there
12   were some consulting fees as it relates to the
13   certificate of need application early on in '17
14   when initially -- when Alecto Wheeling was going
15   to acquire OVMC, there was a certificate of need
16   application filed, and we had to engage a
17   consultant to help with that.  There were certain
18   purchase services primarily related to software
19   vendors, different software services that were
20   paid.  There are a few payments to me because,
21   like, I paid the registered agent fee, and then I
22   got reimbursed.  There was some contract labor.
23   For a while we had an interim CFO, Chuck Cave.  He
24   was paid by Alecto, then it was intercompanied to

1   Alecto Ohio Valley.  We had legal fees, and that
2   includes both fees paid to defense counsel in
3   certain settlements that were required to be made
4   by either the malpractice insurance carrier or
5   because Alecto was named as a defendant.  I'm
6   trying to think what else.  There were purchase
7   services -- accounting and audit fees.  So Moss
8   Adams was our auditor, so there were fees paid in
9   connection with that.  There were also audits as
10  it relates to the pension plan.  Alecto Ohio
11  Valley sponsored a frozen pension plan.  So there
12  were audit fees related to that that had to be
13  paid, and those were paid by Alecto.  And then
14  there was some, you know, just miscellaneous --
15  I'll call them miscellaneous things, but there
16  were different things that were paid.  I think
17  there is a report that's out there, but that's my
18  -- those are the general categories of things.
19  And then insurance is the big thing.  So the
20  insurance for -- not health insurance, but, like,
21  malpractice insurance, property insurance,
22  liability insurance, workers' comp, those were all
23  under master policies issued to Alecto.  So then
24  Alecto would pay the premium and then those

```
 1   premiums would be allocated among the facilities
 2   that were insured under the policies.  So that's a
 3   monthly expense as well.  And there's some other
 4   things, but generally it's -- a third party was
 5   paid or something that was paid.  And then if it
 6   was specific to Ohio Valley or East Ohio, it was
 7   allocated.  If it was, like, an insurance -- if it
 8   was a specific thing, the whole -- if it was a
 9   bill, things got moved over.  If it was, like,
10   insurance premiums, we had an allocation process,
11   and that was allocated.
12        Q    When you say that there was an
13   allocation process, can you tell me what you mean
14   by that?
15        A    Yeah.  So for, like, the insurance
16   premium -- I'm just making this number up.  If the
17   insurance premium was $100,000, that insurance
18   covered more than just Ohio Valley, like, for
19   malpractice insurance.  And so we would take the
20   $100,000 -- Mr. Krissman did it originally.  He
21   set up the allocation method, and then Mr. Redin
22   followed it with my recommendation or approval, so
23   to speak, of how we would allocate that premium.
24   And generally, we allocated it based on patient
```

```
1          A    No.
2          Q    Okay.  All right.  And specifically,
3    what information did you obtain from Mr. Bradshaw
4    related to this topic?
5          A    I confirmed that we talked to the local
6    team at OVMC.  We were concerned about their
7    administrative capacity to handle the notices, and
8    that we asked Spilman Thomas and Battles'
9    administrative team to actually send out the
10   notices to the employees to generate the -- the
11   letter was generated by OVMC.  They take the
12   letter, stuff it in an envelope, generate the
13   envelope with the address label, and mail it out
14   so it would be mailed from West Virginia rather
15   than California, so it would get to employees
16   quicker.  And there were concerns about the
17   administrative capacity at OVMC to do that.  So
18   that's what I confirmed.  And then I got -- I
19   secured the employee list that was used to send
20   out the notices.
21         Q    Okay.
22         A    But I just confirmed -- that was my
23   understanding, and I confirmed that with
24   Mr. Bradshaw.
```

Transcript of Michael Sarrao Continued
Conducted on July 1, 2022       52

```
1        Q    Okay.  So there was a written notice
2   that was sent to employees; is that right?
3        A    Correct.
4        Q    Okay.  And that notice was sent on
5   August 8th of 2019?
6        A    Yes.
7        Q    Okay.  And that was the date that it was
8   sent to all of the employees on the employee list?
9        A    I think that was the date it was mailed
10  to everybody.  Whether they received it on that
11  day -- it was August 8th, yes.
12       Q    Okay.  So the August 8th letter was
13  sent out to all of the OVMC employees on
14  August 8th, 2019?
15       A    That would've been required to get the
16  notice, yeah.  It wasn't like we did it in
17  tranches where, like, week one, we sent a hundred,
18  week two, we sent a hundred.  No.  It was all done
19  at the same time.
20       Q    Right.  So all the letters were sent out
21  the same day?
22       A    Correct.
23       Q    Okay.  And that was August 8th of
24  2019?
```

1      A    Correct.
2      Q    Okay.  And just to make sure that
3  we're -- we know what we're talking about --
4           MS. DAVIDSON-WELLING:  Would the court
5  reporter pull up Defendants' 82?
6           TECHNICIAN:  Yes.  Stand by.
7           (Exhibit 4 marked for identification and
8  attached to the transcript.)
9      Q    Okay.  Mr. Sarrao, do you have in front
10 of you what has been marked as Exhibit 4 to this
11 deposition?
12     A    I do.
13     Q    Okay.  And what is this Exhibit 4?  Do
14 you recognize it?
15     A    Yeah.  It's the WARN Act notice that was
16 sent to all the employees who were supposed to
17 receive the WARN Act notice.  So this is the WARN
18 Act notice.  This is -- when -- the reference
19 earlier, the August 8th, 2019, notice, this is
20 the notice.
21     Q    Okay.  And so this notice was sent out
22 to all of the OVMC employees on August 8th of
23 2019 by Spilman and Battle?
24     A    Spilman Thomas and Battle.

Transcript of Michael Sarrao Continued
Conducted on July 1, 2022                54

1    Q    Spilman Thomas.
2    A    Yeah.  Well, the notice was sent out by
3  Ohio Valley Medical Center.  They did the
4  administrative part of it, creating the envelopes,
5  creating the labels, and dropping it in the mail,
6  correct.
7    Q    Just to clarify, this letter here in
8  Exhibit 4 was sent out to all of the OVMC
9  employees by Spilman Thomas and Battle, correct?
10   A    Well, when you say sent out, the notice
11 was sent out by Ohio Valley Medical Center.  The
12 administrative part of putting the letter in an
13 envelope, putting a label on the envelope, and
14 dropping those envelope -- putting postage on the
15 envelope, and mailing the envelope, that was done
16 by administrative staff at Spilman Thomas and
17 Battle, correct.
18   Q    Okay.  Thank you for clarifying. Okay.
19 All right.  Let's see.  All right.  Let's go back
20 to the -- okay.  I -- let's see here.  Let me --
21        MS. DAVIDSON-WELLING:  Let's take a --
22 can we take a quick, like, ten-minute break here?
23        THE WITNESS:  Sure.
24        (Whereupon, a recess was had.)

**EXHIBIT 2**

```
1           CERTIFICATE OF REPORTER - NOTARY PUBLIC
2                 I, Kelly Walters, the officer before whom
3    the foregoing deposition was taken, do hereby
4    certify that the foregoing transcript is a true and
5    correct record of the testimony given; that said
6    testimony was taken by me and thereafter reduced to
7    typewriting under my direction; that reading and
8    signing was requested; and that I am neither counsel
9    for, related to, nor employed by any of the parties
10   to this case and have no interest, financial or
11   otherwise, in its outcome.
12                IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 2nd day of
14   JULY, 2022.
15   My Commission Expires: August 25, 2024
16
17
18
19                        [signature: Kelly Walters]
20
21
22
23
24
```