## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| KEITH REED, ELIZABETH SCHENKEL, EMILY WINES, MARK GARAN, and AUGUST ULLUM, individually and on behalf of others similarly situated, | Case No. 5:19-cv-00263-JPB<br><br>Judge John Preston Bailey<br><br>CLASS ACTION |
| Plaintiffs, | |
| v. | |
| ALECTO HEALTHCARE SERVICES LLC, and ALECTO HEALTHCARE SERVICES WHEELING, LLC d/b/a OHIO VALLEY MEDICAL GROUP and d/b/a OVMC PHYSICIANS, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Timothy F. Cogan, Esq. (WVSB # 764)
**Cassidy, Cogan, Shapell & Voegelin, LC**
The First State Capitol Building
1413 Eoff Street
Wheeling, WV 26003
T.: (304) 232-8100

F. Alex Risovich, Esq. (WVSB # 10866)
**Risovich Law Offices, PLLC**
3023 Pennsylvania Avenue
Weirton, WV 26062
T.: (304)723-2588

Bren Pomponio, Esq. (WVSB # 7774)
Laura Davidson, Esq. (WVSB # 13832)
**Mountain State Justice, Inc.**
1217 Quarrier Street
Charleston, WV 25301
T.: (304) 344-3144

Maureen Davidson-Welling, Esq. (*pro hac vice*)
John Stember, Esq. (*pro hac vice*)
**Stember Cohn & Davidson-Welling, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445

Dated:  July 22, 2022

*Attorneys for Plaintiffs*

# I. INTRODUCTION

This case arises from the 2019 decision of Defendants Alecto Healthcare Services, LLC ("AHS") and Alecto Healthcare Services Wheeling, LLC ("AHSW") (collectively, "Defendants") to close the Ohio Valley Medical Center ("OVMC") without providing named Plaintiffs and nearly 700 other employees with the 60-days advance written notice required by the Worker Retraining and Notification Act of 1988 (the "WARN Act"), 29 U.S.C. § 2101, *et seq*. Defendants' seek dismissal of the entire case, but their Motion for Summary Judgment should be denied. Defendants misinterpret the law, overlook a wealth of evidence favoring Plaintiffs, and have not met their burden on their affirmative defenses.

# II. STATEMENT OF FACTS

Plaintiffs incorporate by reference the statement of facts in their Brief in Support of Plaintiffs' Motion for Summary Judgment. ECF No. 164, pp.2-8.

# III. DISCUSSION[1]

As set forth in briefing attendant to Plaintiffs' Motions to Certify Class and for Summary Judgment, Plaintiffs established Defendants violation of the WARN Act, 29 U.S.C. § 2102, *et seq*.

---

[1] Citations to "Def. Mem." and "DX_" refer, respectively to Defendants' Memorandum [ECF 166] and attached Exhibits [ECF 166-01 thru 166-16]. Citations to "AC ¶ ___" and "AA ¶ ___" are to Plaintiffs' Amended Complaint, [ECF Doc. # 37], and Defendants' Amended Answer, [ECF Doc. # 39], respectively. Citations to "PX __ at __" refer to the exhibits and their bates-stamps numbers, respectively, in the Appendix to Plaintiffs' Motion for Class Certification, [ECF Doc. # 124-1], and citations to "PSX __ at __ refer to the exhibits and bates-stamped numbers, respectively, in the Supplemental Appendix to Plaintiffs' Reply Memorandum to Defendants' Response to Plaintiffs' Motion for Class Certification. [ECF Doc. # 152-1.]; Citations to "PSJX" refer to the exhibits in Plaintiffs Appendix to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment filed herewith.

As more fully set forth below, Defendants' arguments are unavailing, and their Motion for Summary Judgment should be denied.

A.    **Legal Standard**

The standard for summary judgment is well-settled. Notably for the purposes of this Response, the employer bears the burden of persuasion when it raises a defense for its failure to provide the 60-day notice due under the WARN Act. *See Local Union 7107 v. Clinchfield Coal*, 124 F.3d 639, 640-41 (4th Cir. 1997) ("[A]n employer relying on an exception [under the WARN Act] bears the burden of persuasion.") (citing 20 C.F.R. § 639.9).

B.    **Defendants Are a Single Employer Under the WARN Act**

Despite asserting in its Response Brief to Plaintiffs' Motion to Certify Class that the single employer issue has "little bearing on the 'heart' or central issues in this lawsuit," (Def. Mem. at 18), Defendants devote the majority of their Memorandum of Law in Support of their Motion for Summary Judgment arguing that Alecto Healthcare Services LLC ("AHS") is not an employer covered by the WARN Act. *See id.* at 8-16. However, the evidence is overwhelming, and there is no genuine issue of *material* fact Defendants together constitute a single employer subject to the WARN Act.

To determine whether AHSW was controlled by and not independent from AHS, the Court should look to regulations promulgated under the WARN Act, not West Virginia state law on limited liability. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 491 (3d Cir. 2001) ("[T]he Department [of Labor] intended for courts to test for affiliated corporate liability under WARN along the dimensions specifically enumerated in its regulation."); *accord Pennington v. Fluor Corp.*, 19 F.4th 589, 597 (4th Cir. 2021); *Pennington v. Fluor Corp.*, 320 F. Supp. 3d 762, 769-70 (D.S.C. 2018).

The DOL "factors," *see* 20 C.F.R. § 639.3(a)(2), "are guideposts only" and "[s]ingle employer status ultimately depends on all the circumstances of the case and is characterized as an absence of an arm-length relationship found among unintegrated companies." *Local 2-1971 of PACE Intl Union v. Cooper*, 364 F. Supp. 2d 546, 564-65 (W.D.N.C. 2005) (quoting *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1005-06 (9th Cir. 2004)). The Court of Appeals for the Fourth Circuit has recognized that WARN Act liability applied to a parent is particularly suited where "the parent through its own management is responsible for a WARN Act violation." *Pennington*, 19 F.4th at 599. Here, notwithstanding Defendants' mischaracterizations of the relationship between themselves and OVMC management, the evidence is clear that each of the DOL factors supports a finding that AHS and AHSW were a single employer.

First, AHS and AHSW shared common ownership. "Common ownership is the least important factor . . . . Single employer status ultimately depends on all the circumstances of the case and is characterized as an absence of an arm's length relationship found among unintegrated companies . . . . While technical common ownership is avoided by corporate formalities, this actual commonality of ownership satisfies this least important factor." *Cooper*, 364 F. Supp. 2d at 564-65 (quoting *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1005-06 (9th Cir. 2004)). This inquiry is not merely a recitation of the corporate family tree, but an untangling of its branches. *Id.* at 565. Here, AHS attempts to rely on tangled branches to escape liability.

AHSW is a manager-managed LLC chartered in Delaware. It has a principal office address of 101 N. Brand Boulevard, Suite 1780, Glendale, California, 91203. PSJX 6. It lists only one officer, identified as a manager, Alecto Healthcare Services Ohio Valley, LLC ("AHSOV"), located at 101 N. Brand Boulevard, Suite 1780, Glendale, California, 91203. PSJX 6. AHSW is a wholly owned subsidiary of AHSOV, a member-managed LLC chartered in Delaware. It also has

a principal office address of 101 N. Brand Boulevard, Suite 1780, Glendale, California, 91203. PSJX 6. It has two officers, identified as members: AHS (80%) and MPT of Wheeling-Alecto Hospital, LLC (20%). PX3 at 3. AHS lists its principal office address as 101 N. Brand Boulevard, Suite 1780, Glendale, California, 91203. PSJX 6.

Defendants incorrectly focus on whether there is a formal, technical ownership relationship between the two Defendants. What is clear from the record is that there is "an absence of an arm's length relationship found among unintegrated companies." *Id*. at 564-65. AHS VP and General Counsel Michael Serrao testified that AHSOV was "a holding corporation." PSJX1 (Dep. of Michael Sarrao at 46).  AHS' use of an intermediary shell corporation with no assets undermines Defendants' contention that Defendants lacked common ownership.

Second, Defendants concede, as they must, that AHS and AHSW shared common directors, Michael Sarrao and Lex Reddy. (Defs.' Mem. at 10, [ECF Doc. # 145].) They discount this clearly satisfied factor by arguing that Sarrao and Reddy had only limited management duties over OVMC. However, as discussed below, AHS directly managed and controlled the activities of AHSW and OVMC.

Third, the evidence shows that AHS owned, managed, and heavily controlled AHSW. AHS and AHSW jointly operated OVMC. AHSW was nominal operator of OVMC, PX 6 at 16454; as General Manager of AHSOV, *id.* at 16459, AHS controlled AHSOV's subsidiaries, including AHSW. *See* PX 6 at 16468; *see also* PX 9 at 2219 (describing in AHSW bylaws the General Manager's rights of control). AHS controlled all AHSW funds, PX 10, and had management rights over OVMC under a Management Services Agreement ("MSA") whereby AHSW, ASHMF, and AHSOV engaged AHS to manage each of them. PX 11 at 2190 (reflecting AHS' total control and lack of separate decision-makers for AHS-subsidiaries). AHS VP Michael Sarrao signed the MSA

on behalf of AHS *and* each AHS-subsidiary. *Id.* at 2203. AHS exercised such a high degree of control over AHSW that AHSW CEO Dunmyer complained to AHS executives in Aug. 2019 that he and AHSW CFO Coello were excluded and not permitted to provide "input" into organizational decisions. PX 44 at 17440 ("Every day (MRI, drugs etc.) we are hearing of decisions being made without even being part of the discussion let alone being the ones to make the decision.").

In March 2019 AHS was interested only in selling OVMC or shutting it down; AHS was unwilling to spend further capital to operate or improve OVMC—as evidenced by Defendants' decision not to use funds available under the lease agreement with MPT. *See* PX 17 at 35154. When AHS could not sell OVMC and EORH, it began planning to close these hospitals. By July 2, 2019, AHS executives had prepared draft WARN notices to regulators and employees. PX 13. On July 15, 2019, AHS executives met with West Virginia Secretary of Health and Human Resources, Bill Crouch, to alert him to the "extreme distress OVMC and EORH were under" and prepare state officials for the "very real possibility" that the hospitals would close in the coming weeks. PX 5 at 16436. In late July, AHS senior leadership proposed closing one or both hospitals. They held discussions with MPT and their bankers (CNHF) to get approvals needed to shut down without defaulting under AHS' lease and credit agreements. PX 14 at 31918; PX 15; PX 19.

AHS director, Mark Bradshaw was responsible for drafting the defective WARN notice. PX13 at DEFENDANTS 32105. AHS' counsel mailed the notice to employees. AHSW CEO Dan Dunmyer testified he had no knowledge about the WARN Act and no involvement in drafting the notice. PSJX2 (Dunmyer Dep. at 35-37.) Defendants ignore AHS' *de facto* control of AHSW, arguing the decision to shut down OVMC was made in consensus with OVMC management. (Def. Mem. at 12.) This argument misses the point: AHS was responsible for the defective and untimely notice, which gave rise to this suit. *See Ray v. Mechel Bluestone, Inc.*, 2016 U.S. Dist. LEXIS

26314, at *12 (S.D.W. Va. Mar. 2, 2016) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 495 (3rd Cir. 2001)) (*de facto* control factor refers to "whether the parent has specifically directed the allegedly illegal employment practice that forms the basis for this litigation."). Defendants concede AHS and AHSW jointly decided to close OVMC.

Fourth, "In the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy." *Pennington*, 320 F. Supp. 3d at 771 (citing *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 143 (S.D.N.Y. 2004)). As stated earlier, Defendants concede they jointly decided to close OVMC, at the very least. Accordingly, this factor is also satisfied.

Fifth, the dependency of operations factor "addresses three areas of overlap between related corporations; (1) sharing of administrative or purchasing services, (2) interchanges of employees or equipment, or (3) commingled finances." *Pennington*, 320 F. Supp. 3d at 771 (quoting *Guippone v. BH S & B Holdings LLC*, No. 09 CIV.1029 (CM), 2010 U.S. Dist. LEXIS 50482, 2010 WL 2077189 at *6 (S.D.N.Y. May 18, 2010)). AHS controlled all AHSW funds, PX 10, and had management rights over OVMC under a MSA whereby AHSW, ASHMF, and AHSOV engaged AHS to manage each of them. PX 11 at 2190 (reflecting AHS' total control and lack of separate decision-makers for AHS-subsidiaries). The evidence is clear regarding the dependency of operations relating to OVMC.

Considering all factors in the DOL regulation, there is no genuine issue of fact that AHS and AHSW were a single employer for purposes of WARN Act liability.

## C.     Defendants Did NOT Send "Compliant WARN Notices"

Defendants contend AHSW sent "compliant WARN notices," (Def. Mem. at 17-19) — but the facts show they did not provide the best available information and actively misled employees and government officials as to the dates and planned schedule of the OVMC closure in the Notices.

The WARN Act "requires employers who are planning a plant closing…to give affected employees at least 60 days' notice of such an employment action." 20 C.F.R. § 639.2.  Notice is to be in writing, "specific," and based on "the best information available…at the time notice is served." 20 C.F.R. § 639.7(a). Notice to affected employees must tell them: "whether the planned action is expected to be permanent or temporary;" the "expected date when the plant closing or mass layoff will commence;" the "expected date when the individual employee will be separated;" and certain other information. 20 C.F.R. § 639.7(d). Like notice must be provided to the state dislocated worker unit and chief elected local government official, 29 U.S.C. § 2102(1)(a)(2), including the "expected date of the first separation, and the anticipated schedule for making separations." 20 C.F.R. 639.7.  As the DOL stated in promulgating the WARN regulations, "[t]he date of the layoff or schedule of layoff dates is **essential** to enable all recipients of notice to understand when employment losses actually will occur." 54 FR 16042-01 at 16060 (emph. supp.).

Contrary to Defendants' assertions, they did not comply with WARN notice requirements, and did not give specific, best available notice to officials and employees on when plant closure and "employment losses actually will occur." 54 FR. 16042-01 at 16060; *see* ECF No. 124-24; ECF No. 124-22. Indeed, Defendants' original timeframe for closing OVMC, which AHS Manager Sarrao described as "realistic," identified September 8, 2019 as the "target date" for closure, ECF No. 124-29 (PX 18, DEFENDANTS 31919-31922 at 1, 10) —which is almost exactly the date that OVMC shutdown (September 4). However, AHS managers revised the timeframe a day later before submitting it to regulators and elected officials to make it appear they were complying with the requirement to give 60-days' notice. *See* ECF No. 166-02, DX2 at DEFENDANTS 3-6 (Aug. 8 letters from Sarrao to officials and government unit advising that plant closure would occur "October 7, 2019" and all positions would be eliminated "on that date");

ECF No. 124-22 at DEFENDANTS 7-11 (providing J. Marra with "<u>draft</u> timeline with respect to OVMC's operations over the next sixty (60) days").

Additionally, Defendants' Aug. 8 letters to employees misleadingly told them they would "not be scheduled to work after," "Oct. 7, 2019" (when it would be earlier for 97% of them) and Defendants' letters to officials and employees did not disclose their actual intent to layoff ("TLO" or "flex") employees as they cut services, and not pay those employees' wages, while Defendants waited out the remainder of the 60-day notice period. *See* ECF No. 152-06 (PSX5, Sarrao Dep. at 164-165); ECF No. 152-07 (PSX6, Dunmyer Dep. at 39-41). Defendants' purported notice was neither "specific" nor based on "best information available" and lacked "essential" information that employees and regulators needed.

Implicitly recognizing the defects in the August 8 letters to employees and officials, Defendants invite the Court to consider Dunmyer's August 7, 2019 email and attached Employee Q&A and Press Release—but these documents further misled recipients, since *each* advised that closure was likely to take **"60 to 90 days."** *See* DX2 at DEFENDANTS 6707 ("We announced today that we are beginning the closure process of both hospitals which typically takes 60-90 days."); *id.* at DEFENDANTS 6708 ("Absent unusual events, the wind down of the hospitals will take 60-90 days."); *id.* at DEFENDANTS 6711 ("The closure process for facilities like OVMC and EORH typically takes 60 to 90 days and OVMC and EORH will share a definitive timeline with all interested parties in the coming days.").

Tellingly, no Defendant communication told employees or officials what would actually occur, which was that within days Defendants would begin layoffs with no intention of recall; that hundreds would be laid off and effectively terminated within 30 days, and only about 3% of the putative Class would still be working when Defendants claim they permanently laid them off and

terminated them on October 7, 2019. *See* ECF No. 152-02 at ¶11; ECF No. 154 (Sealed Ex. 2). Defendants' senior leadership knew the TLOs were occurring—yet even after announcing OVMC's shutdown of acute and inpatient services on September 4, 2019, Defendants maintained the pretense there was no "employment loss" before Oct. 7, 2019, to try to avoid WARN liability. *See, e.g.*, ECF No. 124-32 at REED1 (notes of 9/3/19 managers meeting where CEO Dunmyer told managers, "Employees will not be laid off at this time, but most will have their hours reduced to zero…Employees cannot be laid off during [W]arn notice period, which ends Oct. 7th.").

Under these circumstances, the official termination dates and schedule offered in the Notices were a sham, a record-keeping fiction, wholly unrelated to the dates on which the Class suffered employment loss or Defendants' expected plant closure to occur, and the notice given amounted to no notice at all. *See, e.g., In re TransCare Corp.*, 611 B.R. 160, 168 (Bankr. S.D.N.Y. 2020) (notices "failed to provide the type of specific information…required by 20 C.F.R. §637(d)(2)" where "average employee…would not have known whether to show up for work the next day or for how long that employment would last."). At minimum, the substantive defects in Defendants' notices create a dispute of material fact whether notice was insufficient.[2]

## D.   Defendants Violated The WARN Act By Depriving Employees Of Wages And Benefits During The Notice Period

Defendants assert there was no WARN violation and the case should be dismissed because OVMC did not have sufficient "employment loss" to qualify as a "plant closing" until October 7,

---

[2] Even if the content of the letters met statutory requirements (it did not), the letters were not sent timely, and did not provide affected employees with 60 days' notice as required. 20 C.F.R. § 639.2. Indeed, Defendants shut OVMC down on Sept. 4, 2019—just 27 days after they mailed the letters. And, even if the letters were mailed on Aug. 8, 2019, they would not have been received that day. Applying the customary three-day mailbox rule (and as USPS does not deliver Sundays), at best, employees received the letters on Monday, Aug. 12, 2019. *See Smith v. N. Virginia Orthodontics Ctr., LLC.*, No. 1:18-CV-1244, 2019 WL 3225686, at *3 (E.D. Va. July 16, 2019) (noting the Fourth Circuit has held that "courts presume receipt [of a letter] three days after mailing.").

2019, "60 days after the employees were given notice." Def. Mem. at 19-23. Defendants are incorrect on the facts and their legal implications.

### 1.        The record establishes the requisite 50 employment losses before October 7

A "plant closure" is defined as a "permanent or temporary shutdown of a single site of employment…if the shutdown results in an employment loss…during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. §2101(a)(2). Here, Defendants' pay and timekeeping records and admissions establish that plant closure occurred at OVMC by September 5, 2019, as reflected in the Fed. R. Evid. 1006 summary chart at ECF 154 (sealed Exhibit 2).

Defendants concede that a plant closure occurred (though they say it happened Oct. 7) and that all employees other than those who Defendants classified as having quit lost employment as a result of OVMC's shutdown. *See* Def. Mem. at 22-23, n.9. Defendants' Aug. 8 notices to employees also establish all employees would lose employment from the same (single) site, *i.e.*, the "hospital and related facilities located at 2000 Eoff Street, Wheeling, West Virginia." ECF No. 124-24 (DEFENDANTS 82); *see also* PSJX3 (Resp. to RFA No. 5, admitting "as of September 2, 2019, OVMC operated at a single location or group of contiguous locations.").[3] Thus

---

[3] In a footnote, (Def. Mem. 19 n.7), Defendants belatedly and erroneously contend AHSW "employed 110 individuals who worked away from OVMC's main campus on Eoff Street in Wheeling," citing as the sole support thousands of pages of inapposite payroll registers at Ex. 2 (Bates Nos. 91-2018 and 14787-15015) that do not establish the proposition asserted.  Moreover, Defendants already admitted in the August 8 notices and RFA responses that all of these employees were associated with and would lose employment from a single site (Eoff Street), and the OVMC operated as single site. The payroll registers Defendants rely on contain data for both employees who worked at OVMC and EORH, and do NOT show or establish that any employee from OVMC worked elsewhere or should be excluded.

the only real issues in dispute relate to when plant closure occurred, and who should be counted

toward the 50-employee threshold.[4]

Under the facts of this case, all employees except part-time workers working less than 20-

plus hours per week)[5] should be counted in determining whether a plant closure, including those

who resigned, since the separations of those who resigned were not "voluntary," 29 USC

2101(a)(6). Those resignations were compelled by Defendants' shutdown of OVMC on September

4, 2019, the elimination of their positions, and unlawful failure to pay their full wages during the

notice period. Indeed, not a single one of the employees from OVMC who Defendants' classified

as having "quit" resigned before the September 4, 2019, shutdown of the hospital. *See* ECF 154,

Sealed Ex. 2 at 10-12 (listing employees classified as having "quit" in order from earliest to latest

last dates of work at OVMC, along with the dates they resigned); 54 FR 16042-01, 16048 ("the

---

[4] Defendants complain—erroneously—that Plaintiffs' supporting chart (ECF No. 154, Sealed Ex. 2) is "misleading" based on Defendants' counts of employees from data sources that included *both* OVMC and EORH employees such as the payroll registers and timekeeping records. Def. Mem. at 19 n.8. However, Plaintiffs painstakingly went through the documents and compiled the data summary only for the group of 734 OVMC employees (some of whom were excluded from class due to working past October 8 or having no hours work at OVMC in 2019 according to pay records as indicated in Note 2 on last page of Chart). Further, Plaintiffs' chart at ECF No. 154 is sorted by termination type ("quit", "resign", "st-low" which is marked "low census" in the chart based on earlier statements by Defendants, but Sarrao recently testified as Defendants' 30(b)(6) designee meant "status-laid off worker." PSJX1, Sarrao 30(b)(6) Dep. at 110. As noted in the Chart itself and related Declaration, ECF 152-02 at ¶¶ 7-11, ECF No. 154 (last page of chart at Note 1), Plaintiffs did not include PTO hours drawn after the point that employees no longer performed any work at OVMC, or hours worked by OVMC after last day of OVMC work at EORH, which was operated by a separate corporation, Alecto Healthcare Services Martinsburg, LLC.

Defendants also complain—without legal citation, *see* Def. Mem. 19 n.8—to inclusion of "casual/per diem" employees, many of whom had worked at OVMC for years if not decades and plainly had ongoing employment even if hours fluctuated. *See* ECF No. 154 (chart reflecting dates of hire for some per diem ("PD") employees going back decades). This argument is meritless; all affected employees were entitled to notice, 29 U.S.C. § 2102(a); 29 U.S.C. § 2101(a)(5).

[5] Employees who work 20 or more hours per week on average are not considered "part-time" under the WARN Act.  29 U.S.C. § 2101(a)(8). Moreover, although "part-time" employees are not counted for purposes of determining whether a plant closure occurred, they are entitled to notice.

ability to reassign workers is not without limits. An employer may not vary the terms of a worker's assignment so much as to constructively discharge…the employee.").

In a footnote, Defendants contend that there was no "pressure or coercion" to support a finding of constructive discharge for those who resigned, *see* Def. Mem. 23 n.9 citing 54 Fed. Reg. 16042, 16048 (1989) and *Long v. Dunlop Sport Grp. Americas, Inc.*, 506 F.3d 299, 204 (4th Cir. 2007), but neither of those citations addresses the type of situation that occurred here, where Defendants prematurely ordered a plant closure and eliminated employees' jobs on less than 60 days' notice <u>and</u> drove them to leave by illegally cutting their wages during the notice period in violation of the WARN Act.[6]  Employees had bills to pay and families to feed, and Defendants' unlawful acts created the exact kind of "coercion" and financial pressure on employees to resign immediately that the WARN Act was intended to prevent. *See, e.g., Collins v. Gee W. Seattle LLC*, 631 F.3d 1001, 1007 (9th Cir. 2011) ("Congress also intended to give terminated employees time to readjust without immediately searching for a new job or being pressured "to mitigate damages by taking any job offered."). Absent evidence to the contrary, resignations under these circumstances were "involuntary" and/or constructive discharges within the meaning of the WARN Act.

All that said, even if only the "full-time" employees who did not resign are considered in determining whether a plant closure occurred, the evidence still establishes that least 50 "full-time" employees had been "TLOed" and had no further work at OVMC by September 5, 2019. *See* ECF

---

[6] "*Long* stands only for the proposition that where an employer 'continues to pay its employees full wages and benefits[,]' the employees do not face an unanticipated 'employment loss' under the WARN Act until the cessation of such wages and benefits." *Morton v. Vanderbilt Univ.*, No. 3:13-01012, 2014 WL 4657473, at *5 (M.D. Tenn. Sept. 17, 2014) (citation omitted). And the DOL merely noted its view that notice given 60-days in advance of a plant closure did not "necessarily" result in constructive discharge.  54 Fed. Reg. 16042, 16048.

154 (Sealed Ex. 2 at 1-4), listing in date order from earliest to latest employees' last date of actual work at OVMC those employees who Defendants claim to have permanently laid off and terminated on October 7, 2019); PSJX1, Sarrao 30(b)(6) Dep. at 89-96 (testifying that "FT is full-time" in spreadsheet at DEFENDANTS 16730, which was data source for employee classifications in chart at ECF 154 (Sealed Ex. 2), *see* last page of Sealed Exhibit 2 identifying "data sources"). At least 50 "full-time" employees who Defendants claim to have terminated on October 7, 2019 were no longer working after September 4, 2019.  ECF No. 152-02 ¶8; ECF No. 154 (Sealed Ex. 2).

### 2. The "temporary layoffs" during the 60-day notice period were "employment loss"

Defendants contends these layoffs during the 60-day notice period could not constitute "employment loss" within the meaning of 29 U.S.C. § 2101(a)(6)—ostensibly because they were neither "employment terminations" nor "reduction in hours of work of more than 50 percent during each month of any six-month period." (Def. Mem. at 20-22.) This argument is misleading.

First, contrary to Defendants' arguments, these layoffs can be reasonably understood as "employment termination" within the meaning of 29 U.S.C. § 2101(a)(6)(A), since Defendants had no objectively reasonable expectation of calling these individuals back to work before the facility permanently shuttered its doors on October 7, 2019. *See* PSJX4, Sarrao Dep. at 170-71 (testifying AHS had no expectation of recalling TLOed employees unless there was an acquisition or other similar event; "something would have had to happen"); 29 C.F.R. § 639.3(a)(1) ("[w]orkers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees."); ECF No. 124-34 at DEFENDANTS 25373 (reflecting that Defendants were working to "reduce" active employees as much as possible, not trying to recall them).

Second, Defendants spend pages knocking down a strawman argument they acknowledge

Plaintiffs disclaimed (*i.e.*, that "employment loss" was based on "reduction in hours"), but,

tellingly, say absolutely nothing about whether the alleged "temporary layoffs" that began between

August 7, 2019, and October 6, 2019, constitute "employment loss" because the layoffs extended

beyond six months.  29 U.S.C. § 2101(a)(6)(B) ("employment loss means…(B) a layoff exceeding

six months"). They do. The WARN Act makes express that layoffs that begin as temporary but

end up extending beyond six months qualify as employment loss *from the date the layoff originally*

*begins*.[7] *See* 29 USC § 2102(c); 54 FR 16042-01 at 16052 (explaining under the WARN Act, a

layoff that is announced as temporary but lasts longer than six months "**is treated as an**

**employment loss from the date of its commencement**"). Thus, whether viewed as "terminations"

or "layoffs," there was "employment loss."

Moreover, as the analogous case of *Gray v. Walt Disney Co.,* 915 F. Supp. 2d 725 (D. Md.

2013) illustrates, Defendants cannot circumvent the WARN Act and avoid paying full wages and

benefits due to employees through record-keeping maneuvers. Thus, under WARN Act and Fourth

Circuit precedents, the district court held that "Once an employer has failed to either give adequate

notice or has failed to continue paying its employees full wages and benefits for 60 days after a

closing, employees are entitled to prove back pay for all of the time they "would have worked"

during the 60–day period."  *Id.*  That holding and reasoning apply equally here, where Defendants

seek to avoid WARN liability through a similar "scheme," and Defendants' efforts should be

---

[7] The only exception to this is where it is originally unforeseeable the leave might extend past six
months, and the employer later gave notice when it first became foreseeable. 29 U.S.C. § 2102(c).
Obviously neither exception applies, since it was entirely foreseeable as of August 7, 2019, that
any layoffs might become permanent when the hospital shut its doors on October 7, and it is
undisputed that Defendants did not give any supplemental WARN notice to employees. PSJX1
(Sarrao 30(b)(6) Dep. at 58).

similarly rejected. In short, the record amply establishes a viable WARN Act claim, and Defendants summary judgment motion should be denied.

**E.**   **Defendants Do Not Satisfy The Requirements for the "Faltering Company" Exception to the WARN Act**

Defendants do not satisfy the elements of the faltering company defense (and ignores the content of the applicable regulation since they cannot satisfy it), and their motion should be denied.

The "faltering company" exception provides,

> if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1). The regulations provide that this exception is to be "construed narrowly," and to avail itself of this exception, an employer "bears the burden" of proving:

> (1) An employer must have been actively seeking capital or business at the time that 60-day notice would have been required. That is, the employer must have been seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially reasonable method. The employer must be able to identify specific actions taken to obtain capital or business.

> (2) There must have been a realistic opportunity to obtain the financing or business sought.

> (3) The financing or business sought must have been sufficient, if obtained, to have enabled the employer to avoid or postpone the shutdown. The employer must be able to objectively demonstrate that the amount of capital or the volume of new business sought would have enabled the employer to keep the facility, operating unit, or site open for a reasonable period of time.

> (4) The employer reasonably and in good faith must have believed that giving the required notice would have precluded the employer from obtaining the needed capital or business. The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating

unit, or site might have to close. This condition may be satisfied if the employer can show that the financing or business source would not choose to do business with a troubled company or with a company whose workforce would be looking for other jobs.  The actions of an employer relying on the "faltering company" exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed.

20 C.F.R. § 639.9(a). In addition, "[t]he employer must, *at the time notice actually is given*, provide a brief statement of the reason for reducing the notice period, in addition to the other elements set out in § 639.7." *Id.* (emph. supp.). Defendants cannot establish the preconditions, or any of the elements of this defense.

*First*, Defendants cannot satisfy the precondition to invoke the defense, i.e., they cannot show that "at the time notice actually is given" they provided "a brief statement of the reason for reducing the notice period, in addition the other" required elements of the notice regulations. *See Newman as Tr. of World Mktg. Tr. v. Crane, Heyman, Simon, Welch, & Clar*, 435 F. Supp. 3d 834, 843–44 (N.D. Ill. 2020) ("Courts to consider the issue appear to have uniformly held that giving proper shortened notice is a prerequisite to invoking one of the statutory exceptions.")(collecting cases); *see, e.g.*, *Weekes-Walker v. Macon Cnty. Greyhound Park, Inc.*, 877 F. Supp. 2d 1192, 1208 (M.D. Ala. 2012) ("The brief statement requirement is not satisfied when…there is no reference to WARN, to the defense, or to the reasons for reducing the notification period.").

Here, Defendants only gave purported WARN notice to employees and officials on August 8, 2019, PSJX1 (Sarrao 30b6 Dep. at 58)—at which point Defendants' informed employees and officials that they are closing OVMC and terminating employees in 60 days, and Defendants never later told anybody it was shortening the notice period because its position was that there was no plant closure or employment loss until Oct. 7, 2019. *See* PSJX4 (Sarrao Dep. at 171-172 ("I don't think there was, like, another follow-up notice saying, hey, we know we said it was 60 days, now

17

it's only going to be 10 days or 15 days or 35 or 40 days. I don't believe so."). As courts have recognized, "Congress included the brief statement requirement …'to prohibit employers who have failed to provide the requisite 60–day notice from asserting litigation-convenient but factually post hoc justifications for their actions.'" *Weekes-Walker*, 877 F. Supp. 2d at 1207. Having never admitted or notified employees and officials of the shortened notice period or reasons for it in 2019, Defendants cannot assert this "ligitation-convenient" "post hoc" justification now.

*Second*, Defendants cannot prove that they were "actively seeking capital or business at the time that 60-day notice would have been required." 20 C.F.R. § 639.9. Defendants cite extensively to their efforts to sell OVMC, (*see* Def. Mem. at 23-26), but the exception does not apply to sales of hospitals. *See In re AE Liquidation, Inc.,* 522 B.R. 62, 67 (Bankr. D. Del. 2014) ("Case law makes clear that a sale of the business does not meet this definition."); *L. v. Am. Cap. Strategies, Ltd.*, No. CIV. 3:05-0836, 2007 WL 221671, at *10 (M.D. Tenn. Jan. 26, 2007) ("The language of the statute and the regulations promulgated pursuant thereto speak in terms of the employer seeking capital or business which would allow the employer to avoid a shutdown, not a sale of the company which would allow another entity to run the company."); *Local 397, Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL–CIO v. Midwest Fasteners, Inc.*, 763 F.Supp. 78, 83-84 (D.N.J. 1990) (negotiating the sale of a company does not qualify as "actively seeking capital").

Further, the vast majority of Defendants' asserted "efforts" listed in its memorandum either do not indicate when they occurred or did not occur "at the time that 60-day notice would have been required," 20 C.F.R. § 639.9 (i.e., at the very beginning of July). (*See* Def. Mem.at 23-27 (vaguely listing "discussions" without reference to dates and listing numerous discussion and acts that took place outside first week of July 2019).) In fact, the only two items that Defendants non-

sale efforts that are listed for June or early July are an informal, oral request to MPT for 20 million dollars (which was flatly denied in that June phone call and provided no reason to delay notice in early July) and the discussion with Access Ohio, which is listed as occurring July 2, but the cited evidence shows the discussion was in August. (*See* Def. Mem. at 24 citing Bates 34115.) Defendants bear the burden of proof and persuasion yet have not come close to offering evidence showing they were actively seeking capital at the beginning of July.

Defendants also cite to vague requests for unspecified "support" from governments and third parties, but it is undisputed in these discussions Defendants never directly asked for money or specified an amount. PSJX4, Sarrao Dep. at 104-107. Nor did Defendants ever ask for specific amounts of financing from its bankers.  PSJX5 (Defs' Suppl. Answers to First Interrogatory No. 7. stating, "No specific funding figures were ever requested"). This evidence is insufficient to establish a material fact dispute (much less judgment in Defendants' favor) as to whether it was "actively seeking" capital or business at all.  *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 250 (3d Cir. 2008), as amended (Oct. 27, 2008) ("this single exchange—which did not constitute a formal request for financing—is insufficient to demonstrate that APA Transport was "actively seeking" financing").

In reality, the evidence shows that Defendants were *only* seeking a buyer for the hospitals, not funds to invest in OVMC. Defendants planned to sell all out-of-state operations, PX12 at DEFENDANTS 33042, had refused to draw down on the 20 million dollars that MPT had made available so as to avoid incurring more debt, PX18 at DEFENDANTS 35154, and had credit line capacity in July 2019 that they had not drawn on, *see* PX14 at DEFENDANTS 31999 (indicating more than $10M remained on facility cap on line of credit).

*Fourth*, Defendants cannot "objectively demonstrate that the amount of capital or the volume of new business sought" in late June or early July 2019 "would have enabled the employer to keep the facility, operating unit, or site open for a reasonable period of time." 20 C.F.R. § 639.9(a). Defendants' do not address what would have been a "reasonable period of time", and do not even acknowledge that OVMC had roughly 20 million dollars in losses in 2018 and first half of 2019, (PX 14 at DEFENDANTS 32003); needed millions of dollars for structural improvements; and was running heavy operating losses monthly in 2019. *Id.* By early July, when notice was due, Defendants already knew that MPT had refused the $20 million that had been requested. *See* PSJX4 (Sarrao Dep. at 43-44, in the phone call where the fund request was made, "Emphatically, he said no."). And Defendants have proffered no other evidence of any specific funding requests made. Thus, Defendant shave not shown any evidence capable of meeting their burden on this element of the defense.

*Fifth*, the evidence does not suggest, much less conclusively establish any "realistic opportunity to obtain the financing or business sought" at that time. MPT had already denied previous requests for funding, *see* PSJX4 (Sarrao Dep. at 43-44, noting in phone call that MPT manager was "surprised we were asking him again. He emphatically said no to $20 million. Or any amount of money, he said no."). Further, Defendants had no collateral that could be offered to secure a new loan from any third-party lender, PSJX4 (Sarrao Dep. at 101-102) (testifying that borrowing was not possible because Defendants "had nothing to offer as collateral."). Even assuming sales of hospitals were considered, which they should not be, Defendants had been trying to sell OVMC and EORH for over a year without success and had no "realistic" likelihood of doing so. PX14 at DEFENDANTS 32000 (reflecting in July 2019 that had been trying to sell hospitals for over 12 months). And, having never actually submitted any formal, written request for

20

financing, PSJX5 (Defs' Supp. Interrog. Answer No. 7 at pp.6-7) it was not realistic to think Defendants would obtain any. Thus, Defendants cannot establish this element of the defense.

Finally, Defendants have not shown that they "reasonably and in good faith…believed that giving the required notice would have precluded" them from "obtaining the needed capital or business." Defendants contend that after closure "things got worse," (Def. Mem. at 27), but they have not shown they reasonably believed any of the government entities from whom they requested "support" would have refused to provide it because of a WARN notice, or that MPT, which was a partial owner, would have refused because of notice, or that Defendants believed no buyer would come forward if WARN notice were given. Indeed, given the various efforts that Defendants have detailed engaging in *after* giving notice, it could fairly be inferred that they thought notice might incentivize buyers or regulators to come forward. Thus, Defendants evidence does not establish its position as a matter of law on this element of the defense either.

The defense is to be narrowly construed. Accordingly, for all these reasons, Defendants' motion for summary judgment on the "faltering company" exception fails. *See, e.g., Messer v. Bristol Compressors Int'l, LLC*, No. 1:18CV00040, 2020 WL 1472217, at *16 (W.D. Va. Mar. 26, 2020) (denying summary judgment).

**E.** **Defendants Failed to Meet Their Burden and Establish the Good Faith Exception.**

Under the WARN Act, a court, in its discretion, may reduce liability if the employer "proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter." 29 U.S.C. § 2104(a)(4). Additionally, the employer bears the burden of proof in establishing the good faith defense and the defense must be narrowly construed. *Washington v. Aircap Indus., Inc*., 860 F. Supp. 307, 315 (D.S.C. 1994) (noting the Fourth Circuit's recognition that rules of construction provides that exemptions from remedial statutes are

to be construed narrowly); *see also*, *e.g.*, *Day v. Celadon Trucking Services, Inc.*, 827 F.3d 817, 836 (8th Cir. 2016).

To begin, the good faith defense would permit a reduction in Plaintiffs' damages, not a bar to liability. Accordingly, to some extent the Defendant's Motion for Summary Judgment on this defense is premature. Nevertheless, Defendants fail to carry their burden that they had the subjective intent to comply with the WARN Act's notice requirement or reasonable grounds for believing that their conduct did not violate the WARN Act. Defendants' August 8, 2018, letters failed to give notice of the employment loss that actually occurred. PX 23. These letters do not specify a termination date and were not based on "best information available" known to the employer. Instead, they misrepresented that OVMC would close on or after October 7, 2019, even though Defendants expected it to close sooner, and planned to cut hours sooner. The October 7, 2019, date in the letters was a sham and a record-keeping fiction, wholly unrelated to the dates on which Plaintiffs suffered employment loss. Rather than evidence of good faith, the evidence suggests Defendants lacked any subjective intent to comply with the WARN Act.

The fact that Defendants later "organized employee forums, daily huddles, drafted recommendations for new jobs, provided multiple employee Q&A, arranged for unemployment site visits, and otherwise supported its employees," (Defs.' Mem. of Law for Summ. J. at 29), does not establish the good faith defense was met. An employer's conduct *after* the WARN Act violation is not relevant to the determination of good faith contemplated by the statute. Rather, "the pertinent inquiry in deciding whether to exercise the court's discretion in favor of reducing the defendant[s'] liability is the defendant[s'] conduct prior to the notice; *i.e.*, whether the act or omission which violated [the Act] was in good faith and whether the employer reasonably believed that the act or omission was not a violation of this Act." *Jones v. Kayser-Roth Hosiery*, Inc., 748

F. Supp. 1276, 1291 (E.D. Tenn. 1990); *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 733 (7th Cir. 2004) (noting that the employer's efforts to help employees find new employment after a deficient warn notice was not evidence of good faith intent to comply with the Act).

Further, the idea that Defendants belatedly realized they needed to "suspend certain medical services to ensure patient safety" resulting in early plant closure in September of 2019 is untenable. Defendants almost certainly knew at the time the decision was made that patient care would be impacted when it began shutting down operations. In fact, Defendants anticipated shutting down OVMC earlier than the October 7, 2019, date, yet proceeded to keep employees on the books to subvert the purposes of the WARN Act. Likewise, employees who were required to use paid time off ("PTO") after their positions were eliminated still suffered an employment loss under the WARN Act. *See Gray*, 915 F. Supp. 2d at ("The . . . 'paid leave in lieu of notice' arrangement challenged by the plaintiffs is in fact a violation of the WARN notice requirement . . . ."). Class members were entitled to sixty days regular wages and benefits under the WARN Act, and this entitlement did not depend on whether they had accrued PTO. Defendant surely has not established that it acted in good faith belief that it was complying with the WARN Act, or that its actions designed to avoid the 60-days statutory damages for its violation was reasonable.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

/s/ Bren J. Pomponio

| | |
|---|---|
| Timothy F. Cogan, Esq. (WVSB # 764) | Bren Pomponio, Esq. (WVSB # 7774) |
| tfc@walslaw.com | bren@msjlaw.org |
| **Cassidy, Cogan, Shapell & Voegelin, LC** | **Mountain State Justice, Inc.** |
| The First State Capitol Building | 1217 Quarrier Street |

1413 Eoff Street
Wheeling, WV 26003
T.: (304) 232-8100

F. Alex Risovich, Esq. (WVSB # 10866)
alex.risovich@risovichlaw.com
**Risovich Law Offices, PLLC**
3023 Pennsylvania Avenue
Weirton, WV 26062
T.: (304)723-2588
F.: (304)723-2504

Dated:  July 22, 2022

Charleston, WV 25301
T.: (304) 344-3144

Maureen Davidson-Welling, Esq. (*pro hac vice*)
mdw@stembercohn.com
John Stember, Esq. (*pro hac vice*)
jstember@stembercohn.com
**Stember Cohn & Davidson-Welling, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445

*Attorneys for Plaintiffs*