IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**KEITH REED, ELIZABETH SCHENKEL,
EMILY WINES, MARK GARAN and
AUGUST ULLUM, individually and on
behalf of others similarly situated,**

    **Plaintiffs,**

v.                                                         **Civil Action No.: 5:19-cv-263**
                                                                   **(Judge John P. Bailey)**

**ALECTO HEALTHCARE SERVICES LLC,
and ALECTO HEALTHCARE SERVICES
WHEELING, LLC d/b/a OHIO VALLEY
MEDICAL GROUP and d/b/a OVMC
PHYSICIANS,**

    **Defendants.**

**DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Alecto Healthcare Services LLC ("AHS") and Alecto Healthcare Services Wheeling, LLC ("AHSW") (collectively, the "Defendants") hereby reply to "Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment" [CM/ECF Doc. No. 172] (the "Response") and in further support of "Defendants' Motion for Summary Judgment." [CM/ECF Doc. Nos. 165-166] ("Motion"). The Motion laid out in detail why there were no genuine issues of material fact and/or the Defendants were entitled to judgement as a matter of law on the sole WARN Act claim. Plaintiffs' Response largely repeats arguments and evidence provided in "Plaintiffs' Motion for Summary Judgment," [CM/ECF Doc. Nos. 163-164] which Defendants have provided detailed opposition to [CM/ECF Doc. No. 170]. In the interest of judicial efficiency and clarity, "Defendants' Response in Opposition to Plaintiffs' Motion to Dismiss" [CM/ECF Doc. No. 170] is incorporated herein by reference, and will be referenced when appropriate below.

# LEGAL ARGUMENT

## I. There is No Single Employer Liability.

AHS can only be liable under the WARN Act if it is a single employer of Plaintiffs alongside AHSW. In the Motion, Defendants address each of the five DOL factors for single employer status and how the same conclusion is reached under state law on LLC veil piercing. In their Response, the Plaintiffs largely repeat the own arguments and evidence on single employer liability from their own dispositive motion. This evidence that Plaintiffs list in both their dispositive motion and Response consists largely of the LLC Operating Agreements for AHSW and AHSOV, the Management Services Agreement, an e-mail from Dan Dunmyer (CEO of OVMC), the involvement of Mark Bradshaw (Corporate Counsel for AHS) in the WARN Notice process, and a draft closure timeline prepared by Michael Sarrao (General Counsel and Executive Vice President of AHS; Executive Vice-President and Secretary of AHSW). In their own response in opposition to Plaintiffs' dispositive motion, Defendants painstakingly analyze each piece of evidence and explained why it does not support a finding of single employer liability. Rather than rehash that analysis, the Defendants incorporate by reference the relevant portion of "Defendants' Response in Opposition to Plaintiffs' Motion to Dismiss" [CM/ECF Doc. No. 170]. The Defendants will also address the handful of new items raised in Plaintiffs' Response below:

First, Plaintiffs continually assert that there is evidence of *de facto* control in the LLC Operating Agreements. That is fully addressed in the Defendants' incorporated response, but it must be noted that, in the Response, Plaintiffs do not correctly describe the management structure of AHSOV (<u>manager</u> managed) or AHSW (<u>member</u> managed) as explained in the LLC Agreements. This further shows that Plaintiffs misunderstand or misapply the LLC Agreements.

2

Second, Plaintiffs claim that AHS "controlled" AHSW funds and point to a single e-mail dated August 7, 2019, regarding AP procedures. *See* Exhibit A (Bates No. 28041-2). This is another mischaracterization, as it assumes that the allegedly "controlled" funds either belonged or were due to AHSW. That is not the case. There is ample testimony about how AHSW received more money under the AR credit line than it ever collected or was entitled to, and that OVMC was being subsidized by other hospitals. *See, e.g.*, Sarrao 46:15-48:4 (explaining AR lending agreement in detail). The report for the credit line confirms that, even after the August 7, 2019, e-mail cited by Plaintiffs, AHSW was receiving money well and above what it had actually made or collected. For example, in August 2019 (the same month that Plaintiffs claim AHS was "controlling" AHSW funds), AHSW received $9,110,000.00 under the credit line even though it only collected $7,855,365.04 of its own AR—meaning AHSW walked away that month with $1.2 million more than it was due. Looking at 2019 as a whole, AHSW was freely given $6.8 million more and, over the course of its entire operation, AHSW was given $11.4 million more than it was due. This is in addition to the nearly $8 million in AHS funds that were used to pay for AHSW expenses. *See* [CM/ECF No. 166-2 Bates No. 36419 & 36424-6]. Therefore, the Plaintiffs' claim that AHS was "controlling" or withholding funds that belonged to AHSW is absolutely false.

Third, Plaintiffs claim the Defendants did not use money available to AHSW under its lease with an MPT subsidiary. This is another warped interpretation. As explained in deposition testimony, the referenced money was earmarked exclusively for capital improvements to buildings, and was not "free" money—it would be factored into a new, higher rent payment. Given that AHSW had already defaulted on the ease and stopped paying rent payment in October 2018, it was not eligible to draw on that money, could not afford to raise its rent, and could not otherwise afford to cease operations at the hospital while construction was ongoing. In fact, the Defendants

asked for that money to be used as <u>operating cash,</u> which was what was needed, and were denied. Thus, any implication that the Defendants ignored available funds available is false.

Finally, but importantly, the fact that AHSW and AHS jointly decided to close OVMC does not evidence "*de facto* control" or single employer liability. There is a real and meaningful difference between a joint decision or "consensus" as happened here, and the type of "control" that Plaintiffs urge happened or justify single employer liability. In the Response, Plaintiffs cite *Pennington v. Fluor Corp.*, 320 F. Supp. 3d 762 (D.S.C. 2018) and *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136 (S.D.N.Y. 2004) to support their argument that AHS is liable as a single employer because it jointly made the decision with AHSW to close OVMC. Those cases do not support Plaintiffs' argument because they are factually distinct. In *Pennington*, there was evidence and argument that the parent entity "<u>controlled</u> the decision to terminate all the employees." 320 F. Supp. 3d at 771 (emphasis added). In *Vogt*, the parent similarly "<u>controlled</u> the ultimate decision to close the plant." 318 F. Supp. 2d at 143 (emphasis added). Simply put, the type of "control" referenced in *Pennington* and *Vogt* is not applicable here. Dunmyer testified extensively about his participation and his team's participation in coming up with different solutions and alternatives; discussions internally and with AHS about the same; how he personally came to believe that OVMC could not remain open; and his personal involvement in the "open" discussion and "consensus" that OVMC would close. Dunmyer 13:23-22:24. This is very different from of the type of "control" referenced in Plaintiffs' case law.

This difference between "control" and "consensus" is one often reviewed when a party tries to hold a parent liable under the "direct liability" theory. As explained by the United States District Court for the Southern District of West Virginia, the "direct liability" doctrine holds a parent entity liable when "in degree and detail, actions <u>directed to the facility</u> by an agent of the

4

parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5402230, at *8-9 (S.D.W. Va. Sept. 26, 2016) (quoting *United States v. Bestfoods*, 524 U.S. 51, 72, 118 S. Ct. 1876, 1889, 141 L. Ed. 2d 43 (1998)) (emphasis added). The Third Circuit has explained direct liability this way: "direct" liability may attach if the parent has overridden the subsidiary's ordinary decision-making process and ordered it to institute an unfair labor practice, or to create discriminatory hiring policies. In this way, direct liability functions essentially as a kind of "transaction-specific" alter ego theory. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001). The Third Circuit's description of "transaction-specific" alter ego theory is precisely what Plaintiffs try to do here: hold grandparent entity AHS responsible alongside AHSW because AHS jointly participated in the "transaction" of deciding to close OVMC. Thus, the case law on direct liability is analogous and insightful, particularly when it highlights that direct liability is found only when a parent is "controlling," "forcing a subsidiary to take a particular action," "overrid[ing] the subsidiary's ordinary decision-making process," "exercising complete domination over the [subsidiary's] decisionmaking," or "order[ing]" a subsidiary to take action. 2016 WL 5402230, at *8-9; 247 F.3d at 487; *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 753 (7th Cir. 1989). These descriptions are a far cry from the "open discussions," solution and options braining storming, "consensus" and joint decision making that has been testified to in this matter. Dunmyer 13:23-23:21; Reddy 27:18-29:5; Sarrao 134:9-135:14. Accordingly, Plaintiffs' claim that single employer liability applies because AHSW and AHS jointly made the decision to close OVMC is not supported by their cited case law, and analogous case law on direct liability highlights why: AHS did not order, direct, dominate, force, or control AHSW into closing OVMC.

5

For these reasons and the reasons listed in the Motion and "Defendants' Response in Opposition to Plaintiffs' Motion for Summary Judgment," there is no genuine issue of material fact and AHS is entitled to judgment as a matter of law that it is not a single employer with AHSW.

## II. <u>Plaintiffs Received Adequate Notice of OVMC's Closure on August 7</u>.

Plaintiffs' argument that they received inadequate notice of the plant closure under the WARN Act focuses on one requirement—the "expected date when the plant closing will commence and the expected date when the individual employee will be separated." 20 C.F.R. § 639.7. The August 7 e-mail, August 7 Employee Q&A, August 7 press release, and August 8 letters all identified October 7 as the target closure date. [CM/ECF Doc. 166-2 Bates No. 82 & 6707-6712]. The Employee Q&A and letter also *notified employees that employment would cease as of October 7*, unless an employee was terminated before then under the hospital's usual policies on discipline. *Id*. Plaintiffs' argument that AHSW failed to specify the "expected date when the plant closing will commence" assumes that AHSW lied when it notified employees that their employment would cease as of October 7. Plaintiffs' only support for their argument that the notice was inadequate is their speculation that the October 7 employment termination date was a "sham." [CM/ECF Doc. No. 172 p. 10]. This argument ignores the undisputed fact that, unless an employee voluntarily resigned before October 7, 2019, AHSW continued to pay his or her benefits, PTO, and wages for hours worked through October 7, 2019. [CM/ECF No. 166 p. 21-22]. The October 7 termination date listed in the letter, e-mail, and Q&A cannot be a "sham" or "lie," because AHSW continued to provide those essential elements of employment through the listed date. Accordingly, the October 7 date provided to employees was accurate. As the Fourth Circuit has noted, "the nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135,

140 (4th Cir. 2008) (internal quotation omitted). Plaintiffs' speculation is insufficient to overcome summary judgment and AHSW provided adequate notice under the WARN Act.

### III. "Employment Loss" Occurred On October 7 And Plaintiffs Had Adequate Notice.

The WARN Act provides "any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff . . . ." 29 U.S.C. § 2104(a)(1). Establishing liability under the WARN Act requires Plaintiffs to prove they suffered "an employment loss as a result of" the plant closing. "Not every negative turn in employment circumstances constitutes an 'employment loss' for purposes of the WARN Act." *Graphic Commc'ns Int'l Union, Loc. 31-N v. Quebecor Printing (USA) Corp.*, 252 F.3d 296, 299 (4th Cir. 2001). Relevant to this action, the WARN Act defines an "employment loss" as "an employment termination, other than a discharge for cause, voluntary departure, or retirement . . . ." 29 U.S.C. § 2101(a)(6). Plaintiffs cannot prove they suffered an "employment loss" without adequate notice. Plaintiff Garan voluntarily departed before AHSW's closure for a job with better compensation. And the remaining Plaintiffs did not suffer an "employment loss" because a reduction in hours is not an "employment termination." Because Plaintiffs cannot prove they suffered an "employment loss" without 60 days' notice, the Court should grant summary judgment and dismiss Plaintiffs' claims under the WARN Act.

### A. Plaintiff Garan Cannot Prove He Is Entitled To Relief Under The WARN Act Because He Resigned To Accept A Better Paying Position Elsewhere.

A "voluntary departure" is not an employment loss under the statutory definition. 29 U.S.C. § 2101(a)(6). Contrary to Plaintiffs' argument, the law does not presume every employee who quits after a plant closing is announced has involuntarily quit. According to the Department of Labor, which is responsible for interpreting the WARN Act, "a worker who, after the announcement of a plant closing or mass layoff, decides to leave early *has not necessarily been*

7

*constructively discharged or quit 'involuntarily.'*" Worker Adjustment Retraining and Notification, 54 Fed. Reg. 16,042, 16,048 (Apr. 20, 1989) (emphasis added). Courts, including the Fourth Circuit, have accepted the DOL's interpretation. *See, e.g.*, *Chain v. N. E. Freightways, Inc.*, No. 16 CIV. 3371 (JCM), 2020 WL 7481142, at *7 (S.D.N.Y. Dec. 18, 2020) ("The Court defers to the DOL's interpretation of 'voluntary departure' since it is an agency's reasonable interpretation of an ambiguous statute that it has administered."); *Long v. Dunlop Sports Grp. Americas, Inc.*, 506 F.3d 299, 303 (4th Cir. 2007). And, contrary to Plaintiffs' argument, Defendants do not have the burden of proving a negative—that is, proving that Plaintiff Garan was not constructively discharged. [CM/ECF Doc. NO. 172 p. 13] ("Absent evidence to the contrary, resignations under these circumstances were 'involuntary' and/or constructive discharges within the meaning of the WARN Act."). To prove a claim under the WARN Act, *Plaintiff Garan must prove* that he suffered an employment loss. 29 U.S.C. § 2104(a)(1); *Sullivan v. Nine Mile Min., Inc.*, No. 2:13CV00040, 2014 WL 4385780, at *1 (W.D. Va. Sept. 4, 2014) (explaining plaintiffs have burden to prove elements of their claims under the WARN Act). He has not done so. There are no allegations—nor could there be—that Plaintiff Garan or any of the other 171 OVMC employees who voluntarily left between August 7 and October 7 were constructively discharged. In fact, Plaintiff Garan clocked in and worked an 8 ½ hour shift at OVMC on September 13, and told his supervisor the same day that he was leaving to accept employment with another employer, where he earned a much higher wage than he earned at AHSW. *See* Deposition of Mark Garan 52:24-54:16 (worked September 13, 2019); 25:23-26:4 (starting wage at new job was $27-28/hour); 72:13-20 (wage at OVMC when left was $24.73). The purpose of the WARN Act is to provide "workers and their families some transition time to . . . seek and obtain alternative jobs and . . . ." 20 C.F.R. § 639.1(a). This purpose is not served by finding Plaintiff Garan suffered an "employment loss" because he

accepted a position before October 7 that paid him more than he earned at AHSW. The Court should grant summary judgment and dismiss Plaintiff Garan's claims (and the similar claims of the other 171 OVMC employees who left prior to October 7) under the WARN Act.

### B. AHSW Terminated the Remaining Plaintiffs' Employment On October 7.

Plaintiffs argue that, although they were paid all benefits, PTO, and any wages for hours worked for the 60 days after they received notice of OVMC's expected closure, they nonetheless suffered an "employment loss" because their hours worked were less than before the notice. However, "neither WARN nor the regulations dictate the nature of work to be performed—or whether work must be performed—during a period of employment after notice of an impending plant closing or mass layoff has been given." Worker Adjustment Retraining and Notification, 54 Fed. Reg. 16,042, 16,048 (Apr. 20, 1989). The fact that there were fewer working hours in September or October does not create an "employment termination," particularly when flexing for patient census was a long-standing OVMC practice. Thus, ample evidence shows that the employment relationship between AHSW and Plaintiffs did not permanently end until October 7, even if hours were lower than normal in the few weeks prior.

Plaintiffs rely heavily on the case of *Gray v. Walt Disney Co* without acknowledging that the facts are distinguishable from the facts of this case. 915 F. Supp. 2d 725 (D. Md. 2013). In *Gray*, the plaintiffs were orally told that the restaurant where they worked would close on June 9, even though the decision was made months earlier in March. *Id*. at 728. On June 16, the employer told employees the restaurant was closed and they were on leave for the next 60 days. *Id*. During the leave, the employees would be paid weekly wages equal to the average pay they had received during the previous six months. *Id*. Employees eligible for severance would receive their severance pay, but less the average weekly wages they earned during the 60-day leave. *Id*. On these facts,

9

the court ruled that the employer violated the WARN Act because it did not pay employees "full wages and benefits" during the 60-day period. *Id*. at 733-34.

Unlike *Gray,* in which the employer forced employees go on leave with questionable pay and offsetting, Plaintiffs were paid full benefits and full pay for hours worked between August 7 and October 7, and any reduction of hours was either due to low patient census (a long standing practice at OVMC and across other hospitals nationwide) or, in some cases, Plaintiffs' declining to work hours in another capacity, or in another department. *See, e.g.*, Deposition of August Ullum 54:5-11 (Plaintiff Ullum was aware that there was an opportunity for him to assist in the wind-down of his own physical therapy department and others, but did not do so). Thus, Plaintiffs' reliance on *Gray* is misplaced, and their argument in response to the Motion is without merit.

Finally, in the Response, the Plaintiffs again point to a chart they created [CM/ECF Doc. No. 154 Ex. 2] as evidence of their "employment loss" date. That chart contains a column titled "LAST OVMC WORK DATE" which goes to the heart of this controversy, as the dates in this column are solely based upon Plaintiffs' argument that they suffered employment loss as of the date they last performed certain work at OVMC, and not when their employment with ASHW permanently ended (which is the definition encouraged by DOL regulations and the Defendants). In the Response, Plaintiffs admit in a footnote that the "LAST OVMC WORK DATE" they have chosen for each employee ignores (a) subsequent dates when the employee uses PTO, even though use of PTO is evidence of employment, (b) subsequent dates when that employee actually performed work at OVMC's sister hospital, EORH, and was paid by AHSW for that time, which is obviously evidence of employment, (c) subsequent dates upon which AHSW paid for the employee's benefits, which is evidence of employment, or (d) any other indicators of employment for subsequent dates, like those listed in Motion. Thus, Plaintiffs' chart is self-serving and contrary

to definition of "employment termination" provided by the DOL, interpreting case law, and common usage. Accordingly, it is not viable evidence of when employment loss occurred.

### C. There Was No Six Month Long Layoff To Constitute Employment Loss.

In their Response, Plaintiffs raise the idea—for the first time—that they suffered an employment loss because they were subjected to a layoff that exceeded six months. The statutory definition of "employment loss" is "(i) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (ii) a layoff exceeding 6 months, or (iii) a reduction in hours of work of individual employees of more than 50% during each month of any 6-month period." 20 CFR § 639.3(f)(1)(i)-(iii). The Motion, Defendants' Response in Opposition to the Plaintiffs' Motion for Summary Judgment, and this Reply all outline why the first subpart regarding "employment termination" does not apply to Plaintiffs until October 7, 2019 (unless they had a prior voluntary departure). Plaintiffs admitted in discovery they do not qualify for and are not seeking the third subpart regarding a "reduction in hours" over a six month period. Plaintiffs therefore make a last ditch effort to prove they suffered an "employment loss" prior to October 7, 2019, by invoking the last, remaining subpart of 20 CFR § 639.3(f)(1)(ii) for a "layoff exceeding 6 months." This argument, however, makes no sense. Defendants have always maintained that AHSW's employees at OVMC were terminated effective October 7, 2019. Payroll information shows they were terminated as of that date, and health insurance/benefit coverage ceased as of October 31, 2019 because of the October 7, 2019, termination. Plaintiffs were notified in multiple writings that their employment would cease as of October 7, 2019 when the hospital closed. Given this evidence and Defendants' consistent arguments, the layoff subpart has no applicable because there is simply not six months between October 7, 2019, (when employees were terminated) and either August 7, 2019, (date closure was first announced) or September 4, 2019, (date OVMC

11

suspended certain acute and medical services). Thus, no employee at OVMC was subject to a layoff exceeding six months, and therefore did not suffer employment loss on that account.

      **D.**    **Conclusion on Employment Loss and Plant Closing.**

In conclusion, the Court should grant summary judgment in favor of the Defendants because there is no genuine issue of material fact—the Plaintiffs did not suffer an employment loss prior to October 7, 2019. Accordingly, there was no plant closing until that date. Given that the plant closing occurred on October 7, 2019, and Plaintiffs were provided adequate notice on August 7-8, 2019, there is no violation of the WARN Act. Summary judgment is warranted on this issue in favor of Defendants.

**IV.**    **Faltering Business Exception Applies, As Defendants Were Negotiating Better Terms With a New Credit Lender In July 2019 When Plaintiffs Claim Notice Was Due.**

Plaintiffs claim that the faltering business exception does not apply because there were only efforts to find a buyer, and those were made outside the July 2019 time when they claim notice was due. Though the Defendants did make substantial efforts to find a buyer, that was not Defendants' sole focus. The Motion details the different financing sought, and Defendants provide more detail on a critical financial negotiation and change that occurred the first week of July 2019.

Prior to July 2019, AHSW and AHS were both creditors under a credit line held by White Oak that was secured by the accounts receivable (AR) of both entities and other hospitals. White Oak permitted the creditors to borrow a certain amount each day based upon the collective AR of those hospitals. Part of White Oak's calculation of that amount included totaling up the AR, discounting certain types or sources of AR it deemed "ineligible," setting aside a certain amount for reserves, and accounting for the collections that paid down the loan. These figures, including the amount that could be borrowed, was communicated in daily "base borrowing certificates." The Defendants, almost without exception, maxed out what was offered.

The Defendants and other co-borrowers believed that White Oak was being too restrictive with their calculations, and began seeking out alternative financing. *See, e.g.,* Sarrao 46:3-53:20 (testifying White Oak was "generally not willing" to lift reserves or take other measures to increase borrowing amount). The Defendants therefore negotiated with CNH Finance to purchase the AR loan from White Oak and refinance it—that transaction took effect July 8, 2019.[1] As Sarrao testified, the Defendants negotiated with CNH to lower the reserves, give credit for additional types and sources of AR, and make greater allowances, all of which increase the borrowing amount. *See, e.g.,* Sarrao 46:3-53:20 (testifying to how CNH provided more favorable terms). Given that these more favorable terms applied to the AR of every hospital (not just OVMC) on an on-going basis, the result was a much higher borrowing capacity. AHSW and AHS continued to max out and get over-advancements with CHN using the new, higher borrowing capacity. Importantly, Sarrao testified that an influx of just $1 million dollars would have helped the hospital "break even" and remain open for longer. *See* Sarrao 106:9-20. These changes in the AR credit line that AHSW and AHS negotiated with CNH during the first week of July 2019 (when Plaintiffs argue WARN Notice would have been provided) could reasonably have satisfied that figure, given the amounts listed in the CNH base borrowing certificates immediately following the transition. *See, e.g.*, *See* Exhibit B (Bates Nos. 17062-5) (Borrowing amount of $547,616 on 7/10/19; $1.5 million on 7/15/19; $1.7 million on 7/16/19).

There was also reasonable belief that CNH would not have entered into this transaction if, concurrently, WARN notice was provided to employees given that an impending closure of the hospital would affect the AR from OVMC that CHN was relying upon as security. Additionally, as an entity with a potential financial stake in OVMC, CNH would be just as concerned as a buyer

---

[1] That effective date is reflected in the base borrowing certificates—the last BBC from White Oak came on July 5, 2019, and the first BBC from CNH came on July 10, 2019. *See* Exhibit B (Bates Nos. 17062-17075).

13

about plummeting patient census, staff resignation, health provider departures, vendor demands, supplies withholdings, community backlash, loss of goodwill, criticism from public officials, and the many other negative effects OVMC felt in response to the August 2019 announcement. *See, e.g.,* Schenkel. 55:9-56:8; 59:1-7; Garan. 46:10-15; Reed. 53:24-57:13; Wines 56:16-22; Ullum 47:4-13; Dunmyer 26:12-33:4 (closure announcement added "urgency" and gave "leverage" to potential buyer/investor in an already "difficult" negotiation process); Krissman 30:16-45:15 (belief that loss of staff after WARN notice would be major concern for potential purchaser); Sarrao. 152:2-155:5 & 173:24-174:177:2 (noting "once you announce a closure, or beginning the closure process, kind of everything breaks loose"); [CM/ECF Doc. 166-2 Bates No. 16435-16440].

Finally, Plaintiffs ignore federal decisions that WARN notice may be comprised of multiple documents. *See In re TransCare Corp.*, 611 B.R. 160, 168 (Bankr. S.D.N.Y. 2020); *In re AE Liquidation, Inc.*, 522 B.R. 62, 70 (Bankr. D. Del. 2014). Under this precedent, *even if* the Plaintiffs are correct that the August 8 letter to employment lacks a "brief" statement about a shortened notice period (which Defendants deny), any lack is cured by AHSW's other written notices to employees including the August 7, 2019 e-mail, Employee Q&A, and Press Release, or September 4, 2019 e-mail to employees, for the reasons explained more fully in the Motion.

Taken together, there is ample evidence that AHSW qualifies for the faltering business exception, and that Defendants are entitled to summary judgment on the issue.

**V.     <u>Any Acts or Omissions in Violation of the WARN Act Were Made In Good Faith</u>.**

The purpose of the WARN Act is to provide "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a). AHSW provided Plaintiffs (and government officials)

with notice that tracked the Act's requirements. AHSW paid benefits and wages for all hours worked for 60 days after providing the required notice. These actions were taken at a substantial cost and designed to comply with the Act's requirements and further its purpose. Plaintiffs urge the Court to ignore all of the Defendants' evidence of good faith because it allegedly occurred "before the violation." However, whether a violation occurred (or when it could have occurred based on the definitions of "employment loss" and "plant closing") is contested, and the Defendants maintain that their good faith efforts in August-October 2019 are valid considerations. Additionally, Defendants identified other good faith efforts before August 2019, like (a) finding a buyer, investors, strategic partner, or refinancing; (b) securing AHSW millions more in financing than its AR permitted under the credit line; (c) having AHS pay for AHSW's expenses using its own funds; (d) creating documents like the Employee Q&A to provide assistance; and (e) seeking input and advice from other hospitals, elected officials, MPT, CNH, etc. All these are detailed in the Motion and in Defendants' response in Opposition to Plaintiffs' dispositive motion, and all are evidence of good faith.

## **CONCLUSION**

The Motion provides ample evidence that Defendants are entitled to summary judgment on the WARN Act claim and/or several issues therein. Plaintiffs' Response does not alter this conclusion for the reasons stated above or in "Defendants' Response in Opposition to Plaintiffs' Motion for Summary Judgment."

**ALECTO HEALTHCARE SERVICES LLC and ALECTO HEALTHCARE SERVICES WHEELING, LLC**

By Counsel,

**SPILMAN THOMAS & BATTLE, PLLC**

/s/ Kevin L. Carr
Kevin L. Carr (WV Bar # 6872)
Chelsea E. Thompson (WV Bar #12565)
Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard, East
Charleston, WV  25301
Telephone: 304.340.3800
Fax: 304.340.3801
E-mail: kcarr@spilmanlaw.com
E-mail: cthompson@spilmanlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**KEITH REED, ELIZABETH SCHENKEL,**
**EMILY WINES, MARK GARAN and**
**AUGUST ULLUM, individually and on**
**behalf of others similarly situated,**

    **Plaintiffs,**

v.                                                         **Civil Action No.: 5:19-cv-263**
                                                                             **(Judge John P. Bailey)**

**ALECTO HEALTHCARE SERVICES LLC,**
**and ALECTO HEALTHCARE SERVICES**
**WHEELING, LLC d/b/a OHIO VALLEY**
**MEDICAL GROUP and d/b/a OVMC**
**PHYSICIANS,**

    **Defendants.**

## CERTIFICATE OF SERVICE

    I, Kevin L. Carr, certify that, on July 29, 2022, I served the forgoing "**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**" on the parties via ECF E-Filing as follows:

Timothy F. Cogan, Esquire
tfc@walslaw.com
Cassidy, Cogan, Shapell & Voegelin, L.C.
The First State Capitol Building
1413 Eoff Street
Wheeling, WV 26003

Laura Davidson, Esquire
laura@ourfuturewv.org
Bren Pomponio, Esquire
bren@msjlaw.org
Mountain State Justice, Inc.
1217 Quarrier Street
Charleston, WV 25301

Maureen Davidson-Welling, Esquire
mdw@stembercohn.com
John Stember, Esquire
jstember@stembercohn.com
Stember Cohn & Davidson-Welling, LLC
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219

F. Alex Risovich, Esquire
alex.risovich@risovichlaw.com
Risovich Law Offices, PLLC
3023 Pennsylvania Avenue
Weirton, WV 26062

                                                /s/Kevin L. Carr
                                                Kevin L. Carr (WV State Bar # 6872)